RECORD NO. 22-1995

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

ANTONIO SMITH,
*Plaintiff-Appellant*,

v.

THOMAS W. HARKER, Acting Secretary, United States Department of the Navy,
*Defendant-Appellee*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

C ORRECTED JOINT APPENDIX

Dated: November 28, 2022

Ellen K. Renaud
Alan Lescht and Associates, PC
1825 K Street, NW, Suite 750
Washington, DC 20006
(202) 852-8483
ellen.renaud@leschtlaw.com

*Counsel for Plaintiff-Appellant*

Yuri S. Fuchs
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
yuri.fuchs@usdoj.gov

*Counsel for Defendant-Appellee*

## TABLE OF CONTENTS

| Description of Entry | Docket Number | Appendix Page |
|---|---|---|
| Docket Report | | 1-3 |
| Complaint | R. 1 | 4-11 |
| Defendant's Motion for Summary Judgment | R. 10 | 12-13 |
| Memorandum of Law in Support of Defendant's Motion for Summary Judgment | R. 11 | 14-36 |
| Agency's Final Decision (MSJ Exhibit 1) | R. 11-1 | 37-46 |
| TECD Organization Chart (MSJ Exhibit 2) | R. 11-1 | 47-48 |
| Operations Officer (Supervisory) Position Description (MSJ Exhibit 3) | R. 11-1 | 49-52 |
| Declaration of Antonio Smith (MSJ Exhibit 4/Opp MSJ Exhibit 7) | R. 11-1; R. 16-7 | 53-58 |
| 12/22/2017, Email Chain between Antonio Smith and Colonel Patrick Hittle re: Employee Concerns about Marginalization (MSJ Exhibit 5) | R. 11-1 | 59-64 |
| 2018/04/16, Colonel Hittle's Response to Interrogatories (MSJ Exhibit 6) | R. 11-1 | 65-68 |
| Declaration of Patrick Hittle (MSJ Exhibit 7/Opp MSJ Exhibit 1) | R. 11-1; R. 16-1 | 69-76 |
| Supervisory Head, Training & Education Capabilities Division Job Announcement #ST-10042390-17-LMJ (MSJ Exhibit 8) | R. 11-1 | 77-86 |
| Certificate of Eligibles for Supervisory Head, Training & Education Capabilities Division Job Announcement #ST-10042390-17-LMJ (MSJ Exhibit 9) | R. 11-1 | 87-91 |
| Declaration of Greg Blazer (MSJ Exhibit 10) | R. 11-1 | 92-97 |
| Hiring Summary for TECOM Training & Education Capabilities Division Position, Deputy Director (MSJ Exhibit 11) | R. 11-1 | 98-100 |
| Evaluation of Applicant Resume Matric for Deputy Director, TECD (MSJ Exhibit 12) | R. 11-1 | 101-102 |
| Declaration of Lawrence Ramsey (MSJ Exhibit 13) | R. 11-1 | 103-107 |
| TECD Deputy Director, GS-0301-15 Interview Questions (MSJ Exhibit 14) | R. 11-1 | 108-111 |
| Excerpts from EEOC Hearing (MSJ Exhibit 15) | R. 11-1 | 112-123 |

| | | |
|---|---|---|
| 4/16/2018, Email from Colonel Patrick Hittle to Stephanie Andrews re: Memo regarding Meeting with Antonio Smith to Discuss the Hiring Action for the TECD Deputy Position (MSJ Exhibit 16/Opp MSJ Exhibit 6) | R. 11-1; R. 16-6 | 124-126 |
| Formal Complaint of Discrimination (MSJ Exhibit 17) | R. 11-1 | 127-131 |
| Plaintiff's Memorandum in Opposition to Summary Judgment | R. 16 | 132-156 |
| 12/22/2017, Email Chain between Antonio Smith and Colonel Patrick Hittle re: Employee Concerns about Marginalization (Opp MSJ Exhibit 2) | R. 16-2 | 157-160 |
| 12/16/2019, Excerpts from EEOC Hearing (Opp MSJ Exhibit 3) | R. 16-3 | 161-259 |
| TECD Organizational Chart (Opp MSJ Exhibit 4) | R. 16-4 | 260 |
| 07/25/2017 Antonio Memo for the Record re: Colonel's Hittle's Announcement that E. Sobieranski Would Serve as the Interim Deputy Director (Opp MSJ Exhibit 5) | R. 16-5 | 261 |
| Resume of Edward Roman Sobieranski (Opp MSJ Exhibit 8) | R. 16-8 | 262-269 |
| Reply Memorandum of Law in Support of Defendant's Motion for Summary Judgment | R. 17 | 270-291 |
| Additional Excerpts from EEOC Hearing (MSJ Exhibit 18) | R. 17-1 | 292-300 |
| Plaintiff's Notice | R. 18 | 301-302 |
| Plaintiff's Notice Exhibit 1 | R. 18-1 | 303 |
| Defendant's Motion to Strike | R. 19 | 304-305 |
| Memorandum in Support of Defendant's Motion to Strike | R. 20 | 306-313 |
| Minute Entry | R. 22 | 314 |
| Memorandum Opinion & Order | R. 23 | 315-335 |
| Judgment | R. 24 | 336 |
| Plaintiff's Notice of Appeal | R. 25 | 337-338 |

APPEAL,CLOSED,JURY

# U.S. District Court
## Eastern District of Virginia - (Alexandria)
## CIVIL DOCKET FOR CASE #: 1:21-cv-01406-MSN-IDD

Smith v. Del Toro
Assigned to: District Judge Michael S Nachmanoff
Referred to: Magistrate Judge Ivan D. Davis
Demand: $250,000
Case in other court:  4th Circuit, 22-01995
Cause: 42:1983 Civil Rights (Employment Discrimination)

Date Filed: 12/17/2021
Date Terminated: 09/02/2022
Jury Demand: Plaintiff
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**Antonio Smith**                          represented by   **Ellen Kyriacou Renaud**
                                                            Alan Lescht & Associates
                                                            1825 K Street, NW
                                                            Suite 750
                                                            Washington, DC 20006
                                                            202-852-8483
                                                            Fax: 202-463-6067
                                                            Email: ellen.renaud@leschtlaw.com
                                                            *ATTORNEY TO BE NOTICED*

**Defendant**

**Thomas W. Harker**                       represented by   **Yuri Fuchs**
*Acting Secretary, United States Department*               US Attorney's Office (Alexandria)
*of the Navy*                                              2100 Jamieson Avenue
                                                            Alexandria, VA 22314
                                                            NA
                                                            703-299-3700
                                                            Email: Yuri.Fuchs@usdoj.gov
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 12/17/2021 | 1 | Complaint ( Filing fee $ 402, receipt number AVAEDC-8160615.), filed by Antonio Smith. (Attachments: # 1 Civil Cover Sheet)(Renaud, Ellen) (Entered: 12/17/2021) |
| 12/17/2021 | 2 | Proposed Summons by Antonio Smith. (Renaud, Ellen) (Entered: 12/17/2021) |
| 12/17/2021 | 3 | Proposed Summons by Antonio Smith. (Renaud, Ellen) (Entered: 12/17/2021) |
| 12/17/2021 | 4 | Proposed Summons by Antonio Smith. (Renaud, Ellen) (Entered: 12/17/2021) |
| 12/17/2021 |   | Initial Case Assignment to District Judge Michael S Nachmanoff and Magistrate Judge Ivan D. Davis. (nneb) (Entered: 12/20/2021) |
| 12/20/2021 | 5 | Summons Issued as to Thomas W. Harker, U.S. Attorney and U.S. Attorney General NOTICE TO ATTORNEY: Please remove the headers and print two duplexed copies of the electronically issued summons for each Defendant. Please serve one copy of the summons and a copy of the Complaint upon each Defendant. Please ensure that your |

JA 001

| | | |
|---|---|---|
| | | process server returns the service copy (executed or unexecuted) to your attention and electronically file it using the filing events, Summons Returned Executed or Summons Returned Unexecuted. (Attachments: # 1 Notice to Attorney)(nneb) (Entered: 12/20/2021) |
| 03/22/2022 | 6 | SUMMONS Returned Executed by Antonio Smith. Thomas W. Harker served on 3/4/2022, answer due 5/3/2022. (Renaud, Ellen) (Entered: 03/22/2022) |
| 03/22/2022 | 7 | SUMMONS Returned Executed by Antonio Smith. (Renaud, Ellen) (Entered: 03/22/2022) |
| 04/27/2022 | 8 | Consent MOTION for Extension of Time to File Response/Reply as to 1 Complaint by Thomas W. Harker. (Attachments: # 1 Proposed Order)(Fuchs, Yuri) (Entered: 04/27/2022) |
| 04/27/2022 | 9 | ORDERED granting 8 Consent MOTION for Extension of Time to File Response/Reply; and it is further ORDERED that the Defendant will respond to the Complaint [Dkt. No. 1] on or before May 13, 2022. Signed by Magistrate Judge Ivan D. Davis on 4/27/2022. (nneb) (Entered: 04/27/2022) |
| 05/13/2022 | 10 | MOTION for Summary Judgment by Thomas W. Harker. (Fuchs, Yuri) (Entered: 05/13/2022) |
| 05/13/2022 | 11 | Memorandum in Support re 10 MOTION for Summary Judgment filed by Thomas W. Harker. (Attachments: # 1 Exhibit Exhibits 1-17)(Fuchs, Yuri) (Entered: 05/13/2022) |
| 05/13/2022 | 12 | Waiver of re 10 MOTION for Summary Judgment *of Hearing* by Thomas W. Harker (Fuchs, Yuri) (Entered: 05/13/2022) |
| 05/25/2022 | 13 | Consent MOTION for Extension of Time to File Response/Reply by Antonio Smith. (Renaud, Ellen) Modified to add text on 5/26/2022 (nneb, ). (Entered: 05/25/2022) |
| 05/25/2022 | 14 | Notice of Hearing Date re 10 MOTION for Summary Judgment (Renaud, Ellen) (Entered: 05/25/2022) |
| 05/25/2022 | | Set Deadlines as to 10 MOTION for Summary Judgment . Motion Hearing set for 6/10/2022 at 10:00 AM in Alexandria Courtroom 400 before District Judge Michael S Nachmanoff. (clar, ) (Entered: 05/26/2022) |
| 05/25/2022 | 15 | ORDER granting 13 Motion for Extension of Time to File Response/Reply; and it is further ORDERED that Plaintiff's response is due on or before May 31, 2022. Signed by Magistrate Judge Ivan D. Davis on 5/25/2022. (nneb) (Entered: 05/27/2022) |
| 05/31/2022 | 16 | Memorandum in Opposition re 10 MOTION for Summary Judgment filed by Antonio Smith. (Attachments: # 1 Exhibit Hittle Declaration, # 2 Exhibit Email re discrimination and marginalization, # 3 Exhibit Hearing Transcript Excerpt, # 4 Exhibit Organizational Chart, # 5 Exhibit Memo re Sobieranski Acting DD, # 6 Exhibit Hittle Memo re Selection, # 7 Exhibit Smith Declaration, # 8 Exhibit Sobieranski Resume)(Renaud, Ellen) (Entered: 05/31/2022) |
| 06/02/2022 | | Reset Deadlines as to 10 MOTION for Summary Judgment . Motion Hearing set for **6/17/2022 at 10:00 AM** in Alexandria Courtroom 400 before District Judge Michael S Nachmanoff. (Per MSN chambers - DM) (clar, ) (Entered: 06/02/2022) |
| 06/06/2022 | 17 | REPLY to Response to Motion re 10 MOTION for Summary Judgment filed by Thomas W. Harker. (Attachments: # 1 Exhibit Exhibit 18)(Fuchs, Yuri) (Entered: 06/06/2022) |
| 06/13/2022 | 18 | NOTICE by Antonio Smith (Attachments: # 1 Exhibit)(Renaud, Ellen) (Entered: 06/13/2022) |
| 06/13/2022 | 19 | MOTION to Strike 18 NOTICE by Thomas W. Harker. (Fuchs, Yuri) (Entered: 06/13/2022) |
| 06/13/2022 | 20 | Memorandum in Support re 19 MOTION to Strike 18 NOTICE filed by Thomas W. |

| | | |
|---|---|---|
| | | Harker. (Fuchs, Yuri) (Entered: 06/13/2022) |
| 06/13/2022 | 21 | Waiver of re 19 MOTION to Strike 18 NOTICE , 20 Memorandum in Support *of Hearing* by Thomas W. Harker (Fuchs, Yuri) (Entered: 06/13/2022) |
| 06/17/2022 | 22 | Minute Entry for proceedings held before District Judge Michael S Nachmanoff:Motion Hearing held on 6/17/2022. Plaintiff appeared through counsel Ellen Ranaud. Defendant appeared through counsel Yuri Fuchs. Motion re 19 MOTION to Strike 18 -GRANTED. Motion for Summary Judgment re 10 - TAKEN UNDER ADVISEMENT. Parties encouraged to confer if interested in settlement. Order to follow. (Court Reporter D. Salters.)(lcre, ) (Entered: 06/17/2022) |
| 09/01/2022 | 23 | MEMORANDUM OPINION and ORDERED that defendant's Motion for Summary Judgment (Dkt. No. 10) is GRANTED; and it is further ORDERED that defendant's Motion to Strike (Dkt. No. 19) is GRANTED for the reasons stated in open court on June 17, 2022 (see Order for further details). Signed by District Judge Michael S Nachmanoff on 9/1/2022. (nneb) (Entered: 09/02/2022) |
| 09/02/2022 | 24 | Clerk's Judgment is hereby entered in accordance with Rule 58 of the Federal Rules of Civil Procedure in favor of Defendant, Carlos Del Toro and against the Plaintiff Antonio Smith. Entered by Clerk on 9/2/2022. (nneb) (Entered: 09/02/2022) |
| 09/15/2022 | 25 | NOTICE OF APPEAL by Antonio Smith. Filing fee $ 505, receipt number AVAEDC-8571542. (Renaud, Ellen) (Entered: 09/15/2022) |
| 09/19/2022 | 26 | Transmission of Notice of Appeal to US Court of Appeals re 25 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (jlan) (Entered: 09/19/2022) |
| 09/21/2022 | 27 | USCA Case Number 22-1995 4th Circuit, case manager Naeemah R. Sims for 25 Notice of Appeal filed by Antonio Smith. (nneb) (Entered: 09/21/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 11/14/2022 16:48:48 | | |
| **PACER Login:** | ekrenaud7768 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:21-cv-01406-MSN-IDD |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **ANTONIO SMITH** | ) | |
| **15804 Ibsen Place** | ) | |
| **Dumfries, VA 22025.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | |
| **THOMAS W. HARKER,** | ) | |
| **Acting Secretary** | ) | |
| **United States Department of the Navy** | ) | **COMPLAINT & JURY DEMAND** |
| **20 MacDill Boulevard, Suite 164** | ) | |
| **Washington, D.C.  20032** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>COMPLAINT</u>

Plaintiff, Antonio Smith, by and through his undersigned counsel, complains against

Defendant as for race discrimination and retaliation for protected activity.  This is the unusual

case where the responsible management official has admitted that the Plaintiff's protected

activity was a factor in his decision.  Mr. Smith, an African American, had made a prior

complaint of race discrimination against Colonel Patrick Hittle, who is Caucasian.  Col. Hittle

then rejected Mr. Smith's application for promotion.  At a hearing in this matter, Col. Hittle

testified that he did not like working with the Plaintiff because he felt he needed to "walk on

eggshells" around him due to his complaint of discrimination.  As described in further detail

below, Mr. Smith alleges that this decision violated his rights under Title VII of the Civil Rights

Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII").

## JURISDICTION & VENUE

1. This Court maintains federal question jurisdiction over this action pursuant to Title VII, 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1331.

2. Venue is proper pursuant to 42 U.S.C. § 2000e-(5)(f)(3) because the unlawful employment practices are alleged to have occurred in this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

3. The Plaintiff timely filed a Formal EEO Complaint on April 30, 2018.

4. Following a hearing, an Administrative Judge of the EEOC issued a decision on March 4, 2020.

5. Plaintiff requested reconsideration of that decision, which was denied on September 27, 2021.

6. In accordance with 29 C.F.R. § 1614.407(c), Plaintiff timely files this civil action within 90 days of receipt of the Defendant federal agency's final decision.

7. Therefore, Plaintiff has exhausted all of his administrative remedies.

## PARTIES

8. Plaintiff is a resident of Dumfries, Virginia. During the relevant time period, he worked in Quantico, Virginia, as Defendant's employee within the meaning of Title VII.

9. Thomas W. Harker, Acting Secretary of the Navy, U.S. Department of the Navy, is named in his official capacity as Acting Secretary of the Federal Agency that employed Plaintiff within the U.S. Government.

## FACTS

10. Antonio Smith served as the Operations Branch Head/ Operations Officer (supervisory), Training & Education Capabilities Division ("TECD") and later renamed Range Training Programs Division, GS-0301-14, from September 2009 – August 2019.  From August 2019 – October 2021, he served as the Management Program Analyst (non-supervisory), Doctrine Branch, Policy and Standards Division ("PSD").  In October 2021, Mr. Smith was detailed to the Operations and Support Branch as the Deputy Operations Branch Head (non-supervisory), PSD and is currently pending permanent reassignment to that position.

11. Mr. Smith is African American.

12. As the Branch Head of Operations for TECD, Mr. Smith served as the resource sponsor and requirements generator for both virtual and constructive training devices/simulations *and* range training areas.  Mr. Smith was also responsible for directing, managing, supervising, and conducting technical research in support of simulations and range area management.  As the Branch Head of Operations, Mr. Smith was third in-line to the Director of TECD.

13.  Mr. Smith is considered the Subject Matter Expert to guide validation of current and future needs of training simulation system requirements and range training area requirements, and assist in the identification, development, or acquisition of systems, devices, and range training areas to meet those needs.

14. From September 2009 to 2012 and April 2015 to July 2017, Mr. Smith's direct supervisor was the Deputy Director of TECD, Terry Bennington, a white male with no protected activity.

15. Colonel Patrick Hittle was Mr. Smith's second level supervisor from November 2015 to August 2018.

3

16. Colonel Hittle made the decision not to select Mr. Smith for promotion.

17. Colonel Hittle is Caucasian and has not engaged in protected activity.

18. When Mr. Bennington retired in 2017, his position as Deputy Director became vacant; Mr. Smith's non-selection for that position is the subject of his complaint in this case.

19. On or about the day of Mr. Benington's retirement in July 2017, Colonel Hittle selected Edward Sobieranski, without competition, to serve as the Acting Deputy Director.

20. Although the Agency denies that Mr. Sobieranski was promoted in July 2017, the evidence shows that by early August 2017, Mr. Sobieranski began approving time sheets and leave requests of branch heads, including Mr. Smith.

21. Mr. Sobieranski is white and has not made complaints of discrimination.

22. At the time of his selection decision, Col. Hittle was aware that Mr. Smith had filed two EEO complaints against the Agency.  Indeed, Mr. Smith named Col. Hittle as the discriminating official in his most recent complaint.  Mr. Smith had also brought his concerns of retaliation and discrimination directly to Col. Hittle, who deflected and refused to address these concerns.

23. The permanent position of Deputy Director of TECD was advertised in October 2017, three months after it became vacant, and Mr. Sobieranski had been allowed to act in the position.

24. During the application and selection process, Col. Hittle permitted Mr. Sobieranski to continue to act in the position. In total, Col. Hittle allowed Mr. Sobieranski to serve on this detail for more than six months despite the fact that 5 U.S. Code 3341(b) limits such details to 120 days.

4

25. Also, during the selection process, *i.e.,* between October 2017 and February 2018, Col. Hittle suddenly reassigned several of Mr. Smith's subordinates, without warning, to further marginalize him.

26. The resume review panel gave Mr. Smith's resume 145 points. *See* ROI at 134. Mr. Sobieranski's resume received 138 points.

27. The interview panel for the position at issue was "blown away, [Mr. Smith] was so good" in his interview.

28. Col. Hittle, however, disregarded the views of the two panels and rejected Mr. Smith's application for promotion. Instead, he hand-picked Mr. Sobieranski, the white applicant with no EEO activity, for promotion to the Deputy Director position.

29. Col. Hittle admits that he did not select Mr. Smith for the Deputy Director position because of his prior EEO complaints.

30. Col. Hittle testified that he felt he had to "walk on eggshells" around Mr. Smith because he had filed EEO complaints of discrimination. Col. Hittle emphasized that he did not like working with Mr. Smith because he "had never been the subject of an EEO complaint [before]" and that being named in Mr. Smith's complaint made him feel that he had to walk on eggshells around him.

31. Col. Hittle also admitted that he would not be comfortable having to "walk on eggshells" with his Deputy Director.

32. Col. Hittle testified, "I felt that I was being drug into the conversation about the prior EEO action from Mr. Smith," and "I didn't want to be involved in that." Col. Hittle made the (non)selection just one month after feeling he was being "dragged into" Mr. Smith's EEO

complaints when Mr. Smith attempted to discuss feelings of marginalization, discrimination, and retaliation directly with him.

33. Col. Hittle did not preserve his interview notes even though he knew Mr. Smith had filed an EEO complaint. Furthermore, Stephanie Andrews, Branch Head, Civilian Manpower Branch, G-1 Division, served as Col. Hittle's note taker during the interview and did not preserve her notes. Ms. Andrews was aware of previous EEO complaints and failed to provide a ROI statement after repeated requests. Col. Hittle and Ms. Andrews were the only command officials present during the final interview.

34. Col. Hittle was the sole selecting official for the Deputy Director position. The selectee, Edward Sobieranski, is Caucasian and had no prior EEO activity. Prior to his selection as acting Deputy Director, Mr. Sobieranski was the Deputy Branch Manager of Range and Training Area Management Branch ("RTAMB").

35. RTAMB was a branch within TECD. Thus, Mr. Smith, as Branch Head of Operations with leadership responsibilities across the division, oversaw and delegated tasks to RTAMB, MAGTF Training Simulations Branch, Marine Corps Synthetic Training Branch, and Business Support Branch.

36. Mr. Smith holds a bachelor's degree and two masters' degrees in Strategic Studies and Military Studies, from the U.S. Army War College and U.S. Marine Corps Command and Staff College, respectively.

37. Mr. Sobieranski completed approximately four semesters of undergraduate work and does not have a college degree.

## COUNT I

### Non-Selection for Promotion Based upon Race
*(Title VII – 42 U.S.C. § 2000(e) et seq.)*

38.   Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 37.

39.   Plaintiff was not selected for promotion to the Deputy Director position because he is African American.

40.   Defendant's actions were intentional, reckless, and taken with malice.

41.   As a direct and proximate result of the Agency's unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered significant damages, including but not limited to, pain and suffering, humiliation, mental and emotional distress, lost wages, and other damages.

## COUNT II

### Non-Selection for Promotion Based upon Retaliation
*(Title VII – 42 U.S.C. § 2000(e) et seq.)*

42.   Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 37.

43.   Plaintiff was not selected for promotion to the Deputy Director position in retaliation for Plaintiff's protected activity.

44.   Defendant's actions were intentional, reckless, and taken with malice.

45.   As a direct and proximate result of the Agency's unlawful and retaliatory conduct in violation of Title VII, Plaintiff has suffered significant damages, including but not limited to, pain and suffering, humiliation, mental and emotional distress, lost wages, and other damages.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all Counts contained in the Complaint.

7

JA 010

## **<u>PRAYER FOR RELIEF</u>**

Plaintiff respectfully requests this Court enter judgment against Defendant and award

Plaintiff lost wages and benefits; compensatory damages for pain and suffering, mental anguish,

and emotional distress in the amount of $250,000, or any such amount as is determined by a jury;

pre- and post-judgment interest to the amount of any award; the tax on any award; attorneys' fees

and litigation costs; and such other relief as the Court deems fair and just.


Date: December 17, 2021                          Respectfully submitted,

                                                 */s/* Ellen K. Renaud
                                                 Ellen K. Renaud
                                                 Alan Lescht & Associates, PC
                                                 1825 K Street NW, Suite 750
                                                 Washington, DC 20006
                                                 Tel. (202) 852-8483
                                                 Fax. (202) 463-6067
                                                 Ellen.renaud@leschtlaw.com

                                                 *Counsel for Plaintiff*

8

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| ANTONIO SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 1:21-cv-1406-MSN-IDD |
| | ) | |
| CARLOS DEL TORO, Secretary | ) | |
| United States Department of the Navy,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendant Carlos Del Toro, in his official capacity as Secretary of the United States Department of the Navy, and through the undersigned counsel, hereby respectfully files this motion for summary judgment.  The grounds for this motion are more fully explicated in the memorandum of law that has been simultaneously filed with the motion.

Dated: May 13, 2022

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____/s/_____
YURI S. FUCHS
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:     (703) 299-3872
Fax:     (703) 299-3983
Email:  yuri.fuchs@usdoj.gov
*Counsel for Defendant*

---

[1] Carlos Del Toro is substituted under Federal Rule of Civil Procedure 25(d) in place of Thomas W. Harker—the prior Acting Secretary identified in Plaintiff's case caption—as the as Secretary of the United States Department of the Navy as he assumed office on August 9, 2021.

<u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on this 13th day of May, 2022, I have electronically filed the foregoing

using the CM/ECF system.


_____/s/_____
Yuri S. Fuchs
Assistant U.S. Attorney
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Tel: (703) 299-3872
Fax: (703) 299-3983
Email: yuri.fuchs@usdoj.gov
*Counsel for Defendant*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| ANTONIO SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 1:21-cv-1406-MSN-IDD |
| | ) | |
| CARLOS DEL TORO, Secretary | ) | |
| United States Department of the Navy, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Defendant Carlos Del Toro, in his official capacity as Secretary of the United States

Department of the Navy, respectfully submits this memorandum of law in support of his motion for

summary judgment pursuant to Rule 56.

### INTRODUCTION AND SUMMARY

In the instant action, Plaintiff Antonio Smith alleges that he was not selected for a Deputy

Director position with his employer, the Department of the Navy, in February 2018 on account of

his race and as a result of prior Equal Employment Opportunity ("EEO") complaints. However, the

record evidence in this case—developed through comprehensive administrative proceedings,

including an evidentiary hearing, before the Equal Employment Opportunity Commission

("EEOC")—makes it abundantly clear that Plaintiff's non-selection for a promotion was wholly

unrelated to his race and/or protected activity and only by selectively excerpting sworn testimony

can Plaintiff even suggest otherwise. Once viewed in its totality, the decision to select another

individual ahead of Plaintiff was based on the decision maker's perception that this other candidate,

as a result of his particular qualifications, was more suited for the position in question. Wholly

missing from the record evidence or Plaintiff's allegations is any evidence casting doubt on the

credibility of Plaintiff's non-selection. Because the record evidence demonstrates that Plaintiff's non-selection was the product of legitimate decision making and not pretextual, both Plaintiff's discrimination and retaliation claims fail on the merits.

Plaintiff's retaliation claim fails for other reasons as well. Plaintiff suggests that there is direct evidence of retaliation, claiming that the selecting official, Colonel Patrick Hittle, made comments reflecting Hittle's concern regarding Plaintiff's prior EEO complaints and that Hittle felt that he was "walking on eggshells" around Plaintiff. But those comments were unrelated to and post-dated Plaintiff's non-selection and are therefore plainly insufficient to assert a claim of direct evidence of retaliation. Moreover, those comments arose from Colonel Hittle's testimony in Plaintiff's EEO proceedings and reflected Colonel Hittle's testimony that he was concerned about being fair and overly sensitive to Plaintiff. Apart from failing to assert direct evidence of retaliation, Plaintiff cannot state a *prima facie* case of retaliation either because there is no causal link as required for a retaliation claim. For one, Plaintiff's Complaint includes no allegation of when Plaintiff engaged in prior protected activity. But based on other record evidence, it appears that Plaintiff is trying to tie his February 2018 non-selection to EEO complaints that he filed all the way back in June 2015 and September 2016. This fares no better as Plaintiff is relying on temporal proximity between his protected activity and his non-selection but is attempting to tie his non-selection to EEO complaints over a year and over two years prior. This does not suffice for a *prima facie* case. For the reasons discussed further herein, the Court should grant Defendant's motion for summary judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I. Plaintiff's Employment History and Prior EEO Complaints.

1.    Plaintiff identifies as an African-American male and is currently employed in the United States Department of the Navy. ECF No. 1 ¶¶ 9, 11 (hereinafter "Compl.").

2.    From September 2009 to August 2019, Plaintiff served in a supervisory capacity as

2

the Operations Branch Head or Operations Officer at the Training & Education Capabilities

Division ("TECD") in the United States Marine Corps. Compl. ¶ 10; EXH. 1 at 2; EXH. 2. TECD

provides resources and generates the requirements for virtual and constructive training devices and

simulations that military members of the Marine Corps must complete. EXH. 3. In his role, Plaintiff

provided overall management of current and future operations of TECD and oversaw work product

produced by TECD's Operations Branch. EXH. 3.

3.  From April 2015 to July 2017, Plaintiff's direct supervisor was Terry Bennington

who was the Deputy Director of TECD before retiring. Compl. ¶ 14. From November 2015 to

August 2018, Plaintiff's second-level supervisor named Colonel Patrick Hittle, who was then the

Director of TECD. Compl. ¶ 15; EXH. 2.

4.  Prior to his non-selection for the Deputy Director position, Plaintiff filed two EEO

complaints, the first in June 2015 and the second in September 2016. EXH. 1 at 2; EXH. 4 at 2.

5.  Colonel Hittle became aware of Plaintiff's first EEO complaint as of December

2015. EXH. 1 at 2.

6.  In September and December 2017, Plaintiff took issue with Colonel Hittle's decision

to re-assign contractors away from the Operations Branch. EXH. 5. Hittle explained in email

correspondence to Plaintiff that the contractors had been detailed to provide a Lieutenant Colonel

within another part of TECD "help and []additional bandwidth" for other specific tasks. EXH. 5 at

3. Hittle then asked Plaintiff if there was a compelling reason for why the contractors needed to

remain in Plaintiff's TECD section and stated that he was "[o]pen to comments and thoughts," but

in response Plaintiff simply identified his EEO complaint and claimed that he was being

marginalized rather than offer any explanation of why the contractors should not have been moved.

EXH. 5 at 1-3.

**II. The Position of Deputy Director Becomes Vacant.**

7.      On or about July 31, 2017, Mr. Bennington retired from his position as Deputy Director/Supervisory Head of TECD, leaving his position vacant. EXH. 6 at 1.

8.      Following Bennington's retirement, Colonel Hittle selected Edward Sobieranski to serve as the acting Deputy Director/Supervisory Head to act in Bennington's position in 2017. EXH. 1 at 2; EXH. 7 at 5. Sobieranski is a White male who had, prior to his selection as the acting Deputy Director, been the Branch Head for the Range & Training Area Management Branch in TECD and was a GS-14 employee like Plaintiff, reporting to the Deputy Director. EXH. 2; EXH. 6 at 1. In December 2017, TECD personnel made arrangements for Plaintiff to be placed into the position of acting Deputy Director once Sobieranski's detail ended on January 29, 2018, but Plaintiff ultimately declined to temporarily assume the Deputy Director position. EXH. 6 at 1-2.

9.      On October 11, 2017, the position of Deputy Director/Supervisory Head of TECD was announced and made open for selection. Colonel Hittle acted as the selecting official for the position. EXH. 1 at 2; EXH. 8.

10.      Plaintiff applied for the position Deputy Director/Supervisory Head of TECD after the vacancy was announced, as did Sobieranski. EXH. 1 at 2; EXH. 9.

**III. Selection Process for the Deputy Director Position.**

11.      The selection process for the Deputy Director/Supervisory Head position, consisted of three separate phases: (1) a resume review panel; (2) an interview panel; and (3) final interviews with the selecting official. EXH. 1 at 3; EXH. 10 at 2.

12.      The resume review panel consisted of three individuals: Jose Rivera, Kim Yarboro, and Larry Ramsey. Those individuals conducted their resume review on December 12, 2017, ranking and scoring 72 resumes. EXH. 11.

13.     The resume review panel rated Plaintiff with a score of 145 and Sobieranski with a score of 138. Importantly, although Plaintiff received a higher score in his overall resume rating, both individuals received the same score for their "experience" on their resumes. Three *other* individuals scored higher than Plaintiff on the resume review. EXH. 12.

14.     On December 27, 2017, interviews were then offered to the top 14 eligible candidates following the resume review, which included Plaintiff and Sobieranski. All 14 interviews were conducted between January 3-4, 2018, and the interview panel recommended their three top candidates and two alternate candidates for the selecting official to interview. EXH. 11 at 1.

15.     The interview panel consisted of four individuals: Ly Fecteau, Greg Balzer, Kim Yarboro, and Larry Ramsey. EXH. 11 at 1. Ramsey later testified that "[Plaintiff] and selectee [Sobieranski] were by far the top two candidates," noting that "the panel was blown away" by Plaintiff . . . but when [Sobieranski] interviewed later [the panel] again said 'holy cow' he was really good as well." EXH. 13 at 3. Ramsey offered his personal opinion that if he was "the selecting official, [he was] not sure who [he] would have picked between the two as it was that close and a really tough call." EXH. 13 at 3. Balzer separately testified that he would have ranked Plaintiff as the "Number 2" candidate for the position of Deputy Director/Supervisory Head and would have ranked Sobieranski as the number one candidate for the position. EXH. 10 at 3-4.

16.     The interview panel forwarded three candidates—Plaintiff, Sobieranski, and an individual named Eric Fox—for further consideration for the Deputy Director/Supervisory Head position. When the interview panel forwarded the candidates to Colonel Hittle, they did not provide their individual evaluations or scores of the candidates, instead sending along a unanimous, unranked list of the top three candidates. EXH. 10 at 3; EXH. 13 at 2. Final interviews were done with the selecting official, Colonel Hittle, as well as with Stephanie Andrews of the Marine Corps' Command Personnel Office, on January 9, 2018. EXH. 1 at 3; EXH. 7 at 4.

17.     In advance of the interviews, Colonel Hittle provided interview questions to the top three candidates. EXH. 1 at 3; EXH. 14 at 3. Hittle later testified that he had come up with these questions based on what he believed the responsibilities for the position would entail. EXH. 15 at 67-68.

18.     In explaining his choice for the Deputy Director/Supervisory Head position, Hittle testified that he viewed Plaintiff as "a very close second to Mr. Sobieranski" among applicants for the position. EXH. 7 at 6. However, Hittle believed that Sobieranski was the best candidate because while Plaintiff "had a lot of general experience working on the training simulation [he] did not have the background in developing policy." EXH. 7 at 4. Sobieranski, by contrast, had "previously wrote Marine Corps orders, policies, and directives and that is what [TECD] needs to do in the upcoming years." EXH. 7 at 4. Hittle also explained that Sobieranski had experience that would be useful to the range and training areas with which TECD was involved. EXH. 7 at 4. Further, Hittle noted that, while both candidates were experienced, Sobieranski had been in the command longer than Plaintiff and that Plaintiff could not offer the same amount of tangible examples of cross-service coordination that Sobieranski could. EXH. 7 at 4-6.

19.     On January 29, 2018, Hittle informed Plaintiff that a tentative offer for the position of Deputy Director/Supervisory Head had been made to Sobieranski and that Plaintiff did not receive the position. EXH. 1 at 3; EXH. 16.

20.     On February 18, 2018, Sobieranski became the Deputy Director/Supervisory Head of TECD. EXH. 1 at 3.

**IV. Plaintiff's EEO Proceedings.**

21.     On April 30, 2018, Plaintiff filed a formal EEO complaint, alleging that Colonel Hittle's decision to select Sobieranski over him for the Deputy Director/Supervisory Head position was motivated by animus directed at his race and was in retaliation for the EEO complaints that

Plaintiff had filed nearly a year and a half earlier. Compl. ¶ 3; EXH. 1 at 1; EXH. 17.

22.     After the Marine Corps completed a full investigation of Plaintiff's claims, which resulted in a comprehensive 200 page plus Report of Investigation ("ROI"), Plaintiff then sought a "hearing" before an EEOC Administrative Judge ("AJ") on November 9, 2018. EXH. 1 at 1.

23.     After both Plaintiff and the Marine Corps informed the AJ that they did not need further discovery in order to present their arguments on Plaintiff's claims, a hearing was held on December 6, 2019 before the presiding AJ, who requested testimony from a few witnesses in order to reach a decision beyond the fulsome record already available to her. EXH. 15 at 1, 4.

24.     Plaintiff and Colonel Hittle both provided oral testimony during the December 6, 2019 hearing. When specifically asked if he took any steps to respond to Plaintiff's concerns in December 2017 about the re-assignment of contractors and Plaintiff's feeling that he was being marginalized—as previously discussed herein, EXH. 5—Hittle answered that he "felt that [he] was being drug into the conversation about the prior EEO action from [Plaintiff]" but that "[he] didn't want to be involved in that" and that Hittle's "goal was not to take people from [Plaintiff]" but to "get the work done and put the resources in the right place." EXH. 15 at 156-157. Colonel Hittle added, in this context, that he believed, in light of Plaintiff's existing EEO complaints, that he "had to walk around [Plaintiff] on eggshells," meaning that Hittle had to be "overly sensitive" to Plaintiff's concerns while Hittle otherwise "did everything in [his] power to be [] honest with [Plaintiff] and straightforward." EXH. 15 at 157. When asked to further explain his "eggshells" comments, Hittle expounded that he "had never been the subject of an EEO complaint" and being named in one by Plaintiff made Hittle "[feel] like [he] had failed in something" as he "[didn't] want anyone to feel that that they're being not given full opportunity to perform their best." EXH. 15 at 168. Hittle also testified that, despite his feelings of walking around on eggshells, he believed that he

7

and Plaintiff were able to get work done on time and operate professionally in TECD. EXH. 15 at 170.

25.    The December 6, 2019 hearing ran, with breaks, for a total of five hours after which the AJ concluded the targeted hearing and informed the parties that she would issue a decision based on the facts gleamed from the hearing testimony, stipulated facts submitted by the parties, and based on the ROI. EXH. 15 at 4, 221.

26.    After the hearing, the AJ issued a decision on Plaintiff's EEO complaint on March 4, 2020, finding in favor of the Marine Corps. EXH. 1. Specifically, the AJ found that the Marine Corps had articulated legitimate, non-discriminatory, and non-retaliatory reasons for Plaintiff's non-selection and that Plaintiff could not demonstrate pretext. EXH. 1 at 5, 7.

27.    Reconsideration of that decision was denied on September 27, 2021. Compl. ¶ 5

28.    Plaintiff subsequently filed his Complaint in this Court on December 17, 2021. *See* ECF No. 1.

## LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine issue as to any material fact" and based on those undisputed facts the moving party "is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To serve as a bar to summary judgment, facts must be "material," which means that the disputed fact "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, courts must "view the evidence in the light most favorable to . . . the non-movant." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).

8

## ARGUMENT

**I.      THERE IS NO RECORD EVIDENCE IN SUPPORT OF PLAINTIFF'S CLAIM OF DISCRETE ACT DISCRIMINATION ON THE BASIS OF RACE (COUNT I).**

The record evidence in this case fails to support Plaintiff's non-selection claim that he was impermissibly discriminated on the basis of race in violation of Title VII. *See, e.g.*, 42 U.S.C. § 2000e-16(a), (c). Plaintiff can attempt to prove his claim through either direct or circumstantial evidence of discrimination, the latter of which requires resort to the burden-shifting framework announced in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-05 (1973). *See Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011).

Here, Plaintiff alleges no direct evidence of discrimination, which would require "evidence of conduct or statements that both reflect directly on the alleged discriminatory attitude and that bear directly on the contested employment decision." *Johnson v. Mechs. & Farmers Bank*, 309 F. App'x 675, 681 (4th Cir. 2009). Thus, Plaintiff must proceed under the *McDonnell Douglas* burden shifting framework.

Under this framework, Plaintiff first must identify evidence demonstrating a *prima facie* case of race discrimination, *see Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-253 (1981), or "prov[e] a set of facts which would enable the fact-finder to conclude, in the absence of any further explanation, that it is more likely than not that the adverse employment action was the product of discrimination." *Ennis v. Nat'l Ass'n*, 53 F.3d 55, 58 (4th Cir. 1995). If the plaintiff can establish a *prima facie* case, a burden of production—not proof or persuasion—shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Burdine*, 450 U.S. at 253 (quoting *McDonnell Douglas*, 411 U.S. at 802). If defendant meets its burden of production, plaintiff must then prove, by a preponderance of the evidence, that the defendant's articulated reasons are a pretext for discrimination. *Id*. Nevertheless, the "ultimate burden of persuading the

9

trier of fact that the defendant intentionally discriminated [or retaliated] against the plaintiff *remains at all times with the plaintiff.*" *Id.* (emphasis added).

In a non-selection claim, such as the instant case, to establish a *prima facie* case:

[A] plaintiff must show that (1) she is a member of a protected group; (2) she applied for the position in question; (3) she was qualified for the position; and (4) she was rejected for the position in favor of someone not a member of the protected group under circumstances giving rise to an inference of unlawful discrimination.

*Burgess v. Bowen*, 466 F. App'x 272, 280-281 (4th Cir. 2012); *see also Tawwaab v. Virginia Linen Serv., Inc.*, 729 F. Supp. 2d 757, 780 (D. Md. 2010).

Here, while Plaintiff meets the first three elements of this analytical framework, it is not clear that he meets the fourth element. To be sure, Plaintiff was not selected for the Deputy Director/Supervisory Head position, and the individual who was selected was not a member of Plaintiff's protected group (Sobieranski, who is White). That, however, is not sufficient to establish a *prima facie* case; rather, Plaintiff must demonstrate not only that a member of a different protected class was selected for the position but also that the selection occurred "under circumstances giving rise to an inference of unlawful discrimination." *Burgess*, 466 F. App'x at 281. Plaintiff cannot meet this burden because there are simply no factual circumstances surrounding the selection process that provide an inference of protected class discrimination. But given that the reasons that this lack of factual circumstance also serve to defeat any attempt by Plaintiff to demonstrate that Colonel Hittle's choice not to select him for the Deputy Director/Supervisory Head position was pretextual, *see Schamann v. O'Keefe*, 314 F. Supp. 2d 515, 527 n.7 (D. Md. 2004), and mindful both that the *prima facie* requirement is not intended to be burdensome, *see Burdine*, 450 U.S. at 253, and of the interest in judicial efficiency, Defendant assumes *arguendo* that Plaintiff has a *prima facie* case of discrimination. *See, e.g., Johnson v. Toys-R-Us*, 95 F. App'x 1, 7 (4th Cir. 2004) (assuming satisfaction of *prima facie* burden arguendo and proceeding directly to pretext analysis); *Carrier-Tal v. McHugh*, 2016 WL 9016633, at *13 (E.D. Va. Apr. 15, 2016) (same).

In any event, Plaintiff cannot demonstrate pretext, and the well-developed record evidence from Plaintiff's EEO hearing and investigation demonstrates that there were legitimate, non-discriminatory reasons for Plaintiff's non-selection. As to pretext, when an employer makes a selection decision—whether for a threshold employment position or a promotion such as the one at issue here—based on a comparison of candidates' qualifications, a Title VII plaintiff must demonstrate not just that his "job qualifications [were] similar or only slightly superior to those of the person eventually selected." *Heiko v. Columbo Sav. Bank, F.S.B.*, 434 F.3d 249, 261-262 (4th Cir. 2006). Instead, in order to demonstrate pretext, the employee must make "a strong showing that his qualifications" for the assignment in question "are demonstrably superior." *Id.* (emphasis added); *see also Matias v. Elon Univ.*, 780 F. App'x 28, 31 (4th Cir. 2019); *see also Hamilton v. Geithner*, 2009 WL 1683298, at *14 (E.D. Va. June 15, 2009) ("To show that the employer's proffered non-discriminatory reason for non-selection is pretextual, the Fourth Circuit has required a plaintiff to establish that he was the better-qualified candidate for the position or to put on sufficient evidence to undermine the credibility of the employer's stated reasons for the plaintiff's non-selection."). Otherwise, "the promotion decision remains vested in the sound business judgment of the employer." *Heiko*, 434 F.3d at 261-262; *see also Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) ("Job performance and relative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision."); *Bush v. Hagel*, 2014 WL 345650, at *3 (E.D. Va. Jan. 30, 2014) (recognizing that an employer's "hiring decision based on an evaluation of the qualifications of competing candidates is entitled to substantial deference"), *aff'd*, 597 F. App'x 178 (4th Cir. 2015).

For pretext, "the inquiry is further honed so that to establish that a proffered reason for the challenged action was pretext for discrimination, the plaintiff must prove 'both that the reason was false, and that discrimination was the real reason' for the challenged conduct.'" *Jiminez v. Mary*

11

*Washington Coll.*, 57 F.3d 369, 377–78 (4th Cir. 1995) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). As the Fourth Circuit has conclusively held, a plaintiff cannot succeed merely by establishing that the given rationale for an action was not "wise, fair, or even correct." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998).

Here, Colonel Hittle articulated legitimate, non-discriminatory reasons for selecting Sobieranski over Plaintiff for the position of Deputy Director/Supervisory Head of TECD. Specifically, Colonel Hittle determined that while both candidates were good fits for the position—which made the decision a very close one—he chose Sobieranski because he believed that Sobieranski: had necessary experience in developing policy that Plaintiff did not; had experience in range and training areas useful to TECD; had experience coordinating with other branches of the military; and had been in the command longer than Plaintiff. EXH. 7 at 4. In short, Hittle believed that Sobieranski was a better fit for the position—a view independently shared by a member of the interview panel that selected Plaintiff and Sobieranski as the final candidates. *See* EXH. 10 at 4.

Plaintiff's Complaint suggests that he should have been selected for the position because he subjectively believes that he was better qualified, pointing to his resume score, a remark of an individual from the interview panel that the panel was "blown away" by him, and that, unlike Sobieranski, Plaintiff possesses a college and masters' degrees. *See* Compl. ¶¶ 26-27, 36-37. For one, "the mere assertion that a plaintiff is more qualified than the selectee is insufficient to establish pretext." *Ransom v. Danzig*, 69 F. Supp. 2d 779, 786 (E.D. Va. 1999), *aff'd* 188 F.3d 503 (4th Cir. 1999). Rather, "[i]t is the perception of the decisionmaker which is relevant, not the self-assessment of the plaintiff." *Evans*, 80 F.3d at 960-961 (citation omitted). But, for another, Plaintiff's claims of being more qualified fall flat on the record evidence. Plaintiff's claim that he scored higher in a resume panel fails to note that the resume review was just one facet of the interview process and that he and Sobieranski had the same score when assessed for experience on their resumes. EXH.

12. Further, the resume score was not the be-all, end-all of the process of the interview process. Indeed, had it been, Plaintiff might not have been one of the top three candidates forwarded to Colonel Hittle for the final decision, as three other individuals had a higher score from the resume panel.

Plaintiff's separate claim that he blew the interview panel away but that Colonel Hittle "disregarded the views of the [resume and interview] panels," Compl. ¶ 27, ignores that the panels were responsible for winnowing down the applicants for the selecting official and that the interview panel was similarly impressed and laudatory of Sobieranski as an applicant. *See* EXH. 13 at 3. It is also contrary to the record evidence because the interview panel did not convey any particular comments about the applicants to Colonel Hittle but instead provided him with a unanimous, unranked list of the top three candidates. EXH. 10 at 3; EXH. 13 at 2. Thus, even if the panel was "blown away," Compl. ¶ 27, this was not something that was known to Colonel Hittle when he made his selection. In fact, had the applicants been ranked by the interview panel, the record evidence shows that at least one panel member would have ranked Sobieranski ahead of Plaintiff as an applicant. EXH. 10 at 3-4.

Finally, Plaintiff's Complaint suggests that he should have been selected because he had undergraduate and masters' degrees that Sobieranski did not have. *See* Compl. ¶¶ 36-37. But he can point to nothing about the position he applied for that required or prioritized advanced education. *See* EXH. 8. Rather, the interview questions posed by the interview panel and Hittle identified that TECD was looking for an individuals with command experience and cross-discipline experience, *see* EXH. 14, something that Sobieranski had. *See also Phillips v. Esper*, 2020 WL 3579796, at *15 (E.D. Va. June 30, 2020) ("[T]he Fourth Circuit has recognized that a plaintiff's superiority to the selectee in one relevant area does not establish pretext when the decision was also based on other factors.") (citing *Harris v. Mayor & City Council of Baltimore*, 429 F. App'x 195, 204 (4th Cir. 2011)). And a

plaintiff's "belief as to what the proper selection criteria should have been" rather than the actual selection criteria is insufficient to show pretext. *DeLoach v. Blinken*, 2022 WL 659184, at *7 (E.D. Va. Mar. 4, 2022).

Plaintiff cannot otherwise show pretext by undermining Hittle's stated reasons for not selecting him for the Deputy Director/Supervisory Head position. Those reasons remained consistent in his declaration and in testimony at Plaintiff's EEO hearing. *See, e.g.*, *Russell v. Sessions*, 2018 WL 4137018, at *6 (E.D. Va. Aug. 29, 2018), ("[T]he Fourth Circuit has sensibly upheld the granting of summary judgment to employers in Title VII cases in which the employer's explanation has changed over time when the given reasons are not materially inconsistent, as such a case presents no question of material fact on the issue of pretext.") (collecting cases). There is nothing in the record undermining Hittle's stated reason that he believed Sobieranski was better qualified because Sobieranski had more experience in drafting policy, more experience in cross-discipline coordination, and more experience in command. *See, e.g*, *DeLoach*, 2022 WL 659184, at *5 (holding that pretext was lacking where plaintiff could not show he was superior with respect to the factors considered by the decisionmaker and that "the Court must assess relative job qualifications based on the criteria that the employer has established as relevant to the position in question") (citation omitted). Indeed, others who were not involved in the final selection of Sobieranski also believed that he was as qualified if not more qualified than Plaintiff for the position. *See* EXH. 10 at 4. While Plaintiff may not have agreed with Sobieranski's selection or believe that he had some of Sobieranski's experience, there is no record evidence through which a reasonable trier of fact could conclude that Hittle's decision was nothing more than a mere ruse for unlawful race discrimination . *See, e.g.*, *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004). Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim of race discrimination.

## II. THERE IS NO RECORD EVIDENCE IN SUPPORT OF PLAINTIFF'S CLAIM OF RETALIATION (COUNT II).

In order to prove retaliation, as with discrimination, Plaintiff must do so either through direct evidence or through the pretext framework articulated by the Supreme Court in *McDonnell Douglas*. *See Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013). Absent direct evidence, "[t]he elements of a *prima facie* retaliation claim under Title VII are: (1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." *Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010. After the plaintiff makes a *prima facie* showing, the employer must then offer a legitimate, non-retaliatory reason for the employer's adverse action. *See Strothers v. City of Laurel, Md.*, 895 F.3d 317, 328 (4th Cir. 2018). If the employer meets this burden, then the employee must show that the employer's purported reason was not a true reason, but rather a pretext for intentional retaliation. *Id.* A plaintiff must ultimately prove that "the desire to retaliate was the but-for cause of the challenged employment action." *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 900 (4th Cir. 2017) (quoting *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)); *see also Foster v. Univ. of Md.- Eastern Shore*, 787 F.3d 243, 252 (4th Cir. 2015). In other words, a plaintiff must show that the employer's adverse action "would not have occurred in the absence of—that is, but for—the defendant's conduct." *Nassar*, 570 U.S. at 346-347 (internal quotations omitted). To date, the Fourth Circuit has applied this framework to private-sector and federal-sector retaliation claims alike. *See, e.g., Villa*, 858 F.3d at 900 (private-sector retaliation); *Terry v. Perdue*, 2021 WL 3418124, at *3 (4th Cir. Aug. 5, 2021) (federal-sector retaliation).

Here, the record evidence does not support a claim of retaliation through direct evidence or through the pretext framework.

### A. The Record Evidence Does Not Demonstrate Direct Evidence of Retaliation.

The record evidence in this action does not show direct evidence of retaliation, which

15

requires "evidence of conduct or statements that both reflect directly on the alleged discriminatory attitude and that bear directly on the contested employment decision." *Johnson*, 309 F. App'x at 681. Nonetheless, Plaintiff's Complaint in this action avers that there is such direct evidence, conclusorily asserting that "Col. Hittle admits that he did not select [Plaintiff] for the Deputy Director position because of his prior EEO complaints." Compl. ¶ 29. In identifying where Colonel Hittle "admit[ted]" his retaliatory reasoning, Plaintiff points to comments from Colonel Hittle that he had to "walk on eggshells," "had never been the subject of an EEO complaint," "didn't want to be involved in that," and "felt that [he] was being drug into the conversation about the prior EEO action." Compl. ¶¶ 30, 32. Read on their face, those passing comments, at best, represent Colonel Hittle's lack of enthusiasm at being part of an EEO complaint; they do not represent direct evidence of retaliation.

But more importantly, a review of the record reveals the significant lack of veracity inherent in Plaintiff's allegations. Indeed, a closer review of Colonel Hittle's testimony at the EEO hearing demonstrates that he made no such admission, that his testimony falls well short of the standard needed to demonstrate direct evidence, and that there was no such admission of retaliatory animus in any event.

Importantly, despite the clear impression sought through Plaintiff's Complaint, none of these comments even concern Colonel Hittle's non-selection of Plaintiff for the Deputy Director/Supervisory Head position. In fact, it is clear that these statements were not made in or around the time that Colonel Hittle reviewed applicants for the Deputy Director/Supervisory Head position in February 2018. Plaintiff's Complaint does not explain from where he pulled these statements or when they were made. For good reason. They were not part of Plaintiff's non-selection, but as they are, in fact, from Colonel Hittle's testimony in the December 2019 hearing on Plaintiff's EEO complaint—over a year and a half after Plaintiff's non-selection—and concern a

December 2017 email about the transfer of contractors in which *Plaintiff himself* raised the specter of

his prior protected activity. *See* EXH. 15 at 156-157, 167. That clearly does not suffice for direct

evidence of retaliation. *See, e.g., McCray v. Pee Dee Reg'l Transp. Auth.,* 263 F. App'x 301, 306 (4th

Cir.2008) ("While isolated statements can constitute direct evidence of discrimination, the

statements must be *contemporaneous* to the adverse employment action.") (emphasis added);

*McLaughlin v. CSX Transportation, Inc.,* 211 F. Supp. 3d 770, 779 (D.S.C. 2016) ("Plaintiff must

present evidence demonstrating a link between the remarks and the challenged decision or action.").

     Further, these non-contemporaneous statements do not show that Colonel Hittle sought to

retaliate against Plaintiff. Plaintiff offers his characterization of those statements as somehow

evincing Colonel Hittle's retaliatory motive but a full look at those comments demonstrates to the

contrary. First, Plaintiff claims that "Col. Hittle testified that he felt he had to 'walk on eggshells'

around [Plaintiff] because he had filed EEO complaints of discrimination." Compl. ¶ 30. But a full

review of the testimony where Plaintiff made this statement notes that Colonel Hittle testified that

he felt he had to be respectful of Plaintiff in light of his EEO complaint, specifically stating:

> Mr. Smith took that as an opportunity to say Colonel Hittle, you're marginalizing me by
> taking people from me. My goal was not to take people from him. My goal was to get the
> work done and put the resources in the right place. I was -- I felt, for the three years that I
> was in that job, that I had to walk around Mr. Smith on eggshells. I had to be, I don't know,
> overly sensitive. I did everything in my power to be as honest with him and straightforward
> and leverage -- give him every opportunity to avail him of any resource. If he felt he was
> marginalized, that wasn't the intent.

EXH. 15 at 156-157. Plaintiff's additional claim that "Col. Hittle emphasized that he did not like

working with [Plaintiff] because he 'had never been the subject of an EEO complaint [before],'"

Compl. ¶ 30, is similarly a recasting of testimony in which Colonel Hittle said nothing of the sort. In

stating that he had never been the subject of an EEO complaint, Colonel Hittle once again was

noting that he felt he had to be respectful of Plaintiff and that Colonel Hittle lamented that Plaintiff

felt he was being marginalized:

Q: Mr. Hittle, did you feel like you had to walk around on eggshells with Mr. Smith because he addressed concerns of discrimination and retaliation with you?

A: Just because I had never been the subject of an EEO complaint. I feel I've always tried to be as extremely fair and honest and open with anyone that I worked with as I could. I've not been in that situation before, so it was new and a little bit disturbing to me because I felt like I had failed in something. Even though I hadn't even been there when whatever happened in the spring of 2015 happened, I was somehow going to be accused of something, at some point. I don't want anyone to feel that way. I don't want anyone to feel that they're being not given full opportunity to perform to their best.

EXH. 15 at 167-168.

Finally, Plaintiff's claim that "Col. Hittle made the (non)selection just one month after feeling he was being 'dragged into' [Plaintiff's] EEO complaints when [Plaintiff] attempted to discuss feelings of marginalization, discrimination, and retaliation directly with him" is inaccurate. Compl. ¶ 32. Colonel Hittle made the statement about feeling that he was being "drug into the conversation about the prior EEO action," EXH. 15 at 156, not one month prior to selecting the Deputy Director/Supervisory Head but in the December 2019 EEO hearing over a year later. Once again, a full view of the testimony that Plaintiff references shows that it is a discussion of Colonel Hittle's reaction to an email exchange in December 2017. In that exchange, Colonel Hittle explained to Plaintiff why a contractor had been moved from the Operations Branch and asked for a "compelling explanation" for why the contractor needed to stay in the Operations Branch, but Plaintiff then declined to do so and impromptu claimed that he was being marginalized, stating his belief that Hittle had moved a contractor because of Plaintiff's prior EEO complaint. See EXH. 5 at 2-3. The AJ presiding over Plaintiff's hearing directed Colonel Hittle to this email in the ROI and asked Colonel Hittle on what he did when Plaintiff raised his claims of marginalization:

JUDGE WOODHAM: Can somebody give him Page 178 and 179 -- and 180, I'm sorry. Give him all three of those.
. . .
JUDGE WOODHAM: Mr. Hittle, did you take any steps to address [Plaintiff's] concerns that he was being marginalized?

THE WITNESS: Your Honor, I felt that I was being drug into the conversation about the

18

prior EEO action from [Plaintiff]. He was taking this opportunity to say, effectively, you've taken this contractor from my team and given him to someone else because whatever, to make his case. I didn't want to be involved in that, Your Honor. What I wanted to do is I wanted to put the resources with the right leaders, so we can make progress. . . . [Plaintiff] didn't own the contractor. The contractor was there to do the work. So when I -- I think I saw this email, and then I heard that there was confusion about where [the contractor] -- who he was working for and whatnot. I think I sent this to clear up any confusion. [Plaintiff] took that as an opportunity to say Colonel Hittle, you're marginalizing me by taking people from me.

EXH. 15 at 155-156.

In other words, Plaintiff first raised a workflow related issue in December 2017 to Colonel Hittle; then independently raised his EEO complaint when Colonel Hittle asked him for an explanation of his workflow concerns; and now raises later testimony from a December 2019 hearing about this December 2017 correspondence to claim retaliatory animus as to a non-selection in February 2018. The total effect of this is that Plaintiff is asserting direct evidence of retaliation based on him having filed EEO complaints and Colonel Hittle being forced to respond to Plaintiff's repeated claims of retaliation. That is not direct evidence let alone a showing of retaliatory animus. Indeed, what Plaintiff may be trying to do is to tie any and all actions taken with respect to him all the way back to EEO activity that he took back in 2015 and 2016. However, the Fourth Circuit has squarely rejected the idea that everything postdating protected activity must be tied to retaliation or that an employee is insulated from any employment action by virtue of his or her prior protected activity. *See, e.g., Villa*, 858 F.3d at 904 (rejecting an approach that "would 'mandate' that all employees who have reported any Title VII violation must be granted permanent immunity from any adverse action taken by an employer for any reason in the future"). In sum, Plaintiff cannot present direct evidence of retaliation.

B.    **Plaintiff Cannot Make Out a Prima Facie Case of Retaliation or Otherwise Demonstrate Pretext.**

For the reasons already discussed, Plaintiff's non-selection was based on a legitimate, non-discriminatory, non-retaliatory reason that Plaintiff cannot show was mere pretext for unlawful

retaliatory animus. *See supra* Section I. However, Plaintiff cannot make out a prima face case of retaliation even at the outset. Specifically, there is no causal link between Plaintiff's protected activity and his non-selection.

A causal connection may be inferred when an adverse employment action is taken shortly after a defendant learns of the employee's participation in protected activity. *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006). On the other hand, "[a] lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998). Although there is no bright line, the Fourth Circuit has held that two months between the protected activity and the adverse employment action is too long to establish causation by temporal proximity alone. *Pascual*, 193 F. App'x at 233 (citing *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2006)). Lower courts in this circuit have accordingly dismissed cases where the gap between protected activity and alleged retaliation was more than one month. *See Kelly v. Berryhill*, 2019 WL 1300816, at *6 (D. Md. Mar. 20, 2019) (four-month gap); *Adams v. Dep't of Def.*, 2017 WL 6699484, at *5 (E.D. Va. Sept. 29, 2017) (six-month gap); *Rodriguez v. McHugh*, 2016 WL 10677888, at *4 (E.D. Va. Feb. 17, 2016) (one-month gap); *Sherlock*, 2012 WL 3062708, at *3 (four-month gap); *see also Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012) (affirming district court's grant of summary judgment to defendant where gap was 10 weeks)).

Here, Plaintiff attempts to forge a causal link temporally by alleging that he was not selected for a promotion after Plaintiff "filed two EEO complaints against the Agency." Compl. ¶ 22. Plaintiff's Complaint, to begin with, does not actually plead when Plaintiff filed his prior EEO complaints—only the date on which he filed the EEO complaint underlying this lawsuit, *see* Compl. ¶ 3 (noting Plaintiff filed a formal EEO complaint after his non-selection)—thus giving the Court

20

no sense of how any non-selection is causally linked to his EEO complaints. On a motion to
dismiss, let alone for summary judgment, this failure would be fatal. That is, a "lack of clarity"
surrounding the dates that Plaintiff filed his prior EEO complaints "would be troublesome in any
complaint, but it is particularly problematic in the context of a retaliation claim, because the viability
of the plaintiff's allegations depends on whether [he] has plausibly alleged a causal relationship
between [his] protected activity and any adverse action [he] claims to have suffered as a result of
engaging in that protected activity." *Guillen v. Esper*, 2020 WL 3695007, at *1 (E.D. Va. July 13, 2020)
(dismissing retaliation claim).

However, the record evidence shows that Plaintiff's prior EEO complaints were filed in
June 2015 and September 2016. Thus, Plaintiff attempts to tie his non-selection in February 2018 to
an EEO complaint filed more than a year before that decision (in September 2016) and to an EEO
complaint more than two years before that decision (in June 2015). "[T]his time period is too long to
establish a causal connection by temporal proximity alone." *Pascual*, 193 F. App'x at 233.

Because Plaintiff cannot establish causation for these events based on time alone, his
Complaint must contain allegations that make it plausible that there is some retaliatory animus in the
intervening period. *See, e.g., Perry*, 489 F. App'x at 643. For instance, in *Lettieri v. Equant Inc.*, seven
months lapsed between the time the plaintiff lodged her complaint of gender discrimination with her
employer and the time her employer terminated her. 478 F.3d 640, 650-51 (4th Cir. 2007). However,
immediately after she filed her complaint, she was denied a previously-approved office transfer and
"stripped of significant job responsibilities"— "steps [that] made it easier for [the plaintiff's
employer] to take the position later that [the plaintiff] was not needed and should be terminated." *Id.*
at 651. Therefore, the Fourth Circuit found that, although the plaintiff could not establish causation
based on temporal proximity alone, the employer's conduct during the period between the plaintiff's
complaint and her termination displayed a retaliatory animus against the plaintiff which was

sufficient support for a causal connection.

The record evidence here would not support a causal connection on this basis though. To the extent that Plaintiff suggests retaliatory acts before his non-selection, the earliest one alleged by Plaintiff is that by October 2017, Colonel Hittle "reassigned several of [Plaintiff's] subordinates, without warning, to further marginalize him." Compl. ¶ 25. To start, record evidence indicates that these individuals were contractors—not Plaintiff's subordinates—and that they were moved from the Operations Branch for legitimate reasons of workload whereupon Plaintiff then claimed marginalization. *See, e.g.*, EXH. 5 at 2-3; EXH. 15 at 156. But even accepting Plaintiff's narrative of marginalization and reassignment, the movement of contractors away from his Operations Branch still postdates Plaintiff's prior September 2016 EEO complaint by *over a year*. Thus, Plaintiff's allegation that his non-selection is attributable to protected activity that occurred over a year prior is implausible, and his retaliation claim fails for lack of causation.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment should be granted.

Dated: May 13, 2022

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:     _____/s/_____
YURI S. FUCHS
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:      (703) 299-3872
Fax:      (703) 299-3983
Email:  yuri.fuchs@usdoj.gov
  *Counsel for Defendant*

CERTIFICATE OF SERVICE

I do hereby certify that on this 13th day of May, 2022, I have electronically filed the foregoing

using the CM/ECF system.

                        _____/s/_____
                        Yuri S. Fuchs
                        Assistant U.S. Attorney
                        U.S. Attorney's Office
                        2100 Jamieson Avenue
                        Alexandria, VA 22314
                        Tel: (703) 299-3872
                        Fax: (703) 299-3983
                        Email: yuri.fuchs@usdoj.gov
                        *Counsel for Defendant*

23

# Exhibit 1



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Washington Field Office**

131 M Street, N. E., Suite 4NW02F
Washington, D. C.  20507
Intake Information Group:  (800) 669-4000
Intake Information Group TTY:  (800) 669-6820
Washington Status Line: (866) 408-8075
Washington Direct Dial:  (202) 419-0713
TTY (202) 419-0702
FAX (202) 419-0740
Website:  www.eeoc.gov

| | |
|---|---|
| Antonio Smith,<br>　　　Complainant,<br><br>　　　　　　　　　v.<br><br>Richard V. Spencer, Secretary,<br>DOD NV Marine Corps HQ,<br>　　　Agency. | ) EEOC No.  570-2019-00511X<br>) Agency No. 18-67856-01699<br>)<br>)<br>)<br>)　　AJ Maricia Woodham<br>)<br>)<br>)　　Date:　　March 4, 2020 |

## DECISION

After reviewing the evidentiary record, as well as conducting an In-Person Initial Conference/Targeted Hearing with Court Reporter (Conference) to afford both parties the opportunity to argue the substantive merits of the above-captioned case, including whether additional discovery is warranted, I find: (1) further development of the record is unlikely to lead to a finding of discrimination; and (2) preponderant evidence fails to show Complainant was subjected to discrimination.  Accordingly, this Decision is being issued pursuant to 29 C.F.R. § 1614.109.

### Procedural Posture

On April 30, 2018, Complainant Antonio Smith filed his formal complaint of discrimination alleging that the Agency discriminated against him because of his race and reprisal when he was not selected for the supervisory head deputy director position.  Report of Investigation, "ROI", p. 9.  Complainant filed his hearing request on  November 9, 2018.  ROI, p. 3.

The parties were ORDERED to attend a conference on October 24, 2019 to discuss the issues in this complaint and to discuss whether any further development of the record was needed. During the October 24, 2019 status conference, the parties confirmed that the record has been adequately developed and that no additional discovery was necessary. The Agency, in response to the October 1, 2019 Order, indicated that it did not have any documents responsive to those requested.  Testimony from Col Hittle (ret) indicated that he purged all of the documents in his office upon his retirement.

### Issue

Whether Complainant was discriminated against based on his race (African American) and reprisal by Colonel Patrick Hittle when on or about January 29, 2018, he was not selected for the

JA 038

supervisory head deputy director position, a GS-0301-15 position, under Vacancy Announcement No. ST-10042390-17-LMJ.  ROI, p. 48.

## FINDINGS OF FACT

A preponderance of the evidence establishes the following facts[1]:

1.  Since 2009, Complainant has been employed with the Agency as an Operations Branch Head/Operations Officer, Training & Education Capabilities Division ("TECD"), Training and Education Command ("TECOM") GS-0301-14. *See* ROI, p. 169. Since August 2019, Complainant has been detailed to the Doctrine Branch.

2.  Complainant identifies as an African American. *See* ROI, p. 169. Complainant has filed two other EEO complaints, in June 2015 and September 2016. *See* ROI, p. 170.

3.  For all times relevant, Col. Patrick Hittle was the Director of TECD, TECOM and Complainant's direct supervisor. *See* ROI, pp. 195-196. Col. Hittle identifies as Caucasian. *See id.*

4.  Col. Hittle was aware of Complainant's race by visual observation in or around December 2015. *See* ROI, p. 196.

5.  Col. Hittle was aware of Complainant's first EEO complaint as of December 2015 and was named as the responsible management official in Complainant's second EEO complaint filed in or around September 2016. *See* ROI, pp. 195-96; HT, p. 85.

6.  Supervisory Head/Deputy Directory, TECD, TECOM. *See* ROI, p. 21. Mr. Bennington is Caucasian. *See id.*

7.  Upon Mr. Bennington's departure, Col. Hittle selected Mr. Edward Sobieranski as acting Deputy Director/Supervisory head. *See* ROI, p. 199. Mr. Sobieranski is Caucasian and has no prior EEO activity. *See* ROI, pp. 79-80.

8.  On October 11, 2017, the Agency announced the position of Supervisory Head of TECD, TECOM, VAN # ST-10042390-17-LMJ. *See* ROI at 83. Col. Hittle acted as the selecting official for the position. *See* ROI, p. 197.

9.  Complainant applied for the position of Supervisory Head of TECD during the open vacancy announcement. *See* ROI, p. 94.

10. On November 3, 2017, Leah Joyner, HR Specialist, issued the Certificate of Eligibles for the position, which included Complainant. *See* ROI, p. 94.

---

[1] Facts 1-21 were stipulated to by the parties in their respective pleadings dated October 21, 2019.

2

11. There were three separate phases for the selection process for Supervisory Head/Deputy Director TECD, TECOM: (1) a resume review panel; (2) an interview panel; and (3) final interviews with the selecting official. *See* ROI, p. 187.

12. The initial resume scoring panel of the following individuals: Mr. Jose Rivera, Deputy Director, G3/5/7 (TECOM); Ms. Kim Yaboro, Deputy Program Manager Training Systems (MARCORSYSCOM); and Mr. Larry Ramsey, Head, Programming Branch, G8 (TECOM). *See* ROI, p. 132.

13. On December 12, 2017, the resume panel conducted its review, and scored all 72 resumes. *See* ROI, p. 131.

14. On December 27, 2017, the Agency offered interviews to 14 individuals. *See* ROI, p. 131. All 14 interviews were conducted between January 3, 2018 and January 4, 2018, to include Complainant's interview. *See* ROI, p. 131.

15. The interview panel consisted of the following individuals: Col Ly Fecteau, Chief of Staff, Training Command; Mr. Greg Balzer, Deputy Chief of Staff, TECOM; Ms. Yaboro; and Mr. Ramsey. *See* ROI, p. 132.

16. Complainant was one of three candidates forwarded to Col. Hittle as the selecting official for consideration for the Supervisory Head position. *See* ROI, p.189.

17. Col. Hittle conducted interviews of the top three candidates, *i.e.* Complainant, Mr. Sobieranski, and Mr. Eric Fox, on January 9, 2018. HT, p. 67; s*ee also* ROI, p. 197.

18. On or about January 29, 2018, Col. Hittle informed Complainant that he was not selected for the position of Supervisory Head. *See* ROI, pp. 141-42.

19. On February 18, 2018, Mr. Edward Sobieranski became the Supervisory Head/Deputy Director, TECD, TECOM. *See* ROI at 79-80.

20. Prior to his appointment as the Supervisory Head/Deputy Director of TECD, Mr. Sobieranski was the Range and Training Area Branch Manager, TECD, TECOM. *See* ROI, p. 84.

21. In advance of the interviews, Col. Hittle provided interview questions to the top three candidates. ROI, p. 137; HT, pp. 67. Col. Hittle testified that he drafted these questions based on his understanding of the responsibilities for the position and the vision for the organization. HT, pp. 67-68.

22. Complainant testified that there was nothing unusual about his interview with Hittle. In fact, he describes it as being "professional." HT, p. 19.

# I.      SUBSTANTIVE BURDENS OF PROOF

In the absence of direct evidence of discrimination, a disparate treatment claim under Title VII is examined under the three-part test set forth in *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792 (1973).  Under this analysis, a complainant initially must establish a *prima facie* case of discrimination by presenting facts that, if unexplained, reasonably give rise to an inference of discrimination.  *See St Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507 (1993); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981); *McDonnell-Douglas,* 411 U.S. at 802.

Once Complainant has established a prima facie case, the burden then shifts to the Agency to articulate a legitimate, nondiscriminatory reason for its actions. *Burdine,* 450 U.S. 248 at 253. If the Agency is successful, the burden reverts back to Complainant to demonstrate by a preponderance of the evidence that the Agency's reason(s) for its action was a pretext for discrimination. At all times, Complainant retains the burden of persuasion, and it is his obligation to show by a preponderance of the evidence that the Agency acted on the basis of a prohibited reason. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000); *Hicks,* 509 U.S. at 511; *Burdine,* 450 U.S. at 252-53; *McDonnell-Douglas,* 411 U.S. at 804.  A complainant can do this either directly, by showing that a discriminatory reason more likely motivated the agency, or indirectly, by showing that the agency's proffered explanation is unworthy of credence.  *Hicks*, 509 U.S. at 507 (1993); *Burdine*, 450 U.S. at 256 (1983).  Additionally, in a non-selection case, pretext may be found where the complainant's qualifications are plainly superior to the qualifications of the selectee. *See Bauer v. Bailar*, 647 F.2d 1037, 1048 (10th Cir. 1981); and *Wasser v. Dep't of Labor*, EEOC Request No. 05940058 (Nov. 2, 1995).

In order to establish a *prima facie* case of reprisal, Complainant must show that:  (1) he engaged in a statutorily protected EEO activity; (2) the Agency was aware of the EEO activity; (3) the employer took an adverse employment action against Complainant; and (4) a causal connection exists between the EEO activity and the adverse action (*e.g.*, action in question followed the protected activity within such a period of time that a retaliatory motivation may be inferred).  *See Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1423 (D.C. Cir. 1988); *McKenna v. Weinberger,* 729 F.2d 783, 788, 790 (D.C. Cir. 1984).

4

## II.    ANALYSIS

A preponderance of the evidence reveals that the Agency has articulated legitimate non-discriminatory reasons for the non-selection challenged by Complainant in this complaint.   The Agency explains that the selection was a business-based decision and that selectee Sobieranski was selected because of his experience and expertise given the mission and vision of the Agency. Specifically, Hittle testified that in filling this position, the Agency was looking for someone who had experience with simulations in order to broaden this area across the entire division.  HT, p. 72. Hittle testified that the successful candidate had to have experience and an understanding of how to leverage the other services' progress  towards live virtual training.  *Id*.

Hittle further testified that selectee Soberianski was the ideal candidate because he had been working in the range and training area management branch (which focused on range development systems) and had been involved in future year acquisitions for the expansion of Marine Corp installations.  HT, p. 78; ROI, p. 198.    It is clear that Hittle leveraged his understanding of selectee Sobieranski's experience and qualifications based on his interactions with him while Sobieranski was in the RTAM position.  HT, pp. 78-80.   Hittle further testified that he credited the fact that Soberianski had been selected as the Deputy RTAM branch manager. *Id*. at p. 80.   Although both candidates had prior management experience, Hittle viewed Complainant, as head of the Operations Branch, slightly less qualified than Sobieranski given the vision of the Agency.  HT, pp. 78-70, 91-93.  Hittle testified that both were qualified, but that Soberianski had worked on managing the aspects of the RTAM program across the MCICOM regions, working with regional range professional and managers and working at the installation level on developing policy issues, on working safety investigation boards related to mishaps that occurred on the ranges.  *Id*.   Hittle further explained that Sobieranski's understanding of policy issues was very deep as he had worked on developing policies and that he, as opposed to Complainant, was sought out as a subject matter expert in this area.  HT, pp. 89-90.   However, he concluded that Complainant had a lot of general experience; that the did not have the background working on policy matters; and that he did not have the technical hands-on experience with actual simulations as compared to the selectee.  HT, p. 198.

As the Agency has articulated legitimate non-discriminatory reasons for Complainant's non-selection, the burden shifts to Complainant to demonstrate that the Agency's reasons are a mere pretext for discrimination.   Complainant can do this either directly, by showing that a discriminatory reason more likely motivated the Agency, or indirectly, by showing that the

Agency's proffered explanation is unworthy of credence. *Hicks*, 509 U.S. at 507; *Burdine*, 450 U.S. at 256.

In an effort to establish pretext, Complainant relies on the testimony of Jeffrey Williams, who worked under his supervision. However, Williams testimony did not support Complainant's allegations regarding animus based on reprisal in the non-selection in this matter. HT, pp. 57-63. Complainant further maintains that the Agency's explanation is pretext because (1) unlike Soberianski, he was not afforded the opportunity to serve in an acting role prior to the selection in this matter; (2) Hittle marginalized him by removing contractors from his branch on two separate occasions in September and December 2017; (3) and that since Hittle had been named in a prior complaint, he should not have served as the lone interviewer for the selection. HT, p. 26; ROI, pp. 171, 171.

Testimonial evidence reveals that whether formally or informally, Sobieranski assumed the position of acting director in the summer of 2017 following Hittle's absence from the office on a personal matter. HT, pp. 98-99; ROI, p. 174. I find that Hittle credibly testified that there was an urgent personal matter that necessitated his absence from the office and because he had worked closely with and had knowledge about his work, he asked Soberianski to assume the position in August 2017. HT, pp. 99-100. Thereafter, upon Hittle's return to the office, Sobieranski was officially detailed in to the position in October 2017 for a period not to exceed 120 days. *Id.* At the conclusion of Sobieranski's 120-day detail, Complainant was offered the opportunity to serve in an acting capacity. HT, pp. 102-104. However, given the timing of the selection in this matter, Complainant declined to serve in this capacity. HT, p. 24.

As to this complaints about marginalization, *i.e.* that contractors were removed from his branch without sufficient notice, Hittle testified that in making reassignments, his goal was to get the work done and to place resources in the right place. HT, pp. 156-157; ROI, pp. 178-182. Additionally, Hittle explains that the contractors were not specifically assigned to Complainant's branch, but were tied to the deliverables of the particular contract in which they were assigned. HT, pp. 159-160. Although Hittle describes his relationship with Complainant as "professional and cordial" he felt as if he had to walk on eggshells around Complainant because he tied every decision that he disagreed with to his prior EEO activity. HT, pp. 157, 197; ROI, p. 196. Hittle further testified that since he was aware of his prior EEO activity, he did not want to say anything to Complainant that could be taken the wrong way and was cautious about answering any questions. HT, p. 106.

6

Lastly, Complainant's argument regarding the selection process are not persuasive. The evidence reveals that each of the three final candidates received a copy of the questions before the interview; that a recorder (Stephanie Andrews) was present during the interview to take notes; that Complainant's interview lasted approximately 45 minutes; and that in Complainant's assessment, it was a professional interview. HT, p. 17.   There is no question that the selection in this matter was a tough call between two individuals who were equally qualified.  Hittle's testimony reveals that this was his first selection and that at best he was inexperienced in the mechanics of the selection process. However, Complainant has failed to demonstrate that his qualifications for the Supervisory Head Deputy Director position were plainly superior as compared to the selectee.  He has likewise failed to present evidence of retaliatory animus.

After reviewing the evidentiary record and considering the in-person testimony provided during the Conference and assessing credibility, I have determined that Complainant has failed to establish a causal connection between his race (African American), prior EEO activity and the non-selection in this case. Based on a full review of the entire record, I find that no reasonable factfinder could resolve the claims in Complainant's favor and hereby render a finding in favor of the Agency.

It is so **ORDERED**.

For the Commission:                                MARICIA WOODHAM
                                                   Administrative Judge

## NOTICE TO THE PARTIES

This is a decision by an Equal Employment Opportunity Commission Administrative Judge issued pursuant to 29 C.F.R. §1614.109(b), 109(g) or 109(i). **With the exception detailed in the next paragraph, Complainant may not file an appeal to the Commission directly from this decision.** EEOC regulations require the Agency to take final action on the complaint by issuing a final order notifying Complainant whether or not the Agency will fully implement this decision within 40 calendar days of receipt of the hearing file and this decision. The complainant may appeal to the Commission within 30 calendar days of receipt of the Agency's final order. The complainant may file an appeal whether the Agency decides to sully implement this decision or not.

The Agency's final order shall notify complainant whether or not the Agency will fully implement this decision, and shall contain notice of Complainant's right to appeal to the Commission, the right to file a civil action in federal district court, the name of the proper defendant in any such lawsuit and the applicable time limits for such appeal or lawsuit. If the final order does not fully implement this decision, the Agency must also simultaneously file an appeal to the Commission in accordance with 29 C.F.R. §1614.403, and append a copy of the appeal to the final order. A copy of EEOC Form 573 must be attached to the final order. A copy of the final order shall also be provided by the Agency to the Administrative Judge.

Complainant may only appeal directly from this decision in the event that the Agency has **not** issued its final order within 40 calendar days of its receipt of the hearing file and this decision. In this event, the complainant should append a copy of the Administrative Judge's decision to the appeal. Complainant should furnish a copy of the appeal to the opposing party at the same time it is filed with the Commission, and should certify to the Commission the date and method by which such service was made on the opposing party. All appeals to the Commission must be filed by mail, personal delivery or facsimile to the following address:

**Director**
**Office of Federal Operations**
**U. S. Equal Employment Opportunity Commission**
**131 M Street, NE**
**Washington, DC 20507**
**Facsimile:  202-663-7022**

Facsimile transmissions over 10 pages will not be accepted.

For further guidance regarding appeals, the parties may consult 29 C.F.R. §1614.401 et seq. and Chapter 9 of the Commission's Management Directive-110. These documents are available on the EEOC's website at www.eeoc.gov.

8

## COMPLIANCE WITH AN AGENCY FINAL ACTION

Pursuant to 29 C.F.R. §1614.504, an Agency's final action that has not been the subject of an appeal to the Commission or civil action is binding on the Agency. If the complainant believes that the Agency has failed to comply with the terms of its final action, the complainant shall notify the Agency's EEO Director, in writing, of the alleged noncompliance within 30 calendar days of when the complainant knew or should have known of the alleged noncompliance. The Agency shall resolve the matter and respond to the complainant in writing. If the complainant is not satisfied with the Agency's attempt to resolve the matter, the complainant may appeal to the Commission for a determination of whether the Agency has complied with the terms of its final action. The complainant may file such an appeal within 30 calendar days of receipt of the Agency's determination or, in the event that the Agency fails to respond, at least 35 calendar days after complainant has served the Agency with the allegations of noncompliance. A copy of the appeal must be served on the Agency, and the Agency may submit a response to the Commission within 30 calendar days of receiving the notice of appeal.

# Exhibit 2

1

# TECD Organizational Chart

**Legend:**
- Military (green)
- Civilian (Gov't) (blue)
- Vacant (Funded) (white)

**P. R. Hittle** — Director, Colonel, M304070848

**Vacant** — Deputy Director, GS15, M304070212

**Lauren Thomson** — Branch Head Business Supt, GS14, M3040701696

**Vacant** — Business Support Strategic Manager, GS14 M3040700430, Reduce to GS-12

**Tonya Cornell** — Admin Officer, GS12, M3040701004

**Vacant** — IT Manager, GS-12, CTR CONV

**Richard Jackson** — RTAM Business Ops Mgr, GS12/13, M3040701697

**Vacant** — Bus & Fin Sec Mgr, GS-9/11, CTR CONV

**Vacant** — MTSB Business Ops Mgr, GS12, M3040700991

**Vacant** — Bus & Fin Sec Mgr, GS-9/11, CTR CONV

**Vacant** — MC Synthetic Training Env Branch Head, LTCOL, M3040700681

**Vacant** — Deputy MC Synthetic Training Env Branch, GS15(14), M3040700243

**Nicholas Stewart** — Future Ops, CAPT, M3040700223

**Russell Duenow** — Head Rqmts, GS13, M3040701321

**Harry Jenkins** — Rqmts Anal, GS12, M3040700999

**John Keppeler** — CurOp/SITE Pt Mgr, GS13, M3040700998

**Anthony Cross** — Hd JT Rqmt & Sim, GS14, M3040701007

**Alex Arrieta** — V,V&A Mgr, GS12, M3040701006

**Casey DeMunck** — M&S Off, MAJ, M3040700221

**Vacant** — S&T Analysis, GS-9, CTR CONV

**Vacant** — JCIDS Writer, GS-13, CTR CONV

**Vacant** — JCIDS Writer, GS-13, CTR CONV

**Vacant** — JCIDS Writer, GS-12, CTR CONV

**Antonio Smith** — Branch Head Operations, GS14, M3040701001

**Jeffrey Williams** — Asst Ops Off, GS13, M3040701003

**Gary Tepera** — Branch Head MTSB, GS14 M3040701325

**Vacant** — M&S Off, CAPT, M3040700216

**Dave Duelee** — MAGTF Cap Anal, GS13 (12), M3040700992

**Pat Young** — Head Current Ops, GS13, M3040701322

**Vic Szalankiewicz** — Portfolio Mgr, GS12, M3040700220

**Fred Rott** — Portfolio Mgr, GS12, M3040701000

**Preston Malone** — Portfolio Mgr, GS12, M3040700222

**Anthony Regner** — Portfolio Mgr, GS12, M3040701002

**Ron Slater** — Portfolio Mgr, GS12, M3040701009

**Fitima Cox** — Instruct Design Spec, GS11, M3040701478

**Vacant** — Branch Head RTAMB GS14, M3040700246

**Carlos Hathcock** — Sec Hd Safety & Design, GS14 M3040700247

**Vacant** — S&D Sect Mgr, GS13, M3040701122

**James Cook** — Lead Rng Dev, GS13, M3040701220

**Patrick Hillmann** — Lead Gnd Rng Saf, GS13, M3040701219

**Michael Wissmeyer** — Rng Instr S&D, GYSGT, M3040700252

**Mark Drinkwater** — RTAM Spec, GS13, M3040701217

**Loring Tabor** — Sec Hd Rng Ops&Con, GS14 M3040701121

**Jesus Leon** — Rng Ops Mgr, GS13, M3040701125

**Frederick Salo** — Lead Rng Control, GS13, M3040701124

**Michael Caras** — Env Cap Anal/Cord, GS13, M3040700253

**James Fraley** — Sec Hd Rng Rqmts, GS14, M3040701698

**Archie White** — Rng Sys Sust Mgr, GS13, M3040701700

**Paul Garrod** — Immer Trng Cap Mgr, GS13, M3040701146

**Chris Maser** — Battlefield Eff Mgr, GS13, M3040701701

**James O'Brien** — Rng Instr Sys Mgr, GS11, M3040701699

**Daniel Mobley** — Sys Supt Off, GS13, M3040701130

**Disel Hinkle** — SSO/IIT Site Mgr, GS13, M3040701309

**Robert Mango** — SSO/IIT Site Mgr, GS12, M3040701240

**Matt Carpenter** — Sys Supt Off, GS12(11), M3040701239

**Vacant** — Sys Supt Off, GS12, M3040701140

**Ed Sobieranski** — RTAMB Mgt, GS14, M3040700244

# Exhibit 3

**Operations Officer (Supervisory)**
**Training and Education Capabilities Division**
**GS-0301-14 (PDW859A/854457)**

1

Introduction

This position is located in the Office of Training and Education Capabilities Division (TECD), Training and Education Command, Marine Corps Combat Development Command. The employee provides technical expertise to determine the training requirements for training simulation and range systems. TECD serves the role of resource sponsor and requirements generator for virtual and constructive training devices and simulations, and range training areas. The Operations Officer provides overall management of current and future operations of TECD as well as overseeing work products produced by the Operations Branch. The Director serves as technical advisor to Commanding General, Training and Education Command.

Major Duties

The employee provides the subject matter expertise and branch head management for the Operations Branch, TECD. The Operation Branch Head/Operations Officer duties include implementing, and delegating tasks to employees of the Operations Branch, MAGTF Training Simulations Branch (MTSB), Range Training Area Management (RTAM) Branch, Marine Corps Synthetic Training Environment (MCSTE) Branch, and Business Support Branch, such as research, evaluation, drafting, and maintaining documentation involved in determining the training requirements and way ahead for ground training LVC simulations and range training areas as follows:

Generate documentation and guidance in support of TECOM plans, policy and oversight of LVC simulations and range training areas that includes, but not limited to: The Marine Air Ground Task Force (MAGTF) and Joint training requirements. Direct the coordination of policy and guidance and/or the implementation of programs throughout the Marine Corps affecting simulation training systems and range training areas to include development and maintenance of technical libraries, databases, websites and other various resources to manage simulation training systems and range training areas. Performs research and analysis on specifications and operational environments involving the use of constructive training systems. Manages; directs; and/or supervises Requirements Managers; Portfolio Managers; Virtual and Constructive Action Officers; Modeling and Simulations Officer; and Verification, Validation & accreditation Officer for TECD. 35%

Attend selected meetings as TECOM representative at Congressional, DoD, Joint and Inter-service meetings relating to simulations and range training areas (i.e. committees, Integrated Product Teams, etc.) and analyzing issues presented to support modeling and simulations of the MTSB, RTAM, MCSTE and the Marine Corps Modeling and Simulation Management Office (MCMSMO). Direct, manage, supervise and conduct technical research in support of simulations and range area management to identify or validate training performance issues contained within capabilities integration and development documentation, such as Initial Capabilities Documents (ICD), Capability Development Documents (CDD) and Capabilities Production Documents (CPD). In addition, collect and validate requirements from the end user community to generate requirements documents and prioritize the requirements within those documents. Responsible for all incoming taskers and requests for information (RFI's) from TECOM internal and external division/agencies, Inter-service, DoD agencies, and all Branches of the Government such as Congressional Committees, Government Accounting Office, Cost Assessment & Program Office, etc. 35%

Direct, manage, supervise and perform research and analysis to support the development of planning and programming documentation to assist in the procurement, allocation, and functional management of

**Operations Officer (Supervisory)**
**Training and Education Capabilities Division**
**GS-0301-14 (PDW859A/854457)**

virtual and constructive simulation programs worth over $50 million and USMC range training program assets over $100M. Direct, manage, supervise and provide direct support of mission requirements of the current and future programs. The employee recommends and, in some cases, exercises full discretionary authority to approve the allocation and distribution (or redistribution) of funds in the budget as deemed necessary to fulfill identified requirements. Conducts and supports S&T and R&D evaluations, proposal evaluations and selections. Conduct and support acquisition proposals and selections. 30%

Evaluation Factor

FACTOR 1 - Program Scope and Effect                    Level 1-4 (775 points)

The purpose of this work is to manage requirements, provide resource advocacy and program direction and management in support of warfighter needs, as well as provide to the user community an advocate as the Subject Matter Expert to validate current and future needs of training simulation system requirements and range training area requirements, and assist in the identification, development or acquisition of systems, devices and range training areas to meet these needs. The impact of this work is the continued development of training simulation systems/devices and range training areas/systems that provide Marines with the best training available.

FACTOR 2 – Organizational Setting                    Level 2-3 (325 points)

Guidelines include DOD, Navy and Marine Corps directives concerning correspondence, directives, security, performance evaluation, telecommunications and protocol, and the policies and amplifying guidance of the Director. In the employee's duties, a great deal of work must be accomplished, without set rules or regulations. The employee must exercise ingenuity, resourcefulness, sound judgment and initiative in arriving at proper interpretations and adaptations of guidelines to specific problems such as determining priorities or assigning action.

FACTOR 3 - Supervisory & Management Authority        Level 3-4 (450 points)

This position is under the general supervision of a Division Director and 0-6 Colonel, via the Deputy Director (GS-15). The incumbent is given wide latitude for the demonstration of initiative, flexibility, and management control subject only to administrative and policy direction concerning overall priorities and objectives. Subject to such general guidance, the incumbent routinely makes policy and management decisions on his or her own recognizance. The incumbent is expected to implement such managerial actions as deemed necessary to achieve the desired results. Actions that deviate from established policies are referred to the Division Director for resolution. Completed work when received, is assessed in terms adequacy, appropriateness, and compliance with written or non-written policies. Demonstrated knowledge and expertise in leadership management, supervision and administration of staff while providing long and term direction.

FACTOR 4 - Nature and Purpose of Contacts

Sub Factor 4A - Nature of Contacts                    Level 4A-3 (75 points)

Personal contacts include both members of external and internal staffs actions within TECOM and MCCDC, as well as various outside agencies and are handled electronically, e-mail, telephone, and in person. Examples of such contacts include industrial and educational leaders as well as high-level active duty and retired military members from all Service Branches and DoD organizations.

Sub Factor 4B - Purpose of Contacts                   Level 4B-4 (125 points)

**Operations Officer (Supervisory)**
**Training and Education Capabilities Division**
**GS-0301-14 (PDW859A/854457)**

The purpose is to exchange information, resolve problems, provide guidance, and to influence courses of action in support of Marine Air Ground Task Force (MAGTF) virtual/constructive training systems and USMC range training areas.  This requires the manager to deal with skeptical and uncooperative persons arriving at a compromise solution with the people who have different views, goals, and objectives.

FACTOR 5 - <u>Difficulty of Typical Work Directed</u>                Level 5-8 (1030 points)

The work includes various duties requiring different and unrelated processes and methods. The diversity of duties requires decisions regarding what needs to be done and how best to accomplish it, based on the employee's knowledge or priorities, commitments, policies, training and professional military education processes and relationships. Training and Education Division, organizational and functional structure und outside issues. Action to be taken and response required routinely concern differences in fact or propriety, both of which must be determined by the employee with the proper course of action selected from various alternatives. Particularly sensitive is the requirement that the employee's independently reached initiatives accurately reflect the desires of the Director.

<u>First Level Supervisor</u>

(3) Majors/GS13s: Assistant Operations Officer, Current Operations Officer, & Future Operations Officer
(1) GS-14: Science and Technology Senior Analyst
(2) Captains: Current Operations Analysis, Project Officer/Task Management
(2) GS-13s: Senior Joint Capabilities Integration and Development System Analysts
(1) GS-12: Joint Capabilities Integration and Development System Analyst

FACTOR 6 - <u>Other Conditions</u>                Level 6-6 (1325 points)

Serving as Operations Officer, Training and Education Capabilities Division, the supervisory, resource, and requirements management role of the employee involves major decisions and actions that have a direct and substantial effect on the training and education of all Marines and other related DoD activities.

Moreover, as inevitable changes occur, the employee is a key decision maker to restructure the organization, recast strategic and operational plans to meet substantial changes in programs authority and funding level, and to allocate resources for mission accomplishment.

Supervision and oversight at this level requires exceptional coordination and integration of a number of very important and complex program segments or programs or professional, scientific, technical, managerial, or administrative work comparable in difficulty to the GS-14 or higher level.  Supervision and resource management at this level involves major decisions and actions which have a direct and substantial effect on the organizations and programs managed.

Physical Demands:  The work involves normal risks associated with typical office environment. Work requires minimal travel.

Employee must be able to obtain and maintain a Secret Security Clearance and Access to SIPRNET.

3

# Exhibit 4

# Declaration under Penalty of Perjury

I, (Antonio Smith), in accordance with 28 U.S.C. Section 1746, make the following statement:

EFFECTS OF NONDISCLOSURE: *Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

Q: What is your full name?
R: Antonio Barnard Smith.

**Q:** During the period October 11, 2017 to January 29, 2018, what was your position title, and pay-grade?
R: Operations Branch Head/Operations Officer, Training & Education Capabilities Division, GS-0301-14.

Q: From approximately what date to what date did you hold that position?
R: Since 2009 to present.

Q: Who was your first-level supervisor during the period October 11, 2017 to January 29, 2018?
R: Edward Sobieranski

Q: Who was your second-level supervisor during the period October 11, 2017 to January 29, 2018?
R: Colonel Patrick Hittle.

Q: What organization were you in, starting with the lowest to highest organization during the period October 11, 2017 to January 29, 2018 (i.e., Branch, Section, Division, Directorate, location)?
R: Operations Branch, Training & Education Capabilities Division, Training & Education Command.

Q: What is your race?
R: African American.

*Page 1 of 5 Pages*

Declarant's Initials_____

Q:  In your formal Complainant you allege reprisal based on prior protected EEO activity is this correct?
R:  Yes.

Q:  Can you please describe prior protected EEO activity and current status?
R:  I have two other cases Docket #15-67856-02582, filed June 2015, pending appeal; and Docket #16-67856-02564, filed September 2016, pending appeal.

Q:  Who are you holding responsible for discrimination based on your race, and reprisal in regard to the non-selection as the Supervisor Head Training & Education Capabilities Division?
R:  Colonel Patrick Hittle.

Q:  The record reflects that you were offered an interview and were interview by a panel of four members?  Is this correct?
R:  Yes.  I was not provided any information about the rankings from this interview panel or if the panel provided any information pertaining to the interview to COL Hittle who conducted the second interview.

Q:  Do you hold the first interview panel responsible for any discriminatory or retaliatory action in regard to your non-selection for position at issue?
R:  I believe the discriminatory and retaliatory action was conducted by COL Hittle.  I would like to offer some background that may have affected my standings with the interview panel if they did provide rankings or input to the process.  In July 2017, the Deputy Director position was vacated by Mr. Bennington.  Mr. Bennington was named as a defendant in both of my previous complaints.  At that time, I was the senior branch head and second in line to COL Hittle in the leadership chain.  Instead of COL Hittle directing/detailing me into the position as Deputy Director, he assigned and detailed Mr. Edward Sobieranski to the position on/about July 17, 2017.  Mr. Sobieranski was employed in a position which was one level below me in the hierarchy chain.  COL Hittle did not compete the position for detail and did not afford me any opportunity to be placed into the position, which essentially reduced my competitiveness for the position.  Mr. Sobieranski served as the Deputy from o/a July 17, 2017 until hired February 19, 2018.  According to the regulation pertaining to detailing within the military department, 5 U.S. Code 3341 paragraph b, the limit for any one person to be detailed is 120 days.  The agency violated the code.  The length of time that Mr. Sobieranski served was at least six months.  My chances would have been better with the selection board if I had a chance to be detailed in the position as the Deputy Director as well.  There was enough time for me to have served as a Deputy Director before the board.  *See* Enclosures 1 and 2.

Q:  The record reflects that you were offered a second interview with the selecting official COL Hittle is that correct?
R:  Yes.

Q:  Prior to the selection of the position for which you applied, Supervisor Head Training & Education Capabilities Division, did you know the selecting official?  If so what was your organizational relationship?

*Page 2 of 5 Pages*

Declarant's Initials_

JA 055

R:  COL Hittle conducted the second interview after the initial panel interviews and I believe made the selection.  He was my second level supervisor at the time of selection.

Q:  How can you be certain the selecting official was aware of your race? And when did they become aware?
R:  If COL Hittle was the selecting official, he knew my race from visual observation when we met in November 2015.

Q:  How can you be certain the selecting official were aware of your prior protected EEO activity? And when did they become aware?
R:  COL Hittle was named as a defendant in the September 2016 claim. He also was aware of the 2015 case because I discussed it with him on multiple occasions.

Q:  To your knowledge, who was the selecting official for this position?
R:  I am not completely sure, but I believe it was COL Hittle.

Q:  Why do you believe you should have been selected for the position(s) at issue?  Provide specific knowledge, skills, education, etc.
R:  I served for nine years as Operations Officer and Operations Branch Head.  In the Division hierarchy, the Operations Officer position is the third person in the chain of command under the Director and Deputy Director, Training & Education Capabilities Division.  For nine years I basically served as the third person in charge of the entire division.  I have a Bachelor's degree and two Master's degrees.  I also served on high level staffs in the Marine Corps as a LTC.  I have provided programming requirements and other expertise to obtain ranges and simulation capabilities.

Q:  Do you know who was selected (or interviewed; or applied) and their race?
R:  Edward Sobieranski, and he is Caucasian.

Q:  Do you believe the selecting official knew the selectee and his prior to the selection?
R:  Yes.  As I stated in my previous testimony, Mr. Sobieranski was detailed from a lower level to the Deputy position prior to the selection of this position.

Q:  Why do you believe you were not selected for the position?
R:  There are multiple reasons.  I believe COL Hittle shaped the conditions of the environment leading up to the selection in order to not provide me a fair chance to be as competitive as I should have been for the panel.  It started first with the detailing of Mr. Sobieranski into the position in July 2017, without competing the detail and not allowing others including myself the opportunity to serve temporarily in the position.  Again, the detailing of Mr. Sobieranski exceeded the 120 days by regulation that a detail is limited to.

Second, leading up to the hiring board, COL Hittle continued to marginalize me by removing employees from my branch on two different occasions.  Specifically he removed the first person, Brian Thompson, without consulting me or informing me of the decision.  In essence, I came to work one morning and learned that I had an employee removed from my branch and assigned to another branch.  In December 2017, he moved another person.  This time there was an email sent to me by COL Hittle stating unless I had a compelling reason not to move the person identified,

*Page 3 of 5 Pages*

Declarant's Initials_

JA 056

he was moving him.   I emailed my concerns to him and info copied the Chief of Staff (COS) and the G1 of Training & Education Command, but to no avail.  COL Hittle made the decision to remove an employee from my branch again without any consultation with me.  During the period leading up to the board, he continued to marginalize me and made the work environment difficult for me.  *See* Enclosures 3, 4, and 5.

Third, COL Hittle was the lone interviewer for the second interview.  I filed a complaint which directly named COL Hittle and I don't believe the agency should have allowed him to serve as the lone panelist and selecting official for a positon that I would most likely be a high qualifying competitor.  The agency allowed him to be the selecting official when I had two open cases and one that named COL Hittle as a defendant.

Q:  Why do you believe you are more qualified than selectee?
R:  As previously explained, I listed my education and work experience qualifications which I believe best qualified me for the position, but I also believe that Mr. Sobieranski was provided additional experience that I was not because he was detailed into the position for six months.

Q:  Did your application/resume/interview show the experience you just described?  If not, how can you be certain the selecting official/rating panel were aware of the experience/qualifications you believe made you the superior candidate?
R:  Yes, my application, resume and interview all showed the experience that I described.

Q:  Why do you believe that you were not selected because of your race?
R:  I believe I was not selected due to my race and reprisal.  There is a link with this case to other EEO complaints in which race was a factor in regard to my claim against Mr. Bennington and COL Hittle.  Because of those complaints, I believe COL Hittle continued to discriminate against me to include detailing someone into the position, which was not fair to me.  I feel there are linkages with this case regarding race that dates all the way back to my first complaint.

Q:  Why do you believe that you were not selected because of your prior protected EEO activity?
R:  I believe that COL Hittle was upset that I filed a previous EEO complaint against him and therefore; he retaliated against me by not detailing or selecting me for the position.  I also provided prior testimony in a previous question that speaks to this area.

Q:  Is there anything you would like to add to your statement regarding any of the claims or issues accepted for investigation under Agency Docket No. AR2018-001?  If so, please do so here.
R:  No.

Encl 1, Memo Detailed Deputy Director
Encl 2, TECD Organization Chart
Encl 3, First Reassignment
Encl 4, Team Leader's Concern Regarding Reassignment
Encl 5, Second Reassignment/Informed Chief of Staff & G1

*Page 4 of 5 Pages*

Declarant's Initials _____

END OF STATEMENT

I, (Antonio Smith), declare (*certify, verify or state*) under penalty of perjury, that the foregoing is true and correct.

_____        ___10.11.2018_____
(Declarant's Signature)                          (Date)

*Page 5 of 5 Pages*

Declarant's Initials_____

# Exhibit 5

-----Original Message-----
From: Smith CIV Antonio B
Sent: Friday, December 22, 2017 7:48 AM
To: Hittle Col Patrick R <patrick.r.hittle@usmc.mil>
Cc: Craft Col Joseph A <joseph.craft@usmc.mil>; Wolff CIV Jeffrey A <jeffrey.wolff@usmc.mil>
Subject: RE: Employee Concerns - RE: DoN TRACKER - CIMS CHOP TASK- 115-125 Pg83 Live Virtual and
Constructive Training

Sir,

Thank you for being willing to discuss.  Again, I am not trying to be difficult, but I have seen the second
and third order effects of what happens when I believe someone is looking to find something wrong
with me.  I just wanted to meet to primarily give you the attachments and to have a brief discussion.
We don't have to meet, I can cover my points in this email.  The attachments show when Mr.
Bennington took over as the lead for LVC-TE in the Spring/Summer of 2015 and canceled the Analysis of
Alternatives (AoA).  His decision to canx the AoA charted a course contradictory to JCIDS & Defense
Acquisition System (i.e., No Materiel Development Decision & AoA).  I felt he did this to retaliate against
me because of my complaint and because I wanted to conduct an AoA, but he did not understand the
second and third order effects of his hasty decision on LVC-TE cost and schedule nor unit cohesion
within TECD.  It has taken 3 years to get back on track with LVC-TE/AoA.  So, I feel similar now to how I
did then when decisions were being made in a vacuum, and I appeal to you to allow "due process" in my
case and ask that we work together to accomplish the mission.

Vr,

Tony

Mr. Antonio B. Smith
Operations Officer
T&E Capabilities Division, TECOM
Office - 703.432.2169
Blackberry - 202.631.5160
SIPR - antonio.b.smith@usmc.smil.mil

FOR OFFICIAL USE ONLY - This transmission contains information that is protected from disclosure by
the Privacy Act of 1974 (5 USC 552a) and exemption (b)(6) of the Freedom of Information Act (5 USC
552, as amended).  Please ensure that this information is used solely for the requested purpose. Further
duplication and/or distribution without prior authorization from this office is not authorized. Civil and/or
criminal penalties can apply for improper use.

-----Original Message-----
From: Hittle Col Patrick R
Sent: Wednesday, December 20, 2017 4:42 PM
To: Smith CIV Antonio B <antonio.b.smith@usmc.mil>
Cc: Craft Col Joseph A <joseph.craft@usmc.mil>; Wolff CIV Jeffrey A <jeffrey.wolff@usmc.mil>
Subject: Re: Employee Concerns - RE: DoN TRACKER - CIMS CHOP TASK- 115-125 Pg83 Live Virtual and
Constructive Training

Tony,

I will be glad to discuss with you, but essentially, your wording below indicates this is a complaint on your part. Please feel free to consult with HR, and any others you feel appropriate, if you indeed wish to address this as such.

I've copied G1 for awareness, from the perspective of HR matters.

S/f
Col Pat Hittle, TECD / TECOM
(703) 784-2964
Sent from BB.
  Original Message
From: Smith CIV Antonio B
Sent: Wednesday, December 20, 2017 16:10
To: Hittle Col Patrick R
Cc: Craft Col Joseph A
Subject: Employee Concerns - RE: DoN TRACKER - CIMS CHOP TASK- 115-125 Pg83 Live Virtual and Constructive Training

Sir,

I ask that we sit down and talk.  I am not trying to be difficult, but I feel that you are purposely marginalizing me with actions like the one you're proposing below, couple with other instances in the recent past (i.e., moving contractor from Ops to MTSB) that have adversely impacted me and the mission.  I believe your actions are because I have an EEO complaint against TECOM that includes you.  I just ask that I be allowed to work free of marginalization, discrimination, and other adverse actions.  I cc'ed the Chief of Staff because my case has been ongoing for nearly three years and I want to make him aware of this current matter in hopes that he can help resolve it.  I just ask for "due process" regarding my current case and to be allowed to work in a non-hostile environment without reprisal.

Vr,

Tony

Mr. Antonio B. Smith
Operations Officer
T&E Capabilities Division, TECOM
Office - 703.432.2169
Blackberry - 202.631.5160
SIPR - antonio.b.smith@usmc.smil.mil

FOR OFFICIAL USE ONLY - This transmission contains information that is protected from disclosure by the Privacy Act of 1974 (5 USC 552a) and exemption (b)(6) of the Freedom of Information Act (5 USC 552, as amended).  Please ensure that this information is used solely for the requested purpose. Further duplication and/or distribution without prior authorization from this office is not authorized. Civil and/or criminal penalties can apply for improper use.

-----Original Message-----
From: Hittle Col Patrick R
Sent: Wednesday, December 20, 2017 12:48 PM
To: Smith CIV Antonio B <antonio.b.smith@usmc.mil>
Cc: Sobieranski CIV Edward R <edward.r.sobieranski@usmc.mil>; Harder LtCol Byron R
<byron.harder@usmc.mil>
Subject: Re: DoN TRACKER - CIMS CHOP TASK- 115-125 Pg83 Live Virtual and Constructive Training

Tony
With respect to mechanics on this, my understanding is Charlie Driest is detailed to LtCol Harder
specifically to work this report. He's also directly supporting the LVC TE AoA. Byron needs the help and
the additional bandwidth.

Unless someone can give me a compelling explanation why Charlie needs to stay "in Ops", I want to
make this a permanent move in terms of working relationships and org charts. Open to comments and
thoughts.

S/f
Col Pat Hittle, TECD / TECOM
(703) 784-2964
Sent from BB.
  Original Message
From: Smith CIV Antonio B
Sent: Wednesday, December 20, 2017 12:25
To: Hittle Col Patrick R; Sobieranski CIV Edward R; Fraley CIV James R; Thomson CIV Lauren R; Cross CIV
Anthony; Harder LtCol Byron R
Cc: Jenkins CIV Harry; Mooney CTR MariaCarmela R; Guthrie Capt Pierce C; Duenow CIV Russell E;
Williams CIV Jeffrey R
Subject: RE: DoN TRACKER - CIMS CHOP TASK- 115-125 Pg83 Live Virtual and Constructive Training


ALCON,

MCSTE Br has the lead for this task, per earlier discussions.   MTSB, RTAM, & BusSpt, if you have any
input, please provide to LtCol Harder ASAP.  I spoke to Ms. Kruger (DON Tracker POC) and she's working
on a week extension, but for now, 2 Jan is the suspense.   LtCol Harder - Please route response to CG for
approval prior to suspense.  Many thanks!

S/F,

Tony



Mr. Antonio B. Smith
Operations Officer
T&E Capabilities Division, TECOM
Office - 703.432.2169

Blackberry - 202.631.5160
SIPR - antonio.b.smith@usmc.smil.mil

FOR OFFICIAL USE ONLY - This transmission contains information that is protected from disclosure by
the Privacy Act of 1974 (5 USC 552a) and exemption (b)(6) of the Freedom of Information Act (5 USC
552, as amended).  Please ensure that this information is used solely for the requested purpose. Further
duplication and/or distribution without prior authorization from this office is not authorized. Civil and/or
criminal penalties can apply for improper use.

-----Original Message-----
From: Smith CIV Antonio B
Sent: Thursday, September 28, 2017 2:57 PM
To: 'asmithusmc@aol.com' <asmithusmc@aol.com>
Subject: MFR

Memo For The Record:

On 27 Sep 2017, Col Hittle reassigned Brian Thompson (Contractor) to MAGTF Training Simulation
Branch from the Operations Branch without any notice. I am the Operations Branch Head. In light of the
hostility that I have been subjected to by Col Hittle, I saw this as another adverse action to undermine
me. Col Hittle appears to be upset that I made an EEO complaint against him and therefore, he makes
decisions about my branch without consulting me under the guise of organizational effectiveness. He
displays no concern for the second and third order negative effects of his decisions. This latest action is
another act in a long line of actions regarding people and responsibilities assigned (e.g., MICP, DoN
Tracker, etc.) to my branch that negatively impacts mission accomplishment.


    /s/

Antonio B. Smith

# Exhibit 6

16 April 2018
<u>Colonel Hittle's response to interrogatories</u>

Follow up-Interrogatories

Interrogatories for Col Patrick Hittle

The following interrogatories are addressed to you pursuant to Title 29 of the Code of Federal regulations, Part 1614.102(b)(6). Request you answer each interrogatory fully in writing. If any of the following interrogatories cannot be answered in full, please provide your answer to the extent possible. ==Please provide your responses by discussing or describing, in as much detail as possible, your involvement in, knowledge of or action taken regarding the stated allegations of the complainant.== If possible, please include dates and timeframes.  Your responses will be incorporated in the Counselor's Report.

Allegation

Was Mr. Antonio Smith discriminated against by Col Patrick Hittle on the basis of race (African American) and reprisal (Complaints filed 2015; case number 15-67856-02582 and 2016; case number 16-67856-02564) on or about 29 January 2018, when he was not selected for the position of Supervisory Head/Deputy Director (GS-0301-15), Training and Education Capabilities Division, Training and Education command (Announcement # ST-10042390-17-LMJ).

1.  The Complainant states when Mr. Bennington left the positon Deputy Director, he (Mr. Smith) was serving as the Branch Head, you appointed his subordinate Deputy Branch head Mr. Sobieranski (race Caucasian) to serve as the Acting Deputy Director, therefore bypassing (Mr. Smith's position and not offering him the same  opportunity to serve as Acting Deputy Director. Mr. Sobieranski filled this Acting Deputy Director Position for more than 90 days.  To which the Complainant believes set the stage for Mr. Sobieranski to be selected for the position.

Response:  At the time of Mr. Bennington's retirement (on or about 31 July 2017) Mr. Smith was the Branch Head for the Operations Branch, and Mr. Sobieranski was the Branch Head for the Range & Training Area Management Branch.  Both employees were at the GS-14 civilian level, and both were suitable candidates to fill in temporarily as the Deputy Director for Training & Education Capabilities Division – "TECD".  Mr. Sobieranski did not report to Mr. Smith, but rather, both were in equivalent positions as heads of their respective branches under the Division.  I initially assumed there would be a significant time lag to permanently hire to the Deputy Director position, due to the historic trend in how slow it has been to hire to civilian positions for Training and Education Command – or "TECOM" – (on the order of six to nine months minimum), and as such we would have to consider several different employees under temporary detail to the Deputy position.  Even securing approval from the TECOM headquarters for a temporary detail meant that Mr. Sobieranski was not officially placed in the temporary Deputy Position until on or about 01 October 2017.  I knew the temporary detail to the Deputy position would only be for 120 days, the standard length of time for a temporary detail, and asked Mr. Smith if he desired to be considered to fill in as the temporary Deputy after Mr. Sobieranski, to which Mr. Smith said he did wish to be considered.  In December 2017, we prepared a temporary detail package for approval to place Mr. Smith into the position as Deputy for TECD once Mr. Sobieranski's detail had run out.  That package was in routing for approval at the TECOM level in December 2017 and January 2018, while the recruiting and interview process for a permanent hire was

in progress.  Mr. Sobieranski's temporary detail to the TECD Deputy position formally ended at the end of January 2018.  The final interviews were conducted around 09 January 2018, and a selection was made.  Once that selection was made, a package was prepared and routed for TECOM command-level endorsement.  With that endorsement, Human Resources made the formal offer to the selected candidate, Mr. Sobieranski, who accepted the offer.  After this process had been completed, I contacted both Mr. Sobieranski and Mr. Smith (who were the two candidates from TECOM of the three selected for final interviews) and communicated to both that the selection had been made, and the offer made and accepted.  On that day, 29 January 2018, I asked Mr. Smith if he wanted the command to proceed with the temporary detail, placing him in the TECD Deputy position temporarily until the selected candidate (Mr. Sobieranski) was formally placed in the position, probably sometime in February 2018.  He stated he did not think it was in the best interest of the Division for him (Mr. Smith) to temporarily assume the Deputy position if Mr. Sobieranski was going to be formally placed in the position only a few days or weeks later.

2. Mr. Smith was successful in making the cert and was successful in the first interview held 4 Jan 2018, with 4 panel members. The second interview held 9 January 2018, Col Hittle was the deciding official and was aware of Mr. Smith previous EEO activity. Mr. Smith believes Col Hittle was biased in his decision based on his naming Col Hittle in his previous complaint.

Response:  I do not believe I was biased in any way by my knowledge of Mr. Smith's previous EEO activity.  The questions posed to each candidate, both in the initial panel interview and in the follow-on interview, were prepared in advance; screened and reviewed in accordance with Human Resources policy and standard practices; and focused on eliciting technical details of each candidate's job history, understanding the candidate's unique approach to problem solving, and offering the candidate an opportunity to indicate how he or she might best leverage their management skills and knowledge to meet the Division's mission.

3. Col Hittle reassigned contractors from Mr. Smith's division without consulting him therefore marginalizing him and taking away some of his duties. On 22 December, 2017 Col Hittle advised Mr. Smith of the removal of the second person from Mr. Smith's branch without consulting him. Mr. Smith responded via email to Col Hittle and Col Craft, about his dissatisfaction on how this was being handled.

Response: Contractors may not perform "personal services", and are not assigned to a branch or division.  Contractors who perform work on a contract in support of the Division are engaged to produce a "deliverable" – specifically, a tangible result.  In December 2017, I was made aware that Mr. Smith, as Operations Branch Head, had discussed with LtCol Byron Harder, the Marine Corps Synthetic Training Environment Branch Head, the need for additional contractor support related to the LVC-TE Analysis of Alternatives project.  I stated in an email to Mr. Smith my expectation that a contractor, Mr. Charlie Driest, who had already been supporting LtCol Harder, would continue to work closely with LtCol Harder for the success of the project.  The LVC-TE Analysis of Alternatives is a project directly aligned with the performance work statement and deliverables of the existing LVC-TE support contract.  The purpose of my email was to make my direction and expectations clear, to harmonize the team, and remove confusion and misunderstanding.

4. Col Hittle was placed in a key position during the hiring process which resulted in continued retaliation. Mr. Smith believes the command was complacent in assigning Col Hittle as the sole

16 April 2018
<u>Colonel Hittle's response to interrogatories</u>

second level interviewer who removed people from Mr. Smith branch and prevented Mr. Smith
from the detail to serve as the Acting Deputy.

Response:  I have never retaliated against Mr. Smith for anything, and I have consistently encouraged
him to take advantage of every resource afforded him as a civilian employee, as I would any and every
employee.  Throughout the hiring process, I consistently and continually sought and followed guidance
and direction from the TECOM G1/personnel office and the Human Resources Office, and remained
within the guidelines and policies for civilian hiring practices of the U.S Marine Corps and the
Department of the Navy.  I believe I appropriately fulfilled the duties and responsibilities commensurate
with my rank and position.

5.  Who was responsible for naming Col Hittle as the deciding official in the aforementioned job
announcement?

Response:  As the supervisor of the employee in the Deputy Director position, I was the selecting official.


The above information is pursuant to Public Law 93-579 (Privacy 'Act of 1974)
December 31, 1974, for individuals supplying information for inclusion in the
system of records. The information you supply may be used with the
information developed by investigation to resolve an equal employment
opportunity discrimination complaint, grievance or appeal.

# Exhibit 7

## Declaration under Penalty of Perjury

I, (Patrick Hittle), in accordance with 28 U.S.C. Section 1746, make the following statement:

*EFFECTS OF NONDISCLOSURE: Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

Q: What is your full name?
R  Patrick Russell Hittle.

Q: During the period October 11, 2017 to January 29, 2018, what was your position title, rank, or pay plan, job series, and pay-grade?
R: Colonel/06 Marine Corps. Director, Training & Education Capabilities Division. Training & Education Command, Marine Corps Combat Development Command.

Q: From approximately what date to what date did you hold that position?
R: I assumed that position November 1, 2015 and departed on August 17, 2018. Pending retirement currently.

Q: Who was your first-level supervisor during the period October 11, 2017 to January 29, 2018?
R: Major General Iiams.

Q: Who was your second-level supervisor during the periods October 11, 2017 to January 29, 2018 and August 4, 2017 to September 12, 2017?
R: Lieutenant General Walsh.

Q: What organization were you in, starting with the lowest to highest organization during the period October 11, 2017 to January 29, 2018 (i.e., Branch, Section, Division, Directorate, location)?
R: Training & Education Capabilities Division. Training & Education Command, Marine Corps Combat Development Command.

Q: What is your race?

*Page 1 of 7 Pages*
Declarant's Initials *PH*

R:  Caucasian.

Q:  Did you know Complainant at the time you made the selection decision?  What was your organizational relationship to the Complainant?
R:  Yes.  I was the Director of Education & Capabilities and he was one of my direct subordinate branch heads.  He was the head of the Operations Branch.

Q:  Were you aware of Complainant race at the time you made the selection decision/recommendation? If yes, when and how did you come to this knowledge (i.e. visual observation, conversations).
R:  Yes, by visual observation.  When I arrived and took over the position, in December 25, 2015, he was candid with me and stated that there was an ongoing EEO complaint that he had filed and that he felt that he had been discriminated against due to his race.

Q:  Complainant alleges he engaged in prior protected EEO activity when he filed an EEO complaint in 2015 and 2016?  Were you aware of this prior protected EEO activity?
R:  Yes.  Please review my previous answer.

Q:  If so, when (month/year) did you become aware?
R:  In 2015.

Q:  Are you aware of the Complaint he filed in 2016 as well?
R:  Yes, this all stemmed back to the hiring action for the deputy position in March 2015, which had not been resolved when I joined TECOM in November 2015. Complainant competed for that position and was not selected and filed a complaint.  Complainant wanted the outcome of that complaint to be his receiving that position.  While the complaint was processing, the mission went on and the selectee was placed in the position.  It is necessary for the Operations Branch head to be able to work closely with the Deputy.  When I took over my position, I envisioned all civilian matters to be addressed through the deputy and the branch managers to work through him.  Mr. Smith had conflicts with the individual previously selected as the Deputy.  This became a challenge for me.  Mr. Smith wanted to report directly to me instead of the deputy.  There were various problems during this time period and eventually it all came to a head and led to an issue with Mr. Smith's work schedule.  He filed a complaint in regard to these issues which listed me.

Q:  Have you engaged in protected EEO activity?  If so, please describe your role (complaining party, witness, management official, etc).
R:   Yes.  Only in regard to Complainant's cases.

Q:  Have you ever observed or witnessed anyone in Complainant's chain of command express a bias towards any employee or official for participating in protected EEO activity?  If so, please describe.
R:  No.

Q:  Have you ever been contacted or discussed Complainant's prior protected EEO activity with any personnel prior to or during the selection process in regard to subject vacancy position?
R:  No.

*Page 2 of 7 Pages*
Declarant's Initials  *cm*

Q: How would you describe your relationship with the Complainant?

R: Professional and cordial. He was my Operations Officer and I expected to work very closely with him. The Operations Branch is the essential point that holds the group all together. I saw him as the force that kept everyone focused on strategic goals. He had a very critical role in that. I talked to him daily on specific issues and we could always talk about work. We did not talk about personal things and had no contact after hours. I always felt we could talk, share ideas, and his opinions mattered. When I gave him direction on issues or concerns, I believe he took that direction. He never gave me an indication that he felt I was ever disrespectful, degrading or minimized him. I asked him to be honest and open with me. At the end of the day, I cared about him like I do with all of my folks. I encouraged him to take the time he needed to avail him of any resources such as EEO or his legal representative. I tried to take care of our people. I did not want him to feel that I stymied him in any way from what he wanted to pursue. I did tell him that I might not understand his concerns but wanted him to have access to any resources he needed.

Q: According to the record, you were the selecting official for this position at issue is this correct?

R: Yes.

Q: What was your role in the selection process?

R: The individual that was previously hired into the deputy position in the spring of 2015 informed me in June 2017 that he was going to retire in July 2017. At this point I knew the positon would be open again. To take the organization forward I was looking at casting a broader net for that position than previous and wanted to ensure that we received applications from the broadest specter available in order to take this organization to the next level. I thought there was some merit in looking outside of the organization. We opened the vacancy announcement to the broadest net. My job was to propose the structure on how we would solicit, screen, interview, and ultimately with the best choice as a selectee. We had over seventy applicants on the position certificate. First a resume screen panel went through the resumes. The resume panel went through every resume and scored and ranked the applicants. From that scoring we picked a manageable number of applicants to interview. Another panel completed the interviews. I believe the interview panel then conducted interviews of 12 or 14 candidates. The panel gave me a listing of the top three candidates. They were not ranked in any way. Mr. Smith, Mr. Sobieranski, and Mr. Fox were the top three. I conducted in-person and over the phone interviews with those three. I asked specific questions and based on their responses, I listed strengths and weaknesses and I made a recommendation for the individual that I felt was the best fit. I submitted my selectee and outlined why he was the best candidate to MG Iiams, and he endorsed my recommendation.

Q: Did you make the decision to select Mr. Sobieranski for the position at issue?

R: Yes.

Q: If not, who ultimately made the selection decision at issue?

R: I was the selecting official and my recommendation was sent to MG Iiams for approval and endorsement.

Q: Who were the panel members and who appointed them?

R: I believe I made a recommendation to the G1/Personnel Officer.

*Page 3 of 7 Pages*
Declarant's Initials

Q: The record reflects that you conducted the second interview of the top three candidates is this correct?
R: Yes.

Q: Were you the only person conducting the final interviews, or did you have other panel members?
R: It was just me. Mrs. Stephanie Andrews, of the TECOM G1/Personnel Office, was in the room with me when I met with or telephoned the interviewees.

Q: Who were the candidates?
R: Mr. Smith, Mr. Sobieranski and Mr. Fox.

Q: Who developed the questions for the second interview?
R: I did.

Q: Did you take notes during the three interviews of the responses to analyze and compare candidates?
R: Absolutely.

Q: Where are those notes?
R: I don't believe I still have them and I am sure they went to the burn file.

Q: Who did you recommend and why (please provide specifics)?
R: Training Education Capabilities Division handles two different areas. One big aspect is the range and training program which is over $100 Million dollars a year in funding. The simulators and simulations system piece is probably about $50-60 Million a year. Mr. Sobieranski came with fifteen years of experience in the range program. He had built up a centralized range program which was effectivity managed from my division. Mr. Smith in comparison had a lot of general experience working on the training simulation side but did not have the background on developing policy. He did not have technical hands-on experience with the actual simulation piece and it was more a matter of the practical experience that Sobieranski had and how that would translate to integration of the ranges and simulations programs. Mr. Sobieranski previously wrote Marine Corps orders, policies and directives, and that is what our division needs to do in the upcoming years. It is also important to note that some of our most high visibility issues that the division is involved with involve ranges and training areas. Mr. Sobieranski had experience in developing air space and land expansion projects, expansion of Marine Corps activities in Guam and the Far East. I thought the best candidate to place the Division in for a position of success was with Mr. Sobieranski. Mr. Smith brought a lot of skills to the table and he has been in the command since the mid-2000's, but not quite as long as Mr. Sobieranski. I tried to lay out my thinking and detailed my reasons for selecting Mr. Sobieranski as the best qualified in my letter to MG Iiams in my recommendation.

Q: At the time you made the selection, did you know the selected candidate? What was your organizational relationship to the selected candidate?
R: Yes. Mr. Sobieranski was the interim branch head for the Range and Training Area Management Branch. In July 2017 when the previous deputy left I had to start a temporarily detail package for someone to be the division deputy to keep things going. Mr. Sobieranski was

Page 4 of 7 Pages
Declarant's Initials _Cm_

on boarded into this temporary position in October 2017, and was the acting division deputy from that time until February 2018.

Q:  Complainant contends that Mr. Sobieranski was place in the position in July 2017.  Do you agree with this?  Why or why not?
R:  No.  He was not officially the deputy, neither permanently nor temporarily detailed to the job.

Q:  Was the Deputy position temporary detail competed?  If not why not?
R:  It was not competed.  If we competed the temporary positon that would have taken just as long as the process to permanently fill.  My plan was to do the hiring action as expeditiously as we could.  The temporary detail maximum amount of time is 120 days.  From July to October 2017, I didn't have a deputy.

Q:  Prior to October 2017, was Mr. Sobieranski filling the functions of the Deputy prior to the official detail?
R:  He was not physically sitting in nor doing the functions of the deputy position prior to October.  A lot of my business for the Division regarded his branch.  He led the charge among the branch heads, but was not officially the deputy before October 2017.  He may have been viewed by some, incorrectly, as the acting deputy prior to October 2017, but he wasn't officially moved until October.  After the 120 days detail, I knew I was going to have to transition to another temporary deputy.  In early December 2017, I spoke to Complainant and stated that at the end of the 120 days I would need to replace Mr. Sobieranski, and asked Mr. Smith if he would agree to fill in as the interim deputy.  Mr. Smith stated he would.  We started the paperwork to assign Mr. Smith as the temporary deputy, to commence in February 2018.  As the interview process wrapped up in late January, and upon the selection and approval of Mr. Sobieranski, there remained only a one week gap between the detail and placement into the positon.  Mr. Smith told me that he did not see the sense in filling in as the temporary deputy for one week, since Mr. Sobieranski would be onboarded as the permanent deputy thereafter, and declined to be placed in the position temporarily.

Q:  Complainant contends that he was more qualified than the selected candidate and should have been selected for the following reasons: He had nine years of Operations Officer Branch Head experience; for nine years he served as the third person in charge of the entire division; he possessed a Bachelors and two Masters Degrees'; he served at high level staff positions in the Marine Corp as a LTC; and expertise to obtain ranges and simulation capabilities. Do you agree or disagree with Complainant's assertion that he is more qualified?  Why or why not?
R:  I disagree with his assertion that the Operations Branch Head is any more senior than any other branch head.  Taskings did not flow directly from me through Operations to the other branches.  The hierarchy and organizational wire diagram does not reflect that.  I never told Mr. Smith that I wanted to run business that way and it is not specified in his position description in that manner, to my knowledge.  His position has no supervisory responsibilities over the other branch heads of the division.  There is no identified third level in the organization.  Any of his active duty military service was positive and when I looked as his resume he definitely had that experience.  However in regard to his time as a government civilian I did not see that he had directly worked on higher level issues with broad reach across the Marine Corp.  Mr. Sobieranski had and one of the key things was Mr. Sobieranski flew to Guam once a month and was point man for the Marine Corp for developing the ranges for the Marine Corps in Guam.  He repeatedly briefed senior level officers.  Also one of the strengths of our program is his

coordination with the Army and the G3 personnel. He was one of the driving forces in developing the close coordination between the Marine Corps Ranges program and the Army ranges program, and as a result we have policies that are co-written between the Marine Corps and the Army - because he wrote it in coordination with his Army counterparts. This was due to Mr. Sobieranski as a driving force to make this happen. I looked at his practical experience and results and he was intimately involved in HQ coordination. Mr. Smith didn't have any background in similar cross-Service coordination. He talked about his experience in a deployment environment while he was on active duty during his military service, and that is absolutely great stuff, but what have you done in the DC area and as a civilian that translates and builds upon that? I think he definitely had the capability to do it but he didn't have the tangible examples that showed it.

Q: Where did Complainant rank among candidates for this position?
R: He was a very close second to Mr. Sobieranski.

Q: Complainant alleges that his race and prior protected EEO activity were factors in the decision to not select him for the position. What is your response?
R: Absolutely not. I don't know how to disapprove his idea but I tried to afford him every opportunity. He is a very successful government civilian and it just came down to looking at the factors I mentioned when I made the selection decision.

Q: Knowing that you were named in Complainant's previous EEO complaint, did you consider recusing yourself from the selection process or ensuring that you were not a sole panel member?
R: I didn't not want to recuse myself because I thought I could make a selection in an impartial manner. I thought there would be enough depth in the process. I felt there were enough checks and balances that it would reflect that there was not any bias. Mrs. Stephanie Andrews was in my office when I conducted my interviews.

Q: What, if any guidance did you receive from the Human Resources Office?
R: I was given direction that we had to have the questions drafted beforehand and properly screened along with the requirement to have a third party involved.

Q: Who provided the advice?
R: Mr. Jeffrey Wolff

Q: Did you follow the guidance provided? If not, explain.
R: Yes.

Q: What regulations govern selections in your agency?
R: DON OCHR has a number of directives. I am familiar with the regulations.

Q: Did your decision regarding this selection comply with the controlling regulations?
R: Yes.

Q: During the two year period prior to the period October 11, 2017 to January 29, 2018, how many selection decisions did you make?
R: I believe this was the only position where I was the selecting official.

Q: Was Complainant's race a factor in your selection of position at issue? If yes, explain fully.
R: No.

Q: Was Complainant prior protected EEO activity a factor in your selection of position at issue? If yes, explain fully.
R: No.

Q: Do you have any reason to believe race or reprisal was a factor in any the panel members decisions in this non-selection? Explain your response?
R: No.

Q: Regarding any of the claims or issues accepted for investigation under Agency Docket No. 18-67856-01699, did you take any actions, make any decisions, or engage in any behavior for the purpose of discriminating against, retaliating against the Complainant because of his race or prior protected EEO activity?
R: No.

Q: Regarding any of the claims or issues accepted for investigation under Agency Docket No. 18-67856-01699, do you believe that any involved supervisor or employee took any actions, made any decisions, or engaged in any behavior for the purpose of discriminating against or retaliating against the Complainant because of his race or prior protected EEO activity?
R: No.

Q: Do you have any evidence you would like to submit in connection with Agency Docket No. 18-67856-01699? If so, please label and attach to this statement.
R: No.

Q: Is there anything you would like to add to any of your testimony in connection with any of the claims or issues accepted for investigation under Agency Docket No. 18-67856-01699? If so, please do so here.
R: No.


### END OF STATEMENT


I, *(Patrick Hittle),* declare *(certify, verify or state)* under penalty of perjury, that the foregoing is true and correct.

_____                    _11 OCT 2018_
(Declarant's Signature)                                          (Date)


*Page 7 of 7 Pages*
Declarant's Initials____

JA 076

# Exhibit 8

# SUPV HEAD TRAINING & EDUCATION CAPABILITIES DIV

DEPARTMENT OF THE NAVY

U.S. Marine Corps

## Overview

**Open & closing dates**

◷ 10/11/2017 to 10/17/2017

**Pay scale & grade**

GS 15

**Appointment type**

Permanent

**Salary**

$131,767 to $171,300 per year

**Work schedule**

Full-Time



## Locations

1 vacancy in the following location:

**Quantico, VA**
1 vacancy

**Relocation expenses reimbursed**

No

## This job is open to

🏛  **Federal employees**

Current or former competitive service employees, including:

- Merit promotion
- Career Transition (CTAP, ICTAP, RPL)
- Transfer

🛡  **Veterans**

Filed: 11/28/2022    Pg: 82 of 341    Doc: 15    USCA4 Appeal: 22-1995

⚭   **Military Spouses**

**Announcement number**

ST-10042390-17-LMJ

**Control number**

479008900

# Duties

## Summary

The selectee for this position will serve as a SUPERVISORY HEAD, TRAINING AND EDUCATION CAPABILITIES DIVISION of TRAINING AND EDUCATION COMMAND.

## Responsibilities

The successful selectee will perform the following duties:

- Identify developmental or training needs for a team to achieve program technical, cost, and schedule objectives.
- Create planning or policy documents that identify, monitor, and support required levels of training and readiness as units execute their required respective individual, basic, integrated and advanced training processes.
- Implement training and education programs in compliance with laws and regulations.
- Plan projects for long and short-range training and education goals.

## Travel Required

Occasional travel - You may be expected to travel for this position.

## Supervisory status

Yes

## Who May Apply

### This job is open to...

Current Permanent Competitive Service Federal Employees, Former Federal Employees, Certain Military Spouses EO 13473, VEOA, or ICTAP eligibles.

Questions? This job is open to 3 groups.

### Job family (Series)

**0301 Miscellaneous Administration And Program**
**(https://www.usajobs.gov//Search/?j=0301)**

# Requirements

## Conditions Of Employment

- Must be a US Citizen.
- Males must be registered or exempt from Selective Service. www.sss.gov
- Must be determined suitable for federal employment.
- Must participate in the direct deposit pay program.
- May be required to successfully complete a probationary/trial period.
- See Other Information and Requirements section for additional requirements.

Requirements:

Generally, current Federal employees applying for GS jobs must serve at least one year at the next lower grade level. This requirement is called time-in-grade. All qualifications and time-in-grade requirements must be met by the closing date of this announcement and clearly documented in your resume.

Selectee will be required to complete ethics orientation within three months of appointment and submit a Confidential Financial Disclosure Report, OGE-450, within 30 days of appointment.

Must be able to obtain an interim and/or final secret security clearance prior to entrance on duty AND must be able to maintain the required level of clearance while employed in the subject position. Failure to obtain and maintain the required level of clearance may result in the withdrawal of a job offer or removal.

Supervisors in the executive branch have a heightened personal responsibility for advancing government ethics. The selectee will be required to review the 14 General Principles of Ethical Conduct at 5 CFR 2635.101.

This position may require travel from normal duty station (15%).

## Qualifications

In order to qualify for this position, your resume must provide sufficient experience and/or education, knowledge, skills, and abilities to perform the duties of the specific position for which you are being considered. Your resume is the key means we have for evaluating your skills, knowledge, and abilities as they relate to this position. Therefore, we encourage you to be clear and specific when describing your experience.

Your resume must demonstrate at least one year of specialized experience at or equivalent to the GS-14 grade level or pay band in the Federal service or equivalent experience in the private or public sector. Specialized experience must demonstrate the following: directing and overseeing the development of training initiatives; overseeing budget preparation and execution; developing and implementing strategic operational and tactical plans; supervising subordinates work efforts; and preparing directives and orders for other agencies and higher authorities.

Additional qualification information can be found from the following Office of Personnel Management web site: http://www.opm.gov/qualifications/Standards/group-stds/gs-admin.asp
(http://www.opm.gov/qualifications/Standards/group-stds/gs-admin.asp)

https://www.opm.gov/policy-data-oversight/classification-qualifications/general-schedule-qualification-standards/0300/miscellaneous-administration-and-program-series-0301/
(https://www.opm.gov/policy-data-oversight/classification-qualifications/general-schedule-qualification-standards/0300/miscellaneous-administration-and-program-series-0301/)

To preview this questionnaire and determine if your experience matches the skills required for this position, click on the following link: https://apply.usastaffing.gov/ViewQuestionnaire/10042390

USCA4 Appeal: 22-1995      Doc: 15      Filed: 11/28/2022      Pg: 83 of 341

(https://apply.usastaffing.gov/ViewQuestionnaire/10042390)

Education

## Additional information

This position is covered by the Department of Defense Priority Placement Program.

Additional vacancies may be filled by this announcement.

A tentative offer of employment will be rescinded if the selectee fails to meet the pre-employment requirements, including failure to report to any of the scheduled appointments.

The Department of the Navy uses E-Verify to confirm the employment eligibility of all newly hired employees. To learn more about E-Verify, including your rights and responsibilities, visit www.dhs.gov/E-Verify (http://www.dhs.gov/E-Verify)
.

RETIRED MILITARY: Within the Department of Defense (DoD), the appointment of retired military members within 180 days immediately following retirement date to a civilian position is subject to the provisions of 5 United States Code 3326.

ACTIVE DUTY: Active duty military members MAY apply under this announcement. If selected, appointment eligibility requirements must be met prior to the effective date of appointment. Active duty service member with a statement of service showing that you expect to be honorably discharged or released no later than 120 days after submitting your application. Please note: you will be ineligible for consideration if your statement of service is not submitted with your application or it shows an expected discharge or release date greater than 120 days from the date of the submission of the certification.

If you are unable to apply online and request information about the Alternate Application process, please contact the Department of Navy's Employment Information Center.

Federal annuitant information: The selection of an annuitant is subject to the Department of Defense and Department of the Navy policy on the employment of annuitants. Policy information may be found at:
http://www.secnav.navy.mil/donhr/Documents/CivilianJobs/FedCivAnnuitants.pdf
(http://www.secnav.navy.mil/donhr/Documents/CivilianJobs/FedCivAnnuitants.pdf)

ICTAP Applicants: To be considered well-qualified and exercise selection priority as an ICTAP candidate, displaced Federal employees must satisfy all qualification requirements for the position and receive a rating of 85 or higher. For more information about ICTAP eligibility please review the following link: https://www.usajobs.gov/Help/working-in-government/unique-hiring-paths/federal-employees/ictap/

## How You Will Be Evaluated

When the application process is complete, we will review your resume to ensure you meet the hiring eligibility and qualification requirements listed in this announcement. You will be rated based on the information provided in your resume and responses to the Occupational Questionnaire, along with your supporting documentation to determine your ability to demonstrate the following competencies:

- ACCOUNTABILITY
- DEVELOPING OTHERS
- PLANNING AND EVALUATING
- RULEMAKING AND REGULATION
- STRATEGIC THINKING

You should list any relevant performance appraisals and incentive awards in your resume as that information may be taken into consideration during the selection process.

If selected, you may be required to provide supporting documentation.

If, after reviewing your resume and supporting documentation, a determination is made that you inflated your qualifications and/or experience, your score may be adjusted to more accurately reflect your abilities or you may be found ineligible/not qualified.

Please follow all instructions carefully. Errors or omissions may affect your rating or consideration for employment.

All eligibility, qualifications, and time-in-grade requirements must be met by the closing date of this announcement.

You will receive credit for all qualifying experience, including volunteer and part time experience. You must clearly identify the duties and responsibilities in each position held and the total number of hours per week.

Experience refers to paid and unpaid experience, including volunteer work done through National Service programs (e.g., professional, philanthropic, religious, spiritual, community, student, social). Volunteer work helps build critical competencies, knowledge, and skills and can provide valuable training and experience that translates directly to paid employment.

Background checks and security clearance

Security clearance

Secret
(https://www.usajobs.gov//Help/faq/job-announcement/security-clearances/)

# Required Documents

A COMPLETE RESUME IS REQUIRED. Your resume must show relevant experience (cover letter optional) where you worked, job title, duties and accomplishments, employer's name and address, supervisor's name and phone number, starting and end dates (Mo/Yr), hours per week & salary. If you are a current Federal employee or previous Federal employee, provide your pay plan, series and grade level i.e. GS-0201-09. Note: Only the last resume received will be reviewed.

YOU ARE REQUIRED TO DOCUMENT IN YOUR APPLICATION PACKAGE EVIDENCE THAT SUPPORTS YOUR ELIGIBILITY AND QUALIFICATION CLAIMS. You are strongly encouraged to upload the applicable documents with your application package. These documents will assist the staffing specialist in determining your eligibility and qualifications, but are not required at the time of application. If you do not upload the suggested documents, then you must document in your application package (resume) the information needed to determine your eligibility. If selected, these documents will be requested at the time of tentative job offer to verify eligibility and qualifications. You will have 2 business days to submit these documents before a job offer is rescinded.

DOES THIS POSITION REQUIRE A LICENSE OR CERTIFICATE? You are strongly encouraged to provide a copy of your license or certificate in your application package. It is also acceptable to document your license number and the name of the licensing authority in your resume.

USCA4 Appeal: 22-1995      Doc: 15      Filed: 11/28/2022      Pg: 86 of 341

ARE YOU QUALIFYING BASED ON EDUCATION or A COMBINATION OF EDUCATION AND EXPERIENCE? You must provide sufficient documentation of your education in your resume. You are strongly encouraged to provide a copy of transcripts or degrees in your application package. It is also acceptable to document your applicable course listing in your resume (course number, credits earned, etc...). Education must be accredited by an accrediting institution recognized by the U.S. Department of Education in order for it to be credited towards qualifications. Therefore, provide only the attendance and/or degrees from schools accredited by accrediting institutions recognized by the U.S. Department of Education. Applicants can verify accreditation at the following website:
http://www.ed.gov/admins/finaid/accred/index.html
(http://www.ed.gov/admins/finaid/accred/index.html)
. All education claimed by applicants will be verified by the appointing agency accordingly. If selected, an official/sealed transcript will be required prior to appointment.

ARE YOU A VETERAN CLAIMING SOLE SURVIVORSHIP PREFERENCE OR 5-POINT VETERANS' PREFERENCE?
You are strongly encouraged to provide legible copy/copies of the following: DD-214 (member 4 copy), "Certificate of Release or Discharge from Active Duty," showing all dates of service, as well as character of service (Honorable, General, etc.) or Statement of Service/Proof of Service (in lieu of a DD-214) from your command or local Personnel Support Detachment (PSD). The Statement of Service/Proof of Service must provide all dates of service, the expected date of discharge and anticipated character of service (Honorable, General, etc.). Veterans should upload their DD-214 once they receive it upon separation.

ARE YOU A DISABLED VETERAN or CLAIMING 10-POINT VETERANS' PREFERENCE?
Disabled veterans, veterans, widows, spouses or the mother of a veteran, who are eligible for 10-point veterans' preference, are strongly encouraged to provide legible copies of the following: Applicable supporting documents as noted on Standard Form-15 (SF-15). To obtain a copy of SF-15, go to http://www.opm.gov/forms/pdf_fill/SF15.pdf
(http://www.opm.gov/forms/pdf_fill/SF15.pdf)

## If you are relying on your education to meet qualification requirements:

You MUST submit a copy of your transcript if you want to substitute your education for experience. If you claim qualifications based on education, and do not submit a transcript, your education will not be used in making a qualification determination and you may be found "not qualified".

Education must be accredited by an accrediting institution recognized by the U.S. Department of Education in order for it to be credited towards qualifications. Therefore, provide only the attendance and/or degrees from schools accredited by accrediting institutions recognized by the U.S. Department of Education.
(http://www.ed.gov/admins/finaid/accred/)

Failure to provide all of the required information as stated in this vacancy announcement may result in an ineligible rating or may affect the overall rating.

# Benefits

A career with the U.S. Government provides employees with a comprehensive benefits package. As a federal employee, you and your family will have access to a range of benefits that are designed to make your federal career very rewarding.

- Benefits for federal employees
  (https://www.usa.gov/benefits-for-federal-employees#item-36407)
- Healthcare insurance
  (https://www.opm.gov/healthcare-insurance/)
- Pay and leave
  (https://www.usajobs.gov/Help/working-in-government/pay-and-leave/)

http://www.secnav.navy.mil/donhr/Benefits/Pages/Default.aspx

Eligibility for benefits depends on the type of position you hold and whether your position is full-time, part-time, or intermittent. Contact the hiring agency for more information on the specific benefits offered.

# How to Apply

Click the Apply Online button to create an account or log in to your existing USAJOBS account.

To apply for this position, you must provide a complete Application Package which includes:
1. Complete resume with relevant experience where you worked, job title, duties and accomplishments, employer's name and address, supervisor's name and phone number, starting and end dates (Mo/Yr), hours per week and salary. If you are a current or previous federal employee, provide your pay plan, series and grade level (e.g. GS-0201-09).
2. Complete assessment questionnaire. For a quick preview of the assessment questionnaire click here:
https://apply.usastaffing.gov/ViewQuestionnaire/10042390
(https://apply.usastaffing.gov/ViewQuestionnaire/10042390)

3. Supporting documentation

Failure to submit a complete application package will result in an ineligible rating and loss of consideration.

Your complete application (resume, assessment questionnaire, and all supporting documents) must be received by 11:59 pm Eastern Standard Time (EST) on 10/17/2017. Applications received after 10/17/2017 may result in an ineligible rating and loss of consideration. If more than one resume is received, only the last resume received and processed will be reviewed.

Note: To check the status of your application or return to a previous or incomplete application, log into your USAJOBS account: https://mydon.usajobs.gov/Account/Login
(https://mydon.usajobs.gov/Account/Login)
select Application Status, and click on the more information link under the application status for this position. Your uploaded documents may take several hours to clear the virus scan process so please plan appropriately.

You are encouraged to apply online. Applying online will allow you to review and track the status of your application.

If you are unable to apply online or unable to upload your supporting documents contact Department of Navy EIC at DONEIC@navy.mil or 800-378-4559.

Do not email or send hard copy resumes/applications to the Contact Information or Agency Information listed in this vacancy announcement. All resumes/applications received at the addresses listed in the Contact Information or Agency Information will be destroyed and will not be considered for this vacancy announcement.

It is the applicant's responsibility to verify that all information in their resume and documents are legible and accurate. HR will not modify answers/documents submitted by an applicant.

## Agency contact information

👤 Department of Navy EIC

### Phone

800-378-4559
(tel://800-378-4559)

### Email

DONEIC@navy.mil
(mailto:DONEIC@navy.mil)

Learn more about this agency
(#agency-modal-trigger)

### Address

TRAINING AND EDUCATION COMMAND
1019 Elliot Road
Quantico, VA
US

USCA4 Appeal: 22-1995   Doc: 15   Filed: 11/28/2022   Pg: 88 of 341

## Visit our careers page

Learn more about what it's like to work at U.S. Marine Corps, what the agency does, and about the types of careers this agency offers.

http://www.secnav.navy.mil/donhr/Pages/Default.aspx/
(http://www.secnav.navy.mil/donhr/Pages/Default.aspx)

## Next steps

When the application process is complete, your application will be reviewed to determine if you meet the hiring eligibility and qualification requirements for which you requested consideration. You will be rated based on the information provided in your resume and responses to the questionnaire, along with your supporting documentation to determine your level of knowledge, skill, and ability related to the job requirements.

Best qualified applicants will be referred to the hiring manager. The hiring manager may choose to conduct interviews. Once the selection is made, you will receive a notification of the decision.

Stay informed of changes to your application status by signing up for automatic email alerts at
https://www.usajobs.gov/Applicant/Application/ListApplications
(https://www.usajobs.gov/Applicant/Application/ListApplications)

# Fair & Transparent

The Federal hiring process is setup to be fair and transparent. Please read the following guidance.

## Equal Employment Opportunity Policy

The United States Government does not discriminate in employment on the basis of race, color, religion, sex (including pregnancy And gender identity), national origin, political affiliation, sexual orientation, marital status, disability, genetic information, age, membership in an employee organization, retaliation, parental status, military service, or other non-merit factor.

- Equal Employment Opportunity (EEO) office at OPM
  (https://www.opm.gov/about-us/our-people-organization/support-functions/equal-employment-opportunity/)
- Office of Equal Opportunity
  (http://www.eeoc.gov/eeoc/internal_eeo/index.cfm)

## Reasonable Accommodation Policy

Federal agencies must provide reasonable accommodation to applicants with disabilities where appropriate. Applicants requiring reasonable accommodation for any part of the application and hiring process should contact the hiring agency directly. Determinations on requests for reasonable accommodation will be made on a Case-by-Case basis.

A reasonable accommodation is any change in the workplace or the way things are customarily done that provides an equal employment opportunity to an individual with a disability. Under the Rehabilitation Act of 1973 the Equal Employment Opportunity Commission (EEOC) must provide reasonable accommodations:

- An applicant with a disability needs an accommodation to have an equal opportunity to apply for a job.
- An employee with a disability needs an accommodation to perform the essential job duties or to gain access to the workplace.
- An employee with a disability needs an accommodation to receive equal access to benefits, such as details, training, and office-sponsored events.
- Disability Employment - Reasonable Accommodations
  (https://www.opm.gov/policy-data-oversight/disability-employment/reasonable-accommodations/)

- How to contact an agency
  (https://www.usajobs.gov//Help/how-to/application/agency/contact/)

## Legal and regulatory guidance

**Financial suitability**
(https://www.usajobs.gov//Help/working-in-government/fair-and-transparent/financial-suitability/)

**Privacy Act**
(https://www.usajobs.gov//Help/working-in-government/fair-and-transparent/privacy-act/)

**Selective Service**
(https://www.usajobs.gov//Help/working-in-government/fair-and-transparent/selective-service/)

**Social security number request**
(https://www.usajobs.gov//Help/working-in-government/fair-and-transparent/social-security-number/)

**Signature & False statements**
(https://www.usajobs.gov//Help/working-in-government/fair-and-transparent/signature-false-statements/)

**New employee probationary period**
(https://www.usajobs.gov//Help/working-in-government/fair-and-transparent/probationary-period/)

# Exhibit 9

# Certificate of Eligibles

SUPV HEAD TRAINING & EDUCATION CAPABILITIES DIV

GS-0301-15

ST-10042390-17-LMJ

## Criteria

| | |
|---|---|
| Location | Quantico, VA |
| Pay Plan | GS |
| Series | 0301 |
| Grade | 15 |
| Specialties | N/A |

## Certificate Details

| | |
|---|---|
| Certificate Number | 20171103-CACJ-008 |
| Certificate Type | Competitive Merit Promotion |
| Issued Date | 11/03/2017 |
| Issued By | Leah Joyner |
| Priority Order | Float Priority Referrals |
| Rank By | Rating (exclude Veteran Points) |
| Refer Method | Cutpoint (90.00) |

## Applicant List

| Agency Action | Applicant Name | Eligibility Labels |
|---|---|---|
| Not Selected | Dascanio, Michael | Perm Comp Fed/VEOA |
| Not Selected | Wasikowski, Ernest James | Perm Comp Fed/VEOA |
| Not Selected | Nelson, Larry R | Perm Comp Fed/VEOA |
| Not Selected | Blevins, Phillip Shane | Perm Comp Fed/VEOA |
| Not Selected | Jennings, Danny | |
| Not Selected | Davis, Gualano | Perm Comp Fed/VEOA |
| Not Selected | Whatley, Michael Timothy | Perm Comp Fed/VEOA |
| Not Selected | Murray, Greg | Perm Comp Fed/VEOA |
| Not Selected | Allah, Hakim Bey | Perm Comp Fed/VEOA |
| Not Selected | Hughes, Michael | Perm Comp Fed/VEOA |
| Not Selected | Montgomery, Jay B | VEOA |
| Not Selected | Langille, Richard Sorenson | Perm Comp Fed/VEOA |
| Alternate Selection 1 | Fox, Eric Richard | Perm Comp Fed/VEOA |
| Not Selected | Wadd, Matthew | Perm Comp Fed/VEOA |

USCA4 Appeal: 22-1995      Doc: 15      Filed: 11/28/2022      Pg: 91 of 341

JA 088

# Certificate of Eligibles

SUPV HEAD TRAIN & EDUCATION CAPABILITIES DIV

GS-0301-15

ST-10042390-17-LMJ

## Applicant List

| Agency Action | Applicant Name | Eligibility Labels |
|---|---|---|
| Not Selected | Ramirez, David Elias | VEOA |
| Not Selected | McNeil, Annie Louise | VEOA |
| Not Selected | Smith, Michael K | Perm Comp Fed/VEOA |
| Not Selected | Dukes, Zolten Lee | Perm Comp Fed/VEOA |
| Not Selected | Bezak, Charles Edward Jason | VEOA |
| Not Selected | Green-DM, Carolyn R | Perm Comp Fed/VEOA |
| Not Selected | Boyd, Jesse Willard | VEOA |
| Not Selected | Curry, Peter Joseph | Perm Comp Fed/VEOA |
| Not Selected | Hammonds, Stanley J | Perm Comp Fed/VEOA |
| Not Selected | Mapes, Steven | Perm Comp Fed/VEOA |
| Not Selected | Williams, Scott P | Perm Comp Fed/VEOA |
| Not Selected | Killion, Michael Patrick | VEOA |
| Not Selected | Hart, Jason Robert | VEOA |
| Not Selected | Terrell, Karlton G | VEOA |
| Not Selected | Porter-Lee, Andrea | VEOA |
| Not Selected | HEROD, DONALD | |
| Not Selected | LEONARD, CHRISTOPHER DALE | VEOA |
| Not Selected | Alvarez, Lemuel | |
| Alternate Selection 2 | Smith, Antonio | Perm Comp Fed/VEOA |
| Not Selected | Housley, Leonard Alexander | Perm Comp Fed |
| Not Selected | Wahler, Christopher | Perm Comp Fed/VEOA |

# Certificate of Eligibles

SUPV HEAD TRAINING & EDUCATION CAPABILITIES DIV

GS-0301-15

ST-10042390-17-LMJ

## Applicant List

| Agency Action | Applicant Name | Eligibility Labels |
|---|---|---|
| Not Selected | Jablow, Leon Roman | VEOA |
| Not Selected | Graham, Michael Wayne | VEOA |
| Not Selected | Davis, Eugene Harrison | VEOA |
| Not Selected | Bink, Martin Lamar | |
| Not Selected | Bradham, Kirk Ryan | VEOA |
| Not Selected | Perry, Todd Everett | VEOA |
| Not Selected | Besser, James Harry | |
| Not Selected | Hajduk, James Robert | Perm Comp Fed/VEOA |
| Not Selected | Anibal, James | VEOA |
| Selected | Sobieranski, Edward Roman | Perm Comp Fed/VEOA |
| Not Selected | Farr, Paul | |
| Not Selected | Davis, Sammie L | VEOA |
| Not Selected | Martynenko, Alexander Victor | |
| Not Selected | Licata, Peter John | |

Selecting Official Signature _____     Date _____

Selecting Official Organization _____

Selecting Official Telephone Number_____

Appointing Official Signature _____     Date _____

JA 090

SUPV HEAD TRAINI ⌢ & EDUCATION CAPABILITIES DIV

# Certificate of Eligibles

GS-0301-15

ST-10042390-17-LMJ

USCA4 Appeal: 22-1995   Doc: 15   Filed: 11/28/2022   Pg: 94 of 341

## Applicant List

| Agency Action | Applicant Name | Eligibility Labels |
|---|---|---|
| Not Selected | Schroth, Timothy | |
| Not Selected | Burdick, David S | Perm Comp Fed/VEOA |
| Not Selected | Mathes, Donald John | |
| Not Selected | McCloskey, Robert M | VEOA |
| Not Selected | Shelverton, Claude Winchester | Perm Comp Fed/VEOA |
| Not Selected | Rife, Michael | |
| Not Selected | Neubert, Paul Douglas | Perm Comp Fed/VEOA |
| Not Selected | Shannon, Richard James | |
| Not Selected | Amarillo, Mauricio | Perm Comp Fed/VEOA |
| Not Selected | Tinkey, Steven M | |
| Not Selected | Damour, Christopher Donat | Perm Comp Fed |
| Not Selected | Pinckney, Allen | Perm Comp Fed/VEOA |
| Not Selected | johnson, michael | Perm Comp Fed/VEOA |
| Not Selected | Troutman, John Douglas | VEOA |
| Not Selected | Blanchard, John T | Perm Comp Fed/VEOA |
| Not Selected | Krasley, Paul F | Perm Comp Fed |
| Not Selected | Weaver, Douglas | Perm Comp Fed |
| Not Selected | Bennett, Ricky E | Perm Comp Fed |
| Not Selected | Combado, Brian Manibusan | ADSM |
| Not Selected | Saunders, Michael Jon | Perm Comp Fed/VEOA |
| Not Selected | Gainer, John | VEOA |

JA 091

# Exhibit 10

## Declaration under Penalty of Perjury

I, (Greg Balzer), in accordance with 28 U.S.C. Section 1746, make the following statement:

*EFFECTS OF NONDISCLOSURE: Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

Q: What is your full name?
R: **Gregory Paul Balzer**

Q: During the period October 11, 2017 to January 29, 2018, what was your position title, rank, or pay plan, job series, and pay-grade?
R: **Deputy Chief of Staff, GS-0342-15**

Q: From approximately what date to what date did you hold that position?
R: **May 2009**

Q: Who was your first-level supervisor during the period October 11, 2017 to January 29, 2018?
R: **Col Joseph A. Craft, Chief of Staff**

Q: Who was your second-level supervisor during the period October 11, 2017 to January 29, 2018?
R: **SES Dennis C. Thompson**

Q: What organization were you in, starting with the lowest to highest organization during the period October 11, 2017 to January 29, 2018 (i.e., Branch, Section, Division, Directorate, location)?
R: **Training & Education Command (TECOM), Command Deck; Marine Corps Combat Development Command, Quantico, Va. 22134**

Q: What is your race?
R: **Caucasian**

*Page 1 of 5 Pages*
Declarant's Initials

Q: Did you know Complainant at the time you made the recommendation? What was your organizational relationship to the Complainant?

R: **Yes, through several years of close work association. No direct organizational relationship. Mr. Smith's organization, Training and Education Capabilities Division (TECD) is a subordinate organization within TECOM. As the Deputy Chief of Staff, I coordinate details on behalf of the Chief of Staff but have no direct operational or reporting authorities over Mr. Smith, or any other member of the TECOM staff.**

Q: Were you aware of Complainant race at the time you made the selection recommendation? (If yes, how and when (i.e. visual observation).

R: **Yes, through several years of close work association, and face-to-face interview as part of this hiring process.**

Q: Complainant alleges he engaged in prior protected EEO activity in 2015 and 2016. Were you aware of this prior protected EEO activity?

R: **Yes, although I had no knowledge of the exact nature of the prior EEO activity, the specific complaint, or who the complaint was with. The TECOM command deck does a good job of protecting personnel who have grievances, and so as the Deputy Chief of Staff it is natural that I would hear of the prior activity, but not have access as to the specifics of the complaint.**

Q: Have you engaged in protected EEO activity? If so, please describe your role (complaining party, witness, management official, etc).

R: **No.**

Q: Have you ever observed or witnessed anyone in Complainant's chain of command express a bias towards any employee or official for participating in protected EEO activity? If so, please describe.

R: **No.**

Q: Documents provided by the Agency reflect there were two different panels convened in regard to this subject position. The first panel reviewed resumes and the second panel conducted interviews? Is this correct?

R: **I believe there were actually three phases to the process for this hire. Phase I was a resume review panel. Phase II was an interview panel. Phase III was final interviews by the Selecting Official.**

Q: According to the record, you were a member on the Interview Panel for this selection at issue correct?

R: **Yes.**

Q: Explain the process employed by the Interview Selection panel.

R: **The interview panel was composed of four members. We were provided a list of interview questions which had been previously approved by HR, and we divided the questions amongst the four of us. Each candidate was escorted into the interview room by the TECOM G-1 representative, introduced to the members of the interview panel, and then beginning with question #1 the panel members read their interview questions verbatim. In some instances we had follow-up questions to clarify a response, or to ensure**

the panel understood an unfamiliar acronym.  At the conclusion of the interviews the panel discussed the strengths and weaknesses of each candidate based on the position description. Following our discussions the panel took an informal vote on the most qualified candidates. The top five candidates were unanimous amongst the board members.  The top three candidates were also unanimously agreed upon, and the panel agreed that rather than forwarding a ranking of the top three candidates, we would forward a unanimous, unranked listing list of the top three candidates along with the two alternates included, as we all felt that all five met the qualifications for the position, and any one of them could perform in the position.  The TECOM G-1 invited the Selecting Official to the board room, and was provided a verbal brief by the interview panel as to the names of the primary and alternate candidates being recommended.

Q:  The record indicates the selection panel interviewed 14 candidates is this correct?
R:  **Yes.**

Q:  How did you track the candidates and their performance during the interviews?  Was a scoring matrix utilized?
R:  **A scoresheet was provided by the TECOM G-1, but I think each panel member used their own method of scoring the interview candidates based on their responses.**

Q:  Did you take notes during the interview?  If so where are the notes or to whom were the notes provided after the interview session?
R:  **I used a copy of the interview questions for each candidate, writing their responses next to each question, and then using a Likert Scale of 1-5 to score their individual responses. No notes were retained.**

Q:  If you didn't take notes, how did you remember the specifics of each interview and come to the conclusion of the top five candidates?
R:  **N/A.**

Q:  Have you sat on any other panels in the two-year period prior to this interview?  If yes, did you use scoring sheets during that selection process?
R:  **Yes, for the Commanding General's Executive Assistant.  No score sheets were used, but panel members recorded their own notes, and a discussion followed by a vote was taken.  Results of the vote were forwarded to the Selecting Official in the Hiring Methodology letter.**

Q:  Is it normal procedure in your organization **not** to use a scoring matrix in regard to interviews conducted?
R:  **Yes. Per TECOM Policy Letter 01011 dated 22 Feb 2011, "Selecting panels will not use a scoring system to determine their recommendations."**

Q:  Are their regulation and guidance published by your organization in regard to panel requirements and selection processes?
R:  **TECOM Policy Letter 01011 dated 22 Feb 2011.**

Q:  Where was the Complainant ranked in the candidates recommended to the selecting official?



R:  **The panel sent a unanimous, unranked listing of the top three candidates to the Selecting Official.  Mr. Smith was in the top 3 candidates forwarded to the Selecting Official.**

Q:  If you had to rank the candidates forwarded to the Selection Official, where would Complainant rank?
R:  **Number 2.**

Q:  What is your scope or authority over the position at issue?
R:  **As previously answered on page 2, None.**

Q:  Who asked you to serve on the panel?
R:  **The Selecting Official.**

Q:  Who drafted the interview questions?
R:  **I am not aware as they were provided by the TECOM G-1.  We were briefed that the questions had been approved by HR.**

Q:  Did you, or the panel as a whole, make a recommendation?
R:  **The panel sent a unanimous, unranked listing of the top three candidates to the Selecting Official.**

Q:  Who did you make recommendation to?
R:  **The recommendation was made verbally to the Selecting Official by the hiring panel.**

Q:  At the time you made the recommendation, were you aware of the selected candidate race?  If so how (i.e. visual observation).
R:  **As previously answered on page 2 of this questionnaire, Yes, through several years of close work association, and face-to-face interview as part of this hiring process.**

Q:  How did you rank the Complainant compared to the selectee?
R:  **As previously answered on this page, number 2.**

Q:  Were you directed or persuaded to recommend a particular candidate or to not recommend a candidate?  If so, please explain your response?
R:  **No.**

Q:  What, if any guidance did you receive from the Human Resources Office?
R:  **None from HR.  TECOM G-1 provided information to the panel to read the approved questions as written, and to afford each candidate the same process and consideration before the board, to remain impartial, and to assess each candidate on the answer provided.**

Q:  Was Complainant's race or prior protected activity factor in your recommendation of position at issue?  If yes, explain fully.
R:  **No.**

Q: Do you have any reason to believe race or prior protected EEO activity were factors in the selecting official's decisions in this non-selection? Explain your response?
R: **No.**

Q: Regarding any of the claims or issues accepted for investigation under Agency Docket No. 18-67856-01699, did you take any actions, make any decisions, or engage in any behavior for the purpose of discriminating against or retaliating against the Complainant because of his race, or prior protected EEO activity?
R: **No.**

Q: Regarding any of the claims or issues accepted for investigation under Agency Docket No. 18-67856-01699, do you believe that any involved supervisor or employee took any actions, made any decisions, or engaged in any behavior for the purpose of discriminating against or retaliating against the Complainant because of his race or previous protected EEO activity?
R: **No.**

Q: Do you have any evidence you would like to submit in connection with Agency Docket No. 18-67856-01699? If so, please label and attach to this statement.
R: **No.**

Q: Is there anything you would like to add to any of your testimony in connection with any of the claims or issues accepted for investigation under Agency Docket No. 18-67856-01699? If so, please do so here.
R: **No.**


## END OF STATEMENT


I, *(Greg Balzer),* declare *(certify, verify or state)* under penalty of perjury, that the foregoing is true and correct.


_____                    _1 OCT 2018_____
(Declarant's Signature)                                (Date)

# Exhibit 11

1

# Hiring Summary for TECOM Training & Education Capabilities Division Position

## Deputy Director / 0301 / GS15

## Board Members

Initial Resume Scoring Panel:

Mr. Jose Rivera, Deputy Director, G3/5/7 (TECOM)

Ms. Kim Yarboro, Deputy Program Manager Training Systems (MARCORSYSCOM)

Mr. Larry Ramsey, Head, Programming Branch, G8 (TECOM)

Interview Panel:

Colonel Ly Fecteau, Chief of Staff, Training Command

Mr. Greg Balzer, Deputy Chief of Staff, TECOM

Ms. Kim Yarboro, Deputy Program Manager Training Systems (MARCORSYSCOM)

Mr. Larry Ramsey, Head, Programming Branch, TECOM G8

## Timeline of Recruitment Activities

| | |
|---|---|
| **3 Nov 17** | Official Certificate received from HROM.  72 eligible candidates were identified. |
| **12 Dec 17** | Resume review conducted.  All 72 resumes were ranked and scored. |
| **27 Dec 17** | Interviews were offered to the top 14 eligible candidates; all accepted. |
| **3-4 Jan 18** | Interviews conducted on 14 eligible candidates; the Interview Panel recommended three top candidates and two alternate candidates for Selecting Official interviews. |
| **5 Jan 18** | Interviews were offered to top 3 candidates; all accepted. |
| **9 Jan 18** | Selecting Official conducted interviews with top three candidates. |
| **19 Jan 18** | Official Certificate expires.  [Extension requested on 17 Jan 18 for additional two weeks for CG's review as Appointing Official.] |

1

Enclosure (1)

Pg: 102 of 341     Filed: 11/28/2022     Doc: 15     USCA4 Appeal: 22-1995

No prior EEO Activity on all names listed below

Initial Resume scoring panel

Mr Jose Rovira: jose.rovira@usmc.mil (703) 784 9581/Native Hawaiian

Ms. Kim Yarboro: kim.yarboro@usmc.mil (407) 380-4712/Hispanic

Mr. Larry Ramsey: larry.ramsey@usmc.mil (703) 784-4786/White


Interview Panel

Colonel Ly Fecteau: ly.fecteau@usmc.mil (910) 451-3685/race unknown

Mr. Greg Balzer: Gregory.balzer@usmc.mil (703) 432-1977/White

Ms. Kim Yarboro: see above

Mr. Larry Ramsey: see above


Final Selecting official

Patrick Hittle

Patrick.r.hittle@usmc.mil phone 703 784 2964/White

# Exhibit 12

| Evaluation of Applicant Resume Matrix for: Deputy Director, TECD | | | | | | | | | |
| Please do not change anything in a colored cell. | Rating Elements | Part A: Resume Rating | | | | Part B: Resume Rating (Experience) | | | | SUM |
| Cert Applicant Names | Notes: | Ramsey | Rovira | Yaraboro | Total by Score Area | Ramsey | Rovira | Yaraboro | Total by Score Area | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Dascanio, Michael | | 31 | 34 | 39 | 104 | 17 | 17 | 17 | 51 | 155 |
| Wasikowski, Ernest | | 24 | 32 | 34 | 90 | 17 | 22 | 16 | 55 | 145 |
| Nelson, Larry | | 23 | 27 | 33 | 83 | 14 | 16 | 10 | 40 | 123 |
| Blevins, Phillip Shane | | 19 | 30 | 28 | 77 | 11 | 17 | 11 | 39 | 116 |
| Jennings, Danny | | 21 | 26 | 24 | 71 | 11 | 14 | 10 | 35 | 106 |
| Davis, Gualano | | 18 | 26 | 29 | 73 | 10 | 14 | 21 | 45 | 118 |
| Whatley, Michael Timothy | | 22 | 33 | 29 | 84 | 14 | 22 | 24 | 60 | 144 |
| Murray, Greg | | 19 | 30 | 35 | 84 | 14 | 16 | 18 | 48 | 132 |
| Allah, Hakim Bey | | 20 | 31 | 30 | 81 | 12 | 15 | 16 | 43 | 124 |
| Hughes, Michael | | 20 | 32 | 35 | 87 | 14 | 17 | 19 | 50 | 137 |
| Montgomery, Jay B | | 27 | 32 | 28 | 87 | 17 | 18 | 15 | 50 | 137 |
| Langille, Richard Sorenson | | 27 | 30 | 35 | 92 | 14 | 16 | 16 | 46 | 138 |
| Fox, Eric Richard | | 24 | 30 | 30 | 84 | 18 | 20 | 16 | 54 | 138 |
| Wadd, Matthew | | 26 | 30 | 30 | 86 | 16 | 20 | 9 | 45 | 131 |
| Ramirez, David Elias | | 28 | 31 | 28 | 87 | 15 | 15 | 9 | 39 | 126 |
| McNeil, Annie Louise | | 29 | 32 | 28 | 89 | 13 | 15 | 7 | 35 | 124 |
| Smith, Michael K | | 30 | 33 | 30 | 93 | 15 | 19 | 25 | 59 | 152 |
| Dukes, Zolten Lee | | 25 | 32 | 30 | 87 | 13 | 15 | 10 | 38 | 125 |
| Bezak, Charles Edward Jason | | 20 | 29 | 30 | 79 | 11 | 10 | 16 | 37 | 116 |
| Green-DM, Carolyn | | 22 | 30 | 29 | 81 | 12 | 15 | 4 | 31 | 112 |
| Boyd, Jesse Willard | | 19 | 26 | 23 | 68 | 11 | 10 | 8 | 29 | 97 |
| Curry, Peter Joseph | | 24 | 31 | 28 | 83 | 14 | 15 | 16 | 45 | 128 |
| Hammonds, Stanley | | 23 | 29 | 30 | 82 | 9 | 10 | 12 | 31 | 113 |
| Mapes, Steven | | 23 | 31 | 30 | 84 | 15 | 15 | 12 | 42 | 126 |
| Williams, Scott | | 27 | 30 | 30 | 87 | 16 | 20 | 13 | 49 | 136 |
| Killion, Michael Patrick | | 27 | 32 | 30 | 89 | 16 | 23 | 12 | 51 | 140 |
| Hart, Jason Robert | | 24 | 30 | 30 | 84 | 14 | 15 | 11 | 40 | 124 |
| Terrell, Karlton G | | 23 | 31 | 30 | 84 | 14 | 15 | 11 | 40 | 124 |
| Porter-Lee, Andrea | | 23 | 31 | 30 | 84 | 13 | 19 | 14 | 46 | 130 |
| Herod, Donald | | 23 | 32 | 29 | 84 | 16 | 18 | 17 | 51 | 135 |
| Leonard, Christopher Dale | | 20 | 29 | 30 | 79 | 11 | 15 | 8 | 34 | 113 |
| Alvarez, Lemuel | | 24 | 30 | 28 | 82 | 13 | 15 | 8 | 36 | 118 |
| Smith, Antonio | | 28 | 32 | 30 | 90 | 18 | 20 | 17 | 55 | 145 |
| Housley, Leonard Alexander | | 24 | 31 | 30 | 85 | 14 | 18 | 12 | 44 | 129 |
| Wahler, Christopher | | 20 | 28 | 30 | 78 | 14 | 15 | 15 | 44 | 122 |
| Schroth, Timothy | | 23 | 31 | 30 | 84 | 14 | 15 | 14 | 43 | 127 |
| Burdick, David | | 23 | 29 | 30 | 82 | 14 | 15 | 11 | 40 | 122 |
| Mathes, Donald John | | 25 | 33 | 35 | 93 | 15 | 19 | 16 | 50 | 143 |
| McCloskey, Robert M | | 22 | 28 | 30 | 80 | 12 | 14 | 13 | 39 | 119 |
| Shelverton, Claude | | 22 | 28 | 30 | 80 | 13 | 15 | 6 | 34 | 114 |
| Rife, Michael | | 18 | 27 | 30 | 75 | 12 | 15 | 13 | 40 | 115 |
| Neubert, Paul Douglas | | 23 | 29 | 35 | 87 | 16 | 18 | 25 | 59 | 146 |
| Shannon, Richard James | | 20 | 27 | 30 | 77 | 12 | 15 | 9 | 36 | 113 |
| Amarillo, Mauricio | | 21 | 29 | 29 | 79 | 13 | 15 | 21 | 49 | 128 |
| Tinkey, Steven | | 22 | 31 | 30 | 83 | 12 | 16 | 16 | 44 | 127 |
| Damour, Christopher Donat | | 21 | 27 | 30 | 78 | 14 | 15 | 10 | 39 | 117 |
| Pinckney, Allen | | 24 | 30 | 30 | 84 | 15 | 15 | 7 | 37 | 121 |
| Johnson, Michael | | 22 | 28 | 28 | 78 | 13 | 15 | 6 | 34 | 112 |
| Troutman, John Douglas | | 19 | 27 | 29 | 75 | 10 | 15 | 6 | 31 | 106 |
| Blanchard, John T | | 22 | 29 | 30 | 81 | 12 | 15 | 11 | 38 | 119 |
| Krasley, Paul F | | 28 | 32 | 30 | 90 | 15 | 15 | 9 | 39 | 129 |
| Weaver, Douglas | | 24 | 29 | 30 | 83 | 12 | 15 | 3 | 30 | 113 |
| Bennett, Ricky E | | 23 | 29 | 29 | 81 | 15 | 15 | 11 | 41 | 122 |
| Combado, Brian Manibusan | | 23 | 28 | 30 | 81 | 14 | 15 | 10 | 39 | 120 |
| Sanders, Michael John | | 23 | 29 | 30 | 82 | 12 | 15 | 9 | 36 | 118 |
| Gainer, John | | 20 | 26 | 29 | 75 | 14 | 12 | 10 | 36 | 111 |
| Jablow, Leon Roman | | 23 | 31 | 30 | 84 | 12 | 15 | 10 | 37 | 121 |
| Graham, Michael Wayne | | 22 | 28 | 30 | 80 | 11 | 10 | 10 | 31 | 111 |
| Davis, Eugene Harrison | | 23 | 28 | 30 | 81 | 16 | 16 | 11 | 43 | 124 |
| Bink, Martin Lamar | | 25 | 29 | 30 | 84 | 13 | 13 | 6 | 32 | 116 |
| Bradham, Kirk Ryan | | 23 | 29 | 28 | 80 | 12 | 11 | 10 | 33 | 113 |
| Perry, Todd Everett | | 24 | 29 | 30 | 83 | 17 | 19 | 21 | 57 | 140 |
| Besser, James Harry | | 24 | 32 | 30 | 86 | 13 | 16 | 16 | 45 | 131 |
| Hajduk, James Robert | | 23 | 28 | 30 | 81 | 12 | 15 | 12 | 39 | 120 |
| Anibal, James | | 24 | 28 | 30 | 82 | 12 | 15 | 10 | 37 | 119 |
| Sobieranski, Edward Roman | | 25 | 28 | 30 | 83 | 17 | 21 | 17 | 55 | 138 |
| Farr, Paul | | 22 | 30 | 30 | 82 | 13 | 15 | 11 | 39 | 121 |
| Davis, Sammie | | 26 | 31 | 30 | 87 | 13 | 15 | 9 | 37 | 124 |
| Martynenko, Alexander Victor | | 24 | 30 | 30 | 84 | 15 | 18 | 16 | 49 | 133 |
| Licata, Peter John | | 22 | 28 | 30 | 80 | 13 | 15 | 6 | 34 | 114 |

# Exhibit 13

1

## Declaration under Penalty of Perjury

I, (Lawrence Ramsey), in accordance with 28 U.S.C. Section 1746, make the following statement:

EFFECTS OF NONDISCLOSURE: *Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

AUTHORITY: *The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

PURPOSE AND USES: *The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

Q: What is your full name?
R: Lawrence Franklin Ramsey Jr.

Q: During the period October 11, 2017 to January 29, 2018, what was your position title, rank, or pay plan, job series, and pay-grade?
R: Head Programming Branch, G8, Training & Education Command, GS-0343-15.

Q: From approximately what date to what date did you hold that position?
R: Since 2011. With reorganizations and changes I have basically been the head for about 23 years.

Q: Who was your first-level supervisor during the period October 11, 2017 to January 29, 2018?
R: LTC Timothy Irwin.

Q: Who was your second-level supervisor during the period October 11, 2017 to January 29, 2018?
R: Ms. Mary Cooney.

Q: What organization were you in, starting with the lowest to highest organization during the period October 11, 2017 to January 29, 2018 (i.e., Branch, Section, Division, Directorate, location)?
R: Programming Branch, G8 Training & Education Command, Quantico.

Q: What is your race?
R: Caucasian.

Q:  Did you know Complainant at the time you made the selection decision/recommendation?  What was your organizational relationship to the Complainant?
R:  Yes.  I chair a working group and Complainant in his position interacts with our group.

Q:  Were you aware of Complainant race at the time you made the selection decision/recommendation?
R:  Yes, based on visual observation.

Q:  Complainant alleges he engaged in prior protected EEO activity in 2015 and 2016.   Were you aware of this prior protected EEO activity?
R:  No.

Q:  Have you engaged in protected EEO activity?  If so, please describe your role (complaining party, witness, management official, etc).
R:  No.

Q:  Have you ever observed or witnessed anyone in Complainant's chain of command express a bias towards any employee or official for participating in protected EEO activity?  If so, please describe.
R:  No.

Q:  According to the record, you were a panel member for the Interview Selection Panel is this correct?
R:  Yes. I was a panel member for the initial interviews conducted.  We interviewed all candidates, recommended the top three in no particular order to the next level.  As a group during discussion we determined that we would not provide a ranking of the candidates recommended.  We provided the top three names in no particular order.

Q:  Explain the process employed by the selection panel.
R:  The same questions were asked of each candidate and as a group we discussed an made a recommendation.

Q:  The record indicates the selection panel interviewed 14 candidates is this correct?
R:  Yes.

Q:  How did you track the candidates and their performance during the interviews?  Did you take notes and where are the notes if so?
R:  It was done individually with notes kept at the time.   I am not sure what happened to the notes after the interviews.  Individually though we kept our own record. I am on types of boards and have my own methodology on how I rank.

Q:  Have you sat on any other panels in the two-year period prior to this interview?  If yes, did you use scoring sheets during that selection process?
R:  No.

Q:  When you state you recommended three top candidates, how was that recommendation made and to whom?

R:  I believe it was an oral recommendation to G1 who turned the recommendation over to the selecting official.

Q:  Do you remember who the top three candidates were?
R:  I don't remember the third one.  I remember the Complainant and the selectee were in the top three.

Q:  During your panel interview where would you rank the Complainant, if you had to rank their performance?
R:  The Complainant and selectee were by far the top two candidates. At the conclusion of Complainant's interview the panel was blown away he was so good.  At the time we thought this is it, but when the selectee interviewed later we again said, "holy cow" he was really good as well.  If I were the selecting official, I am not sure who I would have picked between the two as it was that close and a really tough call.

Q:  Are their regulation and guidance published by your organization in regard to panel requirements and selection processes?
R:  I am not aware of anything published.  I am familiar how they should run in regard to questions.

Q:  Where was the Complainant ranked in the top three candidates recommended to the selecting official?
R:  Yes.

Q:  What is your scope or authority over the position at issue?
R:  None.

Q:  Who asked you to serve on the panel?
R:  G1.

Q:  Who drafted the interview questions?
R:  I am not sure, they were provided to the panel.

Q:  Did you, or the panel as a whole, make a recommendation?
R:  The panel as a whole.

Q:  Who did you make recommendation to?
R:  G1.

Q:  At the time you made the recommendation, were you aware of the selected candidate race?
R:  Yes.

Q:  Were you directed or persuaded to recommend a particular candidate or to not recommend a candidate?  If so, please explain your response?
R:  No.

Q:  What, if any guidance did you receive from the Human Resources Office?
R:  There was someone from G1 sitting in during the entire process.

*Page 3 of 4 Pages*
Declarant's Initials

Q:  Was Complainant's race or prior protected activity factor in your recommendation of position at issue?  If yes, explain fully.
R:  No.

Q:  Do you have any reason to believe race or prior protected EEO activity were factors in the selecting official's decisions in this non-selection?  Explain your response?
R:  No not at all.

Q:  Regarding any of the claims or issues accepted for investigation under Agency Docket No. 18-67856-01699, did you take any actions, make any decisions, or engage in any behavior for the purpose of discriminating against or retaliating against the Complainant because of his race or previous protected EEO activity?
R:  No.

Q:  Regarding any of the claims or issues accepted for investigation under Agency Docket No. 18-67856-01699, do you believe that any involved supervisor or employee took any actions, made any decisions, or engaged in any behavior for the purpose of discriminating against or retaliating against the Complainant because of his race or previous protected EEO activity?
R:  No.

Q:  Do you have any evidence you would like to submit in connection with Agency Docket No. 18-67856-01699?  If so, please label and attach to this statement.
R:  No.

Q:  Is there anything you would like to add to any of your testimony in connection with any of the claims or issues accepted for investigation under Agency Docket No. 18-67856-01699?  If so, please do so here.
R:  I was very surprised about this complaint.  I think the selecting authority received a recommendation for three very good applicants.  I think it would have been a difficult choice for him between two individuals he worked with and both excellent candidates.  Both are very high level performers.

END OF STATEMENT

I, **(Lawrence Ramsey),** declare (*certify, verify or state*) under penalty of perjury, that the foregoing is true and correct.

_____          27 SEPT 2018
(Declarant's Signature)                    (Date)

# Exhibit 14

1

USCA4 Appeal: 22-1895    Doc: 15    Filed: 11/28/2022    Pg: 112 of 341
Case 1:21-cv-01406-MSN-IDD   Document 11-1   Filed 05/13/22   Page 73 of 95 PageID# 132

Version: 15 November 2017

TECD Deputy Director GS-0301-15

1) Explain how the Training and Education Capabilities Division enables the Commanding General, Training and Education Command, to accomplish his organization's mission.

2) Describe any previous government work experience you have and how it has prepared you to be successful in this position.

    a) What unique perspectives did you gain, in the context of Service-level policy management, which you expect to apply?

    b) If you have organizational contacts elsewhere, either in the Marine Corps or across the interagency, how would you leverage these?

3) Briefly summarize your supervisory experience.

    a) What was the biggest challenge you faced in leading civilian employees, and how did you handle it?

4) Briefly describe the Planning, Programming Budget and Execution System and the importance of the Program Objective Memorandum (POM) cycle to the Marine Corps.

5) Describe your role(s) in any budget preparation and execution responsibilities you have held.

    a) What was the scope of the largest budget submission you were directly involved in crafting?

USCA4 Appeal: 22-1895    Doc: 15    Filed: 11/28/2022    Pg: 113 of 341

6) Describe your experience with the Joint Capabilities Integration and Development System, and formal Marine Corps (or other Service) Title X requirements development.

7) Provide an example where you have made a recommendation to positively change an organization, and how your suggestion was acted upon.

8) Please provide any information not covered in your resume or today's interview that you feel makes you a strong candidate for this position.

<u>Notes:</u>

USCA4 Appeal: 22-1895    Doc: 15    Filed: 11/28/2022    Pg: 114 of 341

TECD Deputy Director GS-0301-15

Selecting Official Questions.

1) As a GS-15 your decisions will have potential to make strategic impacts beyond your organization.  What sort of strategic impacts would you like to make, and why is TECOM a good organization from which to make them?

2) Describe any previous experience you have with managing a Program of Record and budgeting program funds.  What is the most important lesson you've learned with respect to managing resources at the institutional level?

3) Briefly summarize any experience you have on projects or programs which span multiple Services (within DoD) or across the Interagency of federal government. How can we ensure unity of effort on major initiatives, despite disparate viewpoints and perspectives from different organizations?

4) Please provide any information not covered in your resume or today's interview that you feel makes you a strong candidate for this position.

Notes:

USCA4 Appeal: 22-1995    Doc: 15    Filed: 11/28/2022    Pg: 115 of 341

# Exhibit 15

1

USCA4 Appeal: 22-1895    Doc: 15    Filed: 11/28/2022    Pg: 116 of 341
Case 1:21-cv-01406-MSN-IDD   Document 11-1   Filed 05/13/22   Page 77 of 95 PageID# 136

1

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE
131 M Street, N.E., Suite 4NW02F
Washington, D.C. 20507

_____ :
                                  :
ANTONIO SMITH,                    : EEOC No.
                                  : 570-2019-00511X
      Complainant,                :
                                  :
      v.                          :
                                  :
RICHARD V. SPENCER,               : Agency No.
SECRETARY,                        : 18-67856-01699
U.S. DEPARTMENT OF DEFENSE,       :
DEPARTMENT OF THE NAVY,           :
MARINE CORPS HEADQUARTERS,        :
                                  :
      Agency.                     :
_____ :

Monday, December 16, 2019

Marine Corps Base Quantico
Lejeune Hall
3250 Catlin Avenue
Quantico, Virginia 22134

The hearing commenced at 10:00 a.m.

BEFORE:

MARICIA WOODHAM,

Administrative Judge

USCA4 Appeal: 22-1895    Doc: 15    Filed: 11/28/2022    Pg: 117 of 341
Case 1:21-cv-01406-MSN-IDD   Document 11-1   Filed 05/13/22   Page 78 of 95 PageID# 137

4

```
 1              P-R-O-C-E-E-D-I-N-G-S

 2                       9:56 a.m.

 3              JUDGE WOODHAM:  It is approximately

 4    9:56 a.m., on this, the 16th day of December

 5    2019.  We're here in the matter of Antonio Smith

 6    v. the Department of the Navy.  It is EEOC No.

 7    570-2019-00511X. The Agency No. is

 8    18-67856-01699.

 9              This is a targeted hearing today with

10    the purpose of supplementing what is currently in

11    the Report of Investigation.  During a conference

12    back in October, the parties acknowledged that no

13    additional discovery was needed.  Therefore, I

14    just need to hear from a few witnesses, in order

15    to make a decision with respect to the issues

16    that have been brought forth by Mr. Smith.

17              Those issues are as follows:  whether

18    Mr. Smith was discriminated against based on his

19    race, African-American, and reprisal, by Colonel

20    Patrick Hittle, when, on or about January 29,

21    2018, he was not selected for the supervisory

22    head deputy director position, a GS-0301-15
```

1    position.

2                    JUDGE WOODHAM:  Those were Mr. Smith,

3    Mr. Sobieranski, and Mr. Fox, is that correct?

4                    MR. HITTLE:  Yes, Your Honor.

5                    JUDGE WOODHAM:  Did you prepare the

6    interview questions for this second round of

7    interviews?

8                    MR. HITTLE:  Yes, Your Honor, I did

9    craft -- I drafted and wrote out those questions.

10                   JUDGE WOODHAM:  Ms. Harrison, do you

11   still have Page 137 out?

12                   MS. HARRISON:  Yes.

13                   JUDGE WOODHAM:  Mr. Hittle, are those

14   the questions that you generated for that

15   interview?

16                   MR. HITTLE:  Yes, Your Honor, I

17   believe these are the questions.

18                   JUDGE WOODHAM:  Did you have any

19   assistance in drafting these questions?

20                   MR. HITTLE:  No, I came up with these

21   based on what I saw the responsibilities for the

22   position would entail, what I thought the best --

USCA4 Appeal: 22-1895    Doc: 15    Filed: 11/28/2022    Pg: 119 of 341
Case 1:21-cv-01406-MSN-IDD   Document 11-1   Filed 05/13/22   Page 80 of 95 PageID# 139

68

1    what I viewed as the vision for -- we would take

2    -- the organization would develop training and

3    education capabilities division in the future,

4    that these questions would lend towards

5    identifying -- best identifying an individual

6    that could do that.

7              JUDGE WOODHAM:  Did you review the

8    position description for the position prior to

9    the -- prior to drafting these questions at all?

10             MR. HITTLE:  The position description?

11             JUDGE WOODHAM:  Yes.

12             MR. HITTLE:  Yes, Your Honor.

13             JUDGE WOODHAM:  Going through these

14   questions, how does No. 1 align with the position

15   description?

16             MR. HITTLE:  Your Honor, understand,

17   it's been well over a year since I drafted it,

18   and I don't have the PD in front of me.

19             JUDGE WOODHAM:  Let me see if I can

20   get it for you.

21             MR. HITTLE:  To answer your question,

22   Your Honor, I would say from what I remember of

USCA4 Appeal: 22-1895    Doc: 15    Filed: 11/28/2022    Pg: 120 of 341
Case 1:21-cv-01406-MSN-IDD   Document 11-1   Filed 05/13/22   Page 81 of 95 PageID# 140

155

1    had made a selection after I had completed

2    interviews with the candidates, and that I would

3    be submitting a package to him for his review and

4    signature.  If he had any questions, I was

5    standing by if he wanted to discuss it further.

6    That was the extent of the update item.  He said

7    thank you, and the conversation moved on.

8              JUDGE WOODHAM:  From the time that you

9    returned in October of 2017 through the date of

10   your selection decision, did you take any steps

11   to address the concerns of Mr. Smith that he was

12   being marginalized?

13             THE WITNESS:  I didn't take any steps

14   to do anything, Your Honor, because I didn't hear

15   from him that he was being marginalized.

16             JUDGE WOODHAM:  Can somebody give him

17   Page 178 and 179 -- and 180, I'm sorry.  Give him

18   all three of those.

19             MR. GORDON:  One eighty and one

20   eighty-one?

21             JUDGE WOODHAM:  Yes, thank you.  Tell

22   me when you've had a chance to review those, Mr.

USCA4 Appeal: 22-1895    Doc: 15    Filed: 11/28/2022    Pg: 121 of 341

1    Hittle.

2              THE WITNESS:  I apologize, Your Honor.

3    Thank you for letting me read that.

4              JUDGE WOODHAM:  Mr. Hittle, did you

5    take any steps to address Mr. Smith's concerns

6    that he was being marginalized?

7              THE WITNESS:  Your Honor, I felt that

8    I was being drug into the conversation about the

9    prior EEO action from Mr. Smith.  He was taking

10   this opportunity to say, effectively, you've

11   taken this contractor from my team and given him

12   to someone else because whatever, to make his

13   case.  I didn't want to be involved in that, Your

14   Honor.  What I wanted to do is I wanted to put

15   the resources with the right leaders, so we can

16   make progress.  That's why I wanted this

17   contractor, Mr. Driest, who was doing technical

18   authoring work, I believe, with Lieutenant

19   Colonel Harder, on the LVC-TE concept, now

20   rebranded the Marine Corps synthetic training

21   environment, under Lieutenant Colonel Harder.

22             Lieutenant Colonel Harder was working

USCA4 Appeal: 22-1895    Doc: 15    Filed: 11/28/2022    Pg: 122 of 341

1    very hard.  He had been there since roughly

2    April/May time frame.  He needed the additional

3    contract support.  Mr. Smith didn't own the

4    contractor.  The contractor was there to do the

5    work.  So when I -- I think I saw this email, and

6    then I heard that there was confusion about where

7    Mr. Driest -- who he was working for and whatnot.

8              I think I sent this to clear up any

9    confusion.  Mr. Smith took that as an opportunity

10   to say Colonel Hittle, you're marginalizing me by

11   taking people from me.  My goal was not to take

12   people from him.  My goal was to get the work

13   done and put the resources in the right place.  I

14   was -- I felt, for the three years that I was in

15   that job, that I had to walk around Mr. Smith on

16   eggshells.  I had to be, I don't know, overly

17   sensitive.  I did everything in my power to be as

18   honest with him and straightforward and leverage

19   -- give him every opportunity to avail him of any

20   resource.

21             If he felt he was marginalized, that

22   wasn't the intent.  If he had come to me and said

1      then how do we build the policy and how do we

2      start to do the procurement and get the support

3      contracts?  How do we do all that?  Mr.

4      Sobieranski was there with Mr. Cuddy and played a

5      key role in working out the details.

6              Q      Mr. Hittle, finally, you talked about

7      feeling like you had to walk around on eggshells

8      for three years in regards to Mr. Smith.  Do you

9      recall that?

10                   (No audible response.)

11                   JUDGE WOODHAM:  Is that a yes?  I'm

12     sorry.

13                   THE WITNESS:  That is a yes, Your

14     Honor.

15                   BY MS. HARRISON:

16             Q      Mr. Hittle, did you feel like you had

17     to walk around on eggshells with Mr. Smith

18     because he addressed concerns of discrimination

19     and retaliation with you?

20             A      Just because I had never been the

21     subject of an EEO complaint.  I feel I've always

22     tried to be as extremely fair and honest and open

USCA4 Appeal: 22-1895    Doc: 15    Filed: 11/28/2022    Pg: 124 of 341
Case 1:21-cv-01406-MSN-IDD    Document 11-1    Filed 05/13/22    Page 85 of 95 PageID# 144

168

1    with anyone that I worked with as I could.  I've

2    not been in that situation before, so it was new

3    and a little bit disturbing to me because I felt

4    like I had failed in something.  Even though I

5    hadn't even been there when whatever happened in

6    the spring of 2015 happened, I was somehow going

7    to be accused of something, at some point.

8            I don't want anyone to feel that way.

9    I don't want anyone to feel that they're being

10   not given full opportunity to perform to their

11   best.  I wanted everyone on the team to do a good

12   job.  I just wanted to be very careful that I

13   didn't say or do anything that can be taken the

14   wrong way or perceived incorrectly.

15           That's very hard because you never

16   know what someone else's perception is.  The

17   easiest thing is to just try and be as open and

18   straightforward and honest and deal with the

19   facts and try and make decisions that are based

20   on resources and clear logic, not be emotional on

21   things.  I just did my best.

22       Q    Mr. Hittle, is it fair to say you felt

1    that.

2              MS. HARRISON:  I have nothing further.

3              JUDGE WOODHAM:  Mr. Gordon, anything

4    else?

5              MR. GORDON:  Just real quick, Your

6    Honor.

7       RECROSS-EXAMINATION

8              BY MR. GORDON:

9       Q       The walking on eggshells thing, did

10   that impact your professional dealings with Mr.

11   Smith on day-to-day operations?

12      A       I felt we were still able to get the

13   work done on time in the stellar manner in which

14   it needed to be done and to serve the Marine

15   Corps and to follow our commanding general's

16   guidance.

17             MR. GORDON:  No further questions.

18             JUDGE WOODHAM:  Mr. Hittle, were you

19   required to take any training with respect to

20   Title VII or discrimination laws?

21             THE WITNESS:  None that I can think of

22   specifically, Your Honor, aside from our normal

1    because there was an extraordinarily qualified

2    individual that was also in the top three that

3    got the job.  Thank you.

4                 JUDGE WOODHAM:  Thank you.  This will

5    conclude the targeted hearing for this matter.  I

6    just want to let you know that I will be using

7    the stipulated facts that were submitted by me

8    from the parties in the pleadings that were dated

9    October 21, 2019.  That will be incorporated in

10   my decision, as well as additional facts that I

11   have gleaned from the testimony and the Report of

12   Investigation.  Then I will submit my decision to

13   the appropriate management -- excuse me,

14   appropriate Agency official and sign and send a

15   copy of my decision to the parties.  Therefore,

16   having heard all of the testimony with this

17   matter, I declare this hearing closed at 2:59

18   p.m. on December 16, 2019.  Thank you so much.

19                 (Whereupon, the above-entitled matter

20   went off the record at 3:00 p.m.)

21

22

# Exhibit 16

| | |
|---|---|
| **From:** | Hittle Col Patrick R |
| **To:** | Andrews CIV Stephanie A |
| **Subject:** | FW: quick minute to talk? |
| **Date:** | Monday, April 16, 2018 11:52:20 AM |

-----Original Message-----
From: Hittle Col Patrick R
Sent: Monday, January 29, 2018 5:09 PM
To: Hittle Col Patrick R <patrick.r.hittle@usmc.mil>
Subject: FW: quick minute to talk?

MEMO FOR THE RECORD

On 29 Jan 2018, I asked Mr Smith to talk. He stopped by my office while I was away, so after I saw his response below, I went down to his office to discuss the hiring action for the TECD Deputy position in person. I'm capturing the main points of that meeting below:

- I explained how I had made a selection for the position, and that CG TECOM (MajGen Iiams) had reviewed my recommendation (as Selecting Official) and he had approved it (as the Appointing Official) late last week.
- Over the last few months, I have been very careful in all conversations with all parties not to disclose any preference or prematurely announce any candidate as the designee for the position. I explained to Tony that OCHR had made the tentative offer to Mr Sobieranski, based on the final approval on the hiring package; and that Ed had accepted the position. I communicated to Tony that I wanted to ensure he heard that news from me, in open and fair expression, so that he would not hear it in the office via rumor or in a "sideways" reference. I wanted to be up-front and honest with him, and explained that the decision was very tough - all three candidates whom I interviewed in the final phase of the interview process were well qualified.
- I did not get into any specific detail on the factors which were the basis of my decision. I did however tell him that he and the other candidate, who were not the number one choice, were slightly less experienced in one or another area, in which Ed had deeper experience across the board.
- Mr Smith graciously accepted the news. We continued to talk about circumstances of the past, in general terms. He reiterated his intent to continue with his personal case. He seemed unhappy that the ongoing case is a matter that weighs on him, but he affirmed to me that he is committed to doing the best he can, in his current position.
- I stated clearly that I believe he has an important part to play in the success of TECD and our mission. I also stated my commitment to communicating openly and often with him, to empower him with the knowledge and information necessary to do his job to the best possible outcome.
- He reverted to discussion about how individuals cannot see their own bias; how TECOM and the Marine Corps have a problem with bias and cannot be fixed; and how maybe Mr Bennington just can't be convinced to change. He was intent on discussion matters that occurred before my tour of duty at TECOM began, but I did not wish to discuss those matters with him, so I effectively made no coment.
- At no point was any evidence or information presented in the conversation by Mr Smith to support his assertion of adverse or detrimental discriminatory bias in the organization, or in my leadership or management of the Division; and while I did not encourage him to continue his case, I made no attempt to convince him to drop his case. I was very neutral in my comments. I wish to be clear on this point: I do now, and have always, fully supported Mr Smith's efforts to seek support from those resources available to him, and to seek redress of any perceived wrong (present or past) he feels is warranted.
- Both Mr Smith and I were professional in demeanor, and all interaction was carried out in conversational tones. I respect Mr Smith and feel he is an individual of value, with many positive traits and qualities he brings to the table to be successful in his job and to benefit the organization.
----end of notes----

-Col Patrick Hittle

-----Original Message-----

From: Smith CIV Antonio B
Sent: Monday, January 29, 2018 4:08 PM
To: Hittle Col Patrick R <patrick.r.hittle@usmc.mil>
Subject: RE: quick minute to talk?

Sir,

I stopped by...will swing by again before I leave.

Vr,

Tony

Mr. Antonio B. Smith
Operations Officer
T&E Capabilities Division, TECOM
Office - 703.432.2169
Blackberry - 202.631.5160
SIPR - antonio.b.smith@usmc.smil.mil

FOR OFFICIAL USE ONLY - This transmission contains information that is protected from disclosure by the
Privacy Act of 1974 (5 USC 552a) and exemption (b)(6) of the Freedom of Information Act (5 USC 552, as
amended).  Please ensure that this information is used solely for the requested purpose. Further duplication and/or
distribution without prior authorization from this office is not authorized. Civil and/or criminal penalties can apply
for improper use.


-----Original Message-----
From: Hittle Col Patrick R
Sent: Monday, January 29, 2018 3:38 PM
To: Smith CIV Antonio B <antonio.b.smith@usmc.mil>
Subject: quick minute to talk?

Tony,
If you have a minute, can you please swing down for a brief talk?

Thank you-

Colonel Pat Hittle
Director, Training & Education Capabilities Division / Training & Education Command
W (703) 784-2964  Fax (703) 432-1697
BB (571) 340-0095

# Exhibit 17

Filed: 11/28/2022     Pg: 131 of 341     Doc: 15     USCA4 Appeal: 22-1995

## FORMAL COMPLAINT FORM

| FORMAL COMPLAINT OF DISCRIMINATION | (Agency Use Only)<br>AGENCY DOCKET NO.<br>DSN: |
|---|---|
| 1. Name of Complainant (Last, First, MI)<br><br>Smith, Antonio B. | 2. Are you represented?<br><br>[X] **YES** (If so, complete 2a-2c below)<br>[ ] NO (Continue with Question No. 3) |
| 1a. Address (incl: City, State, Zip)+<br><br>15804 Ibsen Place<br>Dumfries, VA 22025 | 2a. Name of Representative<br>Victoria M. Harrison |
| | 2b. Address (incl: City, State, Zip)<br>1825 K Street NW, Ste 750<br>Washington D.C. 20006 |
| 1b. Home Telephone (incl: area code)<br>(703) 300-7104 | 2c. Work Telephone (incl: area code)<br>(202) 463-5104<br>Comm: ( )<br>DSN: |
| 3. Are you now working for the Department of the Navy?<br><br>[X] **YES** (Complete 3a-3b)<br>[ ] **NO** (Continue with Question No. 4) | 3a. Name of Activity where you work:<br>TECD, TECOM, MCCDC |
| | 3b. Street Address of your activity (incl: City, State, Zip)<br>Quantico, VA |
| 4. Present Job Title, Series and Grade:<br><br>Operations Officer, GS-0301-14 | |

USCA4 Appeal: 22-1995     Doc: 15     Filed: 11/28/2022     Pg: 132 of 341

| FORMAL COMPLAINT OF DISCRIMINATION | (Agency Use Only)<br>AGENCY DOCKET NO.<br>DON ? |
|---|---|

**5.** Name and address of Activity/Command you believe discriminated against you (if different from 3a-3b):

**6.** Date(s) on which most recent alleged discrimination occurred:

Month  January 29, 2018          Day

Year

**7.** You believe you were discriminated against on the basis of your: (Check below)

| | | | |
|---|---|---|---|
| ☒ | **RACE** (If so, state your race)<br>African American | ☐ | **NATIONAL ORIGIN** (If so, state origin) |
| ☐ | **COLOR** (If so, state your color) | ☐ | **SEX**<br>　　　　Male<br>Female |
| ☐ | **RELIGION** (If so, state your religion) | ☐ | **AGE**<br>　　Date of Birth |
| ☐ | **DISABILITY** (Please describe)<br><br>Mental　　　　　　　　　Physical | | |
| ☒ | **REPRISAL** (If so, date and description of prior protected activity)<br>2 previous EEO complaints filed ((MC) 15-67856-02582; (MC) 16-67856-02564) | | |

**8.** Have you discussed your complaint with an EEO Counselor?

☒ YES          ☐ NO

Name of Counselor: Penny Thomison

Date of Initial EEO Contact: March 1, 2018

Date of Final Interview: Notice of Right to File Received April 16, 2018

USCA4 Appeal: 22-1995      Doc: 15      Filed: 11/28/2022      Pg: 133 of 341

9.   EXPLAIN SPECIFICALLY HOW YOU WERE DISCRIMINATED AGAINST (That is, treated differently from other employees or applicants, because of your race, color, religion, sex, national origin, age, mental or physical disability, or reprisal.) (If your complaint involves more than one allegation, list and number each allegation separately and furnish specific, factual information in support of each.)

Allegation No. 1 (include basis(es) (See Question No. 7):

(Use additional sheets if necessary)

On/about January 29, 2018, Mr. Antonio Smith was not selected for the position of Supervisory Head/Deputy Director (GS-0301-15), Training and Education Capabilities Division, Training and Education Command (Announcement #ST-10042390-17-LMJ), as a result of the continued discriminatory actions on the basis of race (African American) and in retaliation for his prior EEO activity (complaints filed in 2015 and 2016) by Col. Patrick Hittle.



10.  WHAT SPECIFIC CORRECTIVE ACTION DO YOU WANT TAKEN ON YOUR COMPLAINT? (If your complaint involves more than one allegation, state corrective action desired for each separate allegation.)

1. The Agency immediately cease all ongoing discrimination and harassment;
2. Mr. Smith's retroactive promotion to GS-15 position with applicable backpay
3. Payment of compensatory damages not to exceed $300,000
4. A clean record of any negative documentation relating to the case
5. Reimbursement of attorneys fees and costs

USCA4 Appeal: 22-1995   Doc: 15   Filed: 11/28/2022   Pg: 134 of 341

11.   WITH REGARD TO THE ALLEGATIONS DESCRIBED IN Question No. 9, HAVE YOU:

☐ filed a grievance through the negotiated grievance procedure?
If so, date filled _____.

☐ filed an appeal with the Merit Systems Protection Board? If so, date
filed _____.

☐ filed a civil action in U.S. District Court? If so, date filed
_____.

| 12.   Signature of Complainant | 13.   Date Signed |
|---|---|
| /s/ o/b/o Antonio Smith | 4/30/18 |

### TO BE COMPLETED BY THE ACTIVITY

| 14a.   Received by: | 15.   Complaint was: |
|---|---|
| Penny Thomson _(Signature)_ | ☐ Mailed: |
| b.   Typed Name & Title | Postmark date |
| Penny Thomison Complaints Manager | _____ |
| c.   Activity Name and Address: | Received date |
| HDQ'S Marine Corps EEO Office 2004 Barnett Ave Quantico VA | _____ |
| d.   Telephone (incl: area code) | ☐ Hand Delivered:. |
| Comm: 703 784 2368 | Date _____ |
| DSN _____ | ☑ Emailed recieved date 30 April 2018 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| ANTONIO SMITH | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:21-cv-1406-MSN-IDD |
| | ) | |
| THOMAS W. HARKER, Acting Secretary | ) | |
| United States Department of the Navy, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO SUMMARY JUDGMENT**

**INTRODUCTION**

Antonio Smith, an African American man, was marginalized in his job at the Navy because of his race. The conduct was so pervasive that Mr. Smith filed EEO complaints alleging discrimination in June 2015 and September 2016. The September 2016 complaint specifically accused the Director of TECD, Colonel Patrick Hittle, of discrimination.

When Mr. Smith complained of this discrimination, Col. Hittle reacted by distancing himself from him. Col. Hittle refused Mr. Smith's request to "sit down and talk" about issues between them and told him that he needed to take his complaints to Human Resources. At the EEOC hearing in this matter, the supervisor, Col. Hittle explained that he was upset with Mr. Smith for naming him in an EEO complaint and felt uncomfortable working with him. In Col. Hittle's words, he felt like he had to "walk around on eggshells" with Mr. Smith. Because a reasonable jury could find that this discomfort—caused by Mr. Smith's allegations of discrimination and retaliation—is the reason that Col. Hittle selected a white employee junior to Mr. Smith as his

Deputy Director, a role for which Mr. Smith was next in line, summary judgment is not appropriate.

Mr. Smith's qualifications for the Deputy Director position are impeccable. Mr. Smith successfully served as the Operations Branch Head / Operations Officer for the Navy's Training & Education Capabilities Division (TECD) from September 2009 to August 2019. In this role, Mr. Smith was the resource sponsor and requirements generator for both virtual and constructive training devices and simulations and range training areas. He was also responsible for directing, managing, supervising, and conducting technical research in support of simulations and range area management. There were only two TECD positions senior to Mr. Smith's: the Deputy Director and the Director. Mr. Smith served stints as Acting Deputy Director multiple times prior to 2017.

Yet, in July 2017, when then-Deputy Director Terry Bennington retired, Col. Hittle passed Smith over and announced that Edward Sobieranski, a white employee who was a step below Mr. Smith in the TECD hierarchy, would be detailed into the Acting Deputy Director position. Mr. Sobieranski was permitted to act in this position for nearly six months—during the selection process for the permanent position. This was valuable experience for Mr. Sobieranski. Surely, any reasonable and honest person would acknowledge that serving in the position for six months would give Sobieranski a leg up on the competition. Mr. Sobieranski admits that it was. In fact, his experience in the acting position is highlighted on his resume. But Col. Hittle denies that it gave him any advantage. Col. Hittle tried to minimize the importance of Mr. Sobieranski's stint as Acting Deputy Director and dissembled about when and how he gave him that role.

In November 2017, the position of permanent Deputy Director was opened for applications. The selection process involved three phases: first, a resume review and ranking; second, panel interviews; and third, interviews with Col. Hittle, who was the deciding official. Mr.

Smith and Mr. Sobieranski both applied.  The resume review panel ranked Mr. Sobieranski's resume as inferior overall to Mr. Smith's.  Mr. Sobieranski's resume showcased the new skills he had gained as Acting Deputy Director and, on the strength of that experience, the review panel ranked Mr. Sobieranski's and Mr. Smith's resumes the same for experience.  Both men advanced to panel interviews along with 12 other applicants.  After panel interviews, Mr. Smith, Mr. Sobieranski, and one other were passed on for interviews with Colonel Hittle on an unranked list. Col. Hittle conducted those interviews in January 2018.

In the midst of the application process, Col. Hittle assigned contractors away from Mr. Smith's branch without consulting or telling him.  On December 20, 2017, Mr. Smith complained in an email to Col. Hittle that he felt Col. Hittle was marginalizing him and discriminating against him.  Col. Hittle replied that he viewed Mr. Smith's email as a complaint and refused to "sit down and talk" with him, referring him to Human Resources.

About a month after this exchange, on January 29, 2018, Col. Hittle told Mr. Smith that he had selected Mr. Sobieranski over him for the permanent Deputy Director job.  When asked at a later EEO hearing why he selected Mr. Sobieranski over Mr. Smith, Col. Hittle testified that he was offended by Mr. Smith accusing him of discrimination, and that he did not want to work with a Deputy Director around whom he had to "walk on eggshells."

Defendant asks this Court to summarily dispose of this case, claiming that its facts are undisputed and entitle Defendant to a ruling on the law.  Not so.  As demonstrated below, Col. Hittle has repeatedly given conflicting and even demonstrably false explanations for his decision to select Mr. Sobieranski over Mr. Smith.  At the EEOC Hearing, he pretended not to know the nature of Mr. Smith's job, even though he admitted that Mr. Smith reported directly to him and that they talked on a daily basis. He claimed that Mr. Sobieranski was at a higher level in the

organization than he actually was, and he completely changed his explanation for his decision from the one he gave during the investigation of the case.  Thus, a reasonable jury could conclude that Col. Hittle lied. There is no contemporaneous account of his decision because Col. Hittle destroyed his interview notes. The contemporaneous memorandum to his supervisor justifying his decision is also missing.  Aside from those that warrant an adverse inference (and all reasonable inferences must be drawn in favor of Mr. Smith at this stage), the facts that remain could well lead a reasonable jury to conclude that Col. Hittle not selecting Mr. Smith for the Deputy Director position was the result of unlawful discrimination and retaliation.  As such, the motion for summary judgment must be denied.

## RESPONSE TO DEFENDANT'S MATERIAL FACTS[1]

2.      From September 2009 to August 2019, Plaintiff served in a supervisory capacity as the Operations Branch Head or Operations Officer at the Training & Education Capabilities Division ("TECD") in the United States Marine Corps. Compl. ¶ 10; EXH. 1 at 2; EXH. 2. TECD provides resources and generates the requirements for virtual and constructive training devices and simulations that military members of the Marine Corps must complete. EXH. 3. In his role, Plaintiff provided overall management of current and future operations of TECD and oversaw work product produced by TECD's Operations Branch. EXH. 3.

**Plaintiff's Response:  Misleading and incomplete**.    Mr. Smith's duties and responsibilities are described in greater detail in Defendant's Exhibit 3.   In addition, Mr. Smith testified to his "immense" responsibilities, including that he briefed officers at the three-star level and had previously served as acting deputy director for periods of his tenure as the operations officer.  Pl's Ex. 3 at 12-13.  He also testified that in his role as the operations officer, he assigned tasks to Mr. Sobieranski and the other branch heads. *Id.* at 15.  Furthermore, Mr. Smith directed

---

[1] Plaintiff has omitted Defendant's statements that are either admitted or immaterial.

the branches to provide their input into a major assignment which he supervised and consolidated. *Id.* at 16.

5.      Colonel Hittle became aware of Plaintiff's first EEO complaint as of December 2015. EXH. 1 at 2.

**Plaintiff's Response: Incomplete**.  The Agency fails to mention when Col. Hittle became aware of Plaintiff's second (September 2016) EEO complaint.  More importantly, the Agency ignores an email conversation between Col. Hittle and Mr. Smith on December 20, 2017.  Mr. Smith stated that he felt Col. Hittle was "purposely marginalizing" and "discriminating" against him. Pl's Ex. 2 at 179. Col. Hittle responded that Mr. Smith's wording "indicates this is a complaint on your part." *Id.* Just about one month later, and after interviewing Mr. Smith in the interim, Col. Hittle rejected Mr. Smith's application for the Deputy Director position. Pl's Ex. 6 at 141.

6.      In September and December 2017, Plaintiff took issue with Colonel Hittle's decision to re-assign contractors away from the Operations Branch. EXH. 5. Hittle explained in email correspondence to Plaintiff that the contractors had been detailed to provide a Lieutenant Colonel within another part of TECD "help and []additional bandwidth" for other specific tasks. EXH. 5 at 3. Hittle then asked Plaintiff if there was a compelling reason for why the contractors needed to remain in Plaintiff's TECD section and stated that he was "[o]pen to comments and thoughts," but in response Plaintiff simply identified his EEO complaint and claimed that he was being marginalized rather than offer any explanation of why the contractors should not have been moved. EXH. 5 at 1-3.

**Plaintiff's Response:  Disputed**.  Plaintiff has specifically identified that his objection to Colonel Hittle moving contractors out of his branch was the manner in which it was done.  Col. Hittle reassigned contractors away from Mr. Smith's branch "without consulting me or informing me of the decision."  Pl's Ex. 7 at 171-72.  Reassigning contractors in this way did not afford Mr. Smith the "common courtesy" of consultation or explanation.  Pl's Ex. 3 at 29-30.

8.      Following Bennington's retirement, Colonel Hittle selected Edward Sobieranski to serve as the acting Deputy Director/Supervisory Head to act in Bennington's position in 2017. EXH. 1 at 2; EXH. 7 at 5. Sobieranski is a White male who had, prior to his selection as the acting

Deputy Director, been the Branch Head for the Range & Training Area Management Branch in TECD and was a GS-14 employee like Plaintiff, reporting to the Deputy Director. EXH. 2; EXH. 6 at 1. In December 2017, TECD personnel made arrangements for Plaintiff to be placed into the position of acting Deputy Director once Sobieranski's detail ended on January 29, 2018, but Plaintiff ultimately declined to temporarily assume the Deputy Director position. EXH. 6 at 1-2.

**Plaintiff's Response:  Incomplete and disputed**.  First, the Agency does not identify that OPM regulations permit a temporary detail to continue for 120 days, and Mr. Sobieranski was detailed into the deputy director position for approximately six months. Pl's Ex. 7 at 170.  Second, there is no evidence that "personnel *made arrangements* for Plaintiff to be placed into the position of acting Deputy Director once Sobieranski's detail ended on January 29, 2018."  After Mr. Sobieranski was identified as the selectee for the permanent deputy director position (curiously, on the same day his six-month temporary detail ended), Mr. Smith was offered the opportunity to be detailed into the deputy director position for a week or two while Mr. Sobieranski's hiring was finalized.  Pl's Ex. 3 at 24-25.  Mr. Smith declined because he "didn't want to take the staff or the people in the office through the changes of another acting deputy director, when [Mr. Sobieranski] had already been hired for the job. … [Mr. Smith] didn't want to take the staff through that for two weeks." *Id.*

16.    The interview panel forwarded three candidates—Plaintiff, Sobieranski, and an individual named Eric Fox—for further consideration for the Deputy Director/Supervisory Head position. When the interview panel forwarded the candidates to Colonel Hittle, they did not provide their individual evaluations or scores of the candidates, instead sending along a unanimous, unranked list of the top three candidates. EXH. 10 at 3; EXH. 13 at 2. Final interviews were done with the selecting official, Colonel Hittle, as well as with Stephanie Andrews of the Marine Corps' Command Personnel Office, on January 9, 2018. EXH. 1 at 3; EXH. 7 at 4.

**Plaintiff's Response:  Misleading**.  Interviews were not conducted "with" Stephanie Andrews but rather in her presence, with Ms. Andrews serving as "recorder" in order to "have someone else in the room."  Pl's Ex. 3 at 17, 108.

18.    In explaining his choice for the Deputy Director/Supervisory Head position, Hittle testified that he viewed Plaintiff as "a very close second to Mr. Sobieranski" among applicants for the position. EXH. 7 at 6. However, Hittle believed that Sobieranski was the best candidate because while Plaintiff "had a lot of general experience working on the training simulation [he] did not have the background in developing policy." EXH. 7 at 4. Sobieranski, by contrast, had "previously wrote Marine Corps orders, policies, and directives and that is what [TECD] needs to do in the upcoming years." EXH. 7 at 4. Hittle also explained that Sobieranski had experience that would be useful to the range and training areas with which TECD was involved. EXH. 7 at 4. Further, Hittle noted that, while both candidates were experienced, Sobieranski had been in the command longer than Plaintiff and that Plaintiff could not offer the same amount of tangible examples of cross-service coordination that Sobieranski could. EXH. 7 at 4-6.

<u>**Plaintiff's Response**</u>:  **Disputed, misleading, and improper for summary judgement**.

The recitation of Col. Hittle's later-stated justifications for not selecting Mr. Smith is accurate.

However, what Col. Hittle believed about Mr. Smith is in genuine dispute. Col. Hittle testified that

he would not have been comfortable working with Mr. Smith as his Deputy Director because Mr.

Smith's complaints of discrimination.  Pl's Ex. 3 at 167, 169.  Specifically, Col. Hittle admitted

that he felt he had to "walk on eggshells" around Mr. Smith, *id.* at 157, that he felt he had to "walk

around on eggshells" with Mr. Smith because he had made him the subject of his EEO complaint,

*id.* at 167, and that having to walk on eggshells with his Deputy Director would have been

uncomfortable.  *Id.* at 169.  From these statements, a reasonable jury could conclude that the real

reason Col. Hittle did not select Smith as his deputy was so that he would not have to "walk on

eggshells" around him.

19.    On January 29, 2018, Hittle informed Plaintiff that a tentative offer for the position of Deputy Director/Supervisory Head had been made to Sobieranski and that Plaintiff did not receive the position. EXH. 1 at 3; EXH. 16.

<u>**Plaintiff's Response**</u>:  **Misleading**.  Col. Hittle's memorandum of his January 29, 2018

meeting with Plaintiff states:  "I explained how I had made a selection for the position, and that

CG TECOM (MajGen Iiams) had reviewed my recommendation (as Selecting Official) *and he*

*had approved it* (as the Appointing Official) late last week. … I explained to Tony that OCHR had

made the tentative offer to Mr Sobieranski, based on the final approval on the hiring package; *and that Ed had accepted the position*." Pl's Ex. 6 at 141 (emphasis added).

21.     On April 30, 2018, Plaintiff filed a formal EEO complaint, alleging that Colonel Hittle's decision to select Sobieranski over him for the Deputy Director/Supervisory Head position was motivated by animus directed at his race and was in retaliation for the EEO complaints that Plaintiff had filed nearly a year and a half earlier. Compl. ¶ 3; EXH. 1 at 1; EXH. 17.

**Plaintiff's Response:** **Misleading**. Mr. Smith's formal EEO complaint specifically referenced that he was not selected for the Deputy Director position as a result of "*continued discriminatory actions on the basis of race.*" Def.'s Ex. 17 at 8. Such ongoing actions included Col. Hittle reassigning contractors away from Mr. Smith's branch without consultation or notification. Pl's Ex. 3 at 29-30. On December 20, 2018, Mr. Smith complained to Col. Hittle that he was "purposely marginalizing" and "discriminating" against him. Pl's Ex. 2 at 179. Col. Hittle responded that Mr. Smith's wording "indicates this is a complaint on your part," *id.*, and rejected his application for the Deputy Director position shortly thereafter. Pl's Ex. 6 at 141.

22.     After the Marine Corps completed a full investigation of Plaintiff's claims, which resulted in a comprehensive 200 page plus Report of Investigation ("ROI"), Plaintiff then sought a "hearing" before an EEOC Administrative Judge ("AJ") on November 9, 2018. EXH. 1 at 1.

**Plaintiff's Response:** **Misleading**. In 1976, the Supreme Court held that "federal employees are entitled to a trial *de novo* of their employment discrimination claims." *Chandler v. Roudebush*, 425 U.S. 840, 845–46 (1976). Thus, "[p]rior administrative findings, whatever result may be reached, are ordinarily not entitled to preclusive effect in a subsequent discrimination suit, even though the same facts are in dispute." *Rosenfeld v. Dep't of Army*, 769 F.2d 237, 239 (4th Cir. 1985). While the record may be admissible in federal court, the findings of an administrative review have no weight at the summary judgment stage. Rather, the only question before the Court is whether a reasonable jury could conclude from the evidence that Colonel Hittle was motivated by Mr. Smith naming him as a discriminator when he rejected his application for promotion. The

fact that one reasonable person (the Administrative Judge) reached a different conclusion does not take that question away from a jury. *See Benedi v. McNeil-P.P.C., Inc.*, 66 F.3d 1378, 1389 (4th Cir. 1995) ("Because reasonable people could differ in their evaluation of McNeil's conduct, it was the jury's job to weigh the testimony of both sides and determine the motive underlying McNeil's conduct.").

23. After both Plaintiff and the Marine Corps informed the AJ that they did not need further discovery in order to present their arguments on Plaintiff's claims, a hearing was held on December 6, 2019 before the presiding AJ, who requested testimony from a few witnesses in order to reach a decision beyond the fulsome record already available to her. EXH. 15 at 1, 4.

**Plaintiff's Response: Misleading**. This Court should reject Defendant's attempt to deprive Mr. Smith of a trial *de novo*. *See* Response to No. 22.

24. Plaintiff and Colonel Hittle both provided oral testimony during the December 6, 2019 hearing. When specifically asked if he took any steps to respond to Plaintiff's concerns in December 2017 about the re-assignment of contractors and Plaintiff's feeling that he was being marginalized—as previously discussed herein, EXH. 5—Hittle answered that he "felt that [he] was being drug into the conversation about the prior EEO action from [Plaintiff]" but that "[he] didn't want to be involved in that" and that Hittle's "goal was not to take people from [Plaintiff]" but to "get the work done and put the resources in the right place." EXH. 15 at 156-157. Colonel Hittle added, in this context, that he believed, in light of Plaintiff's existing EEO complaints, that he "had to walk around [Plaintiff] on eggshells," meaning that Hittle had to be "overly sensitive" to Plaintiff's concerns while Hittle otherwise "did everything in [his] power to be [] honest with [Plaintiff] and straightforward." EXH. 15 at 157. When asked to further explain his "eggshells" comments, Hittle expounded that he "had never been the subject of an EEO complaint" and being named in one by Plaintiff made Hittle "[feel] like [he] had failed in something" as he "[didn't] want anyone to feel that that they're being not given full opportunity to perform their best." EXH. 15 at 168. Hittle also testified that, despite his feelings of walking around on eggshells, he believed that he and Plaintiff were able to get work done on time and operate professionally in TECD. EXH. 15 at 170.

**Plaintiff's Response: Misleading**. The fact that Col. Hittle testified to feeling that he had to walk on eggshells around Mr. Smith because Mr. Smith made him the subject of an EEO complaint is not disputed. However, this evidence does not support the grant of summary judgment as it gives rise to a reasonable inference that Col. Hittle rejected Mr. Smith as his deputy

9

because he would have felt uncomfortable having him as his right-hand man.  Pl's Ex. 3 at 169 (Col. Hittle admitting that it would not have been comfortable to have a deputy director around whom he had to walk on eggshells).

25.      The December 6, 2019 hearing ran, with breaks, for a total of five hours after which the AJ concluded the targeted hearing and informed the parties that she would issue a decision based on the facts gleamed from the hearing testimony, stipulated facts submitted by the parties, and based on the ROI. EXH. 15 at 4, 221.

**Plaintiff's Response:  Misleading**.  No matter how long the administrative hearing lasted, Mr. Smith is entitled to a trial *de novo* according to the U.S. Supreme Court.  *See Chandler*, 425 U.S. at 845–46.

26.      After the hearing, the AJ issued a decision on Plaintiff's EEO complaint on March 4, 2020, finding in favor of the Marine Corps. EXH. 1. Specifically, the AJ found that the Marine Corps had articulated legitimate, non-discriminatory, and non-retaliatory reasons for Plaintiff's non- selection and that Plaintiff could not demonstrate pretext. EXH. 1 at 5, 7.

**Plaintiff's Response:  Misleading and irrelevant**. *See* Responses to Nos. 22, 23 and 25.

27.      Reconsideration of that decision was denied on September 27, 2021. Compl. ¶ 5

**Plaintiff's Response:  Misleading and irrelevant**.  *See* Responses to No.'s 22, 23 and 25.

## ARGUMENT

I.      **Legal Standard.**

Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The court's role is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Even if "the weight of the evidence favors the moving party [that] does not authorize a court to grant summary judgment." *Poller v. Columbia Broadcasting System, Inc.*, 386 U.S. 464 (1986). The court must view all evidence and any factual inferences in the light most

favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The party seeking summary judgment bears the responsibility of demonstrating the "absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party's demonstration of a genuine issue of material fact is not a high bar:

> [T]he issue of material fact required by 56(c). . . to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a judge or jury to resolve the parties' differing versions of the truth at trial.

*First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968). Summary judgement cannot be granted "if reasonable minds could differ as to the import of the evidence." *Anderson*, 477 U.S. at 250-51.

## II.    Mr. Smith Has Met the Relatively Easy Burden of a Prima Facie Case.

### A.  Mr. Smith Was Rejected for Promotion Under Circumstances Giving Rise to an Inference of Retaliation.

A plaintiff may establish a prima facie case of retaliation by showing "that he engaged in protected activity, that [his employer] took adverse action against him, and that a causal relationship existed between the protected activity and the adverse employment activity." *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004). Defendant does not dispute that Mr. Smith engaged in protected activity or that his non-selection for promotion to the Deputy Director position constitutes an adverse employment action.

Defendant contends, however, that the time frame between Mr. Smith's formal EEO complaint and Mr. Hittle's decision not to promote him is too attenuated in time to establish causation. In so arguing, Defendant misunderstands the law of this Circuit. The Fourth Circuit has made clear that an inference of causation is raised where an adverse employment action is

taken shortly after an employee's follow up protected activity – not simply the filing of a formal complaint or civil action. *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 253 (4th Cir. 2015). In *Foster*, the Court rejected as "contrary to law" the employer's argument that the Court "may only look to [employee's] initial complaint of harassment and not her subsequent complaints of retaliation" in calculating temporal proximity." *Id.* (*citing Carter v. Ball,* 33 F.3d 450, 460 (4th Cir. 1994) (finding temporal proximity where an employee was demoted six weeks after a hearing on his EEO complaint)).

In this case, Mr. Smith complained about Hittle's discrimination and retaliation to Col. Hittle on December 20, 2017 and just over one month later, Hittle rejected his application for promotion. *See* Pl's Ex. 2 at 179 (12/20/17 Email from Smith to Hittle) ("I believe your actions are because I have an EEO complaint against TECOM that includes you" and requesting to "be allowed to work free of marginalization, discrimination, and other adverse actions."); Pl.'s Ex. 6 (1/29/18 Memo for Record indicating Hittle's non-selection of Smith). This Circuit has found that a month between a reminder of allegations of discrimination (an EEOC hearing) and an adverse action was sufficiently close in time to raise an inference of retaliatory motive. *See Foster*, 787 F.3d at 253. Accordingly, Hittle's decision not to promote Mr. Smith fewer than 40 days after receiving an email from him accusing him of discrimination and retaliation constitutes sufficient temporal proximity to establish causation at this stage of the litigation.

### B. Mr. Smith Was Rejected for Promotion Under Circumstances Giving Rise to an Inference of Discrimination.

To demonstrate a prima facie case of discriminatory non-selection, an employee may show that (i) he belonged to a racial minority; (ii) that he applied and was qualified for the promotion he sought; (iii) that he was denied the promotion; and (iv) the position was filled by the employer from another applicant outside his protected class. *Page v. Bolger*, 645 F.2d 227, 229 (4th Cir.

1981). Despite Defendant's contention that the selection of a white person over Mr. Smith is not

sufficient to establish a prima facie case, "[i]t is well-established that in order to satisfy this prong

in an ordinary discrimination case, a plaintiff only needs to show that the position was filled by an

applicant outside of the plaintiff's protected group." *McNaught v. Virginia Cmty. Coll. Sys.*, 933

F. Supp. 2d 804, 817–18 (E.D. Va. 2013) (*citing Patterson v. McLean Credit Union,* 491 U.S. 164,

186–87 (1989) (requiring plaintiff to show that "after she was rejected respondent either continued

to seek applicants for the position, or . . . filled the position with a white employee"). While courts

have permitted plaintiffs to satisfy the fourth prong by showing other circumstances giving rise to

an inference of discrimination, it remains the law in this Circuit that one of the appropriate ways

– indeed, the most common way—for a plaintiff to satisfy the fourth prong of his prima facie case

is to show that a person outside of his protected class was selected over him. *See*

*Carter,* 33 F.3d at 458 ("To satisfy the fourth prong [that 'plaintiff was rejected for the position

under circumstances giving rise to an inference of unlawful discrimination'], [the African

American plaintiff] ... need only show that the position was filled by a white applicant"). In this

case, it is clear that Mr. Smith has presented sufficient evidence that he was rejected under

circumstances giving rise to an inference of race discrimination: he is African American, he

applied and was qualified for the Deputy Director position, he was not selected for the position,

and the position was filled by a white applicant.

## III.    A Reasonable Jury Could Conclude From The Totality of The Evidence That Col. Hittle Provided Pretextual Reasons For Rejecting Mr. Smith's Application For Promotion.

### A. Co. Hittle Admitted that Being Named in Smith's EEO Complaint Made Him Uncomfortable Working With Him.

Col. Hittle's concern that he had to "walk on eggshells" around Mr. Smith leaves wide the

door for a jury to infer that his rejection of Mr. Smith's application for the Deputy Director position

was rooted in discrimination and retaliation.  Col. Hittle testified multiple times that he felt he had to "walk on eggshells" around Mr. Smith because of his EEO complaints.  Pl's Ex. 3 at 157, 167. He further testified that he was so uncomfortable around Mr. Smith because of his knowledge that Mr. Smith had named him in his EEO complaint—which had never happened before.  *Id.* at 169. Moreover, Col. Hittle admitted that he would have to work closely with his Deputy Director and would not feel comfortable working with a Deputy Director around whom he had to walk on eggshells.  *Id.*

While his statements may not qualify as direct evidence of discrimination, similar expressions of discomfort about a person based on their protected class have been held to raise an inference of discrimination.  *See, e.g., Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 301 (4th Cir. 2010) (holding that evidence that plaintiff "was told that she was not hired become some were uncomfortable with women having the job," *inter alia*, raised an inference of sex discrimination); *see also McCrory v. Kraft Food Ingredients*, 98 F.3d 1342 (6th Cir. 1996) ("when viewed together, there is evidence that plaintiff's supervisors may have been uncomfortable with plaintiff's mental illness and, compounded with his age, these improper motives may have constituted the real reasons for his discharge."); *Kimble-Parham v. Minnesota Mining & Mfg.*, No. CIV.00-1242 ADM/AJB, 2002 WL 31229572, at *11 (D. Minn. Oct. 2, 2002) ("statement to Plaintiff that [supervisors] felt uncomfortable giving orders and instructions to her because 'it felt like they were giving instructions to their mother,' and that [decisionmaker] sympathized with them because he had once supervised an 'older woman' at a previous job," was evidence of discriminatory animus).  Thus, a reasonable jury could conclude that Col. Hittle's EEO-induced eggshells are why he did not select Mr. Smith for the Deputy Director position. A jury must decide Col. Hittle's motivations. *See* Santelli v. Electro-Motive, a

14

Div. of Gen. Motors Corp., 136 F. Supp. 2d 922, 936 (N.D. Ill. 2001) ("jury's deliberation of

these delicate questions of motive and intent, regardless of their ultimate answer, will be a more

reliable guideline than this Court's review of the dry papers submitted thus far, particularly given

that a jury will be able to examine [the decisionmaker's] demeanor and gauge his veracity when

he attempts to explain or deny those words at trial.").

> **B. Col. Hittle's Destruction of All Contemporaneous Evidence of His Rationale Combined with His Shift from a "Practical Experience" to "Policy Experience" Justification During Litigation Supports A Jury Finding of Pretext.**

In his sworn declaration to the investigator, Col. Hittle said he selected Mr. Sobieranski

because he had "fifteen years of experience in the range program" and "had built up a centralized

range program which was effectivity [sic] managed from my division." Pl's Ex. 1 at 198. He

claimed that "it was more a matter of the *practical experience* that Mr. Sobieranski had and how

that would translate to integration of the ranges and simulations programs." *Id.* (emphasis added).

At the hearing before the EEOC, however, Col. Hittle claimed that he chose Mr.

Sobieranski over Mr. Smith because of his *policy* experience and made no mention of any practical

experience that Mr. Sobieranski had. Pl's Ex. 3 at 148-149. He testified that he selected Mr.

Sobieranski because he had "credible experience building policy across service lines to other

service counterparts." *Id.* When asked specifically what policy experience he relied upon, Col.

Hittle admitted that Mr. Sobieranski's participation in policy drafting occurred "in the early

2000s." Pl's Ex. 3 at 152. Yet, he claimed that his policy work "was at the crux of what tipped

the scale for Mr. Sobieranski over Mr. Smith." Pl's Ex. 3 at 149. A reasonable jury could conclude

from this shift in explanation—from practical experience to policy experience more than a decade

earlier as the basis for selection—that Col. Hittle has not honestly put forth his reasons for rejecting

Mr. Smith's application for promotion. *See E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852–

USCA4 Appeal: 22-1995    Doc: 15    Filed: 11/28/2022    Pg: 150 of 341

53 (4th Cir. 2001) ("the fact that Sears has offered different justifications at different times for its failure to hire Santana is, in and of itself, probative of pretext."); *see also Dominguez-Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 432 (1st Cir. 2000) ("[W]hen a company, at different times, gives different and arguably inconsistent explanations, a jury may infer that the articulated reasons are pretextual"); *Thurman v. Yellow Freight Sys., Inc.,* 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext.").

The Fourth Circuit has also held that a reasonable jury can infer pretext from the late appearance of a justification—even if that justification is internally consistent with prior explanations. *See Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 576 (4th Cir. 2015) (reversing summary judgment where the justifications were "not internally inconsistent, [but] many of the purported justifications were not raised at the time of termination"). In this case, a reasonable jury could infer that the two distinct reasons proffered by Col. Hittle during the investigation and hearing in this matter are post-hoc rationales because Col. Hittle destroyed all contemporaneous accounts of his reasons for selecting Mr. Sobieranski over Mr. Smith. *Id.* (holding that a jury could infer pretext because the decisionmaker did not mention the justifications raised during litigation in her contemporaneous account of the reasons for the adverse decision). Here, Mr. Hittle testified that he took notes of his impressions during the job interviews and wrote a memo to his superior where he "outlined why [Mr. Sobieranski] was the best candidate to MG Iiams." Pl's Ex. 1 at 197. Yet, despite the Agency's document retention policies, Col. Hittle admitted that he "shredded everything." Pl's Ex. 3 at 77. A jury is entitled to draw the inference that this crucial piece of evidence, intentionally destroyed by Col. Hittle, would have exposed facts unfavorable to Defendant, i.e., inconsistent reasons for his selection decision. *See Vodusek v.*

*Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995) ("Even the mere failure, without more, to produce evidence that naturally would have elucidated a fact at issue permits an inference that 'the party fears [to produce the evidence]; and this fear is some evidence that the circumstance or document or witness, if brought, would have exposed facts unfavorable to the party.'").  Although a jury is entitled to consider Col. Hittle's contention that his actions were ignorant and not intentional, a jury could reject this explanation given that Col. Hittle knew that Mr. Smith had previously challenged employment decisions against him, making the importance of these notes obvious to Col. Hittle.  A jury could find that he destroyed the notes because they were unfavorable to him.

In addition, Defendant has offered no explanation for its failure to produce the justification memorandum that Col. Hittle said he submitted to Major General Iiams.  Thus, while there is no requirement for Plaintiff to show that Col. Hittle acted in bad faith by destroying the evidence, a reasonable jury could conclude that he did.  *Cf. id.* ("We reject the argument that bad faith is an essential element of the spoliation rule").

**C. A Reasonable Jury Could Find that Col. Hittle Made a Series of False Statements Designed to Bolster Mr. Sobieranski's Qualifications While Minimizing Mr. Smith's.**

> *1. A jury could find that Col. Hittle fabricated Sobieranski's start date in the Acting Deputy Director position to conceal the advantage he gave him in the selection process.*

A reasonable jury could infer that Col. Hittle acted with an unlawful motive in rejecting Smith for promotion based on the fact that he allowed Mr. Sobieranski to serve in the Acting Deputy Director position for such a long time and that he did not approach Mr. Smith about serving as Acting Deputy Director in July or August or October or November or December, despite the fact that Mr. Smith had been called on to serve as acting deputy chief multiple times by the prior

Director, Pl's Ex. 3 at 12-13.  Instead, he tapped Mr. Sobieranski—who had no previous experience as the Acting Deputy Director—for the role.  And while federal regulations limit a non-competitive detail to 120 days, Mr. Sobieranski served in this role for more than six months.  In fact, Mr. Sobieranski was permitted to serve—officially or unofficially—as the Acting Deputy during the entire selection process for the permanent position, which Col. Hittle testified went on for "seven or eight months." *Id.* at 102.

Even more incredibly, Col. Hittle testified that detailing Mr. Sobieranski to the Acting Deputy Director position during the selection process did not afford him any advantage over Mr. Smith.  Pl's Ex. 3 at 132-33.  For six months, Col. Hittle allowed Sobieranski to serve as his right hand man but claims that this gave him no advantage in the selection process for the permanent position.  In addition to being incredible on its face, the record evidence shows that Sobieranski's six months working in the position he sought on a permanent basis bolstered the resume review panel's ranking in the subcategory of "experience."  This is particularly significant because the experience listed on Mr. Sobieranski's resume features at the very top nearly half a page of information about his new role as the Acting Deputy Director.  Pl's Ex. 8 at 111-112.  Mr. Sobieranski even admitted that serving in the Acting Deputy Director role provided him "insight" and "an advantage to get more skills."  Pl's Ex. 3 at 193-94.  While the resume review panel ranked Mr. Sobieranski's resume as inferior to Mr. Smith's in other aspects, a reasonable jury could infer that it was only the benefit of Col. Hittle placing Mr. Sobieranski in the Acting Deputy Director role for the latter half of 2017 that brought Mr. Sobieranski's "experience" rating to par with Mr. Smith's.  Most significantly, a jury could find Col. Hittle's claim that serving in the role during the six months before the selection decision brought no benefit to Mr. Sobieranski to be so outlandish that it was not put forth honestly but as a way to cover up the unlawful favoritism he

showed Mr. Sobieranski by giving him that role for so long. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000) (recognizing "the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'").

A jury could also decide that Col. Hittle has tried to conceal the tremendous advantage he gave Mr. Sobieranski when he allowed him to serve as the Acting Deputy Director for six months by falsely claiming that Sobieranski did not serve in that position until October 2017. It is clear from the record that Hittle appointed Sobieranski as the Acting Deputy Director upon the prior deputy's retirement in July 2017 and that he allowed him to serve in that position until January 29, 2018, when he bestowed upon him the permanent promotion. *See* Pl's Ex. 8 (Sobieranski Resume, specifying that he began serving as Acting Deputy Director on August 1, 2017); Pl's Ex. 5 (1/25/17 Memo for Record noting that Col. Hittle announced during weekly branch head meeting that Sobieranski would be the interim deputy director following Mr. Bennington's retirement). Mr. Sobieranski himself testified that he was detailed to the position in July 2017 and that he put in paperwork for the detail to be official at that time. Pl's Ex. 3 at 174-75. Yet, Col. Hittle told the EEO investigator that in July 2017 Mr. Sobieranski "was not officially the deputy, neither permanently nor temporarily detailed to the job," and that *"[as of July 2017, Sobieranski] was not doing the functions of the deputy position prior to October."* Pl's Ex. 1 at 199 (emphasis added). He claimed that "[f]rom July to October 2017, I didn't have a deputy." *Id.* This statement is demonstrably false. In addition, at the EEO hearing, Col. Hittle, bafflingly, was unable to specify if or when he detailed Mr. Sobieranski to the Acting Deputy Director position. He testified that "we built the package to temporarily detail Mr. Sobieranski in August [2017]," and that because the detail was only supposed to last 120 days, he began to consider Mr. Smith for the detail in

October 2017. Pls's Ex. 3 at 100-01. Col. Hittle went on to say that since Mr. Sobieranski's 120 days would be up in October, he decided to give Mr. Smith a chance at the detail in October or November 2017, *id.* at 101, or maybe December or January, *id.* at 103. Col. Hittle's prevarication and dissembling on the important issue of his providing such an extreme advantage to the white applicant is best examined by a jury to determine his motive in rejecting Smith's application for promotion. *See Paroline v. Unisys Corp.*, 879 F.2d 100, 109 (4th Cir. 1989), *opinion vacated in part on reh'g,* 900 F.2d 27 (4th Cir. 1990) ("Questions of intent are quintessentially ones for the fact finder under most circumstances").

### 2. *A jury could infer that Col. Hittle pretended not to know Mr. Smith's job and qualifications in order to minimize them*.

In his declaration during the EEO investigation in this case, Col. Hittle stated that he worked "very closely with [Mr. Smith]," "talked to him daily on specific issues and we could always talk about work" and "always felt we could talk, share ideas, and his opinions mattered." Pl's Ex. 1 at 197. Hittle even called Smith "the force that kept everyone focused on strategic goals" and noted that Smith's branch was "an essential point that holds the group all together." *Id.* Yet, at the hearing in this matter, Col. Hittle claimed that he did not know Mr. Smith's experience or even what he did in his job. Pl's Ex. 3 at 91 ("I struggled, at times, to understand what he really did do."). A reasonable jury could find Col. Hittle's claim false and designed to cover up his retaliatory motive given his admission of regular communication with Mr. Smith and the fact that Mr. Smith reported directly to him for almost three years. Pl's Ex. 3 at 65. More specifically, a jury could find that Col. Hittle's incredible claim that he did not know what Mr. Smith did was designed to cover up the fact that Mr. Smith, as head of the Operations Branch, "typically overs[aw] the entire division and all of its functions with every other branch below that." Pl's Ex.

3 at 58 (Williams); *see also id.* ("Mr. Smith . . . would be the No. 3 person within the division, helping oversee the entire operations of everything going on before the mission.").

At the hearing, Col. Hittle retracted his statement and claimed he was just being "generous" when he said that he was the force that kept everyone focused and that he was an essential point that holds everyone together. Pl's Ex. 3 at 122. He also wavered on whether he actually made the statement at all. *Id.* at 122-23 ("I *may* have said essential.") (emphasis added). However, when Col. Hittle began his testimony at the hearing, he admitted that the roles of the Deputy Director and the Operations Branch Head overlapped. He noted that "*the deputy director typically handled day-to-day oversight of financial processes, administrative work, facilitated the happenings of the division across the branches.*" *Id.* at 66 (emphasis added). And Col. Hittle acknowledged that, as Operations Branch Manager, Mr. Smith pulled together data from across branches to create a coherent response to requests for information necessitating communication across branches and a beneficial knowledge of other branches, *id.* at 117, 119, and that Mr. Smith acted as a liaison between Col. Hittle and other branches heads, *id.* at 121. Thus, Hittle's own testimony contradicts his claim that he didn't know what Smith did in his job and reveals a cogent reason for his false claim – to hide the fact that Mr. Smith's experience as the Operations Branch Head made him well-qualified for the Deputy Director position.

> 3. *A reasonable jury could find that Col. Hittle misrepresented Mr. Sobieranski's organizational level to justify his retaliatory non-selection of Mr. Smith*.

Before Mr. Sobieranski was promoted to Deputy Director, he was a Deputy Branch Manager, reporting to a Branch Head who, in turn, reported to the Deputy Director. Pl's Ex. 3 at 80. At the same time, Mr. Smith was a Branch Head and reporting to the Deputy Director. Pl's Ex. 4. Thus, Mr. Smith was one organizational level above Mr. Sobieranski; the organizational

chart shows that Mr. Smith's position, Branch Head Operations, reported directly to the TECD

Director and that Mr. Sobieranski' s position as Deputy Branch Manager. Pl's Ex. 4.

Col. Hittle falsely testified that Mr. Smith was not organizationally higher than Mr.

Sobieranski when Mr. Sobieranski was in his position of record as RTAMB Mgt GS 14.  However,

Mr. Sobieranski' s position, RTAMB Mgt, reported to the Branch Head for RTAMB, who reported

to the TECD director.  *Id.*  Thus, Mr. Sobieranski was organizationally one level below Mr. Smith

at the time Col. Hittle was making his selection decision.  This is also clear from the testimony of

Jeffrey Williams, a co-worker in the Division:

> Mr. Sobieranski worked for the ranges branch, and he worked for a
> section within the ranges branch. Therefore, his visibility,
> everything else that was going on with simulations, the V&V, the
> validation accreditation program that we have -- there was a number
> of other functions going on that he wouldn't have visibility of
> serving in the capacity that he was during that time. Unlike Mr.
> Smith, who, again, would be the No. 3 person within the division,
> helping oversee the entire operations of everything going on before
> the mission.

Pl's Ex. 3 at 58.

> 4.  *A reasonable jury could find Col. Hittle's claim that he relied on
>     decades-old experience to choose Mr. Sobieranski over Mr. Smith
>     unworthy of credence.*

Col. Hittle testified that simulations experience was important for the Deputy Director

position.  Pl's Ex. 3 at 72 ("An understanding of simulations and experience with simulations

would be very valuable.").  When asked to identify Mr. Sobieranski's relevant experience, Col.

Hittle testified to his participation in the development of the ISMT in the "'80s or '90s."  Pl's Ex.

3 at 129. That Col. Hittle claimed that in 2017 he valued Mr. Sobieranski's development of a

technological system in the 1980's strains credibility.  Moreover, the record contains evidence that

the ISMT is not integrated into the live virtual constructive training environment and therefore has

no bearing on the live virtual constructive training education that Col. Hittle claims was critical to the work of the Deputy Director. Pl.'s Ex. at 203. *But see* Pl's Ex. 1 at 198 (Col. Hittle claiming that he needed his Deputy Director to integrate the ranges and simulations programs).

> 5. *A reasonable jury could find that Col. Hittle falsely claimed Mr. Smith did not complain that he felt marginalized by him to avoid the appearance of retaliation.*

Col. Hittle falsely testified under oath that Mr. Smith did not tell him he felt marginalized by him. He gave this testimony in response to the Administrative Judge's direct question:

> Judge Woodham: From the time that you returned in October of 2017 through the date of your selection decision, did you take any steps to address the concerns of Mr. Smith that he was being marginalized?
>
> Col. Hittle: I didn't take any steps to do anything, Your Honor, because *I didn't hear from him that he was being marginalized.*

Pl's Ex. 3 at 155 (emphasis added). Yet, the record is clear that on December 20, 2017, Col. Hittle received an email from Mr. Smith saying exactly that:

> I ask that we sit down and talk. I am not trying to be difficult, but *I feel that you are purposely marginalizing me* with actions like the one you're proposing below . . . I just ask that I be allowed to work free of *marginalization*, discrimination, and other adverse actions.

Pl's Ex. 2 at 179. Moreover, Col. Hittle acknowledged this email from Mr. Smith, stating that Mr. Smith's wording "indicates this is a complaint on your part." *Id.*[2] Because Col. Hittle's knowledge of Mr. Smith's protected activity is a material fact necessary to Mr. Smith's retaliation claim, a reasonable jury could conclude that Col. Hittle's false denial of such knowledge is evidence of an effort to cover up his retaliatory animus against him. *See Reeves*, 530 U.S. at 147 (recognizing

---

[2] Col. Hittle was shown this email at the EEO hearing and testified that he recalled Mr. Smith raising concerns about discrimination and bias. Pl's Ex. 3 at 106. Later in his testimony, Col. Hittle testified: "I didn't take any steps to do anything, Your Honor, because *I didn't hear from him that he was being marginalized.*" Pl's Ex. 3 at 155 (emphasis added).

23

"the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt.").

## IV.    This Court Should Reject Defendant's Attempt to Deny Mr. Smith a Trial *De Novo*.

It is the law of this Circuit that "[p]rior administrative findings, whatever result may be reached, are ordinarily not entitled to preclusive effect in a subsequent discrimination suit, even though the same facts are in dispute." *Rosenfeld v. Dep't of Army*, 769 F.2d 237, 239 (4th Cir. 1985) (citing *Chandler v. Roudebush*, 425 U.S. 840, 845–46 (1976) ("Since federal-sector employees are entitled by s 717(c) to 'file a civil action as provided in section 706 (42 U.S.C. s 2000e-5 (1970 ed., Supp. IV))' and since the civil action provided in s 706 is a trial de novo, . . . federal employees are entitled to a trial de novo of their employment discrimination claims."). Despite this black letter law, Defendant contends that the Administrative Judge's finding is among the facts "material" to this Court's determination on summary judgment.  *See* Docket No. 11 at 7-8, ¶¶ 22-27.  This Court should reject Defendant's attempt to invade the province of the jury by substituting the judgment of an Administrative Judge of the EEOC for that of the jury.


## CONCLUSION

Because a reasonable jury could conclude that Col. Hittle preferred to promote the white applicant to serve as his right hand because of his race and because he felt uncomfortable working with a black applicant who had accused him of discrimination, summary judgment must be denied.

Date: May 31, 2022

Respectfully submitted,

  /s/ Ellen K. Renaud
Ellen K. Renaud, V.A. Bar # 47326
Alan Lescht & Associates, P.C.
1825 K Street, NW Suite 750
Washington, D.C. 20006
Tel. (202) 852-8483
Ellen.Renaud@leschtlaw.com

*Counsel for Plaintiff*

**Certificate of Service**

I certify that on May 31, 2022, I served the foregoing Memorandum in Opposition to Summary Judgment on counsel of record for Defendant, Yuri S. Fuchs, through the court's electronic filing system.

  /s/ Ellen K. Renaud
Ellen K. Renaud

-----Original Message-----
From: Smith CIV Antonio B
Sent: Friday, December 22, 2017 7:48 AM
To: Hittle Col Patrick R <patrick.r.hittle@usmc.mil>
Cc: Craft Col Joseph A <joseph.craft@usmc.mil>; Wolff CIV Jeffrey A <jeffrey.wolff@usmc.mil>
Subject: RE: Employee Concerns - RE: DoN TRACKER - CIMS CHOP TASK- 115-125 Pg83 Live Virtual and
Constructive Training

Sir,

Thank you for being willing to discuss.  Again, I am not trying to be difficult, but I have seen the second
and third order effects of what happens when I believe someone is looking to find something wrong
with me.  I just wanted to meet to primarily give you the attachments and to have a brief discussion.
We don't have to meet, I can cover my points in this email.  The attachments show when Mr.
Bennington took over as the lead for LVC-TE in the Spring/Summer of 2015 and canceled the Analysis of
Alternatives (AoA).  His decision to canx the AoA charted a course contradictory to JCIDS & Defense
Acquisition System (i.e., No Materiel Development Decision & AoA).  I felt he did this to retaliate against
me because of my complaint and because I wanted to conduct an AoA, but he did not understand the
second and third order effects of his hasty decision on LVC-TE cost and schedule nor unit cohesion
within TECD.  It has taken 3 years to get back on track with LVC-TE/AoA.  So, I feel similar now to how I
did then when decisions were being made in a vacuum, and I appeal to you to allow "due process" in my
case and ask that we work together to accomplish the mission.

Vr,

Tony

Mr. Antonio B. Smith
Operations Officer
T&E Capabilities Division, TECOM
Office - 703.432.2169
Blackberry - 202.631.5160
SIPR - antonio.b.smith@usmc.smil.mil

FOR OFFICIAL USE ONLY - This transmission contains information that is protected from disclosure by
the Privacy Act of 1974 (5 USC 552a) and exemption (b)(6) of the Freedom of Information Act (5 USC
552, as amended).  Please ensure that this information is used solely for the requested purpose. Further
duplication and/or distribution without prior authorization from this office is not authorized. Civil and/or
criminal penalties can apply for improper use.

-----Original Message-----
From: Hittle Col Patrick R
Sent: Wednesday, December 20, 2017 4:42 PM
To: Smith CIV Antonio B <antonio.b.smith@usmc.mil>
Cc: Craft Col Joseph A <joseph.craft@usmc.mil>; Wolff CIV Jeffrey A <jeffrey.wolff@usmc.mil>
Subject: Re: Employee Concerns - RE: DoN TRACKER - CIMS CHOP TASK- 115-125 Pg83 Live Virtual and
Constructive Training

Tony,
I will be glad to discuss with you, but essentially, your wording below indicates this is a complaint on your part. Please feel free to consult with HR, and any others you feel appropriate, if you indeed wish to address this as such.

I've copied G1 for awareness, from the perspective of HR matters.

S/f
Col Pat Hittle, TECD / TECOM
(703) 784-2964
Sent from BB.
  Original Message
From: Smith CIV Antonio B
Sent: Wednesday, December 20, 2017 16:10
To: Hittle Col Patrick R
Cc: Craft Col Joseph A
Subject: Employee Concerns - RE: DoN TRACKER - CIMS CHOP TASK- 115-125 Pg83 Live Virtual and Constructive Training


Sir,

I ask that we sit down and talk.  I am not trying to be difficult, but I feel that you are purposely marginalizing me with actions like the one you're proposing below, couple with other instances in the recent past (i.e., moving contractor from Ops to MTSB) that have adversely impacted me and the mission.  I believe your actions are because I have an EEO complaint against TECOM that includes you.  I just ask that I be allowed to work free of marginalization, discrimination, and other adverse actions.  I cc'ed the Chief of Staff because my case has been ongoing for nearly three years and I want to make him aware of this current matter in hopes that he can help resolve it.  I just ask for "due process" regarding my current case and to be allowed to work in a non-hostile environment without reprisal.

Vr,

Tony

Mr. Antonio B. Smith
Operations Officer
T&E Capabilities Division, TECOM
Office - 703.432.2169
Blackberry - 202.631.5160
SIPR - antonio.b.smith@usmc.smil.mil

FOR OFFICIAL USE ONLY - This transmission contains information that is protected from disclosure by the Privacy Act of 1974 (5 USC 552a) and exemption (b)(6) of the Freedom of Information Act (5 USC 552, as amended).  Please ensure that this information is used solely for the requested purpose. Further duplication and/or distribution without prior authorization from this office is not authorized. Civil and/or criminal penalties can apply for improper use.

JA 158

-----Original Message-----
From: Hittle Col Patrick R
Sent: Wednesday, December 20, 2017 12:48 PM
To: Smith CIV Antonio B <antonio.b.smith@usmc.mil>
Cc: Sobieranski CIV Edward R <edward.r.sobieranski@usmc.mil>; Harder LtCol Byron R
<byron.harder@usmc.mil>
Subject: Re: DoN TRACKER - CIMS CHOP TASK- 115-125 Pg83 Live Virtual and Constructive Training

Tony
With respect to mechanics on this, my understanding is Charlie Driest is detailed to LtCol Harder
specifically to work this report. He's also directly supporting the LVC TE AoA. Byron needs the help and
the additional bandwidth.

Unless someone can give me a compelling explanation why Charlie needs to stay "in Ops", I want to
make this a permanent move in terms of working relationships and org charts. Open to comments and
thoughts.

S/f
Col Pat Hittle, TECD / TECOM
(703) 784-2964
Sent from BB.
  Original Message
From: Smith CIV Antonio B
Sent: Wednesday, December 20, 2017 12:25
To: Hittle Col Patrick R; Sobieranski CIV Edward R; Fraley CIV James R; Thomson CIV Lauren R; Cross CIV
Anthony; Harder LtCol Byron R
Cc: Jenkins CIV Harry; Mooney CTR MariaCarmela R; Guthrie Capt Pierce C; Duenow CIV Russell E;
Williams CIV Jeffrey R
Subject: RE: DoN TRACKER - CIMS CHOP TASK- 115-125 Pg83 Live Virtual and Constructive Training


ALCON,

MCSTE Br has the lead for this task, per earlier discussions.   MTSB, RTAM, & BusSpt, if you have any
input, please provide to LtCol Harder ASAP.  I spoke to Ms. Kruger (DON Tracker POC) and she's working
on a week extension, but for now, 2 Jan is the suspense.   LtCol Harder - Please route response to CG for
approval prior to suspense.  Many thanks!

S/F,

Tony


Mr. Antonio B. Smith
Operations Officer
T&E Capabilities Division, TECOM
Office - 703.432.2169

Blackberry - 202.631.5160
SIPR - antonio.b.smith@usmc.smil.mil

FOR OFFICIAL USE ONLY - This transmission contains information that is protected from disclosure by the Privacy Act of 1974 (5 USC 552a) and exemption (b)(6) of the Freedom of Information Act (5 USC 552, as amended).  Please ensure that this information is used solely for the requested purpose. Further duplication and/or distribution without prior authorization from this office is not authorized. Civil and/or criminal penalties can apply for improper use.

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE
131 M Street, N.E., Suite 4NW02F
Washington, D.C. 20507

```
_____  :
                                 :
ANTONIO SMITH,                   : EEOC No.
                                 : 570-2019-00511X
        Complainant,             :
                                 :
        v.                       :
                                 :
RICHARD V. SPENCER,              : Agency No.
SECRETARY,                       : 18-67856-01699
U.S. DEPARTMENT OF DEFENSE,      :
DEPARTMENT OF THE NAVY,          :
MARINE CORPS HEADQUARTERS,       :
                                 :
        Agency.                  :
_____:
```

Monday, December 16, 2019

Marine Corps Base Quantico
Lejeune Hall
3250 Catlin Avenue
Quantico, Virginia 22134

The hearing commenced at 10:00 a.m.

BEFORE:

MARICIA WOODHAM,

Administrative Judge

APPEARANCES:

On behalf of the Complainant:

       VICTORIA HARRISON, ESQ.
       Alan Lescht & Associates
       1825 K Street, N.W., Suite 750
       Washington, D.C. 20006
       202-463-5104
       victoria.harrison@leschtlaw.com


On behalf of the Agency:

       EVAN R. GORDON, ESQ.
       Associate Counsel
       Quantico Area Counsel Office
       3250 Catlin Avenue, Room 209
       MCB Quantico, Virginia 22134
       703-784-3009
       evan.gordon@usmc.mil

1       training simulations division, in 2009.  At that

2       point, I was the operations officer, the third in

3       line of succession, as far as the order of

4       authority, if you will.

5               That was a division level

6       responsibility, being the operations officer.

7       For the next nine years, I served as the

8       operations officer, where we added branches to

9       our division, and some branches left.  During

10      that time period, I was responsible for assisting

11      the director and the deputy director in leading

12      all of the branches within the division.

13              We had a science and technology

14      branch, ranges and training area management

15      branch, MAGTF training simulations branch.  We

16      had a business support branch.  From that

17      respect, I was a division-level leader for the

18      entire nine years, during the time leading up to

19      this hire.

20              The responsibilities were immense.  I

21      was responsible for briefing officers at the

22      three-star level, Army and Marine Corps Board.

13

1      During this time period, I traveled to France to

2      brief French officers.  During this time period,

3      I participated in talks with Israeli forces.

4      During this time period, I participated in a

5      number of high-level meetings with general

6      officers with the commanding general of the base.

7              At the time of this particular

8      promotion, I had also served for very limited

9      times as the deputy director and as the director

10     if they had left for two or three weeks or

11     something along those lines.  I was very familiar

12     with their responsibilities, as well.

13              JUDGE WOODHAM:  What was, I guess, the

14     longest time frame that you served as, I guess,

15     an acting deputy director?

16              MR. SMITH:  Mr. Bennington was out

17     probably -- he had an open heart surgery.  I'm

18     thinking, ma'am, he was out maybe four to six

19     weeks during the time period I was there.  That

20     was probably the longest time period that I ever

21     served as the acting deputy director.

22              JUDGE WOODHAM:  So you were right

14

1        under Mr. Bennington's supervision in the chain,

2        or where were you?

3                    MR. SMITH:  I was right under Mr.

4        Bennington's supervision.

5                    JUDGE WOODHAM:  Did you work under Mr.

6        Bennington for the entire time, beginning in

7        2009?

8                    MR. SMITH:  No, ma'am.  In 2009,

9        initially, I worked for Mr. Bennington.  Then we

10       had a reorganization in 2012.  From 2012 to 2015,

11       I did not work for Mr. Bennington.  He was

12       basically a co-worker during that time period.

13       We were both equals as a branch head.  Then in

14       2015, he was hired as the deputy.  Then I worked

15       for him until he retired in 2017.

16                   JUDGE WOODHAM:  If you know, where did

17       the successful candidate, Mr. Sobieranski, work

18       during this time frame?

19                   MR. SMITH:  During this time frame,

20       Mr. Sobieranski worked for range and training

21       area management branch.  My understanding of his

22       position in range and training area management

1     branch was initially, he was a section head.

2     Then he became the acting branch head for range

3     and area training management branch.  Those are

4     the two positions that he worked.

5                JUDGE WOODHAM:  Then your prior EEO

6     activity named Colonel Hittle, or then Colonel

7     Hittle, excuse me, as the management official,

8     responsible management official.

9                MR. SMITH:  Yes, ma'am.

10                JUDGE WOODHAM:  Prior to the selection

11     in this case, did you have any working

12     relationship with Mr. Sobieranski?

13                MR. SMITH:  Yes, ma'am.

14                JUDGE WOODHAM:  Can you describe that

15     for me, please?

16                MR. SMITH:  As the operations officer,

17     basically, I tasked all the branches.  From the

18     position of being the operations branch head, I

19     tasked Mr. Sobieranski.  I worked in working

20     groups with him.  That was basically our working

21     relationship, just like I tasked other branch

22     heads from the operations officer position.

1              JUDGE WOODHAM:  When you say you

2       tasked other branch heads and Mr. Sobieranski,

3       what does that mean?

4              MR. SMITH:  That means if we received

5       an assignment from, let's say, our higher

6       headquarters to produce, let's say a brief,

7       something as simple as a brief for the commandant

8       of the Marine Corps, then I would take that, and

9       then I would direct the branches to provide their

10      input to the brief, and then I would supervise

11      them bringing in the information.  Then I would

12      consolidate the information, and then give it

13      back to the deputy branch head or, more than

14      likely, to -- not the deputy branch head, the

15      deputy director or the director.

16             JUDGE WOODHAM:  Moving on to the

17      interview with Colonel Hittle, can you describe

18      that interview for me that occurred in January of

19      2018?

20             MR. SMITH:  Yes, ma'am.  Colonel

21      Hittle was the second round interviewer.  There

22      was a panel prior to that.  When I went to the

1    interview with Colonel Hittle, there was a

2    recorder there, Ms. Stephanie Andrews.  She's the

3    head of the civilian manpower branch.  I saw her

4    there as the recorder.  Colonel Hittle asked the

5    questions.  It was professionally done.  I felt

6    like I answered all of the questions.

7         There was nothing that I felt like,

8    when I left the interview, that I didn't provide

9    a sufficient answer for.  When it was over, he

10   asked if you have any questions.  Maybe I asked

11   one or two questions, and then it ended.  A few

12   weeks later, I found out who was selected.

13        JUDGE WOODHAM:  Tell me about the

14   recorder.  What was her role?

15        MR. SMITH:  Her role was to -- from my

16   standpoint, to take notes.  I had two previous

17   EEO complaints, so this was nothing new to the

18   command.  When I saw her, I was thinking that

19   command was doing its due diligence by having the

20   head of the civilian manpower branch in the

21   interview.  The same with the first panel.

22        The first panel, I felt like the

18

1    command had done its due diligence because it was

2    a GS-15.  It looked like it was a diversified

3    panel.  A recorder was in there from the G-1, but

4    her role was to take notes and basically be the

5    command official.

6                    JUDGE WOODHAM:  Did you see her taking

7    notes?

8                    MR. SMITH:  Yes, ma'am.

9                    JUDGE WOODHAM:  Do you have any idea

10   as to what happened to those notes after the

11   interview?

12                   MR. SMITH:  No, ma'am.

13                   JUDGE WOODHAM:  Tell me the types of

14   questions that Colonel Hittle asked you during

15   the interview.

16                   MR. SMITH:  He asked why do I feel

17   that I'm qualified for this position, provide

18   some examples of why I feel that way.  We talked

19   -- I'm trying to remember some of the other

20   questions.  Basically, my larger experience

21   around the Marine Corps.  In two days, I would

22   have been around the Marine Corps for 32 years,

1    so I have a lot of experience even beyond

2    training and education capabilities division, so

3    questions along those lines, ma'am.

4            JUDGE WOODHAM:  Did you see Colonel

5    Hittle taking any notes?

6            MR. SMITH:  Yes, ma'am.

7            JUDGE WOODHAM:  Could you tell whether

8    he was reading from a script or anything of that

9    nature?

10           MR. SMITH:  I felt that the questions

11   -- he was reading from the questions.  In fact,

12   if I remember correctly, the morning of, he gave

13   us a copy of the questions.  It wasn't -- the

14   questions were exactly what I saw.

15           He read the questions.  I don't feel

16   like he added any questions to the list.  I

17   didn't feel like the beginning of it was

18   necessarily scripted.  It was more -- it was

19   professional, but it was relaxed.

20           JUDGE WOODHAM:  Were any questions

21   asked of you related to the deputy director

22   position?

1    be the acting deputy director, correct?

2              MR. SMITH:  Yes, ma'am.

3              JUDGE WOODHAM:  When did that occur?

4              MR. SMITH:  That occurred late

5    January/early February of 2018, after the hiring

6    board had met.  If I remember correctly, the

7    announcement had already been made for Mr.

8    Sobieranski to be -- they'd already made the

9    announcement that he was selected for the

10   position of deputy director.  Then I was offered

11   to be in the position for what I thought would be

12   one or two weeks, or as long as it took for them

13   to go ahead and put him in the job.  At that

14   point, I declined because I didn't want to take

15   the staff or the people in the office through the

16   changes of another acting deputy director, when

17   he had already been hired for the job.

18              It just didn't make sense to me to

19   accept a job for what I thought would only be two

20   weeks.  Mr. Sobieranski had been in the acting

21   position since 17 July, or thereabout, and he had

22   already been hired.  I felt like once they

1    offered me the job after he had been hired for

2    it, if I wanted to be the acting, I didn't want

3    to take the staff through that for two weeks.

4              JUDGE WOODHAM:  While he was acting in

5    the position from July 17th -- excuse me, July

6    2017 onward, did you have any interactions with

7    him?

8              MR. SMITH:  Yes, ma'am.

9              JUDGE WOODHAM:  Did you have an

10   opportunity to observe his performance in the

11   position?

12             MR. SMITH:  Yes, ma'am.

13             JUDGE WOODHAM:  How would you describe

14   that?

15             MR. SMITH:  I would describe it as

16   normal.  I think that it's a very challenging

17   job.  I think that the -- but I didn't see

18   anything out of the ordinary.  He took over the

19   job.  He was doing time sheets.  He did my time

20   sheet in early August.

21             All of the responsibilities that are

22   commensurate with the deputy position, he started

1    doing those duties, going to the meetings with

2    the commanding general.  I felt like he performed

3    in the position while he was in it.

4              JUDGE WOODHAM:  If you believed that

5    he performed in the position, Mr. Smith, why do

6    you feel that it is because of your race or

7    reprisal that you were not selected for the

8    position?

9              MR. SMITH:  I feel like it was based

10   on a reprisal because I was third in the line of

11   succession after Mr. Bennington.  I would at

12   least expect that during the seven month time

13   period, I would at least get one opportunity to

14   serve as the acting deputy.  I didn't get that

15   opportunity.  Colonel Hittle crafted that to

16   happen, in my mind, because he just didn't give

17   me the opportunity.  There was enough time period

18   in there, even by OPM regulations -- you're only

19   supposed to get 120 days to be detailed into a

20   job.  During that time period, as well, Colonel

21   Hittle continued to marginalize me with removing

22   people from my branch.

1              There were a couple of individuals,

2    they were contractors, but Colonel Hittle just

3    summarily said hey, these people are going to a

4    different branch.  I felt like in the EEO

5    complaints, especially the one where Colonel

6    Hittle -- where I named Colonel Hittle, I

7    couldn't trust Colonel Hittle.

8              During that particular EEO complaint,

9    I received a letter of reprimand.  I tried to go

10   to Colonel Hittle to ask him to help me.  His

11   whole motivation was you need to go see Mr.

12   Bennington.  You need to talk to Mr. Bennington,

13   your supervisor at the time.

14             I couldn't talk to Mr. Bennington.

15   Even when I received a letter of reprimand, Mr.

16   Bennington basically told me I could not speak

17   during the session.  Here I am, I've served, gone

18   to combat, gone to war, and here in the United

19   States, I can't even speak to defend myself in a

20   session.  To me, I couldn't -- Colonel Hittle was

21   not the person that I could go to.  I couldn't

22   trust him anymore after the second EEO complaint,

1    even when I was in a session.  I've waited for

2    this day for so long, just to be able to talk to

3    somebody and say -- just to allow me to speak,

4    nothing special, just to allow me to speak.

5         That was hurtful to not be allowed to

6    speak after serving my country.  Then I can't

7    even speak.  Colonel Hittle purposely put me in

8    those situations.

9         JUDGE WOODHAM:  Did you ever ask to be

10   put in the acting deputy position, saying hey,

11   he's been in there for over 90 days or over 120

12   days; I would like the opportunity?

13        MR. SMITH:  I never asked.

14        JUDGE WOODHAM:  Okay.  Outside of

15   detail, you said that Colonel Hittle would detail

16   others outside of your branch.

17        MR. SMITH:  He did not detail anyone

18   outside of my branch, but I was under the

19   impression that whoever would serve as the acting

20   would be detailed and receive official paperwork

21   from the G-1.

22        JUDGE WOODHAM:  I'm sorry; I guess I

1    misunderstood your testimony.  I thought that you

2    said that Colonel Hittle marginalized you by

3    taking people away from you.

4              MR. SMITH:  I'm sorry; yes, ma'am.  He

5    marginalized me during that period because there

6    were contractors that worked internal to my

7    branch, because as the -- we had various

8    projects, so I had contractors in my branch.  He

9    decided to take a couple of contractors out, not

10   both at the same time.

11             One was taken out in September, and

12   the other one was in December.  I would receive

13   an email or something, basically hey, this

14   person, we're moving him to this job.  I'd go

15   back and hey, sir, can you tell me why we're

16   moving this person?  He would go okay, we're

17   moving because of this particular task.

18             But that's not the way it's done.

19   When you're moving people from one branch to

20   another, there's a common courtesy to sit down

21   with the branch head and just say hey, can you

22   give me some thoughts?  Is this a good move?  Or

1    even, as a commander -- again, I've been in the

2    Marine Corps a long time.  I've commanded.  I

3    understand when people tell you to do something,

4    it's time to do it, but you give them the

5    courtesy of knowing what it is you're about to

6    do.

7                JUDGE WOODHAM:  Did you observe

8    Colonel Hittle extending that courtesy to other

9    branch heads or branch chiefs?

10                MR. SMITH:  I can't say I did, but I

11    can't say I did not.  I don't think any other

12    contractor was moved from another branch into

13    another branch.  But at that point, I just wasn't

14    in a position where I could observe that.

15                JUDGE WOODHAM:  Why do you think it is

16    reprisal?  Why do you think that it's because of

17    your prior EEO activity that you were not

18    selected and not afforded these opportunities

19    leading up to the selection?

20                MR. SMITH:  I think the climate was so

21    hostile with Mr. Bennington, and even the SES, at

22    the time, Mr. Thompson, because I named both of

1    them in the complaint, that their goal was to

2    make me quit or to get rid of me.  I say that

3    because my work schedule was changed a couple of

4    times within a six-month period.  I worked

5    compensatory time and I didn't receive pay for

6    the compensatory time.  There was so many attacks

7    against me to get me to leave during this time

8    period that I saw Colonel Hittle just continuing

9    those attacks.  It was a relentless multiple

10   number of attacks to get me to leave or to quit

11   or to basically take my power away.  Even on this

12   day, I'm no longer the branch head.

13           Eventually, the command just the time

14   and everything else, now I'm detailed into

15   another job until, eventually, the command

16   figures out where they want to put me.  I think

17   when you speak out against and you stand up for

18   your rights, people that don't understand how to

19   be objective will continue to retaliate.

20           I felt like Colonel Hittle was in a

21   position, especially as the second-round

22   interviewer, to make the decision.  To my

1    training and education command.

2                    JUDGE WOODHAM:  What division was that

3    in relation to where Mr. Smith worked?

4                    MR. WILLIAMS:  Within the division,

5    there's an operations branch.  I worked within

6    the operations branch of the MAGTF modeling and

7    simulation division, which is MTSD.

8                    JUDGE WOODHAM:  Was Mr. Smith your

9    supervisor?

10                    MR. WILLIAMS:  Yes, ma'am.

11                    JUDGE WOODHAM:  How long did he act as

12    your supervisor?

13                    MR. WILLIAMS:  I believe we were there

14    seven years, maybe.

15                    JUDGE WOODHAM:  Had you ever worked

16    for Ed Sobieranski?

17                    MR. WILLIAMS:  Yes, ma'am, I believe

18    it was the last few months that I was there, Mr.

19    Sobieranski was my supervisor.

20                    JUDGE WOODHAM:  What time frame are we

21    talking about when you say the last few months

22    you were there?

57

1          MR. WILLIAMS:  Let me take that back.

2     He was my senior rater.  The entire time that he

3     was the deputy, he was my senior rater/reviewer

4     of my evaluations.  Sorry.

5          JUDGE WOODHAM:  Would that still make

6     Mr. Smith your immediate first-line supervisor?

7          MR. WILLIAMS:  Yes, ma'am.

8          JUDGE WOODHAM:  In your -- do you

9     recall signing an affidavit for this matter?

10          MR. WILLIAMS:  Yes, ma'am.

11          JUDGE WOODHAM:  Ms. Harrison, do you

12     have a copy of that affidavit?

13          MS. HARRISON:  I do.

14          JUDGE WOODHAM:  Would you mind showing

15     it to the witness, please?  Mr. Williams, this is

16     an affidavit, the signature page, on Page 3,

17     that's dated October 21, 2019, is that your

18     signature?

19          MR. WILLIAMS:  Yes, ma'am.

20          JUDGE WOODHAM:  If you turn to Page 2.

21     I'm looking at Paragraph 7.

22          MR. WILLIAMS:  Yes, ma'am.

58

1              JUDGE WOODHAM:  Can you tell me why

2       you believe that Mr. Sobieranski did not have the

3       same experience with simulations as Mr. Smith

4       did?

5              MR. WILLIAMS:  Ma'am, what's in the

6       military community, the operations branch

7       typically is overseeing the entire division and

8       all of its functions with every other branch

9       below that.  Mr. Sobieranski worked for the

10      ranges branch, and he worked for a section within

11      the ranges branch.  Therefore, his visibility,

12      everything else that was going on with

13      simulations, the V&V, the validation

14      accreditation program that we have -- there was a

15      number of other functions going on that he

16      wouldn't have visibility of serving in the

17      capacity that he was during that time.  Unlike

18      Mr. Smith, who, again, would be the No. 3 person

19      within the division, helping oversee the entire

20      operations of everything going on before the

21      mission.

22              JUDGE WOODHAM:  Were you aware of Mr.

1        Smith's prior EEO activity?

2                    MR. WILLIAMS:  Yes, ma'am.

3                    JUDGE WOODHAM:  How did you become

4        aware of that activity?

5                    MR. WILLIAMS:  I'd given a statement.

6        Someone had reached out and asked me if I would

7        provide a statement.

8                    JUDGE WOODHAM:  In Paragraph 8, you

9        describe that you were not surprised that Mr.

10       Smith did not receive the position.  Can you tell

11       me why you are not surprised?

12                   MR. WILLIAMS:  Ma'am, quite frankly,

13       there was a number of issues within this

14       division.  We had one particular person who I

15       think targeted Mr. Smith because there was some

16       competition between the deputy positions on the

17       first go around.  This individual was doing a

18       number of things, I think, to discredit Mr.

19       Smith.  I'll give you an example.  When we

20       started there, there were over 20 personnel

21       working within our operations branch.

22                       Over time, gradually -- I could see it

1    those questions are done verbally.  Try to avoid

2    nodding your head, mm-hmm and nuh-uh.  If you use

3    an acronym, if you could tell me what it means,

4    and then you're free to use it thereafter, okay?

5            MR. HITTLE:  Yes.

6            JUDGE WOODHAM:  All right, thank you.

7    We're here today with respect to the complaint

8    Mr. Smith has filed against the Agency with

9    respect to a non-selection that occurred in

10   January of 2018.  Are you familiar with that

11   position?

12           MR. HITTLE:  Yes, I am.

13           JUDGE WOODHAM:  Can you tell me --

14   give me just a little bit of information about

15   your background, Mr. Hittle.  You're currently

16   retired, correct?

17           MR. HITTLE:  That's correct, Your

18   Honor.

19           JUDGE WOODHAM:  When did you retire?

20           MR. HITTLE:  I was commissioned in the

21   Marine Corps as a second lieutenant in 1993.  I

22   retired in the fall of 2018.

1               JUDGE WOODHAM:  Congratulations on

2   your retirement.

3               MR. HITTLE:  Thank you.

4               JUDGE WOODHAM:  At the time that you

5   retired, you had the rank of colonel, but where

6   were you, I guess, stationed, or what was your

7   duty station?

8               MR. HITTLE:  I was stationed here in

9   Quantico, Virginia.  I was the director for

10   training and education capabilities division in

11   training and education command.

12              JUDGE WOODHAM:  How long had you held

13   that position?

14              MR. HITTLE:  I assumed that position

15   the 1st of November of 2015.  I departed the job

16   in August of 2018, almost three years later.

17              JUDGE WOODHAM:  Can you tell me what

18   the duties of the deputy director position

19   entails that you recall?

20              MR. HITTLE:  The duties of the deputy

21   director for TECD, training and education

22   capabilities division, in my view, as the

1    director, I saw them -- at times they were

2    duplicative where I needed a deputy director who

3    could take my place at meetings if I was on

4    travel, or if I was unavailable, the deputy

5    director could fill in and make decisions on my

6    behalf when I was gone.

7            They were also complementary, from the

8    perspective of -- I was busy with a lot of

9    meetings, a lot of interactions with external

10   agencies, so the deputy director typically

11   handled day-to-day oversight of financial

12   processes, administrative work, facilitated the

13   happenings of the division across the branches.

14   While I was typically the decision maker for

15   division-level things, my deputy director was

16   very close right-hand assistant in those matters.

17           JUDGE WOODHAM:  For the deputy

18   director position that we're here for today, do

19   you recall how many individuals you interviewed?

20           MR. HITTLE:  I personally interviewed,

21   in person or over the phone, telephonically,

22   interviewed the final three candidates for the

1    position.

2              JUDGE WOODHAM:  Those were Mr. Smith,

3    Mr. Sobieranski, and Mr. Fox, is that correct?

4              MR. HITTLE:  Yes, Your Honor.

5              JUDGE WOODHAM:  Did you prepare the

6    interview questions for this second round of

7    interviews?

8              MR. HITTLE:  Yes, Your Honor, I did

9    craft -- I drafted and wrote out those questions.

10             JUDGE WOODHAM:  Ms. Harrison, do you

11   still have Page 137 out?

12             MS. HARRISON:  Yes.

13             JUDGE WOODHAM:  Mr. Hittle, are those

14   the questions that you generated for that

15   interview?

16             MR. HITTLE:  Yes, Your Honor, I

17   believe these are the questions.

18             JUDGE WOODHAM:  Did you have any

19   assistance in drafting these questions?

20             MR. HITTLE:  No, I came up with these

21   based on what I saw the responsibilities for the

22   position would entail, what I thought the best --

1    simulation resources, and pulling that together.

2    That really was the next step for LVC, live

3    virtual constructive training resources brought

4    together to give the best training to Marines in

5    units.

6              JUDGE WOODHAM:  If I understand your

7    testimony, you were looking for someone who had

8    experience with simulations in order to broaden

9    it across the whole division.

10             MR. HITTLE:  An understanding of

11   simulations and experience with simulations would

12   be very valuable.  That was one component.

13             JUDGE WOODHAM:  What other components

14   were you looking for, then?

15             MR. HITTLE:  The other components that

16   I saw we needed to have was experience and an

17   understanding of how to leverage the other

18   services' progress towards the same type of

19   things.  The live virtual constructive training

20   concept is something that has been big across the

21   Department of Defense.

22             The Army does some things very

1    similar.  We have a lot in common with the Army

2    simulations, as well as the Army ranges and

3    training programs.  The Air Force has a piece.

4    The United States Navy has a piece.  Basically,

5    because we're trying to pull together -- the

6    Marine Corps' always got this challenge.  We're

7    trying to pull together the nexus of aviation

8    resources, ocean-based resources, blue water

9    Navy, and then land-based resources.  All those

10   operational elements come together.  They each

11   have their own different domain that they tend to

12   operate in.

13          The Marine Corps really is trying to

14   pull it all together from the Marine air-ground

15   task force perspective.  It would help to have

16   cross-service coordination experience and

17   understanding of how the Marine Corps would work

18   closely with other services to build joint

19   components.

20          Because at the end of the day, if our

21   Marine Corps solution to this capability need

22   does not align and mesh well with the other

1    services, we're not able to train in a joint

2    manner, which hinders our ability to

3    operationally fight and execute operations that

4    the nation needs us to in a joint construct.

5              JUDGE WOODHAM:  Were there any other

6    elements that factored into what you were looking

7    for for this position?

8              MR. HITTLE:  Question 2 describes

9    asking the candidate if they have any previous

10   experience managing a program of record and

11   budgeting program funds, hands-on understanding

12   of building program objective memorandum briefs,

13   budget submissions, requests for funding are very

14   important, experience with understanding how

15   budgeting across the future year defense program

16   -- or future year defense plan, the four years of

17   the FYDP, is important, from projecting strategic

18   needs and strategic requirements, understanding

19   program element budgeting and execution system,

20   PEBES.

21             It's how the Marine Corps tracks its

22   money, tracks both what's current year money to

1    be spent and what is future year money that is

2    budgeted.  You can't make long-term plans if you

3    don't understand how the future year budgeting is

4    going.

5            Experience with the program of record

6    level -- your program needs so many dollars this

7    year and in future years, and then the execution

8    piece of how that money is spent is a different

9    side of the house, a different system.

10   Understanding how money is transferred via

11   military interdepartmental purchase request or a

12   MIPR, M-I-P-R.  Different service offices can

13   shift money back and forth.  It's program

14   management.  It's understanding the smaller

15   aspects and tracking that money that you budgeted

16   on the front end, tracking the money that's

17   executed on the back end, but understanding and

18   having familiarity with those processes would be

19   very valuable in a candidate.

20           JUDGE WOODHAM:  Turning to the

21   candidates that you interviewed, and continuing

22   with the last response that you just provided,

1    what experience did Mr. Sobieranski -- let me

2    back up.  Did you take any notes while

3    interviewing these final three individuals for

4    this position?

5              MR. HITTLE:  I did take down a few

6    notes.  I basically printed out the questions

7    list, one for each of the candidates that I was

8    meeting with or talking with on the phone.  I did

9    write down a few notes on each sheet.

10             JUDGE WOODHAM:  Did you meet with Mr.

11   Smith in person?

12             MR. HITTLE:  I did.

13             JUDGE WOODHAM:  Did you meet with Mr.

14   Sobieranski in person?

15             MR. HITTLE:  I did, Your Honor.

16             JUDGE WOODHAM:  Did you meet with Mr.

17   Fox in person?

18             MR. HITTLE:  I interviewed him over

19   the phone.

20             JUDGE WOODHAM:  What did you do with

21   your notes at the conclusion of interviews?

22             MR. HITTLE:  I think I kept them in a

1    folder.  As it's come to light, I've been told I

2    was probably supposed to save them or give them

3    to someone in human resources.  I didn't know

4    that at the time.  I kept the folders in my desk

5    at work.

6              When I departed the position, I

7    cleared out all my old files.  I shredded

8    everything that I thought was sensitive and

9    needed to be protected because it might be

10   potentially personally identifiable information.

11             JUDGE WOODHAM:  Was this the first

12   selection that you had to make of this nature?

13             MR. HITTLE:  Yes, Your Honor.

14             JUDGE WOODHAM:  Did you review the

15   packages of Mr. Smith, Mr. Sobieranski and Mr.

16   Fox prior to their interviews?

17             MR. HITTLE:  I did, Your Honor.

18             JUDGE WOODHAM:  In terms of -- with

19   respect to, excuse me, Mr. Sobieranski, what

20   previous experience did he have with managing a

21   program of record and budgeting program funds?

22             MR. HITTLE:  He had been working in

1    the range and training area management branch,

2    which was originally RTAM, as it's called, which

3    was originally its own independent division, led

4    by a GS-15.  That RTAM organization came into

5    being, I think, in the early 2000s.

6              In the 2012 reorganization, the

7    training and education command executed -- the

8    RTAM division was combined with the MAGTF

9    training simulations division to form TECD, the

10   organization we were at the time of this

11   selection.  Mr. Sobieranski had been working on

12   range development programs.

13             He had -- he was working -- that

14   program, which focused on range development

15   systems, he was involved in future year

16   acquisition discussions about expansion that

17   Marine Corps installations, both in CONUS, the

18   continental United States, Hawaii, some locations

19   overseas, primarily Guam, the realignment of U.S.

20   forces from Okinawa, off of Okinawa to other

21   locations, such as Hawaii and Guam.  Anywhere we

22   had a potential investment to purchase land or to

1    buy range systems to support future ranges, he

2    was involved in those discussions.  That's the

3    program management from the RTAM side.  RTAM is a

4    large Marine Corps programming code, a program

5    that has roughly $100 million plus in it.

6              That is slightly different than some

7    of the other programs of record on the simulation

8    side, which is not one big omnibus program of

9    record.  It's a bunch of smaller programs aligned

10   to each of those training systems, specifically.

11             JUDGE WOODHAM:  Was he managing this

12   $100 million budget?

13             MR. HITTLE:  No, not the entire

14   budget, no, ma'am.

15             JUDGE WOODHAM:  What was the amount of

16   budget that he was managing that he represented

17   to you?

18             MR. HITTLE:  I don't believe he told

19   me a number, and I don't believe I had a number

20   in mind, in terms of a dollar amount, but he did

21   have some experience with the range training

22   systems, evaluation and budgeting for those.  He

1    was either submitting numbers to someone else,

2    who was capturing those for the RTAM program of

3    record, or he was tracking current year funding

4    to buy the systems to go on to the ranges to

5    support pop-up targets and those types of things.

6            JUDGE WOODHAM:  Did he tell you that,

7    or that's what you assumed that he was doing?

8            MR. HITTLE:  I may have leveraged some

9    of my understanding that he was involved in that.

10   I may have made an assumption.

11           JUDGE WOODHAM:  What would you have

12   leveraged your understanding from?

13           MR. HITTLE:  From my interactions with

14   RTAM.  I knew he had been involved in all that.

15   I had garnered that information over the previous

16   two years of working with him.

17           JUDGE WOODHAM:  But do you have a

18   recollection of exactly the duties he was

19   performing at the time that you interviewed him?

20           MR. HITTLE:  Your Honor, at the time

21   that I was doing that interview, he had been

22   selected as the deputy RTAM branch manager.

1    Because we had not advertised the GS-15 position

2    at RTAM for hire, he was de facto filling in as

3    the RTAM branch head, so he was making all those

4    decisions.

5              JUDGE WOODHAM:  How did Mr.

6    Sobieranski summarize his experience with

7    projects or programs that spanned multiple

8    services?

9              MR. HITTLE:  He explained how one of

10   the original tasks that he had been given when he

11   joined range and training area management

12   division was to build a policy for ranges and

13   training area management.  The range management

14   policy was to be developed in concert with the

15   Army's G-3 training team at the headquarters,

16   Department of the Army, in the Pentagon.

17             He worked very closely with

18   counterparts up there to build a policy document,

19   which guides -- it's both a Marine Corps order on

20   the Marine Corps side, Department of the Army

21   equivalent, which aligns the Army's range

22   policies with the Marine Corps' range policies,

1   effectively to the benefit that if you were a

2   leader of a Marine unit and you want to go train

3   at an Army base, the systems and processes

4   interact.

5            They are the same system, in some

6   instances, and you can -- it's transparent to the

7   leader of the Marine unit whether it's training

8   at an Army base or a Marine Corps base and vice

9   versa.  Ed Sobieranski was involved in building

10  that policy and continuing the close relationship

11  with the Army counterparts so that any

12  updates/interactions, those working groups would

13  continue to stay aligned, so that the programs

14  for each service wouldn't diverge.

15           That was the biggest thing that he

16  talked about, that he told me about his real

17  experience in cross-service coordination.  I had

18  known that from being involved in mission capable

19  ranges working group meetings and what I garnered

20  through my day-to-day interaction with the issue

21  on the ranges side in my previous two years or

22  so.

1              JUDGE WOODHAM:  Did he explain or

2     relay any other projects besides the one you just

3     described?

4              MR. HITTLE:  I think that was probably

5     the biggest example, Your Honor.  I don't

6     remember writing down any other particular

7     examples.

8              JUDGE WOODHAM:  Moving on to Mr.

9     Smith, what did he tell you about the projects

10    and programs that he worked on that spanned

11    multiple services?

12             MR. HITTLE:  I do not remember

13    specifically what he mentioned, Your Honor.  I

14    believe I wrote something down, but not having my

15    notes to refer to, I'm at a loss right now.  I

16    can't remember anything specifically, Your Honor.

17             JUDGE WOODHAM:  Do you remember

18    anything specific about his interview?

19             MR. HITTLE:  I believe he did talk to

20    his credible experience with training simulation

21    systems.  He had a very deep -- I believe roughly

22    eight years of experience working with training

1    Sobieranski, had deeper experience across the

2    board.  My question to you, Mr. Hittle, is what

3    were the areas that Mr. Smith was less

4    experienced in that Mr. Sobieranski had more

5    experience?

6              MR. HITTLE:  I mentioned that Mr.

7    Smith had been involved in, at times, I believe,

8    probably the principal action officer on

9    developing a live virtual constructive training

10   environment program of record or policy or

11   anything.

12             JUDGE WOODHAM:  I'm sorry, let's stop.

13   I'm sorry; go ahead, Mr. Hittle.

14             MR. HITTLE:  Mr. Smith had been either

15   the principal lead or directly managing the

16   action officers who were responsible for

17   developing live virtual constructive training

18   solutions and policy, etc.  That was one area

19   that we had not been able to produce a policy, in

20   terms of managing those simulation systems,

21   directing how we would meld the live systems and

22   the simulation systems together.

1          I was looking at that, saying I think

2    more could have been done.  Mr. Smith could have

3    done more, but had not really produced those

4    types of things.  He'd been involved in that

5    developing that concept for many years.

6          JUDGE WOODHAM:  My question is what

7    areas did Mr. Sobieranski have more experience in

8    that Mr. Smith did not?

9          MR. HITTLE:  Your Honor, it was very

10   tough.  They were two candidates that were very,

11   very close on a lot of those things.  One area

12   that comes to mind is Mr. Sobieranski had worked

13   managing the program, the aspects of the RTAM

14   program across the MCICOM regions, working with

15   regional range professionals and managers and

16   working at the installation level on developing

17   policy issues, on working safety investigation

18   boards related to mishaps that occurred on

19   ranges.

20          His understanding of the policy,

21   because he was one of the authors, was incredibly

22   deep.  He was consistently sought out as subject

1    matter expert.  Mr. Smith, I do not believe, was

2    viewed or leveraged, his expertise was not

3    requested and not sought out by experts in the

4    training simulation system field.

5        He'd been associated with the program

6    and working on it, but his knowledge of the

7    simulator systems, themselves, and how we could

8    stitch them together, bring them together in

9    virtual environments, was not as deep.  His

10   understanding of the simulation side was not as

11   deep as Mr. Sobieranski's understanding of the

12   range and training area management program.

13       JUDGE WOODHAM:  Isn't that comparing

14   apples and oranges, Mr. Hittle?  It appears as if

15   you have a vast knowledge of what Mr. Sobieranski

16   may have done in one particular branch, but you

17   really didn't have any understanding of what all

18   of the candidates may have had -- experience all

19   of the candidates have with respect to being

20   across the branches.  Is that fair to say?

21       MR. HITTLE:  Yes, Your Honor.  I don't

22   have an answer to say why I wouldn't.

1          JUDGE WOODHAM:  What other areas was

2     Mr. Sobieranski more experienced in as opposed to

3     Mr. Smith?

4          MR. HITTLE:  Mr. Sobieranski's

5     position as the -- while he was the deputy branch

6     head for the RTAM branch and effectively filling

7     the position -- effectively taking over the

8     responsibilities as the RTAM branch head, he was

9     responsible for oversight and management of all

10    the RTAM budget, the money under that program of

11    record, how it was going to be allocated,

12    shifted, if there was a need to shift it within

13    the program to different responsibilities or

14    different demand signals.  I do not believe that

15    Mr. Smith had direct management of the funds at

16    that type of depth and detail.

17         JUDGE WOODHAM:  Do you have any idea

18    of what Mr. Smith did at all?

19         MR. HITTLE:  I struggled, at times, to

20    understand what he really did do.

21         JUDGE WOODHAM:  Did you take the time

22    to find out what he did?

1    of my time and division-level time, because of

2    the general's focus, were associated with ranges,

3    issues like the Twenty-Nine Palms land expansion,

4    to expand the base at Twenty-Nine Palms by

5    roughly 1/3 the size.

6              We had delicate coordination staff

7    talks with the Federal Aviation Administration at

8    various levels, from the local to regional and

9    national level.  These were top-level items for

10   the commanding general that he was asking me

11   about, my division about, because we managed the

12   policy on those types of issues.  That was one

13   big concern that leaps to mind right off the top.

14             JUDGE WOODHAM:  When you returned in

15   October of 2017, did you request permission to

16   officially detail someone into this position or

17   formally detail them?

18             MR. HITTLE:  I believe we started the

19   paperwork.  We built the package to temporarily

20   detail Mr. Sobieranski in August.  I think that

21   was submitted -- I believe, Your Honor, but I

22   don't have it in front of me to tell you the date

1    on a piece of paper -- that was submitted in

2    August, before I was gone for 30 days.

3              That was working its way through the

4    headquarters approval process, which is

5    bureaucratic and frustrating.  It wasn't until

6    early October that we got that back as it's

7    approved.  You have the funding; you can go ahead

8    and do a temporary detail letter for Mr.

9    Sobieranski.

10             It was at that time I knew that based

11   on the lead time to get a package like this

12   approved, a temporary detail letter that is only

13   -- the approval's good for 120 days; it was the

14   right thing to do to ask Mr. Smith if he wanted

15   to be -- an opportunity to be the deputy for 120

16   days.  We could start the package sooner.  I

17   asked him; he said yes, so we initiated that

18   package roughly October/November time frame to

19   get approval for -- the following 120 days would

20   be his opportunity, his turn, because it just

21   couldn't stay with one individual indefinitely.

22             JUDGE WOODHAM:  Then thereafter, that

1    time frame coincided with the selection in this

2    matter, did it not?

3            MR. HITTLE:  I expected this selection

4    process to take a good long time just because

5    it's a GS-15 position at Quantico.  It's a senior

6    management position.  There would be a lot of

7    individuals interested in applying for it.

8            We did; we had 70 plus-80 plus

9    applicants that were certified, that were

10   qualified and made the certificate of eligibility

11   for the initial screening of the position.  I

12   expected it to take time.

13           JUDGE WOODHAM:  In reality, it did

14   not, correct?

15           MR. HITTLE:  July of 2017 to actually

16   onboarding someone in February of 2018, it was

17   about seven or eight months, Your Honor.

18           JUDGE WOODHAM:  With respect to the

19   timing of the detail, if I understand your

20   testimony, you said that in August of 2017, you

21   began the paperwork for Mr. Sobieranski to take

22   over the acting deputy director -- take over the

1    position as acting deputy director.  That was

2    eventually approved in October, when you

3    returned.  Is that correct?

4                MR. HITTLE:  I believe so, Your Honor.

5                JUDGE WOODHAM:  Then, in October, you

6    likewise asked Mr. Smith whether he wanted to

7    take a stab at it the second time it came around,

8    the second 120 days, correct?

9                MR. HITTLE:  Yes, Your Honor.

10               JUDGE WOODHAM:  That's when you

11   initiated the paperwork for him.

12               MR. HITTLE:  For the second temporary

13   detail, started that paperwork in October.  I

14   think that came back with approval to do so for

15   the second term in December of 2017.

16               JUDGE WOODHAM:  Did you offer that to

17   Mr. Smith in December of 2017, since Mr.

18   Sobieranski had, in de facto, been acting since

19   July?

20               MR. HITTLE:  I think I offered that to

21   Mr. Smith in late December or early January.  I'm

22   not sure, with the holidays in there, how that

1    quite turned out, but as soon as I knew we had

2    approval for a second temporary detail, 120 days

3    for Mr. Smith, I told him.  I didn't delay.  I

4    didn't hold on to that.  As soon as we had it, I

5    wanted to make sure that he knew that.

6              JUDGE WOODHAM:  Do you recall whether

7    or not the selection for this position had

8    already occurred before you offered that to Mr.

9    Smith?

10              MR. HITTLE:  I'm trying to remember

11    back specifically, Your Honor.  It was not a

12    matter of -- I know as soon as I had the

13    notification that we were -- that we had approval

14    for Mr. Smith to do the second temporary detail,

15    I relayed that information to him.

16              I can't remember exactly the timing

17    between the selection or non-selection.  I may

18    have made the selection and submitted the

19    package, but I wanted to ensure that if something

20    didn't happen, that he was afforded the

21    opportunity for the short time, the 120 days that

22    we had approval for.

1              JUDGE WOODHAM:  Who would you have

2     received that approval for the detail, who would

3     you receive that from?

4              MR. HITTLE:  It would have come from

5     our G-1 human resources.  I think probably

6     Stephanie Andrews probably would have been the

7     individual in G-1 that I got that from, or Mr.

8     Jeff Wolfe, the director of the G-1 division.

9              JUDGE WOODHAM:  Directing your

10    attention back to Page 137, Mr. -- am I on the

11    right page?  I'm sorry.  Back to the email that

12    you have in front of you.  Do you recall, during

13    this meeting with Mr. Smith, that he relayed

14    concerns about being subjected to reprisal as a

15    result of this selection decision?

16             MR. HITTLE:  Your Honor, I don't

17    remember Mr. Smith bringing up anything about

18    reprisals in that conversation.

19             JUDGE WOODHAM:  Do you see where Mr.

20    Smith is relaying his concerns about bias?

21             MR. HITTLE:  I apologize, Your Honor;

22    this conversation's almost two years ago.  I

1    haven't read this email --

2                  (Simultaneous speaking.)

3                  JUDGE WOODHAM:  I'll give you the

4    chance.  You can go ahead and review it in its

5    entirety.  Go ahead.  Tell me when you're done.

6                  MR. HITTLE:  Thank you, Your Honor.

7    Can you repeat the question?

8                  JUDGE WOODHAM:  Now, after having

9    reviewed Page 141, do you recall Mr. Smith

10   raising concerns about discrimination or bias?

11                  MR. HITTLE:  Now I do, Your Honor.  To

12   be very frank, I didn't want to go down the road

13   again on, again, a long discussion about Mr.

14   Smith's view about the events that had occurred

15   before I arrived.

16                  I knew there was an ongoing case, and

17   I didn't want to muddy the -- I didn't want to

18   say something inadvertently that I didn't intend

19   or that could be taken the wrong way, so I was

20   very cautious about it.  After a few comments

21   along these lines, I just tried to wrap up the

22   conversation with Mr. Smith and try and ensure

1    that we could move on and get back to work.

2                    Probably more my concern, Your Honor,

3    that I didn't want to get into those details.  I

4    wanted to ensure that he got the message from me

5    regarding the selection and that we would try and

6    move on as best we could and get back to work.

7                    JUDGE WOODHAM:  All right, thank you,

8    Mr. Hittle.  Ms. Harrison, do you have any

9    questions?

10                   MS. HARRISON:  Yes, Your Honor, I do.

11   WHEREUPON,

12        PATRICK HITTLE

13   was called as a witness by Counsel for the

14   Complainant and, having been first duly sworn,

15   assumed the witness stand, was examined and

16   testified as follows:

17        DIRECT EXAMINATION

18                   BY MS. HARRISON:

19        Q     Mr. Hittle, when you were conducting

20   the interviews of the final three candidates was

21   there anyone else present?

22        A     Ms. Stephanie Andrews from the

1    training and education command G-1 was there.

2        Q    Was Ms. Andrews present for all three

3    of the interviews?

4        A    I believe so.

5        Q    Did Ms. Andrews take any notes during

6    the interviews?

7        A    I don't recall if she did or not.

8        Q    Do you know why Ms. Andrews was

9    present during the interviews?

10       A    I discussed how to conduct the

11   interviews.  Mr. Wolfe recommended that I

12   definitely have someone else in the room with me,

13   that I not do these independently, on my own.  He

14   offered that Ms. Andrews, who handled much of the

15   administration matters that directly pertained to

16   my division would probably be a good candidate to

17   be there.

18       Q    Did Ms. Andrews advise you as to what

19   to do with any notes or documentation you used

20   during the interviews?

21       A    I don't believe we talked about my

22   specific handwritten notes.

1    Q    Did anyone else advise you as to what
2    you should do with your notes?

3    A    No, ma'am.

4    Q    Mr. Hittle, the deputy director
5    position, does that oversee more than just RTAM?

6    A    It does.

7    Q    Mr. Hittle, in your opinion, is there
8    any value to having a presence or visibility in
9    the -- actually, let me take a step back.  How
10    many branches are within TECD?

11    A    The way training and education
12    capabilities division was organized, you had the
13    region training area management branch.  You also
14    had -- the second branch was MAGTF training
15    simulations branch.  We had the operations
16    branch.  Then we had a fiscal or a support
17    branch, which handled a lot of
18    budgetary/financial matters types of things.  We
19    had -- we were standing up, I believe, a fifth
20    branch.  We were going to call that a number of
21    different things, but it was Marine Corps
22    synthetic training environment branch or MCSTE

1    branch or something along those lines.

2              Because we had a lieutenant colonel

3    come to the division, Lieutenant Colonel Byron

4    Harder, who had just finished getting a PhD in

5    training simulations or virtual simulations.

6              He was the right expertise to get at

7    some of the really hard technical issues

8    associated with LVC and the MCSTE concept,

9    synthetic training environment concept.  I

10   believe that was stood up -- we consolidated

11   simulations officers under him and one or two

12   planners.  That would have been the fifth branch,

13   if that makes sense.

14        Q    Mr. Hittle, did you have any

15   familiarity with the purpose or the duties of the

16   operations branch?

17        A    In November of 2015?

18        Q    Generally, during your time as the

19   director of TECD.

20        A    Are you asking what my understanding

21   was?

22        Q    Yes, my question was -- let me

1    rephrase that in maybe a clearer manner.  Are you

2    familiar with what the purpose or the duties was

3    or were of the operations branch, specifically?

4    What did it do?

5        A    My view of what the operations branch

6    was supposed to do for training and education

7    capabilities division was to manage the taskings

8    which were given to our division from our higher

9    headquarters, to represent the division in

10   planning teams and outside collaborative efforts

11   with external organizations, to be the outward

12   directed face of the division to those that don't

13   necessarily understand what our division did or

14   how we could help in developing capabilities and

15   supporting training, and also to work with -- to

16   fuse the efforts of the division.

17            There's not only a day to day.  We

18   have a budget which is expended on supporting

19   training every day across the Marine Corps, but

20   there's also efforts to decide where we're going

21   to direct our investment in the future.  How much

22   money do we project we're going to need to

1    year across your programs is the key to success,

2    success being getting effective funding to

3    achieve your long-term objectives to meet what

4    you need to do today per your mission and to get

5    down the road.

6              We have to talk a lot.  We have to

7    share information about very different programs,

8    so that we're working towards the right goals.

9    The operations branch, as I saw that, should be

10   the agency that facilitated the discussions and

11   -- because they managed the system that used to

12   be MCATS, Marine Corps admin action tracking

13   system, and now it's Department of the Navy

14   tracker, the DON TRACKER system.  That's how we

15   get an electronic mailbox, if you will, of -- the

16   task comes in.

17             Someone has to look at that DON

18   TRACKER item, figure out which branch within the

19   division has an equity in developing the answer

20   to that question, and then ensuring that the

21   question gets to the right action officer in each

22   branch, taking their input and putting together a

1    coherent, well thought out, well researched

2    answer to the DON TRACKER question or task.

3                For instance, I mentioned it could be

4    a GAO follow-up question.  The general accounting

5    office has done an investigation a couple years

6    back, and now they want an update.  The service

7    has gone to training and education command.

8                It falls to us, within TECD, to

9    compile statistical data and talk about,

10    programmatically, what we're doing to answer that

11    question, that type of thing.  The operations

12    branch pulls that data together and helps build

13    the coherent response.  That requires a lot of

14    communication.

15        Q     Mr. Hittle, that communication would

16    be communication with the other branches, is that

17    a fair statement?

18        A     Yes, that is.

19        Q     Mr. Hittle, looking back at your

20    response here, this statement, the next sentence

21    says I saw him as the force that kept everyone

22    focused on strategic goals.  Mr. Hittle, in that

118

1    statement -- do you see where I'm looking, that

2    sentence -- are you referring to Mr. Smith?

3        A    Yes.

4        Q    When you say the force that kept

5    everyone focused, who's everyone that you're

6    referring to here?

7        A    Everyone is everyone, primarily

8    through meetings Mr. Smith chaired or through

9    division-level leadership meetings, where it

10   would be the branch heads, the deputy, myself.

11   We would talk about the work we had going on.

12            I'm just trying to lay out exactly how

13   that would be done.  The leaders highlight the

14   priorities, and then it's up to action officers

15   to make sense of that as the operations officer.

16   I would set the priorities.  I would say these

17   are the most important things.  We have these

18   items on the calendar.  We need to make sure that

19   we send a representative to this meeting, a

20   representative to that meeting.  Mr. Smith would

21   help make sure that was tracked.  If the

22   operations branch was managing an effort, then

1   the other branch heads would come to the

2   operations branch and ask for clarity, if there

3   was confusion.

4        Q    Is it fair to say that Mr. Smith, as

5   the branch head of the operations branch, had a

6   presence or visibility in the other areas of TECD

7   besides just operations?

8        A    I would say he had some knowledge of

9   those other branches.  I wouldn't say he

10  necessarily had a presence because as project

11  officers and as capabilities integrators, those

12  -- they managed their programs.

13            Mr. Smith didn't direct where or how

14  they would change their budget amounts or how

15  they -- they would come up with the ideas on how

16  to take the system to the next level to enhance a

17  capability.  Mr. Smith and his branch really just

18  compiled that input together.

19       Q    Do you think there's any benefit for

20  the -- looking at the WD director position, would

21  there be any benefit to having an individual with

22  knowledge of the various divisions or branches

120

1    within TECD?

2         A    That would be beneficial, yes.

3         Q    Mr. Hittle, how often, when you were

4    the director of TECD, how often did you interact

5    with Mr. Smith as the operations officer?

6         A    Pretty much every week, unless I was

7    on travel, often daily.  There would be a lot of

8    emails.  I had days when I would go from meeting

9    to meeting.  I might not sit down and talk with

10   Mr. Smith directly, but he was always involved in

11   emails that I sent out regarding business and

12   strategy items and direction.

13            I strove to ensure that he knew what

14   the vision was, as I saw it, the priorities, and

15   that his branch would be able to effectively

16   manage communications and the tracking systems.

17        Q    Then, Mr. Hittle, is it fair to say

18   that you had an understanding as to what Mr.

19   Smith was working on as the operations officer if

20   you were having this pretty constant interaction

21   with him?

22        A    I think so, yes.

1          Q     Mr. Hittle, is there a reason that you

2     testified today as to your confusion as to what

3     it was that Mr. Smith actually did?

4          A     I think I did not see a lot of benefit

5     from an operations branch because I found myself

6     going directly to the MTSB or the MCSTE or the

7     finance or the RTAM branch head directly, asking

8     questions regarding things.  The operations

9     branch seemed kind of duplicative and kind of

10    overhead.

11             I started to realize more and more

12    that I would send an email to Mr. Smith, and then

13    Mr. Smith would send an email to someone else

14    when, if I had the bandwidth, it didn't make

15    sense to have Mr. Smith and others, Mr. Williams

16    and a number of other folks who were within that

17    operations branch, to manage a tracking system

18    when, if I could have a division deputy who could

19    do that, or someone of -- less than a GS-14.

20             A GS-14's salary is -- that is

21    significant payroll.  When we're trying to do

22    things like ensure we have enough clerks that can

1    manage tracking documents and wide area workflow

2    in other systems that we have to manage finances,

3    if we can communicate effectively with a smaller

4    team, that makes more sense.  I may not have gone

5    to Mr. Smith directly when it was just more

6    expeditious to go directly, to get the question

7    answered, to the branches.

8         Q    But Mr. Hittle, in your statement that

9    we just reviewed, you did call the operations

10   branch an essential point, correct?

11        A    I was being generous.

12        Q    Well, then is it fair to say that as

13   of the date of this statement, which is October

14   11, 2018 -- and I'm looking on Page 201, if you'd

15   like to review the date -- that you believed the

16   operations branch to be an essential point that

17   holds the group all together?

18        A    When I answered these questions, which

19   I believe was the in-phone discussion with the

20   official -- it was shortly before the date.  I

21   think she had to finish typing it up and send it

22   to me.  I thought there was validity.  I may have

1    said essential.

2            I may have been generous because no

3    one wants to lose structure.  No one wants to say

4    I don't need something because then someone else

5    will -- the higher headquarters will take that

6    structure away from you.  I'm not doing a very

7    good job of explaining.

8        Q    Okay, well --

9            (Simultaneous speaking.)

10       A    We always debate organization

11   structure.

12           JUDGE WOODHAM:  Instead of working

13   through the hierarchy, you took steps

14   unilaterally, on your own, to determine what was

15   essential and what was not, based on your

16   day-to-day operations and interactions with Mr.

17   Smith.

18           THE WITNESS:  As a colonel in the

19   Marine Corps, I was given a task to run a

20   training and education capabilities division, a

21   one-of-a-kind, unique organization with a mandate

22   to manage ranges and training simulations.  I had

1    simulations?

2         A     I believe he had experience at the

3    overarching concept level.  I do not believe, to

4    my knowledge, that he had specific expertise.  He

5    didn't have modeling simulations training that

6    specifically spoke to how these systems worked.

7    He had not been directly involved in those

8    particular programs in previous jobs.

9         Q     Mr. Hittle, was Mr. Smith, at some

10    point, the principal lead of an LVC project,

11    task, assignment, whatever you want to

12    characterize it as?

13         A     I believe so.  In the early stages, he

14    was responsible for it.  This grew out of the

15    squad integrated training environment initiative,

16    which I believe dates to the early 2000s,

17    mid-2000s, that yielded a capabilities-based

18    assessment, which exposed some gaps in our

19    training capabilities.

20              The idea was you could better train a

21    squad if you could link all the squads together

22    with some type of virtual system in a constructed

1    environment, so they could do training anytime,

2    anywhere, whether they're physically in the same

3    location or not.  That was established, the SITE,

4    the S-I-T-E, program of record led to the live

5    virtual constructive training environment

6    concept.

7         Q    But, Mr. Hittle, just to clarify, the

8    LVC that we're referring to, that does have to do

9    with simulations, correct?

10        A    PowerPoint deep, yes.

11        Q    Mr. Hittle, to your knowledge, did Mr.

12   Sobieranski, prior to his role as an acting

13   deputy director, did he have any experience with

14   simulations?

15        A    He did.  He was one of the original

16   subject matter experts on development of what

17   became the individual training system, individual

18   squad marksmanship training system, which was the

19   ISMT, I-S-M-T.  ISMT, as we know it, is a

20   marksmanship training system.  Ed was involved in

21   the development of that, dating back to the '80s

22   or '90s, I believe.

1          Q     Mr. Hittle, to your knowledge, do most

2     branch heads have some type of -- handle some

3     type of aspect of the budget?

4          A     Of the five branch heads, we created

5     a MCSTE branch, which was S&T focused.  I don't

6     believe that they had any budget.  The

7     fiscal/support branch, obviously they're the

8     functional arm.  They're kind of administrative,

9     not functional, but MAGTF training simulations

10    branch and RTAM branch had the lion's share.

11          If there was any leftover budget

12    program of record responsibility that fell onto

13    the RTAM branch, that was primarily to focus on

14    getting at science and technology needs from what

15    was the SITE program and became the LVC-TE

16    program.  That dwindled over the years.

17          By 2016-2017 time frame, the SITE

18    capabilities based assessment was approaching ten

19    years old.  As a CBA becomes older, it gets less

20    validity, in terms of making budget arguments.

21    You should fund my program.

22          We had a little bit of research and

1    technology left over, S&T money that was still

2    resident within that, which we had renamed the

3    program from SITE to LVC-TE.  There was a -- if I

4    was to guess how much it was, I think it was less

5    than half a million per year, in terms of money.

6        Q     That budget or that -- that budget was

7    handled by operations, is that correct?

8        A     By John Keppler, I believe.

9        Q     He was within operations.

10       A     Yes.

11       Q     There were aspects of budget that the

12   operations branch handled.  Is that a fair

13   statement?

14       A     On a much more diminished scale.

15       Q     Mr. Hittle, you spoke very briefly

16   about being out of the office sometime in late

17   summer of 2017.  I believe you said it was about

18   30 days --

19       A     Mm-hm.

20       Q     -- correct?  When you returned, did

21   Mr. Sobieranski continue to act as the deputy

22   director in an informal capacity?

1          A      In an informal capacity, yes.

2          Q      Mr. Hittle, do you believe there was

3    any benefit given to Mr. Sobieranski by allowing

4    -- having him -- I'm sorry, let me take a step

5    back.  Mr. Hittle, to the best of your

6    recollection, was Mr. Sobieranski in the acting

7    deputy director position when he applied for the

8    deputy director position?

9          A      I cannot remember exactly when the

10   position was advertised.  If the position was

11   advertised, then that information may be in the

12   case files.  I'm not sure.

13         Q      Sure.  Let me ask you a different

14   question.  To your recollection, was Mr.

15   Sobieranski the acting deputy director when you

16   interviewed him for the deputy director position

17   sometime in January of 2018?

18         A      Yes, he was.

19         Q      Mr. Hittle, do you think there was any

20   benefit that Mr. Sobieranski got from being the

21   acting deputy director when he was interviewing

22   for that very position?

1           A     I don't think so, no.

2                 MS. HARRISON:  I have nothing further.

3                 JUDGE WOODHAM:  Okay.  Do you need a

4     break, Mr. Hittle?

5                 THE WITNESS:  No, I'm fine, Your

6     Honor.

7                 JUDGE WOODHAM:  Anyone else need a

8     break?  No?  Okay, go ahead, Mr. Gordon.

9                 MR. GORDON:  Thank you.

10         CROSS-EXAMINATION

11                BY MR. GORDON:

12         Q     Mr. Hittle, we've kind of discussed

13    how an infantry battalion would be ran and how

14    TECD, an organization like that would be run.

15    Would you agree that in an infantry battalion,

16    you'd have a commanding officer, an executive

17    officer, and then the third -- the next person

18    down would be the operations officer, the third

19    in command, if you will?  That person would be

20    responsible for executing the commander's intent

21    and distributing those directions to the

22    subordinate company commanders.

1         A     I believe the operations officer would

2    be responsible for ensuring that orders are

3    transmitted.  The operations officer would

4    facilitate -- would field questions from the

5    company commanders if there were questions on how

6    that was to be executed as he coordinated broader

7    -- the finer details of a broader plan from the

8    operations office.

9         Q     Typically, in an infantry battalion,

10   an operations officer's probably going to be

11   usually a major.  He's going to be senior to the

12   captain company commanders.

13        A     That's correct, usually.

14        Q     In TECD, you have the four branches

15   that we've discussed.  They all had a branch

16   head.  What were the ranks of the -- pay grades

17   of those four branch heads?

18        A     They were all GS-14 pay grade.

19        Q     Was one above the other?

20        A     No.

21        Q     Was the operations officer, so in this

22   case, at the time, Mr. Smith, was he the de facto

1    or the actual third in command if you were to go

2    down and the deputy director were to go down or

3    not be present?  Was that how the organization

4    was written up?

5         A    I had no policy, formal or informal,

6    written or unwritten, that stated that it was one

7    particular person.  If I was ever to be out for

8    an extended period, or if I was going to be on

9    travel, and the deputy, at the time, was going to

10   be gone, then it was a matter of deciding who was

11   in the best position, from a branch head, in

12   terms of less focus on their programs, meaning

13   maybe that they would have more bandwidth to fill

14   that job, or if they had the most important

15   issues and it was obvious and logical that they

16   would be the best to represent the division

17   because the higher headquarters was asking about

18   issues that dealt with their particular branch.

19   It was a case-by-case basis.

20        Q    You have the four branches.  You have

21   the financial support.  They were a supported

22   element.  The operations, they were -- would you

1    and you need to do extra training, the ISMT is

2    the system of choice because it's always there.

3    It's always on.  It just takes electricity and

4    compressed air.

5         Q    Every recruit going through boot camp

6    and every lieutenant down through TBS has at

7    least basic interaction with the ISMT during

8    their basic training.  Would you agree that the

9    ISMT is one of the most important simulators that

10   we have in the Marine Corps?

11        A    I would say yes.

12        Q    Mr. Sobieranski had a role in

13   developing the ISMT.

14        A    Yes, he did.

15        Q    All three of your final candidates all

16   had varying degrees of qualifications in all the

17   PD -- the description, the PD, and the questions

18   you asked, correct?

19        A    Yes.

20        Q    What set Mr. Sobieranski apart from

21   Mr. Smith?

22        A    Because he had credible experience

1    building policy across service lines to other

2    service counterparts that really was at the crux

3    of what tipped the scale for Mr. Sobieranski over

4    Mr. Smith and Mr. Fox.

5        Q    Was that a vision moving forward of

6    how the organization would look, would be run?

7        A    If you write the Marine Corps policy,

8    the Marine Corps order on the policy, and get it

9    signed, that then directs that resources be

10   allocated, and resources equate to buying more

11   systems, fielding -- getting contract support in

12   place and support civilian hires at the bases and

13   locations where we had these training simulators

14   that need to be managed and there's not enough

15   civilian staff now.  The policies -- you get the

16   policy right, everything falls in line right

17   behind that.

18             JUDGE WOODHAM:  What policy did he

19   write?  What policies did he write that you had

20   knowledge of at the time of his interview?

21             THE WITNESS:  The range and training

22   area management policy, the Marine Corps order on

1    that.

2                    JUDGE WOODHAM:  That's the only one?

3                    THE WITNESS:  It's a voluminous order,

4    and it's got multiple subsections to it, Your

5    Honor, so --

6                    JUDGE WOODHAM:  When did he write it?

7                    THE WITNESS:  This was, I believe, in

8    the mid-2000s, 2006 or '07 was when the effort

9    originally started.

10                   JUDGE WOODHAM:  That's the -- at the

11   time of the interview and your selection

12   decision, that's what you were basing your

13   decision on.

14                   THE WITNESS:  We were in the middle of

15   a final update.  We hadn't done an update on that

16   Marine Corps order since it was signed in, I

17   think, 2008.  It was due for a rewrite.  We had

18   been coordinating a revision and update of that

19   range and training area management policy all

20   through 2017 and into 2018.  I don't believe it

21   had been signed at that time, in January/February

22   of 2018, but I think it was very close.

1              JUDGE WOODHAM:  Why was he only a

2     GS-14 if he had such vast experience at this

3     time?

4              THE WITNESS:  We had a lot of

5     individuals in RTAM that have a lot of experience

6     and a lot of very unique boutique expertise.  You

7     can only have so many GS-15s.  Your Honor, we run

8     into the problem where we can't pay people enough

9     for their expertise, which is why we have

10     contract support.

11              When you talk about a laser -- someone

12     with a doctorate and decades of experience in the

13     laser industry, we're concerned about laser

14     safety on ranges, just like we're concerned about

15     laser safety in some of these simulations.  We

16     contract for a laser safety specialist, someone

17     with technical knowledge that can interact with

18     laser safety coordination boards across the

19     services.

20              JUDGE WOODHAM:  I just need to know

21     what -- at the time, what policy -- and I think

22     you've answered my question -- that Mr.

1    Sobieranski had experience with.  This was

2    something that he drafted in the early 2000s that

3    may or may not have been updated in 2017.  Is

4    that correct?

5            THE WITNESS:  That's correct, Your

6    Honor.

7            JUDGE WOODHAM:  Thank you.  Anything

8    else, Mr. Gordon?

9            MR. GORDON:  Yes.

10           BY MR. GORDON:

11       Q    What's the significance of that order?

12       A    That's the guiding Bible for range and

13   training areas across all the 21 plus

14   installations of the Marine Corps.  It drives the

15   prioritization needs, everything from when a

16   local installation decides, based on what the

17   tenant units are telling you they need to be able

18   to do to train to their tasks.

19           There are various installation

20   development boards.  The RTAM policy order lays

21   out that process and prescribes roles and

22   responsibilities at the headquarters level, all

1    the way down through the region to the

2    installation levels.  It lays out how the deputy

3    commandant for installational logistics, a

4    separate deputy commandantcy of headquarters

5    Marine Corps, how they actually manage that.

6    It's referred to consistently.  We've updated it

7    through MAR admins and other policy edits, but to

8    revise a Marine Corps order is a very deliberate

9    process.  It takes about two years.  It was time

10   that we captured all those Change 1, 2, 3s, etc.,

11   to this policy order, so it was a clear, coherent

12   document.

13        Q    Is simulation set up the same way as

14   range?

15        A    No, we don't have an analog for

16   simulations to the range training or management

17   policy.

18        Q    Was that part of your vision?

19   Obviously, you had limited time that you were

20   active duty.  You had three years, and you

21   retired coming out.  Did you have aspirations or

22   vision for simulations to be built the same way

1    in which Mr. Sobieranski built the range side, as

2    you just mentioned?

3         A     I thought it was what we needed to do,

4    absolutely, and I started -- we were working on

5    draft policies and not making much progress all

6    through 2016-17.  With Lieutenant Colonel Harder

7    and a different team focusing on it, we had -- I

8    think in 2018, they were making better progress,

9    but we didn't have anything in place at the time.

10             MR. GORDON:  Your Honor, no further

11   questions.

12             JUDGE WOODHAM:  Mr. Hittle, do you

13   recall discussing your selection decision with

14   Major Iiams, I-I-A-M --

15             THE WITNESS:  Major General Iiams,

16   ma'am?

17             JUDGE WOODHAM:  Yes.

18             THE WITNESS:  Only at a cursory level,

19   Your Honor.

20             JUDGE WOODHAM:  What did you tell him?

21             THE WITNESS:  I gave him the update

22   that I had -- we had closed out the process.  I

1    had made a selection after I had completed

2    interviews with the candidates, and that I would

3    be submitting a package to him for his review and

4    signature.  If he had any questions, I was

5    standing by if he wanted to discuss it further.

6    That was the extent of the update item.  He said

7    thank you, and the conversation moved on.

8              JUDGE WOODHAM:  From the time that you

9    returned in October of 2017 through the date of

10   your selection decision, did you take any steps

11   to address the concerns of Mr. Smith that he was

12   being marginalized?

13             THE WITNESS:  I didn't take any steps

14   to do anything, Your Honor, because I didn't hear

15   from him that he was being marginalized.

16             JUDGE WOODHAM:  Can somebody give him

17   Page 178 and 179 -- and 180, I'm sorry.  Give him

18   all three of those.

19             MR. GORDON:  One eighty and one

20   eighty-one?

21             JUDGE WOODHAM:  Yes, thank you.  Tell

22   me when you've had a chance to review those, Mr.

1    Hittle.

2              THE WITNESS:  I apologize, Your Honor.

3    Thank you for letting me read that.

4              JUDGE WOODHAM:  Mr. Hittle, did you

5    take any steps to address Mr. Smith's concerns

6    that he was being marginalized?

7              THE WITNESS:  Your Honor, I felt that

8    I was being drug into the conversation about the

9    prior EEO action from Mr. Smith.  He was taking

10   this opportunity to say, effectively, you've

11   taken this contractor from my team and given him

12   to someone else because whatever, to make his

13   case.  I didn't want to be involved in that, Your

14   Honor.  What I wanted to do is I wanted to put

15   the resources with the right leaders, so we can

16   make progress.  That's why I wanted this

17   contractor, Mr. Driest, who was doing technical

18   authoring work, I believe, with Lieutenant

19   Colonel Harder, on the LVC-TE concept, now

20   rebranded the Marine Corps synthetic training

21   environment, under Lieutenant Colonel Harder.

22              Lieutenant Colonel Harder was working

1    very hard.  He had been there since roughly

2    April/May time frame.  He needed the additional

3    contract support.  Mr. Smith didn't own the

4    contractor.  The contractor was there to do the

5    work.  So when I -- I think I saw this email, and

6    then I heard that there was confusion about where

7    Mr. Driest -- who he was working for and whatnot.

8              I think I sent this to clear up any

9    confusion.  Mr. Smith took that as an opportunity

10   to say Colonel Hittle, you're marginalizing me by

11   taking people from me.  My goal was not to take

12   people from him.  My goal was to get the work

13   done and put the resources in the right place.  I

14   was -- I felt, for the three years that I was in

15   that job, that I had to walk around Mr. Smith on

16   eggshells.  I had to be, I don't know, overly

17   sensitive.  I did everything in my power to be as

18   honest with him and straightforward and leverage

19   -- give him every opportunity to avail him of any

20   resource.

21             If he felt he was marginalized, that

22   wasn't the intent.  If he had come to me and said

1    I don't know, sir, this is -- you're being mean

2    to me.  I would be like I don't understand.  This

3    is about putting resources to the right job.

4              JUDGE WOODHAM:  But is that not what

5    he addressed to you here, that you were treating

6    him differently because of his prior EEO

7    activity?

8              THE WITNESS:  I did not understand how

9    there was a nexus to his prior EEO activities

10   with this.  He brought up the LVC-TE AOA.  I

11   disagreed with him, but I didn't want to have a

12   long, long discussion.  I needed the work to be

13   done.

14             JUDGE WOODHAM:  So you understand that

15   he was relating -- or he believed that the

16   actions were being taken because of his prior EEO

17   activity.  You just disagreed with that.

18             THE WITNESS:  I did disagree.  I

19   wasn't doing it because there was any prior EEO

20   activity.

21             JUDGE WOODHAM:  How many other

22   individuals under your supervision had filed

1    prior EEO complaints?

2              THE WITNESS:  None that I know of.

3              JUDGE WOODHAM:  Whenever Mr. Smith

4    raised concerns, you would just direct him back

5    to the EEO office instead of answering his

6    concerns.

7              THE WITNESS:  Your Honor, I didn't

8    feel it was my place to try and direct him with

9    regards to an EEO concern or whatever.  At that

10   point, I knew I was already a named party in the

11   case.  I was just trying to keep the boat afloat

12   and keep us moving in the right direction.

13             JUDGE WOODHAM:  So even if it dealt

14   with his day-to-day duties, you just wouldn't

15   answer his questions.

16             THE WITNESS:  I don't remember getting

17   a specific day-to-day duties question.

18             JUDGE WOODHAM:  Let's look at this

19   email here.  He's specifically asking about

20   someone that worked in his branch, who's being

21   reassigned somewhere else.  Did that not have to

22   do with his day-to-day duties?

1    level.  The operations branch would not

2    necessarily have the intimate knowledge of

3    everything that the program manager is

4    considering in their overall program approach to

5    meeting the need.

6        Q    Mr. Hittle, does the deputy director

7    position, do they produce a product for the

8    Marine Corps?

9        A    I'm having trouble explaining a

10   physical object or direct service, but the deputy

11   director is often the glue that holds things

12   together and produces -- ensures that the product

13   that comes out of TECD or whatever it's called

14   now, in terms of integrated training systems and

15   systems that meet the needs of the Marine Corps,

16   a division deputy with experience would be able

17   to add benefit to the overall process.  Having

18   expertise and a gray beard with experience who's

19   done that type of thing at the program level is

20   very valuable.

21       Q    Mr. Hittle, my question was whether or

22   not -- let me ask you a different way.  Does the

1    deputy director position -- is it fair to say the

2    deputy director manages and oversees the

3    strategic goals for the TECD?  Is that a fair

4    assessment?

5         A    I would qualify that assessment.

6         Q    How would you qualify that?

7         A    I would say the deputy director

8    provides important input to the director on

9    managing and directing the strategy and the

10   policies.  If that's clear then I won't--

11        Q    Ok. The deputy director does not

12   manage a specific program within the TECD, is

13   that fair?

14        A    The deputy director would not, no, not

15   a specific program.

16        Q    Mr. Hittle, you mentioned that Mr.

17   Sobieranski was involved or wrote this RTAM

18   policy.  To your knowledge, did he write that

19   policy all by himself?

20        A    Nobody ever writes a policy all by

21   themselves.  I'm sure he was part of a broader

22   team.

1          Q     I think, Mr. Hittle, you referred to

2     Mr. Sobieranski as building the RTAM branch.  Was

3     there anyone else involved in the building of the

4     RTAM branch, or was it just Mr. Sobieranski?

5          A     Originally, when the range and

6     training area management division was stood up,

7     Mr. Jack Cuddy, who retired as a GS-15 in 2016,

8     he was the -- Jack Cuddy was the plank owner.  He

9     had a very limited group of individuals that he

10    started out with.

11          Ed was not one of the very first, but

12    he was hired within the first few months.  You

13    perhaps could ask him, if he's coming.  He was

14    there within the first year, when Jack Cuddy was

15    driving the small team that identified how are we

16    going to build the case for this need for the

17    Marine Corps?  How are we going to express it to

18    senior leadership?  How are we going to get

19    consensus, and how are we going to get funding to

20    support this idea?  How do we brief the Marine

21    Resources Oversight Committee and get a decision

22    memorandum that says we need to fund ranges, and

1   then how do we build the policy and how do we

2   start to do the procurement and get the support

3   contracts?  How do we do all that?  Mr.

4   Sobieranski was there with Mr. Cuddy and played a

5   key role in working out the details.

6         Q    Mr. Hittle, finally, you talked about

7   feeling like you had to walk around on eggshells

8   for three years in regards to Mr. Smith.  Do you

9   recall that?

10              (No audible response.)

11              JUDGE WOODHAM:  Is that a yes?  I'm

12   sorry.

13              THE WITNESS:  That is a yes, Your

14   Honor.

15              BY MS. HARRISON:

16         Q    Mr. Hittle, did you feel like you had

17   to walk around on eggshells with Mr. Smith

18   because he addressed concerns of discrimination

19   and retaliation with you?

20         A    Just because I had never been the

21   subject of an EEO complaint.  I feel I've always

22   tried to be as extremely fair and honest and open

168

1    with anyone that I worked with as I could.  I've

2    not been in that situation before, so it was new

3    and a little bit disturbing to me because I felt

4    like I had failed in something.  Even though I

5    hadn't even been there when whatever happened in

6    the spring of 2015 happened, I was somehow going

7    to be accused of something, at some point.

8              I don't want anyone to feel that way.

9    I don't want anyone to feel that they're being

10   not given full opportunity to perform to their

11   best.  I wanted everyone on the team to do a good

12   job.  I just wanted to be very careful that I

13   didn't say or do anything that can be taken the

14   wrong way or perceived incorrectly.

15             That's very hard because you never

16   know what someone else's perception is.  The

17   easiest thing is to just try and be as open and

18   straightforward and honest and deal with the

19   facts and try and make decisions that are based

20   on resources and clear logic, not be emotional on

21   things.  I just did my best.

22        Q    Mr. Hittle, is it fair to say you felt

1       like you had to walk around on eggshells because

2       Mr. Smith had filed an EEO complaint that you

3       were named in?

4            A       The knowledge of that EEO complaint

5       contributed to it, yes.

6            Q       Mr. Hittle, the deputy director

7       position was your right-hand man or woman, is

8       that a fair assessment of the position?

9            A       That's fair.

10           Q       You would have to work very closely

11      with the deputy director, correct?

12           A       Yes.

13           Q       Mr. Hittle, would it have been

14      comfortable for you to have a deputy director

15      that you felt like you had to walk around on

16      eggshells when he was around?

17           A       No.

18           Q       Mr. Hittle, would it have been

19      comfortable for you if Mr. Smith -- if you had

20      selected Mr. Smith as the deputy director, given

21      this -- what you have previously testified to?

22           A       I don't know.  I never considered

1    that.

2              MS. HARRISON:  I have nothing further.

3              JUDGE WOODHAM:  Mr. Gordon, anything

4    else?

5              MR. GORDON:  Just real quick, Your

6    Honor.

7         RECROSS-EXAMINATION

8              BY MR. GORDON:

9         Q    The walking on eggshells thing, did

10   that impact your professional dealings with Mr.

11   Smith on day-to-day operations?

12        A    I felt we were still able to get the

13   work done on time in the stellar manner in which

14   it needed to be done and to serve the Marine

15   Corps and to follow our commanding general's

16   guidance.

17             MR. GORDON:  No further questions.

18             JUDGE WOODHAM:  Mr. Hittle, were you

19   required to take any training with respect to

20   Title VII or discrimination laws?

21             THE WITNESS:  None that I can think of

22   specifically, Your Honor, aside from our normal

1    service directed training.

2    JUDGE WOODHAM:  When you say service

3    directed training, what does that entail?

4    THE WITNESS:  We have a number of

5    annual training requirements that reinforce

6    Marine Corps goals and values, everything from

7    training on how to deal with substance abuse to

8    equal opportunity, sexual harassment, sexual

9    assault, those types of things, if that makes

10    sense, Your Honor.

11    JUDGE WOODHAM:  Understood.  Thank

12    you.  I appreciate your testimony here today, Mr.

13    Hittle.  We ask that all witnesses refrain from

14    discussing their testimony in this hearing room

15    with anyone outside because they're protected by

16    the Privacy Act.  Thank you so much.  We can go

17    off.

18    (Whereupon, the above-entitled matter

19    went off the record at 1:39 p.m. and resumed at

20    1:53 p.m.)

21    JUDGE WOODHAM:  Good afternoon.  You

22    can have a seat, thank you.

1              MR. SOBIERANSKI:  Yes, ma'am.

2              JUDGE WOODHAM:  Good afternoon, Mr.

3     Sobieranski.  You've been called as a witness in

4     this matter that Mr. Smith has filed against the

5     Agency.  I, along with the attorneys, will be

6     asking you some questions this afternoon, so we

7     ask that you make all of your responses verbally,

8     try to avoid nodding your head, mm-hmm, nuh-uh,

9     and if you use an acronym, if you could tell me

10    what it means first, and then you're free to use

11    it thereafter, okay?

12             MR. SOBIERANSKI:  Okay, thank you.

13             JUDGE WOODHAM:  Thank you so much.

14    Mr. Sobieranski, if you could just give me a

15    little bit of background on your tenure within --

16    what is this -- a TE -- within TECOM.

17             MR. SOBIERANSKI:  My tenure in TECOM,

18    total?

19             JUDGE WOODHAM:  Yes.

20             MR. SOBIERANSKI:  I retired in the

21    Marine Corps in 2002 -- from the Marine Corps,

22    active duty, in 2002.  I began working at range

1    and training area management division at the

2    time.

3              JUDGE WOODHAM:  That's RTAM.

4              MR. SOBIERANSKI:  Yes, that's RTAM.

5    I was the head of range safety and design for the

6    Marine Corps.  I designed all the ranges across

7    the Marine Corps, wrote the policy for how ranges

8    are operated, the delivery of all the munitions

9    from air to ground, ground to ground, lasers.

10             We did all the scientific data for

11   that and the calculations for those, as well as

12   designing and certifying all the range complexes

13   across the Marine Corps.  I did that about 15

14   years.  Then the director retired.  He asked that

15   I become the director, in the interim, until they

16   hired somebody.  There was a dispute in the

17   command -- because he was a GS-15.  There was a

18   dispute in the command whether that billet should

19   be a 14 or a 15 in the reorganization of TECOM.

20   For about a three-year period, that billet

21   remained vacant and I filled that billet.

22             Now, we've since hired to that

1    position.  It went to OCHR about three times to

2    be reclassified because there were some folks in

3    the command that thought it should be reduced.

4    There's others that thought it didn't, so we went

5    to OCHR with a position description.  It came

6    back as a GS-15 and is a GS-15 as of today.  I

7    filled that billet for about a year and a half.

8            Then when Colonel Hittle -- or Terry

9    Bennington was retiring, Colonel Hittle made a

10    decision -- because most of the work that we do

11    within the division I'm in now and the disparate

12    sizes of those organizations, the majority of the

13    tasks that were day to day were RTAM related.  He

14    asked if I could assume the deputy director of

15    TECD, at the time, so I filled that position.

16            JUDGE WOODHAM:  What time frame are we

17    talking about?

18            MR. SOBIERANSKI:  This was July of

19    2017.  Then it went to -- then that position was

20    advertised.  I applied for it and subsequently

21    got that position, I believe, January of '18.

22            JUDGE WOODHAM:  In July of --

1              MR. SOBIERANSKI:  It's been almost two

2      years now.

3              JUDGE WOODHAM:  In July of 2017, you

4      were informally --

5              MR. SOBIERANSKI:  Actually, it was

6      formally done.  I did it informally for probably

7      -- until they got the paperwork so I could be

8      temporarily promoted.  Then that ran for about

9      120 days.  When that came to expire, they were

10     going to move Tony Smith in to do his 120-day

11     time.  Tony Smith desired not to.

12              He said let's just keep things the way

13     they are.  Then we went through the hiring

14     process.  Then it was announced that I got the

15     position through OCHR in February of '18 or

16     January of '18, one of the two.

17              JUDGE WOODHAM:  I'm just trying to get

18     an understanding of the timeline.  In July of

19     2017, Bennington retires.

20              MR. SOBIERANSKI:  Yes.

21              JUDGE WOODHAM:  You stay in the

22     position until your hire or onboarding in

1    or the one that you assisted in the only program?

2         A     No, there's -- it started out around

3    1990 to be strictly a marksmanship trainer.  As

4    time went on, through the acquisition process, it

5    started adding crew serve weapons and squad

6    trainers and all those things.  But due to what I

7    was doing in the Marine Corps, I was certainly

8    involved in all aspects, as far as the evolution

9    of that.

10        Q     Mr. Sobieranski, when you applied and

11   were interviewed for the deputy director

12   position, did you believe that you had a benefit

13   by -- actually, let me -- sorry, let me rephrase

14   that.  Mr. Sobieranski, when you applied for the

15   position of the deputy director, were you already

16   the acting deputy director?

17        A     Yes.

18        Q     When you were interviewed by Mr.

19   Hittle for the deputy director --

20        A     I would like to -- I don't remember

21   when we submitted resumes.  I'm not 100 percent

22   sure.  I think we may have submitted resumes, and

193

1    then Mr. Bennington retired, and then we went

2    through that process.  I think when I submitted

3    it, I was not already -- the timeline, I don't --

4         Q    Let me ask you a different question,

5    then.  When you were interviewed by Mr. Hittle

6    for the deputy director position, were you the

7    acting deputy director at the time?

8         A    At that time, yes.

9         Q    Do you think you gained any benefit or

10    advantage from being the acting deputy director

11    when you were interviewing for the acting deputy

12    director position?

13        A    I would imagine it would be some

14    insight, but to be perfectly honest with you,

15    when I did those interviews, I talked about what

16    the organization should be, not what it currently

17    is and the direction that it needs to go.

18             I also talked -- I talked a lot about

19    emulating what was created on the range side of

20    the house and bringing that over to the

21    simulation side to have a more comprehensive

22    program.  I think my experience in program

1    management and the things that I did on the range

2    side helped more than anything.  Is there an

3    advantage to get more skills?  Absolutely, but I

4    don't see it as a significant help.

5        Q    Mr. Sobieranski, prior to becoming the

6    acting deputy director, did you have any other

7    responsibilities in any of the other branches

8    besides the RTAM?

9        A    No, as far as responsibilities, but

10   what we would do is coordinate and

11   cross-pollinate with each other to start to

12   integrate the programs.  Because before, they

13   weren't really integrated.  They were not located

14   in the same place.

15            Once I became the head of RTAM, made

16   the decision that we move down to the trailers to

17   put everybody together.  Prior to that point, we

18   were in separate buildings on the installation

19   here at Quantico.  Once I became the head, then I

20   brought everybody -- brought us down to the

21   trailers to move in with everybody else, so we

22   could start to actually collaborate and

1    cross-pollinate to have a better organization.

2         Q    When you say collaborate and

3    cross-pollinate, exactly what areas are you

4    referring to?  Who are you collaborating with?

5         A    The simulation side of the house, the

6    live virtual constructive.  Keep in mind, we're

7    the live component, being the range side, so

8    bringing in the virtual and constructive pieces

9    to that, so basically collaborating more with the

10   simulation guys.  The simulation should be your

11   reps and sets to emulate what you do with the

12   live piece, so making sure that those feed into

13   what the live thing is going to be.

14             MS. HARRISON:  I have nothing further.

15             JUDGE WOODHAM:  Mr. Gordon.

16        CROSS-EXAMINATION

17             BY MR. GORDON:

18        Q    Mr. Sobieranski, when -- Colonel

19   Hittle, he left for approximately six weeks,

20   correct?

21        A    Yes.

22        Q    How much lead time was there between

1    the early '90s have any relevant or applicable

2    experience to the LVC?

3        A    Not in the sense with the indoor

4    simulated marksmanship trainer.  That's one of

5    the systems that you can use independent of live

6    virtual constructive training environment.  The

7    system is basically -- if we were to go on a

8    range and I wanted to teach you how to hit a

9    target, I could teach you how to hit a target

10   with the ISMT.

11         But if you're a commanding general of

12   a marine expeditionary brigade, the ISMT does you

13   no good.  It would not even be integrated into

14   the live virtual constructive training

15   environment.

16       Q    Mr. Smith, do you have any experience

17   in handling budgets or anything of that nature?

18       A    Yes, in the Marine Corps, we call it

19   PPBE, planning, programming, budget, and

20   execution.  From a branch head standpoint, when

21   Colonel Hittle talked about the squad immersive

22   training environment, SITE, and when he talked

# TECD ORG CHART

**Vacant Position**

**Col P. R. Hittle**
Director
Colonel
M3040700848

**Defendant**

Vacant
Deputy Director
GS15
M304070212

**Complainant:**
While in higher position,
never detailed to Dep Dir
in 6 mth
time period

**Detailed & hired to Dep Dir while in lower level position**

Ed Sobieranski
RTAMB Mgt
GS14
M304070244

**Lauren Thomson**
Branch Head
Business Supt
GS14
M304071696

**LtCol Harder**
Branch Head
MC Synthetic Training
Env LtCol
M3040700681

**Antonio Smith**
Branch Head
Operations
GS14
M3040701001

**Gary Tepera**
Branch Head
MTSB
GS14 M3040701325

Vacant
Branch Head
RTAMB GS14
M3040700246

Tonya Cornell
Admin Officer
GS12
M3040701004

Richard Jackson
RTAM Business Ops
Mgr
GS12/13
M3040701697

Vacant
Deputy MC Synthetic
Training Env Branch
GS15(14)
M3040700243

Jeffrey Williams
Asst Ops Off
GS13
M3040701003

Vacant
M&S Off
CAPT
M3040700216

Carlos Hathcock
Sec Hd Safety &
Design
GS14 M3040700247

Loring Tabor
Sec Hd Rng Ops&Con
GS13
GS14 M3040701121

James Fraley
Sec Hd Rng Rqmts
GS13
M3040701698

Vacant
Ground Rng Capabilities
Analyst
GS13
M3040701218

Vacant
IT Manager
GS-12
CTR CONV

Vacant
Business Support
Strategic Manager
GS14 M3040701430
Reduce to GS-12

Anthony Cross
Hd JT Rqmt & Sim
GS14
M3040701007

Nicholas Stewart
Future Ops
CAPT
M3040700223

Dave Durfee
MAGTF Cap Anal
GS13 (12)
M3040700992

Vacant
S&D Sect Mgr
GS13
M3040701122

Jesus Leon
Rng Ops Mgr
GS13
M3040701125

Archie White
Rng Sys Sust Mgr
GS13
M3040701700

Vacant
Aviation Rng
Capabilities Analyst
GS13
M3040701307

Vacant
MTSB Business Ops
Mgr
GS12
M3040700991

Alex Arrieta
V,V&A Mgr
GS12
M3040701006

Russell Duenow
Head Rqmts
GS13
M3040701321

Pat Young
Head Current Ops
GS13
M3040701322

James Cook
Lead Rng Dev
GS13
M3040701220

Frederick Salo
Lead Rng Control
GS13
M3040701124

Paul Garrod
Immer Trng Cap Mgr
GS13
M3040701146

Daniel Mobley
Sys Supt Off
GS13
M3040701130

Fiscal Spt Analyst
GS12
M3040701139

Casey DeMunck
M&S Off
MAJ
M3040700221

Harry Jenkins
Rqmts Anal
GS12
M3040700999

Vic Szalankiewicz
Portfolio Mgr
GS12
M3040700220

Patrick Hillmann
Lead Gnd Rng Saf
GS13
M3040701219

Michael Caras
Env Cap Anal/Cord
GS13
M3040700253

Chris Maser
Battlefield Eff Mgr
GS13
M3040701701

Disel Hinkle
SSO/IIT Site Mgr
GS13
M3040701309

OMMC Fin Analyst
GS13
M3040701320

Vacant
S&T Analysis
GS-9
CTR CONV

John Keppeler
CurOp/SITE Pt Mgr
GS13
M3040700998

Fred Rott
Portfolio Mgr
GS12
M3040701000

Michael Wissmeyer
Rng Instr S&D
GySgt
M3040700252

Vacant
Special Activity
Airspace Analyst
GS13
M3040701310

James O'Brien
Rng Instr Sys Mgr
GS13
M3040701699

Robert Mango
SSO/IIT Site Mgr
GS13
M3040701240

Admin Asst
GS6
M3040700430

Kendy Vierling
Head S&T
GS14
M3040701324

Preston Malone
Portfolio Mgr
GS12
M3040700222

Mark Drinkwater
RTAM Spec
GS13
M3040701217

Vacant
RFMSS Data Manager
GS13
M3040701511

Vacant
Rng Rqmts. Manager
GS13
M3040701702

Matt Carpenter
Sys Supt Off
GS13
M3040701140

Vacant
Bus & Fin Sec Mgr
GS-9/11
CTR CONV

S&T Analyst
GS14
M3040701323

Anthony Regner
Portfolio Mgr
GS12
M3040701002

Vacant
GIS Lead
GS13
M3040701331

Vacant
Sys Supt Off
GS13
M3040701140

Admin Asst
GS6
M3040700245

Vacant
Bus & Fin Sec Mgr
GS-9/11
CTR CONV

Vacant
JCIDS Writer
GS-13
CTR CONV

Ron Slater
Portfolio Mgr
GS12
M3040701009

(1) Filled
Rng Dev Off
CWO5
M3040701526

Vacant
SSO/IIT Site Manager
Okinawa
GS13
M3040701623

Vacant
JCIDS Writer
GS-13
CTR CONV

Fitima Cox
Instruct Design Spec.
GS13
M3040701478

## Legend

| | |
|---|---|
| Military | |
| Civilian (Gov't) | |
| Vacant (Funded) | |
| Vacant (Unfunded) | |
| Proposed CTR CONV | |
| (Non-funded) | |
| TBD | |

Vacant
JCIDS Writer
GS-12
CTR CONV

Vacant
Air&Grnd Sim Anal
GS14
M3040701326

(1) Billet temp to TECOM G-3

as of *20171025*

-----Original Message-----
From: Smith CIV Antonio B
Sent: Tuesday, July 25, 2017 4:33 PM
To: asmithusmc@aol.com
Subject: Memo for the Record/Interim Deputy Director

Memo for the Record

On 17 July 2017, Col Hittle announced during the weekly branch head meeting that Mr. E. Sobieranski
would be the interim deputy director following Mr. Bennington's resignation/retirement.  I found this to
be another act to marginalize me.  Based on my experience and position as the operations branch head,
I should have been the next in line to serve as the interim deputy director until someone is hired for the
position permanently.  I am currently third in succession behind Col Hittle and Mr. Bennington, so
advancing someone lower in the chain to a position higher than me further demonstrates how the
command refuses to treat me fairly.


        /s/
Antonio B. Smith

Mr. Antonio B. Smith
Operations Officer
T&E Capabilities Division, TECOM
Office - 703.432.2169
Blackberry - 202.631.5160
SIPR - antonio.b.smith@usmc.smil.mil


FOR OFFICIAL USE ONLY - This transmission contains information that is protected from disclosure by
the Privacy Act of 1974 (5 USC 552a) and exemption (b)(6) of the Freedom of Information Act (5 USC
552, as amended).  Please ensure that this information is used solely for the requested purpose. Further
duplication and/or distribution without prior authorization from this office is not authorized. Civil and/or
criminal penalties can apply for improper use.

**Edward Roman Sobieranski**



| | |
|---|---|
| **Availability:** | **Job Type:** Permanent |
| | **Work Schedule:** Full-Time |

**Desired locations:** United States - VA - Quantico

**Work Experience: US Marine Corps**                    **08/2017 - Present**
Building 2300A Louis Road                    **Salary:** 145,629.00 USD
Quantico                    Per Year
Quantico, VA 22134 United States                    **Hours per week:** 40
                    **Series:** 0301 **Pay Plan:**
                    GS **Grade:** GS15
                    This a time-limited
                    appointment or temporary
                    promotion

**Acting Deputy Director, Training & Education Capabilities Division (TECD)** (This is a federal job)

**Supervisor**: Col Patrick Hittle ((703) 784-2964)

**Okay to contact this Supervisor:** Yes

On August 1, I assumed the additional duties of Deputy Director and, temporarily Director of TECD for five weeks in addition to maintaining my responsibilities as Acting Head of the Range & Training Area Management Branch. I also received a temporary promotion to GS15 during October for 120 days. These additional duties include oversight of all the functions of TECD, the further development and integration of all live, virtual, and constructive training systems and support, and the supervision of the entire division. TECD comprises over 25% of TECOM's budget authority and its programs are TECOM's most direct links to the support of Operating Force training. During my tenure, TECD has continued to refine its programming and budgeting approach and reinforce policies and procedures that better integrate simulators with live training systems. TECD produced the Ground Training Simulations Implementation Plan (GTSIP) which defines the Marine Corps Synthetic Training Environment (MCSTE) as the entire training capability for the Marine Air Ground Task Force, including computer simulations, weapon system simulators, and training on actual warfighting systems in the Live,

Virtual, and Constructive training domains.

| | |
|---|---|
| **US Marine Corps** | **06/2016 - Present** |
| 2006 Elliott Road | **Salary:** 141,499.00 USD |
| MCB Quantico | Per Year |
| Quantico, VA 22134 United States | **Hours per week:** 40 |
| | **Series:** 0301 **Pay Plan:** |
| | GS **Grade:** GS14 |
| | This a time-limited |
| | appointment or temporary |
| | promotion |

**Acting Head, Range and Training Area Management Branch** (This is a federal job)

**Supervisor**: Col Hittle (7037842964)
**Okay to contact this Supervisor:** Yes

June 2016-present: Acting Head, Range & Training Area Management Branch, Training and Education Capabilities Division (TECD), Training & Education Command

In this GS15 level position I have been charged with sponsoring, developing, executing, and managing the Marine Corps Range Program and representing the interests of Marine Corps training ranges in DOD, inter-Service, and international forums. I'm responsible for maintaining a comprehensive, fully integrated program of policies, standards, range safety training and services, range control operations and training airspace technologies and services, training systems and environments, and training support services to support live combat training throughout the training continuum. As the Range resource sponsor, my responsibilities included the identification, validation, and prioritization of institutional range system requirements to provide a single, integrated program for POM consideration and to ensure that ranges are properly sustained, recapitalized, and modernized to meet Operating Forces' and Formal Schools' training requirements. The execution of these responsibilities require extensive, Service-level interaction with OSD, OPNAV, US Army G-3, Deputy Commandant's I&L, Aviation, PP&O, and P&R, and the staffs of MARCORSYSCOM, MCICOM, SPAWAR, and NAVFAC. Specifically, these responsibilities and accomplishments include:

•Develop, staff, and publish Service-level directives, policies, and standards for Marine Corps Ranges. In my tenure (currently and my previous RTAM position) I was directly responsible for producing Marine Corps Orders on Range Safety (MCO 3570.1_ developed jointly with the US Army), Range and Training Area Management (MCO 3550.10), Range Certification (MCO 3550.9), and Operational Range Clearance (MCO 3550.12). I have also played a major role in the development and evolution of the OPNAV instruction

on training airspace. Prior to 2001, Marine Corps ranges had no institutionalized standards for their development and operation. To address that shortcoming, I led the development and publication of the Marine Corp Reference Publication (MCRP 3-0C) on "Operational Training Ranges Required Capabilities", the Order on Range Certification standards, and, jointly with OSD and the other Services, metrics to better assess range capabilities.

•Modernize, recapitalize, and sustain range training environments and systems.

To overcome decades of neglect and under-investment and to support Marines deploying to multiple theaters of combat, the Range Program identified, validated, prioritized, and fielded nearly $1B in training systems and environments since 2004. The program has developed its own requirements process that integrates traditional system and facility processes and allows range users/managers to input modernization and sustainment requirements. Servicing this substantial inventory of training systems and environments requires constant interaction with MARCORSYSCOM, PEOSTRI, NAVFAC, and SPAWAR to ensure that life-cycle management of these systems is supported with contractual maintenance and appropriate system upgrades.

•Serve as the Subject-Matter Expert on Range Issues at the Service-level and represent the Marine Corps in DOD, DON, Inter-Service, and International forums regarding range and training area issues.

From the NATO range safety working group to the OSD Sustainable Ranges IPT and Live Training Forum, to the quarterly staff meetings with the US Army range office and interaction with regulatory agencies like the Federal Aviation Administration, Fish and Wildlife Service, and Environmental Protection Agency, I have continued to represent the Marine Corps' interests in everything from the range expansion issues at MCAGCC, Townsend Bombing Range, and the Marianas to the encroachment/environmental issues that impact all of our ranges around the world. Our active engagement, along with our partners at DC, I&L, has actually resulted in additional training land and airspace becoming available to Marines during the past decade. I have also been directly involved in resolving issues with Special Operations Command (SOCOM) and supporting the training initiatives and range requirements of Marine Forces Pacific (MARFORPAC).

Provide Leadership and Management to the Range & Training Area Management Branch and the larger range community of interest across the Marine Corps.

The RTAM staff currently consists of over 40 military, government civilian, and direct-support contractors at seven locations around the Marine Corps. For these direct employees of RTAM, I provide the entire array of personnel management actions including; career counseling, work allocation and review, performance evaluations, corrective actions, and awards. For the larger community of interest, including the active and reserve training units, the installation range management and control personnel, and the hundreds of contractors worldwide.

| **US Marine Corps** | **05/2003 - 06/2016** |
|---|---|
| 2006 Elliott Rd | **Salary:** 141,499.00 USD |
| MCB Quantico | Per Year |
| Quantico, VA 22134 United States | **Hours per week:** 40 |
| | **Series:** 0301 **Pay Plan:** |
| | GS **Grade:** GS14 |

**Head, Range Safety and Design Section** (This is a federal job)

**Supervisor**: Col Hittle (703 784 2964)

**Okay to contact this Supervisor:** Yes

Serve as the Head, Range Safety and Design Section, Training and Education Capabilities Division (TECD), Training & Education Command, Quantico, Virginia. In this GS14 position I plan, develop, direct, and execute an institutional level range safety program for the Marine Corps including range design and range safety policy for both ground and aviation range operations. I serve as the Marine Corps representative at Office of the Secretary of Defense (OSD) meetings and serve as the Marine Corps lead for working groups concerning range safety and range design issues. Additionally, I serve as the Marine Corps Range Safety Subject Matters Expert for NATO Range Safety Panel and the International Range Safety Advisory Group (IRSAG).

Develop, manage and execute the Marine Corps Range Safety Program. Directly responsible for the management and execution of a multimillion dollar program that contains the following functions: Range Safety Policy, Range Development & Design, Range Certification and Recertification, Range Inspections, Laser Range Safety (air and ground), Operational Range Clearance, and Range Professional Education & Development. Responsible for the execution of over $250 million in Operational Range Clearance efforts throughout the Marine Corps over the past 10 years that has resulted in thousands of acres of training space being restored for use by the Operating Forces. Management of the Safety Program requires close cooperation with the other elements of RTAM to construct a balanced, integrated resource program and I have been actively engaged in all aspects of resource planning as well as in the production of Service-level policies. Execution of these responsibilities have required frequent liaison with the technical and scientific communities of all Service munitions labs, laser programs, and training technologies.

Range development, assessments, and planning. Continue to serve as the principal ranges and training areas subject matter expert for the relocation of 10,000 Marines from Okinawa, Japan to Guam, USA. This estimated $30 billion dollar effort consists of constructing an entire base to include ~$2 billion in new range and training facility construction throughout the Commonwealth

of the Northern Marianas Islands. In this role I have personally briefed the Governor of Guam and have escorted and briefed numerous General Officers on the opportunities and challenges of training in the Marianas. Provided training range assessments and assistance to the following Nations through COCOM Commanders: United Arab Emirates, Kingdom of Jordan, Kingdom of Thailand, Commonwealth of the Northern Marianas Islands, Senegal, Islands of Palau, Philippines, and Australia. Led the initiative to redesign MCAS Yuma ranges to support SOCOM and Naval Special Warfare, designed the ranges to support the initial USMC training at Eglin AFB, and have provided support to DHS in designing poten

Develop, manage and execute the Marine Corps Range Safety Program. Directly responsible for the management and execution of a multimillion dollar program that contains the following functions: Range Safety Policy, Range Development & Design, Range Certification and Recertification, Range Inspections, Laser Range Safety (air and ground), Operational Range Clearance, and Range Professional Education & Development. Responsible for the execution of over $250 million in Operational Range Clearance efforts throughout the Marine Corps over the past 10 years that has resulted in thousands of acres of training space being restored for use by the Operating Forces. Management of the Safety Program requires close cooperation with the other elements of RTAM to construct a balanced, integrated resource program and I have been actively engaged in all aspects of resource planning as well as in the production of Service-level policies.

Range development, assessments, and planning. Served as the principal ranges and training areas subject matter expert for the relocation of 10,000 Marines from Okinawa, Japan to Guam, USA. This estimated $30 billion dollar effort consists of constructing an entire base to include ~$2 billion in new range and training facility construction throughout the Commonwelth of the Northern Marianas Islands. In this role I have personally briefed the Governor of Guam and have escorted and briefed numerous General Officers on the opportunities and challenges of training in the Marianas. Provided training range assessments and assistance to the following Nations through COCOM Commanders: United Arab Emirates, Kingdom of Jordan, Kingdom of Thailand, Commonwealth of the Northern Marianas Islands, Senegal, Islands of Palau, Philippines, and Australia. Led the initiative to redesign MCAS Yuma ranges to support SOCOM and Naval Special Warfare, designed the ranges to support the initial USMC training at Eglin AFB, and have provided support to DHS in designing potential ranges at Townsend Bombing Range

**US Marine Corps**                                   **05/2000 - 04/2002**

Marine Corps Security Forces Battalion
1340 Olympic Blvd
Chesapeake, VA 23320 United States

**Salary:** 65,000.00 USD
Per Year
**Hours per week:** 60

**Chief Range Officer**

May 2000 to April 2002; Marine Corps Security Force Battalion, Marine Corps Security Force Training Company, 1340 Olympic Blvd. Chesapeake, Virginia, 23322

Range complex management. Managed all aspects of a multimillion-dollar indoor and outdoor range training facility. Certified unit ranges, operated range control, and managed range renovations and training enhancement projects worldwide. Assigned as the installation Explosive Safety Officer, and the Norfolk Regional Range Safety Officer for the Marine Corps and the Navy. Analyzed unit training requirements and provided technical expertise on Range Safety, Range Operations, target systems acquisition, and range design criteria. Assigned as the test and fielding officer for the new M1014 Joint Service Combat Shotgun Marine Corps wide. Developed and supervised training doctrine for Fleet Anti-terrorism Security Teams (FAST). Analyzed mission requirements and developed the unit Training and Readiness (T&R) Manual. Trained and qualified over 200 MCSFBn supervisory personnel in range safety and range operations. Supervised operations for three formal courses of instruction in advanced marksmanship skills for anti-terrorism operations worldwide. Maintained four separate operating budgets to sustain safety, training, and range facility operations. Supervised a 28-person instructor staff training over 2000 personnel annually.

**US Marine Corps**
Pu'uloa Training Facility
Ewa Beach, Hawaii
Ewa Beach, HI 96706 United States

**01/1998 - 03/2000**
**Salary:** 50,000.00 USD
Per Year
**Hours per week:** 60

**Officer-in-Charge**

January 1998 to March 2000; Officer in Charge and Chief Range Officer, Pu'uloa Training Facility, Marine Corps Base Hawaii, Kaneohe Bay, Hawaii

Range complex management. Managed an independent 137-acre multi-faceted range training facility. Increased training capacity from 1,500 to 6,000 annually through effective marketing. Saved nearly $1 million in range and training area renovation costs through innovative ideas. Managed the Environmental Compliance, Physical Security, Occupational Health and Safety, and Hazardous Material issues for the range facility. Established and maintained three separate operating budgets. Redesigned the layout of the ranges and target systems to increase safety and to provide more efficient and

effective training. Served on two community boards relating to security, safety, and community relations.

**US Marine Corps**  **08/1997 - 01/1998**
Marine Corps Base Hawaii  **Salary:** 55,000.00 USD
Kaneohe Bay, Hawaii  Per Year
Marine Corp Base Kaneohe Bay, HI 96863 United  **Hours per week:** 60
States
**Deputy Assistant Chief of Staff G-3**
Deputy Assistant Chief of Staff G-3 Operations, MCB Hawaii. Managed the day-to-day operations of Marine Corps Base Hawaii which included a Marine Regiment, Marine Corps Air Station, Marine Aviation Squadrons, and a Navy P3 Squadron.

**US Marine Corps**  **07/1981 - 07/1995**
Various  **Hours per week:** 60
Beaufort, SC 29905 United States
**Marine Officer**
July 1995 to July 1997; Range Officer, Marine Corps Recruit Depot Parris Island, South Carolina

July 1981 to July 1995; U.S. Marine, various locations.

**Education:**  **Wayland University** Plainview, TX United States
Some College Coursework Completed
**GPA:** 4.0 of a maximum 4.0
**Credits Earned:** 64

**Job Related Training:**  SPECIALIZED/RELATED TRAINING & EDUCATION

Laser Range Safety Officers Course
U. S. Army Close Quarters Battle Course
U.S. Marine Corps Range Officers Course (MOS 9925)
Naval Explosive Safety Supervisors Course
Interservice Range Safety Course (level II)
U.S. Marine Corps Scout Sniper School
Combat Unit Leaders Course
Geographic Information Systems Course
NRA Range Design Course
SIG Arms Range Design Course
High Risk Personnel Course

**Affiliations:**       Quantico Injuerd Military Sportsmen's Association (QIMSA) - Vice President

**References:**

| Name | Employer | Title | Phone | Email |
|---|---|---|---|---|
| Jack Cuddy (*) | Retired | Former Head, RTAM | ███████ | |
| Roger Jacobs (*) | Fortis Solutions | Owner | ███████ | rogerjacobs@fortissolutionsfl.com |
| Terry Bennington (*) | Retired | Former Deputy Director TECD | ███████ | |

(*) Indicates professional reference

**Additional Information:**

2010 Marine Corps Base Quantico Civilian Employee of the Year.
Military Awards
Meritorious Service Medal (2)
Navy Marine Corps Commendation Medal (3)
Joint Service Achievement Medal
Navy Marine Corps Achievement Medal (2)
Army Achievement Medal
Presidential Service Badge
USMC Distinguished Marksman
USMC Distinguished Pistol Shot

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | |
|---|---|
| ANTONIO SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| v. | )    1:21-cv-1406-MSN-IDD |
| | ) |
| CARLOS DEL TORO, Secretary | ) |
| United States Department of the Navy, | ) |
| | ) |
| Defendant. | ) |
| _____) | |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The record evidence in this action establishes that, in February 2018, Plaintiff was not selected for a Deputy Director/Supervisory Head position after a three-round process consisting of a resume review, an interview panel, and a final interview with the selecting official, Colonel Hittle. Although Plaintiff was viewed as a competitive candidate, he was not among the highest ranked individuals during the resume review, and at least one member of the interview panel testified that he would have selected another candidate, Edward Sobieranski, over Plaintiff. Ultimately, Colonel Hittle selected Sobieranski over Plaintiff for the position after evaluating the qualifications of the competing candidates and concluding that Sobieranski's particular experience made him a better fit—a hiring decision that is normally entitled to substantial deference as courts "do not sit as a super-personnel department weighing the prudence of employment decisions." *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005) (citation omitted).

Completely missing from the record evidence is any inference that the selection process was tainted by discriminatory and/or retaliatory animus, and there is absolutely no evidence of discrimination and/or retaliation as noted in Defendant's opening memorandum. *See* ECF No. 11 at 9, 15-19 (hereinafter "Mem."). Indeed, Plaintiff's Opposition now drops any argument of direct

JA 270

evidence of retaliation despite Plaintiff pleading this claim in his Complaint. *See generally* ECF No. 16 (hereinafter "Opp."). And completely missing from the record evidence and Plaintiff's Opposition is any argument or evidence that Plaintiff was demonstrably superior to Sobieranski for the position, something which Plaintiff must demonstrate in a non-selection case on summary judgment. Further, to the extent that Plaintiff claims retaliation, he attempts to tie his non-selection in February 2018 to EEO complaints from 2015 and 2016. That is insufficient for a *prima facie* case of retaliation.

Left without any record evidence establishing an inference of discrimination or retaliation and in light of the legitimate reasons given for Colonel Hittle's selection decision, Plaintiff can only speculatively assert that Colonel Hittle's decision not to select him was a pretext for discrimination and retaliation. Thus, the totality of Plaintiff's argument on pretext is to excerpt isolated statements by Colonel Hittle in an EEO hearing from December 2019, almost two years after the non-selection decision. But a closer look at the actuals record evidence shows that these after-the-fact statements do not show pretext. Plaintiff claims a number of inconsistencies in Colonel Hittle's testimony that, on further glance, were neither inconsistent nor relevant to the selection decision. Most glaringly, Plaintiff seizes on an isolated comment in Colonel Hittle's testimony where Hittle stated his feeling that he had to "walk on eggshells" around Plaintiff in light of his EEO complaint. Plaintiff claims that this *post hoc* statement—provided by Plaintiff without further context—demonstrates Colonel Hittle's retaliatory animus. But Plaintiff conveniently omits the full testimony whereby Colonel Hittle testified that he felt he had to "walk around [Plaintiff] on eggshells" because Hittle had to be "overly sensitive" to Plaintiff and was doing "everything in [his] power to be as honest with [Plaintiff]" in light of Plaintiff's repeated and unprompted claims that he was being marginalized for filing an EEO complaint. That is not retaliatory animus. This same selective excerpting plagues Plaintiff's Complaint and Opposition but is contradicted by the full record and is insufficient to show pretext in any event. For these reasons and those in the opening brief, Defendant respectfully

2

requests that this Court enter summary judgment in favor of Defendant.

**NO MATERIAL FACTS ARE IN DISPUTE**

As a preliminary matter, Plaintiff does not dispute any of the material contained in paragraphs 1, 3-4, 7, 9-15, 17, 20, and 28 of Defendant's statement of undisputed material facts. *See* Opp. at 4-10; Mem. at 2-8. Accordingly, these facts should be deemed admitted. *See* E.D. Va. Local R. 56(B); *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).

As to the remainder of the other paragraphs in Defendant's recitation of undisputed facts that Plaintiff purports to dispute, a closer look reveals that Plaintiff actually concedes what Defendant explicitly stated. Indeed, much of Plaintiff's "disputed facts" consist of Plaintiff's own added exposition or uncorroborated additional details. Further, Plaintiff's putative "disputes" concern collateral points that have nothing to do with Defendant's facts, let alone the causes of action that are presently before the Court.

To start, many of Plaintiff's disputed facts do not actually identify that Plaintiff disputes them, instead claiming that facts are "misleading" or "incomplete." In any event, these facts are neither disputed nor are they "misleading" or "incomplete" despite Plaintiff's protestations. What Plaintiff claims are the "accurate" facts are immaterial to the resolution of the case. They are also not "misleading" but rather irrelevant asides on how Plaintiff would have presented or phrased facts that he actually does not dispute. For instance, Plaintiff claims as misleading: Defendant's purported failure to note Plaintiff's own self-serving testimony of his "immense" responsibilities as Operations Officer; a linguistic gripe of how exactly Stephanie Andrews was "in the room" at the time of Plaintiff's interview; an immaterial note about the particulars of how Plaintiff was told he did not get the Deputy Director/Supervisory Head position; a further gripe on how Plaintiff's formal EEO complaint was characterized; and Plaintiff's imagined assertion that Defendant is trying to use the mere fact of Plaintiff's EEO proceedings taking place and other procedural history to preclude the

3

Court's *de novo* review in this case.[1] *See* Opp. ¶¶ 2, 16, 19, 21-27. Apart from not pointing to anything actually misleading, none of Plaintiff's digressions bear on the central issue in this case, his non-selection.

Plaintiff's characterizations of Defendant's facts as "incomplete" are similarly inapposite. A number of what Plaintiff claims are "incomplete" facts overlap with his claims of "misleading" facts apart from Paragraph 5 of Defendant's statement of undisputed facts. Plaintiff claims Paragraph 5 is "incomplete" because "[t]he Agency fails to mention when Col. Hittle became aware of Plaintiff's second EEO complaint" and "ignores an email conversation between Col. Hittle and Mr. Smith on December 20, 2017." Opp. ¶ 5. The former point is immaterial to establishing when Colonel Hittle was first aware of Plaintiff's EEO activity—the purpose for which it is offered. The latter point of the paragraph being incomplete is disingenuous because Paragraph 6 of Defendant's statement of undisputed facts then explicitly discusses and then cites to a copy of the December 2017 email conversation. *See* Mem. ¶ 6; *see also* Opp. ¶ 6 (noting Plaintiff's "dispute" with this detail).

The three paragraphs of Defendant's statement of undisputed facts that Plaintiff actually does dispute are also immaterial to the resolution of this case and, in any event, are not disputes. Plaintiff first disputes Defendant's Paragraph 6, *see* Opp. ¶ 6, which discusses an email

---

[1] Elsewhere in his Opposition, Plaintiff claims that Defendant is trying to give preclusive effect to the EEO proceedings and deny him a *de novo* trial. *See* Opp. at 24. That argument is cut from whole cloth as no such argument appeared anywhere in Defendant's Memorandum. Plaintiff claims that, because Defendant simply listed the fact of the administrative proceedings in its Statement of Undisputed Facts, Defendant somehow wants to give preclusive effect to those prior administrative findings. Yet a simple read of Defendant's Memorandum highlights that Defendant only offered the fact that the EEO proceedings took place and what occurred therein and never argued that they should have "preclusive" effect. In fact, these details were important to note as facts because Plaintiff *himself* raises the contents of those proceedings in asserting retaliation. That is, Plaintiff attributes *post hoc* statements by Colonel Hittle at the EEO hearing as evidence of Colonel Hittle's retaliatory animus when not selecting Plaintiff for a position over a year and half prior. *See, e.g.*, Compl. ¶¶ 29-30, 32; Mem. at 16-19. Tellingly, Plaintiff continues to rely on testimony from his EEO hearing throughout his Complaint *and* his Opposition.

correspondence Plaintiff had with Colonel Hittle in December 2017 where Plaintiff first took issue with Colonel Hittle re-assigning contractors and then impromptu brought up his EEO complaint when asked by Hittle to provide a compelling reason for why contractors should not have been moved, *see* Mem. ¶ 6. Plaintiff's dispute is not that this correspondence occurred, and he cannot dispute the contents of that correspondence, which were attached to Defendant's Memorandum. *See* Def's Exh. 5. Rather, Plaintiff's purported dispute is that he "specifically identified that his objection to Colonel Hittle moving contractors out of his branch was the manner in which it was done," namely that Plaintiff had not been consulted about the move and was not given "[t]he 'common courtesy' of consultation or explanation." Opp. ¶ 6. This point is immaterial to the resolution of this case for one. But for another, this specific objection is found nowhere in the December 2017 email correspondence that Paragraph 6 discusses. In fact, Plaintiff's claims of how he objected to how Colonel Hittle's re-assignment of contractors come from his late EEO declaration and EEO hearing testimony. *See* ECF Nos. 16-3, 16-7. There is no actual dispute over Paragraph 6.

Plaintiff next disputes Paragraph 8, which discusses the fact that Sobieranski served as the acting Deputy Director/Supervisory Head in 2017 and that Plaintiff declined to temporarily assume the position once Sobieranski's detail ended. Mem. ¶ 8. Plaintiff again does not actually dispute either of these facts. Instead, he raises an argument that Sobieranski was detailed in the acting position for a time period in excess of OPM regulations and quibbles with the language that TECD personnel "*made arrangements*" to put Plaintiff into the acting position. Opp. ¶ 8. Neither point is material to the decision to select the full time Deputy Director/Supervisory Head position—the crux of this lawsuit. Further, the former point is not a dispute over anything contained in Paragraph 8, and the latter point does not dispute that Plaintiff was offered but ultimately declined the Deputy Director position; something Plaintiff actually admits. *See* Opp. ¶ 8 ("Mr. Smith was offered the opportunity to be detailed into the deputy director position.").

Finally, Plaintiff disputes Paragraph 18, which recounts Colonel Hittle's EEO testimony in which he gave his reasons for why he picked Sobieranski for the Deputy Director/Supervisory Head position. Plaintiff cannot and does not dispute that Paragraph 18 accurately conveys Colonel Hittle's testimony. *See* Opp. ¶ 18 ("The recitation of Col. Hittle's later-stated justifications for not selecting Mr. Smith is accurate."). Rather, Plaintiff claims that "what Col. Hittle believed about Mr. Smith is in genuine dispute," as Plaintiff makes the legal argument that "a reasonable jury could conclude that the real reason Col. Hittle did not select Smith as his deputy was so that he would not have to 'walk on eggshells' around him." Opp. ¶ 18.[2] Further, Plaintiff claims that this is "improper for summary judgment." Opp. ¶ 18. There are myriad deficiencies with Plaintiff's argument. Most fundamentally, Plaintiff is not offering a dispute with the content of Paragraph 18—which is what Colonel Hittle testified—but rather Plaintiff's own speculation of what Colonel Hittle believed. Legally, Plaintiff's assertion that it is inappropriate to consider Colonel Hittle's justifications on summary judgment is incorrect because "whether an employer can point to a legitimate, non-discriminatory reason to justify an adverse employment action arises in the 'burden-shifting' framework *at the summary judgment stage.*" *Harrison v. Cap. One Servs., LLC*, 2020 WL 1955472, at *2 (E.D. Va. Apr. 23, 2020) (emphasis added); *see also Moore v. Mukasey*, 305 F. App'x 111, 114 (4th Cir. 2008).

And factually, Plaintiff's claim of a dispute over what Colonel Hittle believed is based on his own unfounded speculation. *See Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). That is, Plaintiff claims that because Colonel Hittle testified at a hearing in December 2019 that he felt he had to "walk on eggshells" around Plaintiff

---

[2] Plaintiff criticizes the use of "later-stated justifications" in his Opposition. Ironically, in that same paragraph, Plaintiff himself relies on *later-stated* testimony to argue what Colonel Hittle's reasoning was for not selecting Plaintiff for the Deputy Director/Supervisory Head position. *See* Opp. ¶ 18.

that this somehow influenced Colonel Hittle's decision over a year and a half prior in February 2018 to select Sobieranski over Plaintiff. But there is no support for Plaintiff's naked assertion. While Plaintiff claims that "Colonel Hittle testified that he would not have been comfortable working with Mr. Smith as his Deputy Director because Mr. Smith's complaints of discrimination," Opp. ¶ 18, Colonel Hittle stated no such thing. As Defendant noted in the opening brief—and never once addressed in Plaintiff's Opposition—the "eggshell" comment was Colonel Hittle testifying about a December 2017 email from Plaintiff unrelated to the selection decision. Further, Hittle testified that he felt he needed to be respectful of Plaintiff in light of his EEO complaint in referring to "walking on eggshells." *See* Mem. at 17-18. At best, Plaintiff's claim—that Colonel Hittle testified that he would not have been comfortable with Plaintiff as his Deputy Director—comes from a "gotcha" question asked by Plaintiff's counsel to Colonel Hittle at the EEO hearing. Yet even that testimony does not support Plaintiff's claim:

> Q   Mr. Hittle, would it have been comfortable for you to have a deputy director that you felt like you had to walk around on eggshells when he was around?
>
> A   No.
>
> Q   Mr. Hittle, would it have been comfortable for you if Mr. Smith -- if you had selected Mr. Smith as the deputy director, given this -- what you have previously testified to?
>
> A   I don't know. I never considered that.
> . . .
> Q   The walking on eggshells thing, did that impact your professional dealings with Mr. Smith on day-to-day operations?
>
> A   I felt we were still able to get the work done on time in the stellar manner in which it needed to be done and to serve the Marine Corps and to follow our commanding general's guidance.

ECF No. 16-3 at 169-170. In sum, Plaintiff's speculation of Colonel Hittle's beliefs are unfounded, even based on the material that he points to, and there are no material facts in dispute precluding a grant of summary judgment to Defendant.

7

JA 276

## ARGUMENT

I.    **THERE IS NO RECORD EVIDENCE THAT PLAINTIFF'S NON-SELECTION WAS BASED ON DISCRIMINATORY OR RETALIATORY REASONS (COUNTS I AND II).[3]**

As discussed in Defendant's Memorandum, the well-developed record evidence demonstrates that there were legitimate, non-discriminatory and non-retaliatory reasons for Plaintiff's non-selection. That is, Colonel Hittle determined—based on the qualifications of the candidates before him, Plaintiff and Sobieranski, and based on the responsibilities of the position— that Sobieranski was the better fit for the position while judging the choice between the candidates to be a close one. Given Defendant's showing of a legitimate reason for the non-selection, the burden then shifts to Plaintiff to prove, by a preponderance of the evidence, that the defendant's articulated reasons are a pretext for discrimination or retaliation. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Plaintiff cannot make a showing of pretext.

Indeed, as highlighted in Defendant's Memorandum, there is a particular showing of pretext that plaintiffs must satisfy in non-selection cases. That is, when an employer makes a selection decision based on a comparison of candidates' qualifications, a Title VII plaintiff has to demonstrate not just that his "job qualifications [were] similar or only slightly superior to those of the person eventually selected." *Heiko v. Columbo Sav. Bank, F.S.B.*, 434 F.3d 249, 261-262 (4th Cir. 2006). Rather, the employee must make "a strong showing that his qualifications" for the assignment in question "are demonstrably superior." *Id.* (emphasis added); *see also Matias v. Elon Univ.*, 780 F. App'x 28, 31 (4th Cir. 2019). Otherwise, "the promotion decision remains vested in the sound business judgment of the employer." *Heiko*, 434 F.3d at 261-262.

---

[3] For the Court's ease of reference, Defendant's reply follows the sequential order of the Counts set out in the Complaint and in Defendant's Memorandum even though Plaintiff's Opposition alters the order of argument.

Plaintiff's Opposition makes no mention of this standard to show pretext or the aforementioned caselaw. And he makes no effort to show pretext under this standard. This is because there is no pretext based on the record evidence. Plaintiff was not demonstrably superior to Sobieranski as a candidate as both were among the top individuals winnowed down for the Deputy Director/Supervisory Head position during the selection process, and some individuals on the interview panel—separate and apart from Colonel Hittle—noted the closeness between the two candidates with one panel member noting that he would have selected Sobieranski ahead of Plaintiff. *See* Mem. at 12-13. That does not suffice to demonstrate pretext under the law, and Plaintiff's failure to deal with this binding standard is telling.

Nonetheless, Plaintiff brings up a number of ancillary, immaterial arguments in support of his assertion that Colonel Hittle's non-selection decision was a pretext for discrimination and/or retaliation. *See* Opp. at 13-24. However, these arguments engage in complete speculation unsupported by the record evidence, are contradicted by the record evidence, and/or play up points that were wholly immaterial to the selection decision at issue in this case. Defendant addresses each of these arguments in turn below.

*a. Colonel Hittle's EEO Testimony Regarding "Eggshells" Does Not Show Pretext.*

Plaintiff's first argument in support of pretext is his reiteration of Colonel Hittle's aside that he felt he had to "walk on eggshells" around Plaintiff. Unsurprisingly, Plaintiff continues to ignore the context of this statement. To explain that context once more: Plaintiff is citing to Colonel Hittle's December 2019 EEO hearing testimony over a year after the non-selection, and this testimony involved a discussion of Colonel Hittle's reaction to an email exchange in December 2017 where Plaintiff independently raised the fact of his EEO complaint when asked a routine workplace question by Hittle. *See* Mem. at 18. Omitted from Plaintiff's repeated harping of the eggshells comment is any further context that Colonel Hittle made this comment in explaining that he wanted

9

to be "overly sensitive" to Plaintiff's concerns. Further omitted is that Colonel Hittle's subsequent

testimony about "walking on eggshells" was in response to leading questions from Plaintiff's counsel

at the EEO hearing. And completely missing from Plaintiff's argument is *any* non-speculative

evidence connecting this *ex post* testimony to Plaintiff's non-selection over a year before. That does

not show pretext.

      Stretching this isolated comment as far as he can, Plaintiff then points to cases, which he

claims found "similar expressions of discomfort about a person based on their protected class . . . to

raise an inference of discrimination." Opp. at 14. To start, Plaintiff's commentary here supposedly

relates to Colonel Hittle's discomfort around Plaintiff's protected activity, not his protected class, so

there is no inference of discrimination. But Plaintiff's cited cases are also inapposite.

      While Plaintiff cites to *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 301 (4th Cir.

2010), there was a plethora of evidence in that case suggesting gender discrimination wherein:

employees frequently made comments prior to plaintiff's termination indicating gender bias such as

"[t]his is not a woman's place," where the plaintiff "was twice passed over in favor of less-

experienced males," and where plaintiff "was told that she was not hired become some were

uncomfortable with women having the job and were wary that the enhanced physical requirements .

. . were too demanding for women." In other words, the plaintiff in *Merritt* showed a repeated

pattern, prior to her termination, of gender bias in the workplace—not just discomfort. A lone *post

hoc* comment about "eggshells" by Colonel Hittle further egged on by Plaintiff's counsel is not

comparable to say the least. So too with Plaintiff's other cited cases. *Kimble-Parham v. Minnesota

Mining & Mfg.*, 2002 WL 31229572, at *11 (D. Minn. Oct. 2, 2002) involved a case where the court

determined that there was *direct* evidence of discrimination where "in the context of Plaintiff's

supervisor explaining to her why she was being treated in a way she felt was discriminatory" the

supervisor stated that he "felt uncomfortable giving orders and instructions to her because 'it felt

like they were giving instructions to their mother.'" This example of direct evidence again is not akin to Colonel Hittle's isolated remark of feeling like he was on "eggshells"—a statement unrelated to and long postdating Plaintiff's non-selection. *See also McCrory v. Kraft Food Ingredients*, 1996 WL 571146 at *2, *6 (6th Cir. 1996) (involving an instance where Plaintiff was directly told at a job performance review by a supervisor that plaintiff's supervisor was "uncomfortable" with plaintiff talking to customers while plaintiff was on medication).

In other words, Plaintiff's cited caselaw involved completely different and far more serious situations where comments predating an adverse action reflected discriminatory animus. This is wholly lacking in Plaintiff's case. Indeed, the record evidence is completely devoid of any discriminatory and/or retaliatory inferences predating Plaintiff's non-selection. Plaintiff's repeated attempt to impugn Colonel Hittle's motives based on an innocuous, after-the-fact statement about his desire to be "overly sensitive to Plaintiff," Mem. at 17, cannot establish pretext.

*b. There Was No Inconsistent Reasoning in Plaintiff's Non-Selection.*

Plaintiff's next line of argument in support of pretext is a supposed inconsistency between the reasoning for why Sobieranski was chosen over Plaintiff as well as a claim that the destruction of notes following Plaintiff's interview was improper. Neither point is availing.

As to the former point, there is no inconsistency. Plaintiff is correct that the Fourth Circuit has allowed an inference of pretext in cases where an "employer has made *substantial changes* to its proffered reason . . . over time." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019) (emphasis added); *see also id.* (noting that the employer had offered an entirely different reason for termination in the litigation and that a prior reason given was not supported). But courts have noted that "[m]inor inconsistencies, however, do not constitute evidence of pretext." *Hysten v. Burlington N. Santa Fe Ry. Co.*, 415 F. App'x 897, 908 (10th Cir. 2011). Further, "consistent, though varying, reasons" do not establish pretext. *Baldwin v. England*, 137 F. App'x 561, 564 (4th Cir. 2005).

Plaintiff's purported inconsistency is that Colonel Hittle, in an EEO declaration, cited Sobieranski's practical experience in his decision to select him and then when asked about his decision at the EEO hearing cited Sobieranski's policy experience. *See* Opp. at 15. For one, it is not clear that this was a substantial or inconsistent change that evinces shifting and therefore disingenuous explanations for Sobieranski's non-selection.[4] For another, the record evidence directly contradicts Plaintiff's claims of an inconsistency. That is, Colonel Hittle's EEO declaration cited Sobieranski's policy experience as a basis for his selection noting that Plaintiff "did not have the background on developing policy" whereas "Sobieranski previously wrote Marine Corps orders, policies and directives, and that is what our division needs to do in the upcoming years." Def's Exh. 7 at 4.[5] Thus, Colonel Hittle's EEO testimony reiterated what he had mentioned in his declaration. That is not an inconsistency.

As to the latter point, Plaintiff offers the entirely speculative claim "that the two distinct reasons proffered by Col. Hittle during the investigation and hearing in this matter are post-hoc rationales because Col. Hittle destroyed all contemporaneous accounts of his reasons for selecting Mr. Sobieranski over Mr. Smith . . . despite the Agency's document retention policies" and that Colonel Hittle destroyed his notes "intentionally." Opp. at 16. But Plaintiff points to no specific policies mandating that Colonel Hittle had to retain his notes—a point that would not be actionable as a claim in this litigation anyway. *See, e.g.*, *Vaughn v. Danzig*, 18 F. App'x 122, 125 (4th Cir. 2001) ("[D]estruction [of records predating a document request] did not violate federal law, as agencies are not required to retain records on the possibility that a FOIA or Privacy Act request may be

---

[4] Plaintiff cites *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 576 (4th Cir. 2015), to assert that different justifications that are "not internally inconsistent" can show pretext, but that case is inapposite as there "many of the purported justifications were not raised at the time of [the adverse action]" but were offered all the way up to the federal court litigation.

[5] Plaintiff's Opposition quotes from one part of this declaration, *see* Opp. at 15, but conveniently omits this other portion of Hittle's declaration explaining his selection of Sobieranski over Plaintiff.

12

submitted."). More importantly, Plaintiff's claim that Colonel Hittle threw out his notes "intentionally" is pure speculation and premised on an assumption that there might be something damning in them regarding Hittle's reasoning for the non-selection. But equally plausible is that there could have been something in those notes consistent with Hittle's reasoning. It is all speculation in any event, which insufficient to create a material dispute of fact to avert summary judgment. *See Beale*, 769 F.2d at 214.[6]

> c. *Plaintiff's Claims of Misrepresentations by Colonel Hittle Are Not Supported or Are Immaterial.*

Finally, Plaintiff claims that a jury could find, as pretext, that Colonel Hittle made a number of misrepresentations or claims designed to bolster Sobieranski's credentials and to undermine Plaintiff's candidacy. *See* Opp. at 17-24. Plaintiff's whole line of argument is a series of complete speculations on his part that are insufficient to withstand summary judgment. *See Beale*, 769 F.2d at 214. Plaintiff's hypothesis appears to be that Colonel Hittle "fabricated" Sobieranski's credentials and "minimize[d]" Plaintiff's credentials so that Sobieranski would obtain the Deputy Director/Supervisory Head position. This unmoored claim that Colonel Hittle engineered Sobieranski's selection into the position falls apart based on the record evidence. This is because there were two interview rounds before the final selection that Colonel Hittle did not participate in, which ultimately winnowed down the candidates to Sobieranski, Plaintiff, and another candidate. *See*

---

[6] Plaintiff separately suggests that any destruction of Colonel Hittle's notes constitutes a spoliation issue, *see* Opp. at 17, but "[t]he duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001). There is no record evidence that Colonel Hittle should have known that Plaintiff would file a lawsuit over his non-selection. Plaintiff also claims that "Defendant has offered no explanation for its failure to produce the justification memorandum that Col. Hittle said he submitted to Major General Iiams." Opp. at 17; *see also* Opp. at 16. Yet there is no record evidence of a "justification memorandum" to Colonel Hittle's superiors that Plaintiff claims is in existence as Colonel Hittle never mentioned a "justification memorandum" in his EEO declaration, *see* Def's Exh. 7 at 3, and noted in his EEO hearing that he had only discussed the selection of the Deputy Director/Supervisory Head "at a cursory level." ECF No. 16-1 at 154-155.

Mem. ¶¶ 11-16. If Colonel Hittle had sought to undermine Plaintiff or bolster Sobieranski, he simply could not have done so in the first two rounds of the interview process.

More importantly, each of Plaintiff's purported misrepresentations had no bearing on Colonel Hittle's decision to select Sobieranski over Plaintiff. Thus, they are immaterial to this Court's analysis because "[t]o give rise to a finding of pretext, inconsistencies must relate to the 'core substance' of the proffered reasons for failing to promote." *Louis v. City of Rockville*, 2018 WL 1471681, at *5 (D. Md. Mar. 23, 2018) (citation omitted); *see also Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006) ("[T]he plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it."). For example, Plaintiff's claim that Colonel Hittle did not recognize that "Sobieranski was organizationally one level below [Plaintiff]," Opp. at 22, is immaterial to this case and cannot show pretext because the organizational levels of Sobieranski and Plaintiff were not part of the selection decision or used by Colonel Hittle as a justification for not selecting Plaintiff. *See, e.g.*, Def's Exh. 7 at 4; Def's Exh. 8. A review of each of Plaintiff's claimed "misrepresentations" also reinforces that they are immaterial and/or are outright inaccurate.

Plaintiff's first claimed "fabrication" is that Colonel Hittle allowed Sobieranski to serve in an Acting Deputy Director position for longer than six months and that this gave Sobieranski a benefit with the resume review panel during the selection process. *See* Opp. at 17-19. Putting aside when Sobieranski became the Acting Deputy Director or for how long, Plaintiff is again engaging in speculation that runs contrary to the record evidence. Sobieranski passed the resume review panel but was also, as Plaintiff neglects to mention, highly recommended by the interview panel. *See* Mem. ¶ 15. Indeed, if the resume panel was the end-all, be-all of the selection process then Plaintiff himself would not have been one of the final three candidates. *See* Mem. ¶ 13. More importantly, there is no record evidence that Colonel Hittle selected Sobieranski for the position of Acting

14

Deputy Director as part of an elaborate, surreptitious attempt to discriminate or retaliate against Plaintiff.[7] And Colonel Hittle's stated reasons for selecting Sobieranski over Plaintiff did not in any way cite Sobieranski's acting role and, in fact, cited work that Sobieranski had done before he ever became Acting Deputy Director. *See* Def's Exh. 7 at 4.

Plaintiff's next claimed misrepresentation is that Colonel Hittle "pretended not to know [Plaintiff]'s job and qualifications in order to minimize them." Opp. at 20. The entire basis of this claim is that, in one aside during his EEO testimony, Colonel Hittle testified that he "struggled, at times, to understand what [Plaintiff] really did do." Opp. at 20. But, once again, Plaintiff is harping on a minor detail in Colonel Hittle's testimony without reference to its broader context. While Colonel Hittle made this initial statement, he followed up by explaining that he then "did the best to understand what [Plaintiff] did" while elaborating at the hearing on the "very broad mandate" that Plaintiff had. EXH. 18 at 92-93. In other words, Colonel Hittle did not "minimize" Plaintiff's experience or pretend not to know it. Further, nothing in Colonel Hittle's decision to select Sobieranski over Plaintiff was based on a minimization of Plaintiff's experience. To the contrary, Plaintiff's claim that Colonel Hittle ignored his qualifications is baffling when read in light of Colonel Hittle's subsequent testimony that Plaintiff "was a very close second to Mr. Sobieranski" for the Deputy Director/Supervisory Head position. Def's Exh. 7 at 6.

Next, Plaintiff claims that Colonel Hittle misrepresented Sobieranski's organizational level relative to Plaintiff. *See* Opp. at 21-22. As previously noted, the organizational levels of Plaintiff and Sobieranski were not material to the selection decision. But even then, Plaintiff's claim that he was organizationally above Sobieranski is based on his own self-serving testimony and Plaintiff's own

---

[7] In his Opposition Plaintiff states that he was afforded the opportunity to "serve[] stints as Acting Deputy Director multiple times prior to 2017." Opp. at 2. This point actually cuts against Plaintiff's argument that Sobieranski had an advantage that Plaintiff did not have in being the Acting Deputy Director.

editorializing of an organization chart, which actually shows that both he and Sobieranski were GS-14 employees and that Sobieranski did not report to Plaintiff. *See, e.g.,* EC No. 16-4.[8]

Plaintiff's second to last argument is that Colonel Hittle was not credible when he testified about the importance of the simulations experience for the Deputy Director/Supervisory Head position and yet valued Sobieranski's experience in developing simulations from the 1980s. *See* Opp. at 22. But Plaintiff's *ipse dixit* statement that Colonel Hittle's statement "strains credulity" is his own opinion, and Plaintiff provides no reasoning for why Sobieranski's experience from prior decades would not have been valuable or why any value of Sobieranski's prior experience would have been "incredulous." Moreover, the fact that Plaintiff disagrees with the wisdom of Colonel Hittle's belief, without more, does not establish pretext. It is well settled that a plaintiff cannot succeed merely by establishing that the given rationale for an action was not "wise, fair, or even correct." *DeJarnette v. Corning, Inc.,* 133 F.3d 293, 299 (4th Cir. 1998). Plaintiff also does not show that this point was relevant to the selection decision, and the record evidence shows that it was not. Indeed, Colonel Hittle noted Plaintiff's experience "working on the training simulation side," but what influenced Colonel Hittle's selection for the Deputy Director/Supervisory Head position was the applicants' policy experience, something that Plaintiff could not demonstrate as a candidate—a point that his Opposition does nothing to rebut. *See* Def's Exh. 7 at 4.

Finally, Plaintiff argues that "Col. Hittle falsely testified under oath that Mr. Smith did not tell him he felt marginalized by him" and that this somehow could demonstrate pretext. Opp. at 23. As with Plaintiff's claims of "misrepresentations" or "fabrications," this point about Colonel Hittle's December 2019 EEO testimony is wholly unrelated to Colonel Hittle's selection decision in

---

[8] In the introduction to his Opposition, Plaintiff also claims he was "next in line" for the Deputy Director position. Opp. at 2. But Plaintiff's claim that he was "next in line" is supported by nothing and runs counter to the record evidence showing a three-stage interview process for the position.

February 2018 and thus immaterial to this Court's analysis. In addition, Plaintiff's claim of falsity

falls flat looking at the record. As with so many of other instances where Plaintiff seizes upon

isolated statements by Colonel Hittle during the EEO proceedings as evidence of a

misrepresentation or retaliatory intent, Plaintiff's argument comes apart when looking at the

statement in context. A full look at Colonel Hittle's EEO testimony notes that, while he may not

have initially remembered a long prior email from December 2017 where Plaintiff claimed that he

was marginalized, Colonel Hittle then clarified his answer when presented with that email thereby

refreshing his memory. Indeed, a *full* review of the EEO transcript—not Plaintiff's circumscribed

excerpt—demonstrates as much:

> JUDGE WOODHAM: From the time that you returned in October of 2017 through the
> date of your selection decision, did you take any steps to address the concerns of Mr. Smith
> that he was being marginalized?
>
> THE WITNESS: I didn't take any steps to do anything, Your Honor, because I didn't hear
> from him that he was being marginalized.
>
> JUDGE WOODHAM: Can somebody give him Page 178 and 179 -- and 180, I'm sorry.
> Give him all three of those.
> . . .
> JUDGE WOODHAM: Yes, thank you. Tell me when you've had a chance to review those,
> Mr. Hittle.
>
> THE WITNESS: I apologize, Your Honor. Thank you for letting me read that.

Def's Exh. 15 at 155-156. That Plaintiff twists Colonel Hittle's initial statement into evidence of a

"falsity" is disingenuous, but it is not surprising.[9] The entire gist of Plaintiff's argument in this case,

---

[9] While claiming a misrepresentation by Colonel Hittle, Plaintiff himself does not accurately
represent the record. Above the line in his argument Plaintiff refers to testimony about a December
2017 email where Plaintiff claimed that he was being marginalized, *see* Opp. 23, but in a footnote
Plaintiff states: "Col. Hittle was shown this email at the EEO hearing and testified that he recalled
Mr. Smith raising concerns about discrimination and bias. Pl's Ex. 3 at 106." Opp. at 23. The
testimony at page 106 of the EEO hearing transcript that Plaintiff cites to did not relate to this
December 2017 email. Rather, it referred to a wholly separate email discussing a meeting where
Plaintiff "relayed concerns about being subject to reprisal as a result of [the] selection decision."
ECF No. 16-3 at 105. As noted on page 106 of the EEO hearing transcript, that email was found on

from his Complaint to his Opposition, has been to contort Colonel Hittle's EEO testimony and to

strain to find some inference of discrimination and/or retaliation based on scattered statements in

that testimony. But there is no such inference, and Plaintiff cannot demonstrate actual record

evidence defeating the legitimate, non-discriminatory and non-retaliatory reasons for his non-

selection.

## II.   PLAINTIFF HAS WAIVED ANY CLAIM OF DIRECT EVIDENCE OF RETALIATION AND CANNOT STATE A PRIMA FACIE CASE OF RETALIATION (COUNT II).

Putting aside the legitimate, non-retaliatory reasons for Plaintiff's non-selection, Plaintiff's

retaliation claim would fail here because Plaintiff cannot show direct evidence of retaliation and/or a

*prima facie* case of retaliation. *See* Mem. at 15-22. While Plaintiff's Complaint pleaded direct evidence

of retaliation, Plaintiff does not rebut Defendant's argument that there is no direct evidence of

retaliation.[10] Thus, any argument on this point is waived. *See Estate of Weeks v. Advance Stores Co.*, 99

F. App'x 470, 474 (4th Cir. 2004) ("[E]ven an issue raised in the complaint but ignored at summary

judgment may be deemed waived.") (citation omitted); *Johnson v. United States*, 861 F. Supp. 2d 629,

634 (D. Md. 2012) ("Failure to raise issues in opposition to summary judgment functions as a

waiver.").

As to the failure to state a *prima facie* case, Plaintiff cannot rebut the fact that he is seeking to

tie EEO complaints filed in June 2015 and September 2016 to a non-selection in February 2018. *See*

---

"Page 141" of the Report of Investigation, which is included as Exhibit 16 to Defendant's
Memorandum, *see* Def's Exh. 16. That email recollects a meeting between Plaintiff and Colonel
Hittle on January 29, 2018 that does not reflect any claims of "marginalization."

[10] To the extent Plaintiff raises this point at all on summary judgment he sheepishly concedes that
"his statements may not qualify as direct evidence of discrimination." Opp. at 14. But Plaintiff offers
no statements demonstrating direct evidence of discrimination or retaliation. In fact, there is no
discriminatory language alleged anywhere in the Complaint as necessary for such a claim. *See, e.g.,*
*Johnson v. Mechs. & Farmers Bank*, 309 F. App'x 675, 681 (4th Cir. 2009) (requiring "evidence of
conduct or statements that both reflect directly on the alleged discriminatory attitude and that bear
directly on the contested employment decision").

Mem. at 21. And Plaintiff cannot rebut Fourth Circuit caselaw that has found causation for a *prima facie* case lacking based on even shorter time periods between protected activity and adverse actions. *See* Mem. at 20 (collecting cases). To get around this problem, Plaintiff claims that "Defendant misunderstands the law of this Circuit" because Plaintiff's reminder in a December 2017 email to Colonel Hittle about his prior protected activity restarts the clock for the purposes of temporal proximity. *See* Opp. at 11-12. It is in fact Plaintiff that misunderstands the law of the Fourth Circuit as he ignores a squarely applicable case cited in Defendant's Memorandum that forecloses Plaintiff's argument: *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896 (4th Cir. 2017). As the Fourth Circuit held there, the mere fact that an employee once filed an EEO complaint did not entitle them to "permanent immunity from any adverse action taken by an employer for any reason in the future." *Id.* at 904. In other words, the Fourth Circuit has made clear that a plaintiff cannot consistently invoke a prior EEO complaint repeatedly as a basis for a retaliation clam—the very thing Plaintiff is trying to do here as Plaintiff *sua sponte* brought up his prior EEO activity in December 2017 correspondence when asked about a routine workplace matter by his supervisor. *See* Mem. at 18. Plaintiff's argument, taken to its conclusion, would allow him to assert a claim of retaliation in perpetuity so as long as he independently invoked prior EEO activity to his employer every time he disagreed with a workplace decision. The Fourth Circuit squarely foreclosed this argument, however.

In support of his argument otherwise, Plaintiff cites to *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243 (4th Cir. 2015). But that case, which predates *Villa*, is inapposite. *Foster* stated the uncontroverted point that subsequent complaints of retaliation and discrimination, i.e., protected activity, do not defeat temporal proximity. *See Foster*, 787 F.3d at 253 n.16. However, Plaintiff did not identify his December 2017 correspondence as protected activity in his Complaint, and he cannot claim now in summary judgment briefing. *See Faulconer v. Centra Health, Inc.*, 808 F. App'x 148, 154 (4th Cir. 2020) (denying "constructive amendment at summary judgment" where plaintiff raised

a new theory and factual allegations in her opposition). Furthermore, the record evidence shows that

the December 2017 correspondence could not have been protected activity because Plaintiff was not

complaining of discrimination on the basis of race in that email; instead, Plaintiff was still tracing his

workplace disagreement back to his prior EEO complaints in 2015 and 2016 without any reference

to Plaintiff's race, color, religion, sex, or national origin. *See, e.g.*, Def's Exh. 5 at 179 ("I believe your

actions are because I have an EEO complaint against TECOM that includes you."). That is not

protected activity. *See Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 122 (4th Cir. 2021) ("Protected

activity under Title VII includes complaints of discrimination based upon 'race, color, religion, sex

or national origin.'"); *Bowman v. Baltimore City Bd. of Sch. Commissioners*, 173 F. Supp. 3d 242, 248 (D.

Md. 2016) ("General complaints of unfair treatment are not protected activity.").

To that end, Plaintiff's other cited case, *Carter v. Ball*, 33 F.3d 450 (4th Cir. 1994) is similarly

inapposite. That case involved adverse actions taken soon after a hearing was held on the plaintiff's

EEO complaint. In other words, adverse actions took place soon after the kind of protected activity

clearly defined by statute. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir.

1998) ("Activities that constitute participation are outlined in the statute: (1) making a charge; (2)

testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or *hearing

under Title VII*.") (citing 42 U.S.C. § 2000e–3(a)) (emphasis added). Plaintiff independently raising the

fact of his long prior EEO complaint in response to a simple workplace question from his

supervisor is not protected activity let alone comparable to *Carter*.

## CONCLUSION

For the foregoing reasons herein and those discussed in Defendant's Memorandum,

Defendant's Motion for Summary Judgment should be granted.

20

Dated: June 6, 2022

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____/ s /_____

YURI S. FUCHS
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:   (703) 299-3872
Fax:   (703) 299-3983
Email:  yuri.fuchs@usdoj.gov
*Counsel for Defendant*

21

JA 290

<u>CERTIFICATE OF SERVICE</u>

      I do hereby certify that on this 6th day of June, 2022, I have electronically filed the foregoing

using the CM/ECF system.


                          _____/s/_____

                          Yuri S. Fuchs

                          Assistant U.S. Attorney

                          U.S. Attorney's Office

                          2100 Jamieson Avenue

                          Alexandria, VA 22314

                          Tel: (703) 299-3872

                          Fax: (703) 299-3983

                          Email: yuri.fuchs@usdoj.gov

                          *Counsel for Defendant*

# Exhibit 18

USCA4 Appeal: 22-1985    Doc: 15    Filed: 11/28/2022    Pg: 296 of 341
Case 1:21-cv-01406-MSN-IDD    Document 17-1    Filed 06/06/22    Page 2 of 9 PageID# 263

1

                    UNITED STATES OF AMERICA
          EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                    WASHINGTON FIELD OFFICE
            131 M Street, N.E., Suite 4NW02F
          Washington, D.C. 20507


    _____ :
                                    :
    ANTONIO SMITH,                   : EEOC No.
                                    : 570-2019-00511X
          Complainant,              :
                                    :
          v.                        :
                                    :
    RICHARD V. SPENCER,             : Agency No.
    SECRETARY,                      : 18-67856-01699
    U.S. DEPARTMENT OF DEFENSE,     :
    DEPARTMENT OF THE NAVY,         :
    MARINE CORPS HEADQUARTERS,      :
                                    :
          Agency.                   :
    _____:


                    Monday, December 16, 2019

                    Marine Corps Base Quantico
                    Lejeune Hall
                    3250 Catlin Avenue
                    Quantico, Virginia 22134

                    The hearing commenced at 10:00 a.m.




        BEFORE:

                    MARICIA WOODHAM,

                    Administrative Judge

APPEARANCES:

On behalf of the Complainant:

       VICTORIA HARRISON, ESQ.
       Alan Lescht & Associates
       1825 K Street, N.W., Suite 750
       Washington, D.C. 20006
       202-463-5104
       victoria.harrison@leschtlaw.com


On behalf of the Agency:

       EVAN R. GORDON, ESQ.
       Associate Counsel
       Quantico Area Counsel Office
       3250 Catlin Avenue, Room 209
       MCB Quantico, Virginia 22134
       703-784-3009
       evan.gordon@usmc.mil

USCA4 Appeal: 22-1985    Doc: 15       Filed: 11/28/2022    Pg: 298 of 341
Case 1:21-cv-01406-MSN-IDD   Document 17-1   Filed 06/06/22   Page 4 of 9 PageID# 265

3

CONTENTS

Opening Statements . . . . . . . . . . . . . . . 5

Closing Arguments. . . . . . . . . . . . . . . 211

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Antonio Smith | 32 | 42 | 199 | |
| Jeffrey Williams | | 61 | | |
| Patrick Hittle | 107 | 133 | 162 | 170 |
| Edward Sobieranski | 186 | 195 | | |

USCA4 Appeal: 22-1985    Doc: 15    Filed: 11/28/2022    Pg: 299 of 341
Case 1:21-cv-01406-MSN-IDD   Document 17-1   Filed 06/06/22   Page 5 of 9 PageID# 266

91

```
 1                    JUDGE WOODHAM:  What other areas was
 2        Mr. Sobieranski more experienced in as opposed to
 3        Mr. Smith?
 4                    MR. HITTLE:  Mr. Sobieranski's
 5        position as the -- while he was the deputy branch
 6        head for the RTAM branch and effectively filling
 7        the position -- effectively taking over the
 8        responsibilities as the RTAM branch head, he was
 9        responsible for oversight and management of all
10        the RTAM budget, the money under that program of
11        record, how it was going to be allocated,
12        shifted, if there was a need to shift it within
13        the program to different responsibilities or
14        different demand signals.  I do not believe that
15        Mr. Smith had direct management of the funds at
16        that type of depth and detail.
17                    JUDGE WOODHAM:  Do you have any idea
18        of what Mr. Smith did at all?
19                    MR. HITTLE:  I struggled, at times, to
20        understand what he really did do.
21                    JUDGE WOODHAM:  Did you take the time
22        to find out what he did?
```

USCA4 Appeal: 22-1985    Doc: 15    Filed: 11/28/2022    Pg: 300 of 341

1              MR. HITTLE:  Yes, Your Honor, from

2       when I took over in 2015, in November, I worked

3       with Mr. Smith on a number of issues.

4              JUDGE WOODHAM:  Did you review his

5       application packet for this position, Mr. Hittle?

6              MR. HITTLE:  Yes, I did, Your Honor.

7              JUDGE WOODHAM:  What did you glean

8       what his work experience was from his application

9       panel?  If you're considering these individuals

10      for this position, it doesn't appear as if you

11      took the time to glean what their experience was

12      at the time of the interviews.

13             MR. HITTLE:  Your Honor, I did the

14      best to understand what Mr. Smith did.  I asked

15      him to take on a variety of projects.  Live

16      virtual constructive training environment was a

17      very demanding project that we had.  He had the

18      most experience with it.  I knew that he had been

19      working to lead that effort for a very long time.

20             He was coordinating across training

21      and education command with not only the other

22      functional divisions within TECOM, but also with

USCA4 Appeal: 22-1985    Doc: 15    Filed: 11/28/2022    Pg: 301 of 341
Case 1:21-cv-01406-MSN-IDD   Document 17-1   Filed 06/06/22   Page 7 of 9 PageID# 268

1    training command, the subordinate element that

2    owns all the schoolhouses that would benefit from

3    these training simulations, as well as from our

4    ranges efforts.

5              As the operations officer, he had a

6    very broad mandate to do a great deal of work in

7    one of our -- if you try and equate what this

8    division does within training and education

9    command at a headquarters level, very unique

10   organizational aspect to what a typical Marine

11   Corps operational unit might do.

12             The operations officer is not the

13   same.  That general description is not the same

14   between the two, but you can draw some parallels.

15   An operations officer in an operational unit

16   typically manages tasks and sorts out

17   responsibilities and will ensure unity of effort

18   across functional elements of the unit.  One of

19   the things I wanted Mr. Smith to help me do was

20   to align the simulations side of the house with

21   the ranges side of the house, and also to manage

22   the systems and the traffic cop flow of daily

1    tasking, requests for information from our higher

2    headquarters at TECOM, taskers that would come

3    in, responses to journal -- accounting office

4    audits.

5              We typically respond to those.  Mr.

6    Smith was deeply involved in reviewing --

7    compiling input from the various sections within

8    our division, crafting those responses, and

9    ensuring -- he would work with me -- that I had a

10   chance to review them before we submitted those

11   responses.

12             He was the division representative on

13   a number of collaborative planning team efforts

14   across training and education command hierarchy,

15   whether it came to -- we were always looking at

16   managing payroll, staffing reductions to meet our

17   civilian payroll concerns, still as a result of

18   the 2012 reorganization effort.  That was a

19   lingering thing, even three, four, five years

20   later.  I worked pretty closely with Mr. Smith,

21   just like I worked pretty closely with Mr.

22   Sobieranski.  I did review his package, Your

USCA4 Appeal: 22-1985    Doc: 15    Filed: 11/28/2022    Pg: 303 of 341

1    Honor.  If I have not answered the question --

2              JUDGE WOODHAM:  Was Mr. Smith one of

3    your direct reports during the fall of 2017

4    through the selection at issue here?

5              MR. HITTLE:  All of the branch heads

6    were civilians.  They all reported to the deputy.

7    In 2017 -- up until July of 2017, when the

8    previous deputy retired, they were all -- the

9    division deputy, Mr. Bennington, was their direct

10   senior, and I was the second-level supervisor to

11   the reviewing evaluations.

12             JUDGE WOODHAM:  So he wasn't your

13   direct report.  You were the second-line rater.

14             MR. HITTLE:  Actually -- just to

15   understand the time frame, Your Honor, this is

16   after July of 2017?

17             JUDGE WOODHAM:  Yes, I'm trying to

18   acquire what your knowledge is of his work

19   experience if he was not your direct report.

20   You've articulated what you believe his prior

21   work experience has been.  I'm trying to get an

22   understanding of what your working relationship

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| ANTONIO SMITH | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|           v. | )     Civil Action No. 1:21-cv-1406-MSN-IDD |
| | ) |
| THOMAS W. HARKER, Acting Secretary | ) |
| United States Department of the Navy, | ) |
| | ) |
|     Defendant. | ) |
| | ) |

**PLAINTIFF'S NOTICE OF FILING**

Plaintiff Antonio Smith respectfully requests that the Court consider the attached sworn statement of John Keppeler in its determination of whether Defendant, through Col. Hittle, has set forth honestly its reason for rejecting Mr. Smith's application for promotion. Specifically, whether Col. Hittle was dishonest in his description of Mr. Smith's qualifications.

Date: June 13, 2022

Respectfully submitted,

  /s/ *Ellen K. Renaud*
Ellen K. Renaud, V.A. Bar # 47326
Alan Lescht & Associates, P.C.
1825 K Street, NW Suite 750
Washington, D.C. 20006
Tel. (202) 852-8483
Ellen.Renaud@leschtlaw.com

*Counsel for Plaintiff*

**<u>Certificate of Service</u>**

I certify that on June 13, 2022, I served the foregoing Notice of Filing on counsel of record

for Defendant, Yuri S. Fuchs, through the court's electronic filing system.


   /s/ *Ellen K. Renaud*
Ellen K. Renaud

2

USCA4 Appeal: 22-1995      Doc: 15      Filed: 11/28/2022      Pg: 306 of 341

<u>Declaration of John J. Keppeler</u>

1. My name is John J. Keppeler.  I am currently a Portfolio Manager in the Range and Training Programs Division (RTPD), Training & Education Command (TECOM), U.S. Marine Corps.

2. I was on active duty in the U.S. Marine Corps from 1990 to 2010.  I retired from active duty in 2010 as a Major and came to work as a civilian in the organization that is now known as the RTPD and have been working in training simulations ever since.

3. I have known Tony Smith since the early 2000's. I worked with him at RTPD from 2010 to approximately 2019, and he was my direct supervisor for approximately four of those years.

4. Tony had been working in the organization now known as RTPD since 2009 and had an extensive knowledge and experience in the field of training simulations.

5. I understand that during a hearing in this case, Col. Hittle testified, that "Mr. Smith, I do not believe, was viewed or leveraged, his expertise was not requested and not sought out by experts in the training simulation system field." This is false.

6. Tony Smith was sought out as the expert in training simulations field.  Leaders in the Training and Education Command (TECOM), all four Marine Expeditionary Forces (MEF), Department of the Navy (DON), Department of Defense (DoD), Office of Naval Research (ORN), Defense Advanced Research Projects Agency (DARPA), and more looked to Tony Smith for his knowledge of training simulations.

7. As the Director of the organization, Col. Hittle should have been well aware that Tony was viewed this way and regularly sought out for briefings and high-level meetings in the training simulation system field.  If Col. Hittle was unaware that would make him incompetent, and I do not believe Col. Hittle was incompetent.

8. Tony Smith is a hard worker, conscientious, a skillful staff officer, a respected leader, and a consummate professional.  He has served the organization well for more than a decade and well respected by subordinates, peers, and superiors.

I swear under penalty of perjury that the foregoing statements are true and correct.

_6-3-22_
Date

_John J. Keppeler_

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| ANTONIO SMITH, | ) |
| | ) |
|         Plaintiff, | ) |
|     v. | )    1:21-cv-1406-MSN-IDD |
| | ) |
| CARLOS DEL TORO, Secretary | ) |
| United States Department of the Navy, | ) |
| | ) |
|         Defendant. | ) |
| _____ | ) |

## DEFENDANT'S MOTION TO STRIKE

Defendant Carlos Del Toro, in his official capacity as Secretary of the United States

Department of the Navy, and through the undersigned counsel, hereby respectfully files this motion

to strike Plaintiff's Notice, ECF No. 18, and the accompanying declaration, ECF No. 18-1, and

respectfully requests that the Court give no consideration to this notice or declaration in deciding

Defendant's motion for summary judgment. The grounds for this motion are more fully explicated

in the memorandum of law that has been simultaneously filed with the motion.

Dated: June 13, 2022

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:            / s /
YURI S. FUCHS
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3872
Fax:   (703) 299-3983
Email: yuri.fuchs@usdoj.gov
*Counsel for Defendant*

<u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on this 13th day of June, 2022, I have electronically filed the foregoing

using the CM/ECF system.

                                     /s/
Yuri S. Fuchs
Assistant U.S. Attorney
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Tel: (703) 299-3872
Fax: (703) 299-3983
Email: yuri.fuchs@usdoj.gov
*Counsel for Defendant*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| ANTONIO SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 1:21-cv-1406-MSN-IDD |
| | ) | |
| CARLOS DEL TORO, Secretary | ) | |
| United States Department of the Navy, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE**</u>

Defendant Carlos Del Toro, in his official capacity as Secretary of the United States

Department of the Navy, respectfully submits this memorandum of law in support of his motion to

strike Plaintiff's Notice, ECF No. 18, and the accompanying declaration, ECF No. 18-1.

## INTRODUCTION AND SUMMARY

In the instant case, summary judgment briefing has been completed as of June 6, 2022, and

all that remains is for the Court to adjudicate Defendant's motion to summary judgment on

Plaintiff's claims of discrimination and retaliation relating to his non-selection for a position in the

United States Marine Corps. As explained in Defendant's summary judgment briefing, the record

evidence here is sufficient to resolve the action. Further, in the course of summary judgment

briefing, both parties submitted items, largely from Plaintiff's prior Equal Employment Opportunity

("EEO") proceedings, for the Court's consideration, appending any relevant testimony or exhibits

to their briefs. *See, e.g.,* ECF Nos. 11, 16-17.

However, on June 13, 2022—more than a week after the conclusion of summary judgment

briefing—Plaintiff filed a "Notice," *see* ECF No. 18, in which he requests that the Court take notice

of a newly submitted declaration by another United States Marine Corps employee, John J.

Keppeler, in considering Defendant's motion for summary judgment. This after-the-fact declaration

proffered by Plaintiff with no prior notice to Defendant or the Court is improper for a variety of reasons, and it should not be considered by this Court.

First, Plaintiff's declaration is submitted without leave and long after Plaintiff's opposition to summary judgment was filed, thereby constituting a sur-reply brief that is not permitted by the local rules of this Court. Second, much of the declaration is not based on the declarant's personal knowledge as required under Federal Rule of Civil Procedure 56(c). And finally, even if the testimony could be considered by this Court, it is immaterial to the resolution of Defendant's motion for summary judgment as it goes to Plaintiff questioning the wisdom of Colonel Hittle's *belief*, something that does not suffice to show pretext. For these reasons, the Court should grant Defendant's motion to strike or, at a minimum, not consider Plaintiff's Notice and the appended declaration in resolving Defendant's motion for summary judgment.[1]

## ARGUMENT

### I.    PLAINTIFF'S NOTICE AND DECLARATION CONSTITUTE AN IMPROPER SUR-REPLY FOR WHICH LEAVE WAS NOT SOUGHT.

Plaintiff's Notice and declaration are improper first because they are effectively a sur-reply. Under this Court's local rules, while parties may file briefs, response briefs, and reply briefs, "[n]o further briefs or written communications may be filed without first obtaining leave of Court." E.D.

---

[1] Another issue with Plaintiff's declaration is that it comes from an employee of the United States Marine Corps, but there is absolutely no statement or evidence that authorization for Keppeler's testimony was procured as necessary under the relevant *Touhy* regulations. According to Department of Army regulations issued in accordance with the decision in *U.S. ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951) (hereinafter "Touhy"), a litigation request must be sent to the Department of Defense ("DoD") before DoD can determine whether or not its own personnel "may be interviewed, contacted, or used as witnesses concerning official DoD information . . . and what, if any, conditions will be imposed upon such release, interview, contact, or testimony." 32 C.F.R. § Pt. 516, App. C. The declaration, however, does not indicate if any such *Touhy* request was made here for Keppeler's testimony on a matter relating to his employment with the United States Marine Corps, and Defendant is not aware of any such request having been made. Because it is not clear if Plaintiff's non-compliance with *Touhy* is a basis for a motion to strike, Defendant does not presently move to strike the Keppeler declaration on this basis.

Va. Local Rule 7(F)(1). Thus, according to this rule, a party "may not file a sur-reply without leave of court." *Darnell v. Lloyd*, 2014 WL 5422370, at *2 (E.D. Va. Oct. 23, 2014). Plaintiff here, however, has filed this "Notice" and the accompanying declaration without ever seeking leave of Court and thus has not complied with the local rules. Accordingly, these materials should be stricken by the Court. *See Tetreault v. Advanced Fed. Servs. Corp.*, 2012 WL 4479977, at *1 (E.D. Va. Sept. 28, 2012) ("The rules permit only one opposition to a motion unless leave of court is granted. Accordingly, the court could strike the pleading without consideration of it.").[2] While Plaintiff may argue that these items are not a sur-reply but rather additional materials, any such argument would be unavailing. Indeed, courts within this district and the Fourth Circuit have observed that a notice, even if labeled as such, is a sur-reply when offered after the conclusion of summary judgment briefing in support of that briefing. *See, e.g.*, *Vaughn v. Patient First*, 2016 WL 11673421, at *2 (E.D. Va. Aug. 10, 2016) (holding that "a document titled, 'Notice of Objection to Response in Opposition to Motion,' . . . appears to the Court to be a surreply that was filed without leave of Court"); *see also F.D.I.C. v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013) (describing "an additional notice of filing in opposition to summary judgment" as a "surreply").

This is particularly true in the instant case where: Plaintiff's summary judgment briefing has focused on the argument that Colonel Hittle's decision not to select him was a pretext for

---

[2] Even if Plaintiff had moved for leave to file a sur-reply, he likely would not have met the standard to be granted leave. "The standard for granting leave to file a sur-reply is whether the party making the motion would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Hooker v. Sirius XM Radio*, Inc., 2013 WL 12149171, at *1 (E.D. Va. May 8, 2013) (quoting *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D. D.C. 2001)). Plaintiff's declaration, however, does not respond to any new evidence or argument in Defendant's reply brief. Rather, it is a declaration from Plaintiff's colleague opining on the merit of testimony that Colonel Hittle gave in a December 2019 EEO hearing that Plaintiff has undoubtedly long been aware of. *Compare* ECF No. 18-1 ¶ 5 (discussing what Keppeler claims was said at an unspecified hearing) *with* ECF No. 16-3 at 90 ("Mr. Smith, I do not believe, was viewed or leveraged, his expertise was not requested and not sought out by experts in the training simulation system field."). That would not satisfy the standard to permit the filing of a sur-reply.

discrimination and retaliation, *see*, ECF No. 16 at 13-24; Defendant has countered that argument in

his briefing, *see, e.g.*, ECF No. 17 at 8-18; and where Plaintiff's declaration is offered so that the

Court can "consider . . . whether Defendant, through Col. Hittle, has set forth honestly its reason

for rejecting Mr. Smith's application for promotion." ECF No. 18. That this Notice and declaration

constitute an improper sur-reply is furthered by the fact that Plaintiff is offering this declaration after

summary judgment briefing has concluded without giving Defendant a chance to rebut it. Had

Plaintiff wanted to make the declaration part of the record evidence and offer it as a fact for this

Court's consideration, he presumably could have attached it to his Opposition, but he did not.[3] The

Court should not permit this sort of gamesmanship.

## II.      PLAINTIFF'S DECLARATION SHOULD BE STRICKEN BECAUSE IT IS NOT BASED ON PERSONAL KNOWLEDGE.

Even if Plaintiff's declaration had been properly submitted in this case, the Court should still

strike it because it is not based on personal knowledge. Under Federal Rule of Civil Procedure

56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on

personal knowledge." "Generally, an affidavit filed in opposition to a motion for summary

judgment must present evidence in substantially the same form as if the affiant were testifying in

court." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996). "Thus, summary

judgment affidavits cannot be conclusory . . . or based upon hearsay." *Id.* Moreover, a declaration

should "present[] a sufficient factual basis for the Court to conclude that [the declarant] has

adequate personal knowledge to testify." *Crump v. TCoombs & Assocs.*, LLC, 2015 WL 5601885, at

*39 (E.D. Va. Sept. 22, 2015). Where some parts of the affidavit demonstrate personal knowledge,

"the entire affidavit need not be stricken, and the court may consider those portions that are not

---

[3] Notably, Plaintiff received an extension to file his Opposition to Defendant's motion for summary judgment, *see* ECF No. 13, and presumably could have sought and obtained another extension if he needed time to incorporate Keppeler's declaration into his Opposition. Plaintiff, however, neither included the declaration as an Opposition nor sought additional time to do so.

deficient." *It's My Party, Inc. v. Live Nation, Inc.*, 2012 WL 3655470, at \*11 (D. Md. Aug. 23, 2012).

While some of the statements in the Keppeler declaration such as his work background appear to be based on personal knowledge, *see* ECF No. 18-1 ¶¶ 1-2, the other statements therein— for which the declaration is proffered—do not demonstrate personal knowledge and should be stricken. Keppeler's opinion that "Col. Hittle should have been well aware that Tony was viewed this way" ECF No. 18-1 ¶ 7, is speculative and conclusory, lacking any kind of factual foundation, while opining on what another individual should have or should not have known. So too with Keppeler's other opinions regarding Plaintiff's purported qualifications and good standing. *See* ECF No. 18-1 ¶¶ 4, 8. Keppeler's other major assertion that "Tony Smith was sought out as the expert in the training simulations field," ECF No. 18-1 ¶ 6, also, without more, does not establish personal knowledge. Keppeler's declaration on this point is wholly devoid of specifics as it does not mention who exactly sought out Plaintiff or when they did so, proclaiming in vague generalities that this occurred without an exact instance of when it did. Further, the declaration does not specify as to how Keppeler has personal knowledge of this fact, which, on its face, relates to Plaintiff's particular experiences. Thus, the Court should strike Keppeler's declaration or, at a minimum, the portions of his declaration that Plaintiff attempts to use to claim pretext.

### III. PLAINTIFF'S DECLARATION SHOULD BE DISREGARD IN ANY EVENT BECAUSE IT IS NOT MATERIAL TO THE RESOLUTION OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT.

Finally, to the extent that the Court does not strike Plaintiff's declaration, it should still be disregarded in its entirety as it is immaterial to this Court's resolution of Defendant's motion for summary judgment. Plaintiff's declaration, as previously mentioned, is offered in support of his argument that Plaintiff's non-selection for a position was pretextual. Specifically, Plaintiff's newfound declaration is meant to provide additional evidence on "whether Col. Hittle was dishonest in his description of Mr. Smith's qualifications." ECF No. 18. But the declaration does not provide

5

record evidence of "dishonesty" to begin with. Specifically, upon review of Colonel Hittle's

December 2019 EEO testimony, Plaintiff's colleague John J. Keppeler takes issue with Hittle's

testimony wherein Hittle—upon being asked by the presiding Administrative Judge about what

experience Edward Sobieranski (the applicant selected for the position) had over Plaintiff—testified

that: "Mr. Smith, I do not *believe*, was viewed or leveraged, his expertise was not requested and not

sought out by experts in the training simulation system field." ECF No. 16-3 at 90 (emphasis

added). Keppeler declares that this belief was "false" because Keppeler cursorily states that

"[Plaintiff] was sought out as the expert in training simulations filed" by certain "leaders" in defense

agencies, without further specifics. ECF No. 18-1 ¶¶ 5-6.

However, Keppeler merely identifies his dispute with the merits of Colonel Hittle's *belief*.

That does not show pretext as it is well-settled that a plaintiff cannot succeed merely by establishing

that the given rationale for an action was not "wise, fair, or even correct." *DeJarnette v. Corning, Inc.*,

133 F.3d 293, 299 (4th Cir. 1998). In other words, while Keppeler may not believe that Colonel

Hittle's belief was well-founded, that does not show that "Col. Hittle was dishonest," ECF No. 18,

and a difference in opinion does not create pretext. *See Mills v. First Fed. Sav. & Loan Ass'n*, 83 F.3d

833, 845 (7th Cir. 1996) (plaintiff must specifically refute *facts* for pretext).[4] Keppeler's dispute with

Colonel Hittle's testimony is also immaterial because—as noted in Defendant's reply brief—Colonel

Hittle did credit Plaintiff's experience in training simulations, but the relative training experience of

the applicants was not material to Colonel Hittle's decision, which was instead influenced by the

difference in the applicants' policy experience. *See* ECF No. 17 at 16. In other words, even if

---

[4] At best, Keppeler vaguely claims that "Col. Hittle should have been well aware that Tony was
viewed this way," without more specifics in support of his claim that Colonel Hittle's statement was
"false." But Keppeler is still pointing to his disagreement with the merits of Colonel Hittle's *belief*.
Notably, Keppeler again provides no specifics as to why Colonel Hittle should have been aware of
how other individuals viewed Plaintiff.

6

Colonel Hittle's belief—that Plaintiff was not being sought out as an expert in the training simulations field—was wrong, this point had no bearing on why Hittle decided to choose Sobieranski over Plaintiff. Notably, Plaintiff's "Notice" recycles the same argument from his Opposition that Colonel Hittle did not properly given credence to Plaintiff's "qualifications," ECF No. 18, but as Defendant's reply brief noted: Colonel Hittle gave very serious consideration to Plaintiff but simply believed that Sobieranski was the better candidate. *See* ECF No. 17 at 15. Plaintiff and his colleague may disagree with the wisdom of that belief, but this does not demonstrate pretext. Thus, even if the Court does not strike the entirety of the Keppeler declaration, the Court should disregard it in deciding Defendant's motion for summary judgment.

## CONCLUSION

For the foregoing reasons, Defendant's motion to strike should be granted, and the Court should disregard Plaintiff's supplemental Notice and declaration.

Dated: June 13, 2022

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:                    /s/
YURI S. FUCHS
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3872
Fax:    (703) 299-3983
Email:  yuri.fuchs@usdoj.gov
*Counsel for Defendant*

CERTIFICATE OF SERVICE

I do hereby certify that on this 13th day of June, 2022, I have electronically filed the foregoing

using the CM/ECF system.


_____/s/_____
Yuri S. Fuchs
Assistant U.S. Attorney
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Tel: (703) 299-3872
Fax: (703) 299-3983
Email: yuri.fuchs@usdoj.gov
*Counsel for Defendant*

8

## **MOTION HEARING**

Date:  <u>6/17/2022</u>                        Judge:  <u>Nachmanoff</u>
                                                    Reporter: <u>Diane Salters</u>
Start: <u>9:59 am</u>                        Deputy Clerk:  <u>Lynnelle Creek</u>
Finish: <u>10:32 am</u>

**Civil Action Number:  <u>1:21-cv-1406</u>**


**<u>Antonio Smith</u>**


vs.


**<u>Thomas W. Harker</u>**

Appearance of Counsel for (✓) Pltf- Ellen Renaud        ( ✓) Deft-Yuri Fuchs
(    ) Matter is Uncontested

Motion for Summary Judgment (Dkt.10)- Taken Under Advisement
Motion to Strike (Dkt.19)- Granted

- Parties directed to confer if interested in settlement.

_____

Argued &
( ✓) Granted   (    ) Denied  (    ) Granted in part/Denied in part
( ✓) Taken Under Advisement    (    ) Continued to
_____

(    ) Report and Recommendation to Follow
(    ) Order to Follow

JA 314

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ANTONIO SMITH,

        Plaintiff,

   v.

CARLOS DEL TORO, Secretary
United States Department of the Navy,

        Defendant.

1:21-cv-01406-MSN-IDD

**MEMORANDUM OPINION & ORDER**

This matter comes before the Court on defendant's Motion for Summary Judgment (Dkt. No. 10). On June 17, 2022, the Court held a hearing on the motion, following which it took the matter under advisement. *See* Dkt. No. 22. Plaintiff is an African-American man employed by the United States Department of the Navy in Quantico, Virginia. He served as the Operations Branch Head/Operations Officer (Supervisory) Training & Education Capabilities Division[1] from September 2009 through August 2019. Plaintiff's direct supervisor from 2009–2012 and 2015–2017 was Terry Bennington.[2] Bennington retired in 2017 and Col. Patrick Hittle was tasked with finding his replacement. In February 2018, Hittle selected Edward Sobieranski to fill that position. Plaintiff alleges Col. Hittle chose Sobieranski over plaintiff for the position because of plaintiff's race and in retaliation for past Equal Employment Opportunity complaints plaintiff had filed against the department, including Col. Hittle. For the reasons that follow, the Court **GRANTS** defendant's motion and dismisses this case.

---

[1] This division later was renamed the Range Training Programs Division. Plaintiff later served as the Management Program Analyst (Non-Supervisory), Doctrine Branch, Policy and Standards Division from August 2019 through October 2021. Then, plaintiff was detailed to the Operations and Support Branch as the Deputy Operations Branch Head (Non-Supervisory) from October 2021 through the date of filing.

[2] From 2015 to 2018, plaintiff's second level supervisor was Col. Patrick Hittle.

## I.  Background

Pursuant to Local Rule 56(B), defendant included twenty-eight paragraphs in his statement of undisputed facts. *See* Def.'s Stmt. of Facts ("SOF") (Dkt. No. 11) at 2–8. Plaintiff purports to dispute or challenge fourteen of those paragraphs in his opposition brief. *See* Pl. Br. (Dkt. No. 16) at 4–10. However, plaintiff fails to adequately refute many of the constituent facts contained within those paragraphs. After a thorough examination of the record and as set forth below, the Court finds certain facts to be undisputed despite plaintiff's efforts to place them in dispute. *Cf. Apedjinou v. Inova Health Care Servs.*, Case No. 1:18-cv-00287, 2018 WL 11269174, at *1 (E.D. Va. Dec. 19, 2018) ("The nonmovant's failure to respond to a fact listed by the movant or to cite to admissible record evidence constitutes an admission that the fact is undisputed."); *Cincinnati Ins. Co. v. Am. Glass Indus.*, Case No. 1:07-cv-1133, 2008 WL 4642228, at *1 (E.D. Va. Oct. 15, 2008) ("[T]he Court assumes that facts alleged in the motion for summary judgment are admitted unless controverted by the responding opposition brief.") (internal quotations omitted).

The Court's review of the record reveals the following undisputed facts:

### a.    Plaintiff's Employment History

Plaintiff identifies as an African-American male and is currently employed in the United States Department of the Navy. SOF ¶ 1. Between September 2009 and August 2019, he served as the Operations Branch Head or Operations Officer within the Training & Education Capabilities Division of the United States Marine Corps ("TECD"). *Id.* ¶ 2. From April 2015 to July 2017, plaintiff's direct supervisor was Terry Bennington, the Deputy Director of TECD. *Id.* ¶ 3. Bennington is Caucasian. *See* Def. Ex. 1 at 2.[3] From November 2015 to August 2018, plaintiff's second-level supervisor was Col. Patrick Hittle, the Director of TECD. SOF ¶ 3. Col. Hittle also

---

[3] Defendant's Exhibits 1–17 appear at Dkt. No. 11-1.

is Caucasian. *See* Def. Ex. 1 at 2. Thus, between November 2015 and July 2017, plaintiff's chain of command included both Bennington and Col. Hittle. SOF ¶ 3.

In June 2015, plaintiff filed an Equal Employment Opportunity Commission ("EEOC") complaint alleging racial discrimination in connection with the hiring process that led to Bennington's selection as the Deputy Director of TECD in April 2015, approximately three years prior to the hiring selection that is the subject of this case. SOF ¶ 4; Def. Ex. 7 at 2. In December 2015, Col. Hittle learned of that complaint. SOF ¶ 5. Plaintiff filed a second EEOC complaint in September 2016, in which he named Bennington and Col. Hittle as the discriminating officials. SOF ¶ 4; Def. Ex. 4 at 2, 4; Def. Ex. 7 at 2; Compl. (Dkt. No. 1) ¶ 22.

### b.    The Selection Process

On or about July 31, 2017, Bennington retired from his position as Deputy Director/Supervisory Head of TECD, leaving his position vacant. SOF ¶ 7; Def. Ex. 6 at 1. On October 11, 2017, a vacancy for the position of Deputy Director/Supervisory Head of TECD was announced and made open for selection. SOF ¶ 9. Col. Hittle acted as the selecting official for the position. *Id.* Plaintiff applied for the position, as did Edward Sobieranski. *Id.* ¶ 10. Sobieranski is Caucasian and began serving as the acting Deputy Director/Supervisory Head of TECD following Bennington's retirement. *Id.* ¶ 8. Before that, Sobieranski had been the Branch Head for the Range & Training Area Management Branch ("RTAMB") in TECD and was a GS-14 employee like plaintiff. *Id.*

The selection process for the Deputy Director/Supervisory Head position consisted of three separate phases: (1) a resume review panel; (2) an interview panel; and (3) final interviews with the selecting official, Col. Hittle. *Id.* ¶ 11. The resume review panel consisted of three individuals. *Id.* ¶ 12. They conducted their resume review on December 12, 2017, ranking and scoring 72

resumes. *Id.* The resume review panel rated plaintiff with an overall score of 145 and Sobieranski with a score of 138. *Id.* ¶ 13. Importantly, although plaintiff received a higher score in his overall resume rating, both individuals received the same score for "experience" as reflected by their resumes. *Id.* Three other individuals scored higher than plaintiff on the overall resume review, with one other individual also receiving a score of 145. *Id.* Two other individuals scored higher than plaintiff for their "experience." *Id.*

On December 27, 2017,[4] interviews were offered to the top fourteen eligible candidates following the prior panel's resume review. *Id.* ¶ 14. Both plaintiff and Sobieranski were among those selected. *Id.* All fourteen interviews were conducted between January 3 and 4, 2018, and the interview panel recommended their three top candidates and two alternate candidates for the selecting official to interview. *Id.* The interview panel consisted of four individuals. *Id.* ¶ 15. One panel member later testified that "[plaintiff] and [Sobieranski] were by far the top two candidates," noting that "the panel was blown away" by plaintiff "but when [Sobieranski] interviewed later [the panel] again said 'holy cow' he was really good as well." *Id.* That interviewer also testified that if he was "the selecting official, [he was] not sure who [he] would have picked between the two as it was that close and a really tough call." *Id.* A different interviewer testified that he would have ranked Sobieranski as the top candidate for the position, immediately followed by plaintiff as the "Number 2" candidate. *Id.*

---

[4] On September 28, 2017, plaintiff recorded that Col. Hittle had reassigned a contractor away from plaintiff's supervision "without any notice." Def. Ex. 5 at 5. On December 20, 2017, Col. Hittle detailed another individual away from plaintiff's supervision. *Id.* at 4. Plaintiff responded to Col. Hittle that same day by stating he felt Col. Hittle was "purposefully marginalizing" him through both this action and the similar one Col. Hittle took in September of that year. Plaintiff continued that he "believe[d] [Col. Hittle's] actions [we]re because [plaintiff] ha[d] an EEO[C] complaint against T[raining and ]E[ducation ]C[ommand] that include[d] [Col. Hittle]" and "ask[ed] that [he] be allowed to work free of marginalization, discrimination, and other adverse actions." *Id.* Col. Hittle responded that he believed plaintiff's "wording indicate[d] . . . a complaint on [plaintiff's] part" and told plaintiff to "feel free to consult with HR" regarding the issue. *Id.*

4

Col. Hittle chose to interview the three unranked candidates provided to him by the lower panel—plaintiff, Sobieranski, and a third individual. *Id.* ¶ 16. On January 9, 2018, Col. Hittle conducted final interviews of those three candidates.[5] *Id.* In advance, Col. Hittle provided each candidate with interview questions he had drafted based on what he believed the responsibilities for the position would entail. *Id.* ¶ 17. Those questions were "screened and reviewed in accordance with Human Resources policy and standard practices[,] and focused on eliciting technical details of each candidate's job history, understanding the candidate's unique approach to problem solving, and offering the candidate an opportunity to indicate how he or she might best leverage their management skills and knowledge to meet" TECD's needs. Def. Ex. 6.

On February 18, 2018, upon Col. Hittle's selection, Sobieranski became the Deputy Director/Supervisory Head of TECD. SOF ¶ 20. Col. Hittle later stated in a sworn statement that he viewed plaintiff as "a very close second to Mr. Sobieranski" among applicants for the position. SOF ¶ 18; Def. Ex. 7 at 6. However, Col. Hittle continued in his sworn statement that he believed Sobieranski was the best candidate because while plaintiff "had a lot of general experience working on the training simulation [he] did not have the background in developing policy." SOF ¶ 18; Def. Ex. 7 at 4. Col. Hittle continued in his sworn statement that Sobieranski, by contrast, "previously wrote Marine Corps orders, policies, and directives and that is what [TECD] need[ed] to do in the upcoming years." SOF ¶ 18; Def. Ex. 7 at 4. Col. Hittle also explained in his sworn statement that he believed Sobieranski had experience that would be useful to the range and training areas with which TECD was involved. SOF ¶ 18; Ex. 7 at 4. Further, Col. Hittle noted in his sworn statement that, while both candidates were experienced, Sobieranski had been in the command longer than

---

[5] Stephanie Andrews of the Marine Corps Command Personnel Office also attended each interview.

plaintiff and that he believed plaintiff could not offer the same amount of tangible examples of cross-service coordination that Sobieranski could. SOF ¶ 18; Def. Ex. 7 at 4-6

### c.    The EEO Proceedings[6]

On April 30, 2018, plaintiff filed a formal EEOC complaint, alleging that Col. Hittle's decision to select Sobieranski over him for the Deputy Director/Supervisory Head position was motivated by animus directed at his race and was "in retaliation for his prior EEO[C] activity (complaints filed in 2015 and 2016)." *Id.* ¶ 21; Def. Ex. 17 at 3. In response, the Marine Corps commenced an investigation of plaintiff's claims, which resulted in a Report of Investigation ("ROI") spanning more than 200 pages. SOF ¶ 22. Plaintiff then sought a hearing before an EEOC Administrative Judge ("AJ") on November 9, 2018. *Id.* After both plaintiff and the Marine Corps informed the AJ that they did not need further discovery to present their arguments, a hearing with live witness testimony was held on December 6, 2019. *Id.* ¶¶ 23–24.

Plaintiff and Col. Hittle both testified during the December 6, 2019 hearing. *Id.* ¶ 24. When specifically asked by the AJ if he took any steps to respond to plaintiff's concerns in December 2017 about the re-assignment of contractors and plaintiff's feeling that he was being marginalized, *supra* n.3, Col. Hittle answered that he "felt that [he] was being drug into the conversation about the prior EEO action from [plaintiff]" but that "[he] didn't want to be involved in that" and that Col. Hittle's "goal was not to take people from [plaintiff]" but to "get the work done and put the resources in the right place." *Id.* Col. Hittle added that he believed he "had to walk around [plaintiff] on eggshells," meaning that he had to be "overly sensitive" to plaintiff's concerns while he otherwise "did everything in [his] power to be [] honest with [plaintiff] and straightforward."

---

[6] Plaintiff objects to defendant's recitation of what happened during the EEOC proceedings under a theory that "the findings of an administrative review have no weight at the summary judgment stage." Pl. Br. at 8–10. The Court includes the following information solely to provide a fulsome recitation of the procedural history in this matter. Accordingly, plaintiff's objection has no bearing on the Court's decision.

6

*Id.* When asked to further explain his "eggshells" comments, Col. Hittle continued that he "had never been the subject of an EEO complaint" and that being named in one by plaintiff in September 2016 made him "[feel] like [he] had failed in something" as he "[didn't] want anyone to feel that they're being not given full opportunity to perform their best." *Id.* Col. Hittle also testified that, despite his feeling of walking on eggshells, he believed that he and plaintiff were able to get work done on time and in a professional manner. *Id.*

On March 4, 2020, the AJ issued a decision in favor of the Marine Corps. *Id.* ¶ 26. Reconsideration of that decision was denied on September 27, 2021. *Id.* ¶ 27.

### d.    Procedural History Before This Court

On December 17, 2021, plaintiff filed a Complaint in this Court alleging discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). *See* Compl. ¶¶ 38–45. In response, defendant filed a consent motion for a briefing schedule that would allow defendant to "move for summary judgment in responding to the Complaint rather than initially moving to dismiss or file an Answer." *See* Dkt. No. 8. The Court granted defendant's request. *See* Dkt. No. 9. On May 13, 2022 defendant moved for summary judgment, and the Court heard argument on defendant's motion on June 17, 2022. *See* Dkt. Nos. 10, 22.

## II.  Standard of Review

Summary judgment is proper where, viewing the facts in a light most favorable to the non-moving party, there remains no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Evans v. Tech. Apps. & Servs. Co.*, 80 F.3d 954, 958–59 (4th Cir. 1996). A party opposing a motion for summary judgment must respond with specific facts, supported by proper documentary evidence, showing that a genuine dispute of

material fact exists and that summary judgment should not be granted in favor of the moving party. *Anderson*, 477 U.S. at 250. As the Supreme Court has held, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 519 (4th Cir. 2003) (quoting *Anderson*, 447 U.S. at 247–48). A dispute over an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 446 U.S. at 248.

On a motion for summary judgment in an employment case, the Court is not required to accept conclusory assertions regarding plaintiff's own state of mind, motivations, or perceptions regarding the employment actions at issue. *See Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 848 (4th Cir. 1988).

## III. Analysis

### a.    Discrimination (Claim I)

At the summary judgment stage, to establish a *prima facie* claim of discrimination through non-selection, plaintiff must either offer sufficient direct evidence of discrimination or proceed under the familiar *McDonnell Douglas* burden-shifting framework that requires plaintiff to show that: (1) he was a member of a protected group; (2) he applied for the position in question; (3) he was qualified for the position; (4) he was rejected for the position in favor of someone not a member of the protected group under circumstances giving rise to an inference of unlawful discrimination. *Burgess v. Bowen*, 466 F. App'x 272, 280–81 (4th Cir. 2012); *see also Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 780 (D. Md. 2010). Upon a *prima facie* showing, the defendant then assumes the "burden of production . . . to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Texas Dep't of Cmty. Affairs v. Burdine*,

8

450 U.S. 248, 253 (1981) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

If defendant meets this burden, plaintiff must then prove by a preponderance of the evidence that

defendant's articulated "legitimate, nondiscriminatory reason" is pretext for discrimination. *Id.*

The plaintiff's burden to show pretext in this context "merges with the plaintiff's ultimate burden

of persuading the court that []he was a victim of intentional discrimination." *Guessous v. Fairview

Prop. Invs., LLC*, 828 F.3d 208, 217 (4th Cir. 2016). Thus, the "ultimate question . . . is whether

the plaintiff was the victim of intentional discrimination" in the employer's particular selection

decision. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 153 (2000).

      Here, defendant is willing to assume, *arguendo*, that plaintiff has made a satisfactory *prima

facie* showing. *See* Def. Br. (Dkt. No. 11) at 10 (citing *Johnson v. Toys-R-Us*, 95 F. App'x 1, 7

(4th Cir. 2004) and *Carrier-Tal v. McHugh*, Case No. 2:14-cv-00626-RAJ, 2016 WL 9016633, at

*13 (E.D. Va. Apr. 15, 2016)). Defendant argues, however, that the record demonstrates plaintiff

was not selected to replace Bennington based on a legitimate, nondiscriminatory reason, *i.e.*, Col.

Hittle's determination that Sobieranski was best qualified for the job. *Id.* at 12–14. The Court finds

this constitutes a legitimate, nondiscriminatory reason for plaintiff's non-selection. *See, e.g.*, *Miller

v. McWilliams*, Case No. 1:20-cv-00671-LO, 2021 WL 3192164, at *5 (E.D. Va. Jul. 28, 2021)

(collecting cases that recognize "employers' broad discretion to make holistic, nondiscriminatory

hiring decisions" and that employers are "entitled to focus on [its] applicants' qualifications taken

as a whole"); *Bush v. Hagel*, Case No. 1:12-cv-01483-AJT, 2014 WL 345650, at *3 (E.D. Va. Jan.

30, 2014) (citing *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005)

(recognizing that an employer's "hiring decision based on an evaluation of the qualifications of

competing candidates is entitled to substantial deference")), *aff'd*, 597 F. App'x 178 (4th Cir.

2015).

Indeed, when an employer makes a selection decision based on a comparison of candidates' qualifications, the non-selected plaintiff "must point to facts and circumstances that allow the reasonable inference that [the employer's] stated reason—that it did not select [him] because others were better qualified—is false and intentional discrimination motivated [the employer's] decision not to promote [him]." *Roane v. United Airlines, Inc.*, Case No. 1:16-cv-01004-AJT, 2017 WL 6667526, at *7 (E.D. Va. Oct. 12, 2017); *see also Bush*, 2014 WL 345650, at *3 (quoting *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 656 (4th Cir. 2002) ("A plaintiff 'must establish that [he] was the better qualified candidate for the position sought'")). And in doing so, a plaintiff may not "choose the areas in which [he] wants to compete" with other applicants. *Anderson*, 406 F.3d at 270. It is insufficient in this context for a plaintiff to "assert[] job qualifications that are similar or only slightly superior to those of the person eventually selected" because, under such circumstances, "the promotion decision remains vested in the sound business judgment of the employer." *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 261 (4th Cir. 2006). "However, a plaintiff's 'strong showing that his qualifications [we]re demonstrably superior' is 'sufficient evidence that the employer's explanation may be pretext for discrimination.'" *Roane*, 2017 WL 6667526, at *8 (quoting *Heiko*, 434 F.3d at 261–62).

It is within this framework that the Court considers plaintiff's arguments for pretext—all of which ultimately focus on various attacks on Col. Hittle's credibility.

*First*, plaintiff argues that Col. Hittle made a series of false statements and/or undertook certain pre-selection actions designed to bolster Sobieranski's credentials and minimize plaintiff's. *See* Pl. Br. at 17–24. Specifically, plaintiff contends Col. Hittle: (1) showed "unlawful favoritism" toward Sobieranski when he allowed Sobieranski to serve "as the Acting Deputy Director during the entire selection process for the permanent position"; (2) "claimed he did not know [plaintiff]'s

experience or even what he did in his job"; (3) "falsely testified that [plaintiff] was not organizationally higher than [ ] Sobieranski . . . at the time Col. Hittle was making his selection decision"; and (4) incredulously identified Sobieranski's "participation in the development" of simulations in the 1980s or 1990s as important to his 2018 hiring decision. *Id.*

*Second*, plaintiff challenges the purportedly "late" explanation Col. Hittle offered for why he favored Sobieranski and argues his explanation shifted in focus from "practical experience to policy experience more than a decade earlier." Pl. Br. at 15.

Defendant responds, "each of [p]laintiff's purported misrepresentations had no bearing on Col[.] Hittle's decision to select Sobieranski over [p]laintiff" and thus "are immaterial to this Court's analysis." Def. Reply (Dkt. No. 17) at 14. Moreover, defendant argues that "there [wa]s no inconsistency" in Col. Hittle's stated reason for not selecting plaintiff because Col. Hittle highlighted Sobieranski's policy experience each time he was asked to explain his selection decision. *Id.* at 12.

The Court agrees with defendant. Col. Hittle's decision to select Sobieranski over plaintiff resulted from an open, structured process involving multiple levels of review and evaluation. At the first level, plaintiff received an evaluation score of 145 and Sobieranski received an evaluation score of 138. *See* Def. Ex. 12. Both, however, received "experience" scores of 55.[7] This was sufficient for each candidate, along with twelve others, to proceed to the next stage of the interview process. There, one member of the four-person interview panel rated Sobieranski as his preferred candidate, followed by plaintiff. *See* Def. Ex. 10. Another member of the panel identified plaintiff and Sobieranski as the top two candidates but believed selecting between them would have been a

---

[7] A third individual who ultimately was selected as a finalist for Col. Hittle's consideration received an overall score of 138 and an experience score of 54. Def. Ex. 12. Other candidates who were not selected as finalists received overall scores as high as 155 and experience scores up to 60. *Id.*

11

"really tough call." *See* Def. Ex. 13. The record, thus, does "not support any inference that [plaintiff] was overall necessarily more qualified than" Sobieranski. *Bush*, 2014 WL 345650, at *3. Rather, it shows a highly competitive selection decision that required Col. Hittle to make that "really tough call" based on who "was better qualified in [his] eyes." *Id.*; *see also id.* (quoting *Dennis*, 290 F.3d at 656) ("In analyzing whether the plaintiff has met [his] burden of proving that [he] was a better qualified candidate, it is the perception of the decision maker which is relevant.").

In making that "really tough call" Col. Hittle, stated that despite ultimately selecting Sobieranski, plaintiff came in a "very close second" place. Def. Ex. 7 at 6. Col. Hittle explained he reached that conclusion by "ask[ing] specific questions and based on the[ candidates'] responses, list[ing] strengths and weaknesses and [] ma[king] a recommendation for the individual [he] felt was the best fit."[8] Def. Ex. 7. Col. Hittle explained that Sobierasnki emerged as his preferred candidate following that exercise because he "came with fifteen years of experience in the range program . . . [which] was effectively managed from [Col. Hittle's] division" and "previously wrote Marine Corps orders, policies and directives" which was "what [Col.] Hittle need[ed] to do in the upcoming years." *Id.*

Specifically, Col. Hittle noted that Sobieranski was "one of the driving forces in developing the close coordination between the Marine Corps Ranges program and the Army [R]anges program, and as a result, [Col. Hittle's division] ha[d] policies that [we]re co-written between the Marine Corps and the Army—because Sobieranski wrote it in coordination with his Army counterparts." *Id.*; *see also* Pl. Ex. 3 (Dkt. No. 16-3) at 148–49 (Col. Hittle testifying that he

---

[8] It is worth noting that Col. Hittle stated the questions he asked each candidate were "screened and reviewed in accordance with Human Resources' policy and standard practices" and that the questions "focused on eliciting technical details of each candidate's job history, understanding the candidate's unique approach to problem solving, and offering the candidate an opportunity to indicate how he or she might best leverage their management skills and knowledge to meet the Division's mission." Def. Ex. 6.

believed Sobieranski's "credible experience building policy across service lines to other service counterparts . . . was at the crux of what tipped the scale for Mr. Sobieranski over" plaintiff and a third candidate). In contrast, Col. Hittle felt plaintiff "did not have the background on developing policy" nor a "background in similar cross-[s]ervice coordination." *Id.* Additionally, Col. Hittle observed that while plaintiff "brought a lot of skills to the table and [ ] ha[d] been in the command since the mid-2000s" his tenure there was "not quite as long" as Sobieranski's. *Id.*

At the time of Col. Hittle's decision, both plaintiff and Sobieranski "had been called on to serve as acting deputy chief," *see* Pl. Br. at 4; Pl. Ex. 3 at 12–13, and both individuals were GS-14 employees even though plaintiff was officially a "Branch Head" and Sobieranski had served in that capacity only on an interim basis, *see* Def. Ex. 7 at 4. As such, Col. Hittle was left with a difficult decision of whom to select for the posted opening. And on this record, plaintiff has provided no evidence that would allow a reasonable mind to conclude that Col. Hittle's stated, non-discriminatory reasons for his selection decision were pretextual and that intentional racial discrimination was the real reason he selected Sobieranski over plaintiff. *See Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 295 (4th Cir. 2010) ("[T]he issue boils down to whether [a plaintiff] has presented a triable question of intentional discrimination."); *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (citing *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997) (plaintiff "must present *evidence*[9] reasonably calling into question the honesty of his employer's belief" that he was not the better-qualified candidate) (emphasis added)).

---

[9] The Court recognizes plaintiff's argument regarding Col. Hittle's purported destruction of evidence but finds that argument lacks merit where there is no evidence to suggest that Col. Hittle was under any obligation to preserve documents and where the parties repeatedly and affirmatively chose not to pursue discovery.

13

Instead, plaintiff attempts to call into question Col. Hittle's conclusion that Sobieranski was the better candidate for the position. The Court, however, reiterates that it is not tasked with judging "the wisdom or folly of the employer's business judgments" when assessing a claim of discriminatory non-selection. *Jiminez v. Mary Wash. Coll.*, 57 F.3d 369, 383 (4th Cir. 1995). Nor does the Court "'sit as a kind of super-personnel department weighing the prudence of employment decisions' by second-guessing whether a particular employment decision was 'wise, fair, or even correct.'" *Miller*, 2021 WL 3192164, at *5 (quoting *DeJarnette*, 133 F.3d at 299). Rather, the Court is tasked with determining whether plaintiff has shown "'pretext[,]' [which] means deceit used to cover one's tracks." *Id.* (quoting *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th Cir. 2001)). That cannot be done "through mere speculation or the building of one inference upon another." *Perry v. Kappos*, 489 F. App'x 637, 644 (4th Cir. 2012) (internal quotations omitted).

On this record, and under such a framework, the Court "finds insufficient indicia of discrimination to warrant second-guessing [d]efendant['s] apparent good-faith efforts to assess the candidates." *Miller*, 2021 WL 3192164, at *7 (citing *Hux v. City of Newport News, Va.*, 451 F.3d 311, 319 (4th Cir. 2006) and *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1130 (4th Cir. 1995)). Instead, what it is left with is an evidentiary record that shows Col. Hittle consistently[10] explained why he valued Sobieranski's specific qualifications when making the "really tough call" of whom to select following a highly competitive process. The Court, thus, finds that plaintiff has not made a "strong showing that his qualifications [we]re demonstrably superior" to Sobieranski's,

---

[10] The Court does not accept plaintiff's assertion that Col. Hittle prevaricated and dissembled on the important issue of whether Sobieranski's practical or policy experience served as the factor distinguishing him from plaintiff. A fair reading of Col. Hittle's sworn declaration and EEOC testimony makes clear that Col. Hittle stated he valued Sobieranski's practical experience creating policy in both instances. *Compare* Pl. Ex. 3 ("Sobieranski previously wrote Marine Corps orders, policies and directives, and that is what our division needs to do in the upcoming years . . . . He was one of the driving forces in developing the close coordination between the Marine Corps Ranges program and the Army Ranges Program, and as a result we have policies that are co-written between the Marine Corps and the Army— because he wrote it in coordination with his Army counterparts. ") *with* Pl. Ex. 1 (Dkt. No. 16-1) (explaining Sobieranski had "credible experience building policy across service lines . . . .").

14

*Heiko*, 434 F.3d at 261–62, and must grant defendant's motion for summary judgment on this claim.[11]

### b.    Retaliation (Claim II)

To establish retaliation under Title VII, a plaintiff must prove  (1) he engaged in protected activity, (2) his employer took "adverse action" against him, and (3) that a "causal relationship existed between the protected activity and the adverse employment activity." *Guessous*, 828 F.3d at 217 (internal citations and quotations omitted); *see also Coleman v. Md. Ct. of App.*, 626 F.3d 187, 190 (4th Cir. 2010). And as with a discrimination claim, in the absence of direct evidence of retaliation, a plaintiff who makes a *prima facie* showing as to these elements shifts the burden to the defendant to articulate a legitimate, non-retaliatory reason for its adverse employment action. *See Strothers v. City of Laurel, Md.*, 895 F.3d 317, 328 (4th Cir. 2018). If the employer meets this burden, then the "burden then shift[s] back to [the plaintiff] to show th[e employer's stated] reason was a pretext to disguise the true retaliatory reason for" his non-selection. *Guessous*, 828 F. 3d at 217. And, again, in showing pretext, "a plaintiff must establish 'both that the employer's reason was false and that retaliation was the real reason for the challenged conduct.'" *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015) (quoting *Jiminez*, 57 F.3d at 378). Indeed, "'Title VII retaliation claims must be proved according to traditional principles of but-for causation.'" *Terry v. Perdue*, Case No. 20-2016, 2021 WL 3418124, at *3 (4th Cir. Aug. 5, 2021) (quoting *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) and citing *Foster*, 787 F.3d at 252).

---

[11] "Proving pretext is the bare minimum requirement [plaintiff] must meet at trial. As discussed herein, although pretext alone may be sufficient to meet the ultimate burden of proving intentional discrimination, a finding of pretext does not compel a verdict in [plaintiff]'s favor. But because [plaintiff] is unable to present sufficient evidence on pretext, []he could not meet h[is] ultimate burden at trial." *Baka v. City of Norfolk*, Case No. 2:19-cv-00458-AWA, 2021 WL 3928836, at *10 n.12 (E.D. Va. July 28, 2021).

The Court, again, assumes *arguendo* that plaintiff has made his *prima facie* case insofar as (1) plaintiff filed EEOC complaints in 2015 and 2016; (2) plaintiff was not selected for the Deputy Director/Supervisory Head of TECD position in 2018; and (3) Col. Hittle, who later stated he was impacted by plaintiff's prior EEOC complaints, was the individual responsible for making the 2018 selection decision. The Court also finds that defendant has provided a non-retaliatory reason for plaintiff's non-selection, namely Col. Hittle's determination that Sobierasnki was the better-qualified candidate. The controlling question thus returns to the issue of pretext.

The heart of plaintiff's argument relates to Col. Hittle's testimony during the December 16, 2019 EEOC proceedings. There, the AJ asked Col. Hittle if he had "take[n] any steps to address [plaintiff]'s concerns that he was being marginalized," as expressed in plaintiff's December 2017 emails. *See* Pl. Ex. 3 at 156–58; *see also supra* n.3. Col. Hittle responded:

> . . . [Plaintiff] took that as an opportunity to say Colonel Hittle, you're marginalizing me by taking people from me. My goal was not to take people from him. My goal was to get the work done and put the resources in the right place. I was—*I felt, for the three years that I was in that job, that I had to walk around [plaintiff] on eggshells. I had to be, I don't know, overly sensitive.* I did everything in my power to be as honest with him and straightforward and leverage—give him every opportunity to avail him of any resource. If he felt he was marginalized, that wasn't the intent.

Pl. Ex. 3 at 157 (emphasis added). The AJ followed up on Col. Hittle's response by asking: "So you understand that [plaintiff] was relating – or he believed that the actions [of reassigning contractors in 2017] were being taken because of his prior EEO activity. You just disagreed with that." *Id.* at 158. Col. Hittle responded: "I did disagree. I wasn't [reassigning contractors] because there was any prior EEO activity." *Id.* Col. Hittle also stated: "I did not understand how there was a nexus to [plaintiff']s prior EEO activities with this [reassignment of contractors]." *Id.*

On cross-examination, plaintiff's EEOC counsel similarly asked Col. Hittle why he felt like he "had to walk around on eggshells with [plaintiff]" and whether that feeling was "because

[plaintiff] addressed concerns of discrimination and retaliation with [him]?" *Id.* at 167. Again, Col.

Hittle responded:

> Just because I had never been the subject of an EEO complaint. I feel I've always tried to be as extremely fair and honest and open with anyone that I worked with as I could. I've not been in that situation before, so it was new and a little bit disturbing to me because I felt like I had failed in something. Even though I hadn't even been there when whatever happened in the spring of 2015 happened, I was somehow going to be accused of something, at some point. I don't want anyone to feel that way. I don't want anyone to feel that they're being not given full opportunity to perform to their best. I wanted everyone on the team to do a good job. I just wanted to be very careful that I didn't say or do anything that can be taken the wrong way or perceived incorrectly.

*Id.* at 167–68. Plaintiff's counsel and Col. Hittle then entered into the following exchange:

> Q: Mr. Hittle, is it fair to say you felt like you had to walk around on eggshells because [plaintiff] had filed an EEO complaint that you were named in?
>
> A: The knowledge of that EEO complaint contributed to it, yes.
>
> Q: Mr. Hittle, the deputy director position was your right-hand man or woman, is that a fair assessment of the position?
>
> A: That's fair.
>
> Q: You would have to work very closely with the deputy director, correct?
>
> A: Yes.
>
> Q: Mr. Hittle, would it have been comfortable for you to have a deputy director that you felt like you had to walk around on eggshells when he was around?
>
> A: No.
>
> Q: Mr. Hittle, would it have been comfortable for you if [plaintiff] – if you had selected [plaintiff] as the deputy director, given this – what you have previously testified to?
>
> A: I don't know. I never considered that.

*Id.* at 168–70. EEOC counsel for defendant then asked Col. Hittle whether "[t]he walking on

eggshells thing . . . impact[ed] [his] professional dealings with [plaintiff] on day-to-day

operations." *Id.* at 170. Col. Hittle replied: "I felt we were still able to get the work done on time in the stellar manner in which it needed to be done and to serve the Marine Corps and to follow our commanding general's guidance." *Id.*

It is against this record that plaintiff argues that "Col. Hittle's concern that he had to 'walk on eggshells' around [plaintiff] leaves wide the door for a jury to infer that his rejection of [plaintiff]'s application for the Deputy Director position was rooted in . . . retaliation." Pl. Br. at 13–14. In support, plaintiff continues that "similar expressions of discomfort about a person based on their protected class have been held to raise an inference of discrimination" and that "a reasonable jury could conclude that Col. Hittle's EEO-induced eggshells are why he did not select [plaintiff] for the Deputy Director position." *Id.* at 14.

The Court, however, finds that such testimony is insufficient to raise a triable issue of material fact regarding the "but-for" cause and "real reason" for plaintiff's non-selection. *Foster*, 787 F.3d at 252. In this case, the selection process involved multiple rounds of independent review that culminated in plaintiff, Sobieranski, and a third individual being placed in front of Col. Hittle for consideration. The selection confirmed that either Sobieranski or plaintiff would have been an appropriate selection in the eyes of the seven other individuals tasked with winnowing the candidate pool down to those final three. In such circumstances, and as explained *supra*, the Court will not second-guess the selecting official's business judgment as to which candidate was the proper choice.

The cases plaintiff relies upon to argue otherwise are inapposite. In *Merritt v. Old Dominion Freight Line, Inc.*, the United States Court of Appeals for the Fourth Circuit reversed a district court's grant of summary judgment in favor of the defendant in a sex discrimination case where there was no discussion of retaliation. *See* 601 F.3d at 291. The plaintiff there was a woman

who had been fired from her job as a truck driver "because she had failed a physical ability test following an ankle injury." *Id.* The Fourth Circuit agreed with plaintiff on appeal that "this asserted rationale was really a 'pretext for discrimination'" and that "the record as a whole" supported the conclusion that "a jury could find that discrimination on the basis of gender was afoot." *Id.* at 295.

In support of its conclusion regarding "pretext," the Fourth Circuit noted: (1) plaintiff's injury had healed by the time of her termination; (2) plaintiff's difficulty with the physical ability test "appeared to have nothing at all to do with her ankle"; (3) defendant selectively required physical activity tests to the benefit of male employees; and (4) the employee who fired plaintiff was responsible for that selective use of physical ability testing *and* operated in a workplace environment that "evinced a very specific yet pervasive aversion to the idea of female Pickup and Delivery drivers" as illustrated by employees "of all ranks" seemingly "shar[ing] a view that women were unfit for that position." *Id.* at 295–302.

Similarly, in *McCrory v. Kraft Food Ingredients*, the United States Court of Appeals for the Sixth Circuit held summary judgment was inappropriate in an age and disability discrimination case where plaintiff's supervisors testified that plaintiff was terminated because he had "problems managing and communicating with his staff" but plaintiff's staff indicated "they had no trouble with plaintiff's managerial or communication style." Case No. 94-6505, 1996 WL 571146, at *5 (6th Cir. Oct. 3, 1996). The record also revealed that before plaintiff was terminated, his supervisors had twice asked about his plans to retire and that plaintiff was told by one supervisor that he was "'uncomfortable' with plaintiff talking to customers while plaintiff was on medication." *Id.* at *6. These additional facts led the Sixth Circuit to find that defendant's stated issues with plaintiff's management style may have been pretext for the decision to terminate him. *Id.*

19

Finally, plaintiff relies on *Kimble-Parham v. Minnesota Mining & Mfg.*, Case No. 00-cv-01242, 2002 WL 31229572, at *11 (D. Minn. Oct. 2, 2002). But that case, too, involved a claim of gender discrimination that involved "direct evidence" in the form of a statement to plaintiff that her supervisors "felt uncomfortable giving orders and instructions to her because 'it felt like they were giving instructions to their mother.'" *Id.*

Each case, thus, allowed a finding of pretext in the discrimination context based on statements attributable to supervisors made prior to the allegedly discriminatory action. There is no such evidence of comments made by Col. Hittle that could be construed as retaliatory at any point during the selection process. Rather, the evidence from that process shows—in plaintiff's words—that Col. Hittle conducted his interview in a manner that "was professionally done." *See* Pl. Ex. 3 at 17; *see also id.* at 19 ("it was professional, but it was relaxed").

It is within this context that the Court must judge Col. Hittle's later testimony that when interacting with plaintiff he "wanted to be very careful that [he] didn't say or do anything that c[ould] be taken the wrong way or perceived incorrectly." Pl. Ex. 3 at 168. The Court finds that such a statement does not raise a triable issue as to plaintiff's claim for retaliation. As discussed above, the record reflects a thorough and well-reasoned process through which Col. Hittle was called upon to exercise his business judgment in selecting his preferred candidate to assume the Deputy Director/Supervisory Head of TECD role in early 2018. Col. Hittle's later testimony explaining that he needed to be cognizant of how plaintiff might perceive their interactions during that process does not render Col. Hittle's stated reasons for his decision pretextual. There is no basis for a reasonable jury to find that Col. Hittle's alleged desire to retaliate against plaintiff for his prior protected activity was the but-for cause of his decision not to select plaintiff for the job. To hold otherwise would be to discredit the entire selection process and impermissibly second-

guess the wisdom or folly of Col. Hittle's business judgments. It would require the Court to find a

reasonable jury could conclude that the only possible explanation for plaintiff's non-selection was

Col. Hittle's desire to retaliate against plaintiff for his past engagement in protected activity. The

record as a whole in no way supports such a conclusion.

*     *     *

Accordingly, it is hereby **ORDERED** that defendant's Motion for Summary Judgment

(Dkt. No. 10) is **GRANTED**; and it is further

**ORDERED** that defendant's Motion to Strike (Dkt. No. 19) is **GRANTED** for the reasons

stated in open court on June 17, 2022.

The Clerk is directed to enter judgment in favor of defendant in accordance with Rule 58

of the Federal Rules of Civil Procedure.

It is **SO ORDERED**.

               /s/_____<br>Michael S. Nachmanoff<br>United States District Judge

September 1, 2022
Alexandria, Virginia

21

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | |
|---|---|
| Antonio Smith | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 1:21-cv-1406 |
| | ) |
| | ) |
| Carlos Del Toro, Secretary | ) |
| United States Department of the Navy | ) |
| | ) |
| Defendant. | ) |

**<u>JUDGMENT</u>**

Pursuant to the order of this Court entered on September 1, 2022, and in accordance with

Federal Rules of Civil Procedure 58, JUDGMENT is hereby entered in favor of the Defendant

Carlos Del Toro and against the Plaintiff Antonio Smith.

FERNANDO GALINDO, CLERK OF COURT

By:_____/s/_____
            N. Neblett
            Deputy Clerk

Dated: 9/2/2022
Alexandria, Virginia

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| ANTONIO SMITH | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:21-cv-1406-MSN-IDD |
| | ) |
| CARLOS DEL TORO, Secretary | ) |
| United States Department of the Navy, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## PLAINTIFF'S NOTICE OF APPEAL

Plaintiff Antonio Smith hereby appeals to the United States Court of Appeals for the Fourth Circuit from the Memorandum Opinion & Order granting defendant's Motion for Summary Judgment entered on September 1, 2022, Docket No. 23, and the final judgment entered on September 2, 2022. *See* Docket No. 24.


Date:  September 15, 2022                Respectfully submitted,

                                          /s/ *Ellen K. Renaud*
                                         Ellen K. Renaud, V.A. Bar # 47326
                                         Alan Lescht & Associates, P.C.
                                         1825 K Street, NW Suite 750
                                         Washington, D.C. 20006
                                         Tel. (202) 852-8483
                                         Ellen.Renaud@leschtlaw.com

                                         *Counsel for Plaintiff*

1

## **<u>Certificate of Service</u>**

I certify that on September 15, 2022, I served the foregoing Notice of Appeal on counsel of record for Defendant, Yuri S. Fuchs, through the court's electronic filing system.


<u>  /s/ *Ellen K. Renaud*</u>
Ellen K. Renaud